# EXHIBIT 3

**THE INTERESTS REPRESENTED BY THIS LIMITED LIABILITY COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE FEDERAL OR STATE SECURITIES LAWS. SUCH INTERESTS MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT AN EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER RESTRICTIONS ON TRANSFER SET FORTH HEREIN.**

## LIMITED LIABILITY COMPANY AGREEMENT

### OF

### Q3 HOLDINGS LLC

**As of April 12, 2018**

QUANTRAN_00541992

## LIMITED LIABILITY COMPANY AGREEMENT

### OF

### Q3 HOLDINGS LLC

**THIS LIMITED LIABILITY COMPANY AGREEMENT**, dated as of April 12, 2018, is being entered into by and among the Members named on Exhibit A hereto.

### RECITALS:

WHEREAS, Q3 HOLDINGS LLC (the "Company") was formed April 10, 2018 as a limited liability company pursuant to the provisions of the Delaware Limited Liability Company Act, as amended from time to time (the "Act");

WHEREAS, the Members of the Company wish to structure the membership interests of the Company and govern their relationship between each other in the Company with the terms and conditions as set forth in this LLC agreement;

NOW, THEREFORE, in consideration of the premises and the mutual agreements contained herein, the parties hereto agree as follows:

### ARTICLE I
### CERTAIN DEFINED TERMS

Section 1.1    Certain Defined Terms.

The following capitalized terms are used herein as defined below:

"Act" has the meaning set forth in the Preamble.

"Additional Member" means any Person admitted to the Company as a Member after the date hereof.

"Affiliate" of a Person means another Person directly or indirectly controlling, controlled by, or under common control with, such Person; for this purpose, "control" of a Person means the power (whether or not exercised) to direct the policies, operations or activities of such Person by or through the ownership of, or right to vote, or to direct the manner of voting of, securities of such Person, or pursuant to law or agreement, or otherwise.

"Agreement" means this Limited Liability Company Agreement, including any Schedules and Exhibits hereto, as supplemented, amended or restated from time to time in the manner provided herein.

"Available Cash" means, the amount of cash on hand, subject to the retention and establishment of Reserves, or payment to third parties of, such funds as may be necessary with respect to the reasonable business needs of the Company, which shall include the payment or the making of

QUANTRAN_00541992

provision for the payment when due of the Company's obligations, and the fees and expenses of the Company incurred by the Members in connection with the formation of the Company, including the repayment of any money borrowed for the initial operations of the Company.

"Bankruptcy" means a situation in which a Member shall: (i) be adjudicated a bankrupt under any present or future federal bankruptcy statute or any state statute, or (ii) suffer or permit a receiver to be appointed to hold or administer any substantial portion of its assets and such appointment shall remain in effect for ninety (90) days, or (iii) make an assignment for the benefit of its creditors, or (iv) file a voluntary petition under the provisions of any present or future federal bankruptcy statute or any state statute for the relief of debtors, or (v) suffer or permit the involuntary transfer of its Interest to any creditors by operation of law or otherwise.

"Board of Managers" has the meaning set forth in Section 7.1(a).

"Capital Account" has the meaning set forth in Section 4.2.

"Capital Contributions" means as to each Member, the amount set forth on the books and records of the Company.

"Carrying Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes; provided, however, that (i) the initial Carrying Value of any asset contributed to the Company shall be adjusted to equal its gross fair market value at the time of its contribution and (ii) the Carrying Values of all assets held by the Company shall be adjusted to equal their respective gross fair market values (taking Code Section 7701(g) into account) upon an adjustment to the Capital Accounts of the Members described in Section 4.2(c). The Carrying Value of any asset whose Carrying Value was adjusted pursuant to the preceding sentence thereafter shall be adjusted in accordance with the provisions of Treasury Regulation Section 1.704-1(b)(2)(iv)(g).

"Change of Control" means, with respect to any Person, (i) a consolidation, merger or acquisition by any means of such Person with or into any other Person in which the equity holders of such Person prior to such transaction do not own a majority of the equity interests of the surviving Person, (ii) a transaction or series of related transactions (including, without limitation, any sale of equity interests, reorganization, recapitalization, merger or consolidation) in which more than fifty percent (50%) of the outstanding equity interests of such Person is disposed of, or (iii) sale of all or substantially all of the assets of such Person, provided, however, a Change of Control shall not include a transaction with a Family Member of an individual that controls such Person, or with an entity controlled by a Family Member of an individual that controls such Person.

"Code" means the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, or any corresponding or succeeding provisions of applicable law.

"Company" has the meaning set forth in the Preamble.

"Damages" has the meaning set forth in Section 7.5.

"Fair Market Value" has the meaning set forth in Section 8.4(b).

"Family Member" means a parent, sibling, in-law, spouse, blood relative, or relative by marriage or adoption.

2

QUANTRAN_00541992

"Fiscal Year" means the annual accounting period used by the Company for tax or financial reporting purposes, as the case may be.

"Key Member" means each of Michael Ackerman, Quan D. Tran, M.D., and James A Seijas.

"Interest" means the entire interest of a Member in the Company, as provided in this Agreement or by applicable law, and all rights, powers, duties and obligations of such Member in and with respect to the Company, including without limitation, the Member's interest in Company Profits, Losses and distributions of Available Cash.

"Liquidating Person" means the Board of Managers, or if there is no Board of Managers with the capacity to act, a Member designated in writing by a Majority of Members.

"Majority of Members" means in any case in which the consent of the Members is required, Members owning more than fifty percent (50%) of the outstanding Units on the date of such determination.

"Manager" means a member of the Board of Managers.

"Member" has the same meaning as the term "member" under the Act, and shall also include such Persons as may hereafter be admitted to the Company as "Members", but does not include any Person who has ceased to be a Member. "Members" includes the current Members and the Additional Members.

"Officer" has the meaning set forth in Section 7.7(a).

"Percentage Interest" means with respect to a Member, the percentage determined by dividing (i) the number of Units owned as of record by the Member, by (ii) the total number of Units owned as of record by all Members, determined immediately prior to the making of any distribution, allocation of Profit or Loss, or other event requiring the calculation of the Percentage Interest of the Member.

"Person" includes without limitation a natural person, corporation, joint stock company, limited liability company, partnership, joint venture, association, trust, government or governmental authority, agency or instrumentality, and any group of any of the foregoing acting in concert.

"Profit" or "Loss" means, for any Fiscal Year, the Company's taxable income or loss, respectively, for such Fiscal Year as computed for federal income tax purposes (including all items required to be separately stated), increased by items of income which are exempt from federal income tax and reduced by expenditures which, under federal income tax law, are neither deductible nor properly chargeable to a capital account, other than  amounts required to be specially allocated pursuant to Section 5.1.

"Reserves" means such cash amounts as are reserved, in the discretion of the Manager, from time to time for the payment of actual or anticipated operating and capital expenses, contingent liabilities and other obligations or liabilities of the Company.

3

QUANTRAN_00541992

"Sale Event" means (i) the sale of greater than fifty percent (50%) of the total Units held by the Members in one or a series of related transactions; (ii) the merger or consolidation of the Company with or into any other entity; or (iii) the sale of all or substantially all of the assets of the Company.

"Transfer" or "transfer" means, with respect to any Interest (or any portion thereof or interest therein) any action or intended action to sell, exchange, assign, transfer, give or otherwise voluntarily or involuntarily dispose of, or any action or intended action to pledge, escrow, hypothecate, mortgage, grant or create an option to acquire or a security interest in or lien upon, or otherwise voluntarily or involuntarily encumber in any way, any Interest in the Company.

"Transferor" means any Person who made or makes a Transfer of an Interest (or any portion thereof or interest therein).

"Transferee" means any Person who receives an Interest (or any portion thereof or interest therein) as a result of a Transfer.

"Treasury Regulation" means any final, temporary or proposed regulation promulgated under the Code. Any reference to specific section shall include any amendments or successor provision thereto.

"Triggering Event" means with respect to any Member, any of the following: (i) death (with no estate planning involving a Transfer to a Permitted Transferee), (ii) Bankruptcy, (iii) if the Member is an entity, a Change of Control of the entity, or (iv) any Transfer of such Member's Interest that does not occur strictly in accordance with the terms of this Agreement, whether such Transfer occurs in connection with a dissolution of marriage or legal separation or in any other manner whether voluntarily or involuntarily.

"Triggering Event Member" means any Member with respect to whom a Triggering Event has occurred and shall include the executor, administrator, or legal guardian of such Member.

Section 1.1   Titles and Captions.  The titles and captions of the Articles and Sections of this Agreement are for convenience of reference only and do not in any way define or interpret the intent of the parties or modify or otherwise affect any of the provisions hereof and shall not affect the construction or interpretation of any provision hereof.

Section 1.2   Conventions.  Whenever the context so requires, each pronoun or verb used herein shall be construed in the singular or the plural sense and each capitalized term defined herein and each pronoun used herein shall be construed in the masculine, feminine or neuter sense. The terms "herein," "hereto," "hereof," "hereby," and "hereunder," and other terms of similar import, refer to this Agreement as a whole, and not to any section or other part hereof. References in this Agreement to "including," "includes" and "include" shall be deemed to be followed by "without limitation."

4

QUANTRAN_00541992

## ARTICLE II
## FORMATION

Section 2.1   Formation.  The Company was formed as a Delaware limited liability company pursuant to the Act upon the filing of a Certificate of Formation with the Secretary of State of the State of Delaware on April 10, 2018.  Hereafter, the Board of Managers shall cause to be executed and filed, on behalf of the Company, such amendments to the Certificate of Formation and such assumed name certificates and affidavits, additional instruments and amendments thereto, as may from time to time be necessary or appropriate to carry out this Agreement and enable the Company to conduct its business in accordance with applicable laws.

Section 2.2   Name and Place of Business.  The name of the Company shall be "Q3 HOLDINGS LLC."  The Company may do business under that name and under any other name or names designated by the Board of Managers. The principal place of business of the Company shall be located at such place or places as the Board of Managers determines. The initial place of business of the Company is 1994 Carolina Circle NE, St Petersburg FL 33703.

Section 2.3   Office and Registered Agent.  The Company's initial registered office and registered agent at that address shall be as set forth in the Certificate of Formation. The registered office and registered agent may be changed from time to time by the filing of the address of the new registered office and/or the name of the new registered agent with the Delaware Secretary of State pursuant to the Act and by giving notice to each of the Members in the manner provided in this Agreement.

Section 2.4   Term.  The term of the Company shall continue in perpetuity until the Company is dissolved in accordance with either the provisions of this Agreement, the Company's Certificate of Formation, or the Act.

Section 2.5   Purposes.  The purposes of the Company shall be to:

     (a)   engage in any lawful activity or enterprise; and

     (b)   do all things necessary, convenient, suitable or proper for the accomplishment of or in furtherance of any of the purposes set forth herein and to do every other act or acts incidental to or arising from or connected with any of such purposes.

## ARTICLE III
## MEMBERS

Section 3.1   Additional Members.  Additional Members may be admitted to the Company as Members in accordance with the terms and conditions of this Agreement. Each Additional Member shall be admitted to the Company as a Member on the first date on which all of the following shall have occurred: (i) the Board of Managers shall have approved the admission of such Person as a Member, (ii) such Person shall have complied with the provisions of Sections 8.2(b)(i) - (v), and (iii) the Company shall have received such Person's capital contribution, if any, as set forth in Exhibit A as such Exhibit may be amended from time to time.

Section 3.2   Representations and Warranties and Covenants of Members.  Each Member hereby represents and warrants to the Company and to each other Member that:

5

(a)     such Member has knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of an investment in the Company and making an informed investment decision with respect thereto;

(b)     such Member has reviewed and evaluated all information necessary to assess the merits and risks of his or its investment in the Company and has had answered to his or its satisfaction any and all questions regarding such information;

(c)     such Member is an "accredited investor" as defined under the rules and regulations promulgated under the Securities Act of 1933, as amended (the "Securities Act"), and is able to bear the economic and financial risk of an investment in the Company for an indefinite period of time;

(d)     such Member is acquiring his or its Interest in the Company for investment only and not with a view to, or for resale in connection with, any distribution to the public or public offering thereof;

(e)     Such Member acknowledges that Interests in the Company have not been registered under the Securities Act or the securities laws of any other jurisdiction and cannot be disposed of unless they are subsequently registered and/or qualified under said Securities Act and such other applicable securities laws, and the provisions of this Agreement have been complied with;

(f)     the execution, delivery and performance of this Agreement have been duly authorized by such Member and do not require such Member to obtain any consent or approval that has not been obtained, and will not contravene or result in a default under any provision of any law or regulation applicable to such Member or other governing documents or any agreement or instrument to which such Member is a party or by which such Member is bound;

(g)     the decision of such Member to acquire an Interest in the Company has been made by such Member independent of any other Member and independent of any statements or opinions as to the advisability of such purchase or as to the properties, business, prospects or condition (financial or otherwise) of the Company which may have been made or given by any other Member, or by any agent or employee of any other Member; and

(h)     this Agreement is valid, binding and enforceable against such Member in accordance with its terms.

Section 3.3  Limitation of Liability of Members.  Except as otherwise provided in this Agreement or as required by applicable law, no Member shall have any personal liability whatsoever in such Member's capacity as a Member, whether to the Company, to any of the other Members, to the creditors of the Company, or to any other third party, for the debts, liabilities, commitments or any other obligations of the Company or for any losses of the Company, and shall be liable only to make such Member's capital contribution to the Company and any other payments which may be expressly required under this Agreement.

Section 3.4  Meetings of Members.  Meetings of the Members may be called by the Board of Managers, or by Member(s) holding a majority of the outstanding Units in the Company. Meetings of the Members shall be held at the principal executive offices of the Company or at such other place as the Board of Managers may otherwise designate, by notice to all Members not less than ten (10) days nor more than sixty (60) days prior to such meeting; provided that any Member may waive notice, and the presence of a

6

QUANTRAN_00541992

Member at a meeting of the Members constitutes a waiver of notice unless such Member is present solely to object to such meeting by reason of failure of timely notice. At any meeting, any Member may participate by telephone or similar communication equipment, provided that each Member can hear the others. Persons present by telephone shall be deemed to be present "in person" for purposes hereof. The presence of Member(s) holding a majority of the outstanding Percentage Interest in the Company shall constitute a quorum for the transaction of business. When a quorum is present at any meeting, the Members who are holders of record of a majority of the total outstanding Units entitled to be voted on a matter shall decide such matter, except when a different vote is required by express provision of law, the Certificate of Formation or this Agreement. The Members also may make decisions, without holding a meeting, by written consent of the Members; decisions by written consent shall require the same approval as would be required at a meeting of the Members. Minutes of each meeting and a record of each decision shall be kept by a designee of the Manager. Members shall not have their votes disqualified on account of having an interest in the matter to be voted on.

Section 3.5   Rights and Duties of Members. Except as may be otherwise required by law, no Member shall have any power or authority to act for and bind the Company in his capacity as such. To the extent that the rights, powers, duties, obligations and liabilities of the Members are different by any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

## ARTICLE IV
## CAPITAL CONTRIBUTIONS; INTERESTS;
## CAPITAL ACCOUNTS; LOANS

Section 4.1   Capital Contributions. The capital contributions, if any, of the Members are set forth on the books and records of the Company, and the number of Units issued to each of the Members, is set forth on Exhibit A. The number of Units issued to Additional Members shall be reflected on Exhibit A as it shall be amended at the time of the admission to the Company of such Additional Members. Except as may be required of any Additional Members in connection with their admission to the Company as Members, no Member shall be required or permitted to contribute any additional capital to the Company.

Section 4.2   Establishment and Determination of Capital Accounts. A capital account ("Capital Account") shall be established for each Member on the books of the Company initially reflecting an amount equal to such Member's initial capital contribution to the Company. Each Member's capital account shall be (a) increased by any additional capital contributions made by such Member pursuant to the terms of this Agreement and such Member's share of Profits, the amount of any Company liabilities that are assumed by such Member and any other items of income and gain allocated to such Member pursuant hereto, (b) decreased by such Member's share of Losses, any distributions to such Member of cash or the fair market value (as determined by the Manager) of any other property (net of liabilities assumed by such Member and liabilities to which such property is subject) distributed to such Member, the amount of any liabilities of such Member that are assumed by the Company, and any other deduction allocated to such Member pursuant hereto, and (c) adjusted as otherwise required by the Code and the Treasury Regulations, including but not limited to, the rules of Treasury Regulation Section 1.704-1(b)(2)(iv)(f). Any references in this Agreement to the capital account of a Member shall be deemed to refer to such capital account as the same may be increased or decreased from time to time as set forth above.

Section 4.3   No Liability for Capital Contributions. No Member shall (a) be personally liable for the return of any portion of the capital contributions of the Members, the return of which shall be made solely from the Company's assets, or (b) be required to cure any deficit capital account.

7

QUANTRAN_00541992

Section 4.4  Company Capital. No Member shall be paid interest on any capital contribution to the Company or on such Member's capital account, and no Member shall have any right (a) to demand the return of such Member's capital contribution or any other distribution from the Company (whether upon resignation, withdrawal or otherwise), except upon dissolution of the Company pursuant hereto, or (b) to cause a partition of the Company's assets. Any loan by a Member to the Company shall not be considered to be a capital contribution for any purpose and shall not result in an increase in the amount of the capital account of such Member.

Section 4.5  Additional Financing. The Company may seek to raise additional equity from third parties and/or Members, and the Company may seek to borrow funds from third parties and/or Members, if the Company were to need additional financing. The terms and conditions of such financings shall be determined by the Board of Managers in its sole discretion.

Section 4.6  Units. All Interests in the Company shall be denominated in Units. Each Unit shall have the same rights, and be subject to the same limitations, as those of each other Unit, provided that the Board of Managers shall have the right to create different classes of Units having such rights and limitations as the Board of Managers may determine. In addition, the Board of Managers has the authority to issue preferred Units on such terms as it may determine. The Company may, in the discretion of the Board of Managers, issue certificates to the Members representing their respective Units, which certificates shall contain customary restrictive legends relating to securities laws and this Agreement.

Section 4.7  Non-Voting Unit. "Non-Voting Unit" shall mean a Unit issued without the right to vote in matters coming before the Company or to participate in the management of the Company.

Section 4.8  Service Provider Units. The initial number of Units the Board of Managers has authorized the Company to issue is 10,000,000. The Board of Managers may increase or decrease such number of Units at any time. It is intended that up to 1,000,000 of the issued and outstanding Units (to be issued as Non-Voting Units) (the "Service Provider Units") be reserved for issuance to employees, officers, directors, advisors, and other service providers ("Service Providers") as the Managers may specify.

## ARTICLE V
## ALLOCATIONS AND DISTRIBUTIONS

Section 5.1  Allocations of Profits and Losses.

(a)  Profits and Losses. Except as otherwise provided in this Agreement, Profits and Losses (and, to the extent necessary, individual items of income, gain, loss, deduction or credit) of the Company shall be allocated among the Members in light of and to give effect to the distribution provisions contained in Section 5.5 and Section 10.2. The accountants of the Company, in attempting to decide how income should be allocated, shall be guided by how cash associated with the income was or will be distributed.

(b)  Tax Allocations. For United States federal, state and local income tax purposes, items of income, gain, loss, deduction and credit shall be allocated to the Members in accordance with the allocations of the corresponding items for Capital Account purposes under Section 5.1(a), except that items with respect to which there is a difference between tax and book basis will be allocated in accordance with Section 704(c) of the Code, the Treasury Regulations thereunder and Treasury Regulation Section 1.704-1(b)(4)(i).

8

QUANTRAN_00541992

(c)     Offsetting Allocations. If, and to the extent that, any Member is deemed to recognize any item of income, gain, deduction or loss as a result of any transaction between such Member and the Company pursuant to Sections 1272-1274, 7872, 483, 482 or 83 of the Code or any similar provision now or hereafter in effect, and the Board of Managers determines that any corresponding Profit or Loss should be allocated to such Member in order to reflect the Members' Percentage Interests in the Company, then the Board of Managers may so allocate such Profit or Loss.

Section 5.2  Section 754 Election.  Upon the decision of the Board of Managers, the Company shall elect, pursuant to Section 754 of the Code, to adjust the basis of Company property as permitted and provided in Sections 734 and 743 of the Code. Such election shall be effective solely for Federal (and, if applicable, state and local) income tax purposes and shall not result in any adjustment to the Carrying Value of any Company asset or to the Member's Capital Accounts (except as provided in Treasury Regulations Section 1.704-1(b)(2)(iv)(m)) or in the determination or allocation of Profit or Loss for purposes other than such tax purposes.

Section 5.3  Amounts Withheld.  All amounts withheld pursuant to the Code or any provision of any state, local or foreign tax law with respect to any payment or distribution to the Company or the Members shall be treated as amounts distributed to the Members under Section 5.5, in such amounts as the Board of Managers may determine in accordance with applicable law.

Section 5.4  Distributions of Available Cash.  Distributions of Available Cash shall be made in such amounts and at such times as the Board of Managers may determine, to the Members as follows:

(a)     First, pro rata to the Members until each Member has been repaid its Capital Contribution;

(b)     thereafter, pro rata to the Members in proportion to each Member's Percentage Interest.

Section 5.5  Tax Distributions.  The Company may, but shall not be obligated to, make distributions of Available Cash in amounts such that, prior to April 15 of each calendar year, each Member has received distributions in aggregate amounts (for the current Fiscal Year and all prior Fiscal Years) which equal not less than the sum for the immediately preceding Fiscal Year and for all prior Fiscal Years of (i) the amount of Profits allocated to such Member for such Fiscal Years, reduced by the amount of Losses allocated to such Member for such Fiscal Years, multiplied by (ii) 35%. To the extent necessary to conform to Section 5.5 any such tax distributions made to any Member shall be repaid to the Company by reducing the amount of the next succeeding distribution or distributions which would otherwise have been made to such Members or, if such distributions are not sufficient for this purpose, by so reducing the proceeds of liquidation otherwise payable to such Member.

Section 5.6  Distributions in Kind.  In the event that the Board of Managers determines to distribute any property other than cash (including, but not limited to securities, notes, mortgages and payments in kind), the Members entitled to such distribution shall be entitled to their pro rata shares of each such asset, in accordance with the aggregate amounts of proceeds due them, respectively.

9

QUANTRAN_00541992

## ARTICLE VI
### FISCAL MATTERS

Section 6.1 Tax Matters Partner. Michael Ackerman shall be the "tax matters partner" of the Company within the meaning of Section 6231(a)(7) of the Code.

Section 6.2 Tax Returns. At the expense of the Company, the Board of Managers shall prepare and file, or shall cause to be prepared and filed, all federal and any required state, local and foreign income and other tax returns for the Company for each Fiscal Year.

Section 6.3 Fiscal Year and Other Elections. The Fiscal Year shall coincide with the taxable year of the Company and end on December 31 of each year or such other date as the Board of Managers may select pursuant to applicable law. All other accounting decisions and elections required or permitted to be made by the Company for tax purposes under applicable law shall be made by the Manager.

Section 6.4 Books and Records. The Board of Managers shall maintain or cause to be maintained at the principal place of business of the Company, or at such other place as the Board of Managers may determine, complete and accurate books and records of the assets, results of operations, financial condition, business and affairs of the Company, including without limitation:

    (a)    a current list of the Members, setting forth the name, address, capital contribution and Percentage Interest of each;

    (b)    a copy of the Company's Certificate of Formation and all amendments thereto and restatements thereof, together with an executed copy of any power of attorney pursuant to which any certificate, or amendment thereto or restatement thereof, is executed;

    (c)    a copy of this Agreement and any amendments thereto; and

    (d)    a copy of the Company's income tax and information returns and reports, if any, for each of the three most recently ended Fiscal Years.

Section 6.5 Bank Accounts. The Company shall maintain one or more accounts (including, but not limited to, brokerage, custodial, checking, cash management and/or money market accounts) in such banks, brokerage houses or other financial institutions as the Board of Managers may determine. All amounts deposited by or on behalf of the Company in those accounts shall be and remain the property of the Company. All withdrawals from such accounts shall be made by the officers authorized to do so by the Board of Managers. No funds of the Company shall be kept in any account other than a Company account, and funds of the Company shall not be commingled with the funds of any other Person; and no Member or Officer shall apply, or permit any other Person to apply, such funds in any manner, except for the benefit of the Company.

Section 6.6 Tax Information. As soon as practicable after the end of each Fiscal Year, the Company shall distribute to each Member a copy of its Schedule K-1 to the Partnership Tax Return (Form 1065).

10

ARTICLE VII
MANAGEMENT

Section 7.1   Management of the Company

(a)   Except as otherwise specifically provided in this Agreement, the business and affairs of the Company shall be managed by or under the direction of a board of Managers (the "Board of Managers") and no Member shall have any right to participate in or exercise control or management power over the business and affairs of the Company or otherwise to bind, act or purport to act on behalf of the Company in any manner solely by reason of being a Member. Subject to the limitations set forth in this Agreement, the Board of Managers shall have all the rights and powers that may be possessed by a manager under the Act.

(b)   The rights and powers of the Managers shall only be exercised (unless otherwise expressly provided for herein) upon the approval of a majority vote of the Board of Managers. No individual Manager, in his or her capacity as such, may act on behalf of the Board of Managers or the Company.

Section 7.2   Number of Managers; Appointment and Removal of Managers. The Board of Managers shall consist of three (3) individuals (each such individual, a "Manager"). Each Key Member shall have the right to appoint him or herself (and not a designee) as a Manager. If a Key Member directly or indirectly transfers its interest its right to act as a Manager will automatically be terminated. Unless a Manager resigns, dies, retires or is removed in accordance with this Section, each Manager shall hold office until a successor shall have been duly appointed in accordance with this Section 7.2. The Parties hereby appoint: Michael Ackerman, Quan D. Tran, M.D., and James A Seijas, as the three initial Managers. Without limiting the generality of Section 7.2 hereof, the Managers shall have power and authority, on behalf of the Company, to do the following:

A.   To acquire property from any Person as the Managers may determine even if a Member is directly or indirectly affiliated or connected with such Person, provided such action has been approved in advance in writing by a Majority-In-Interest;

B.   To borrow money for the Company from banks, other institutions, the Members, or affiliates of the Members, on such terms as it deems appropriate, and in connection therewith, to hypothecate, encumber and grant security interests in the assets of the Company to secure repayment of borrowed sums, provided that no debt or other obligation shall be contracted or liability incurred by or on behalf of the Company except by the Managers;

C.   To purchase liability and other insurance to protect the Company's property and business;

D.   To hold and own any real and/or personal properties in the name of the Company;

E.   To sell or otherwise dispose of or transfer assets of the Company in the ordinary course of business, provided such action has been approved in advance in writing by a Majority-In-Interest;

F.   To execute on behalf of the Company all contracts, instruments, and documents including, without limitation, checks, drafts, notes and other negotiable instruments,

11

mortgages or deeds of trust, deeds, security agreements and financing statements, documents providing for the acquisition, mortgage or disposition of the Company's property, assignments, bills of sale, stock powers, leases, operating agreements, and any other instruments or documents necessary, in the opinion of the Managers, to the business of the Company; and, subject to any limitation contained in the Certificate of Formation or in this Agreement, authorize in writing an agent, generally or specifically, to execute and deliver any contract or other instrument in the name and on behalf of the Company;

      G.    To cause the Company to change its domicile to a jurisdiction other than the State of New York, provided such action has been approved in advance in writing by a Majority-In-Interest;

      H.    To employ accountants, legal counsel, managing agents or other experts to perform services for the Company and to compensate them from the Company funds;

      I.    To make an assignment for the benefit of creditors of the Company, file a voluntary petition in bankruptcy or appoint a receiver for the Company, provided such action has been approved in advance in writing by a Majority-In-Interest;

      J.    To enter into any and all other agreements on behalf of the Company, with any other person or entity for any purpose, in such form as the Managers may approve; and

      K.    To do and perform all other acts as may be necessary or appropriate to the conduct of the Company's business.

Section 7.3  Meetings.

    (a)    Meetings of the Board of Managers for any purpose or purposes may be called at any time by any Manager. Meetings of the Board of Managers shall be held at any place as the Board of Managers may select and may be held telephonically.

    (b)    Written notice of a meeting of the Board of Managers setting forth (i) the day and hour of the meeting, (ii) the identity of the Manager calling the meeting and (iii) the purpose or purposes for which the meeting is being called, shall be delivered to each Manager no fewer than two (2) days nor more than thirty (30) days prior to the date of the meeting, unless waived by each Manager. The presence of a Manager at a meeting of the Board of Managers constitutes a waiver of notice, unless such Manager is present solely to object to such meeting by reason of failure of timely notice. Persons present by telephone shall be deemed to be present "in person" for purposes hereof. The presence of a majority of Managers shall constitute a quorum for the transaction of business. Unless a different vote is specified by law or this Agreement, decisions of the Board of Managers at a meeting shall require the approval of at least a majority of all of the then current Managers.

    (c)    Notwithstanding the foregoing or anything to the contrary in this Agreement, to the extent the Board of Managers desires to sell, assign, and/or transfer any of the following items to any third party and/or Affiliate, the Board of Managers must provide written unanimous consent to any and all such transactions (with all Key Members being necessary to establish a quorum): (i) substantially all of the assets and/or capital equity interests of the Company and or substantially all of the Property of the Company, or (ii) any or all software, algorithms, object code, source code,

12

information architecture, algorithms, methodology, know-how, technical drawings, diagrams, databases, data, programming tools held by the Company.

Section 7.4   Action by Consent; Approvals. Any action required or permitted to be taken by the Board of Managers, either at a meeting or otherwise, may be taken without a meeting, without prior notice and without a vote, if a written consent setting forth the action so taken is signed by a majority of the Managers; provided, however, that in the event that all the Managers do not consent to such action, notice of such action shall promptly be provided to the Managers who have not consented. Such consents shall be delivered to the Company's offices.

Section 7.5   Limitation of Liability. Neither any Manager nor any Advisory Board Member nor any Member shall be liable to the Company or any Member for any loss, damage, liability or expense (collectively, "Damages") suffered or incurred by any Person on account of, or by reason of any claim based on or arising from, any act taken or omitted to be taken in the course of representing or performing services for the Company or otherwise in such Person's capacity as a Manager or Advisory Board Member or Member, including without limitation such Person's appointment or retention of, or reliance upon, any employee or agent of the Company, notwithstanding any negligence, fraud or willful misconduct by such employee, agent or Person, except to the extent that a judgment or other final adjudication adverse to a Manager or Advisory Board Member or Member establishes that the Manager's or Advisory Board Member's or Member's acts or omissions were in bad faith or involved intentional misconduct or a knowing violation of law, or that the Manager or Advisory Board Member or Member personally gained in fact a financial profit or other advantage to which the Manager or Advisory Board Member or Member was not legally entitled, or that with respect to a distribution in violation of the Act, the Manager's or Advisory Board Member's or Member's acts were not performed in accordance with this Agreement.

Section 7.6   Indemnification. The Company shall indemnify each Manager, each Advisory Board Member and the Members and their legal representatives, successors and assigns, and hold each of them harmless from and against any Damages suffered or incurred by the Manager, the Advisory Board Member or the Members, as such, or any of them in the course of serving in any office of, or otherwise representing or acting for or on behalf of the Company, except to the extent that a judgment or other final adjudication adverse to the Manager, the Advisory Board Member or Member or other Person establishes (a) that the Manager's or Advisory Board Member's or Member's or other Person's acts were committed in bad faith or were the result of active and deliberate dishonesty and were material to the cause of action so adjudicated, or (b) that the Manager, the Advisory Board Member or Member or other Person personally gained in fact a financial profit or other advantage to which the Manager, the Advisory Board Member or Member or other Person was not legally entitled; provided, however, that, any other provision hereof notwithstanding, any such indemnification shall be solely from the net assets of the Company, and neither a Manager nor Advisory Board Member nor any Member shall be required to make any capital contribution or otherwise pay any amount from the Manager's or Advisory Board Member's or Member's own assets as a result thereof. The Company may procure insurance in such amounts and covering such risks as the Board of Managers deems appropriate, in consultation with all of the Members, to fund any indemnification required or permitted to be made hereunder.

Section 7.7   Officers, Managers.

(a)     The Board of Managers may delegate powers and duties to others, and may appoint one or more persons, who need not be Members, to serve as officers of the Company ("Officers"), and may assign titles (including, without limitation, Managers, chairman, chief executive officer, president, vice president, secretary, assistant secretary, treasurer and assistant treasurer) to any

13

QUANTRAN_00541992

such person and shall record the same in the minute books of the Company. The Company may enter into employment agreements with one or more employees of the Company, on such terms as the Board of Managers shall approve in its sole discretion. Unless the Board of Managers decides otherwise, if the title is one commonly used for officers of a business corporation, the assignment of such powers, duties or title shall constitute the delegation to such person of the authority and duties that are normally associated with that office. Any number of titles may be held by the same person. Any appointment of an officer and any delegation or assignment of powers, duties, or title pursuant to this Section 7.7 may be revoked at any time by the Board of Managers with or without cause. Designation of a Person as an Officer of the Company shall not of itself create any contract rights in such Person.

(b)     Number, Tenure and Qualifications. In the event the Managers resigns, or is removed, he shall be elected by the vote of Members owning in the aggregate a simple majority of the Percentage Interests ("Majority-In-Interest") at a meeting of the Members and shall hold office until the next meeting of Members at which an election of the Managers is held, or such longer period as shall be approved by such vote, and until his successor shall have been duly elected and qualified. The Company may engage the Managers pursuant to a written management agreement for the period to which the Managers was elected. The Managers need not be a resident of the State of Delaware. The Managers shall not be precluded from serving the Company in capacities, other than management of the Company, for which the Managers receives compensation from the Company.

(c)     Any Officer of the Company may resign as such at any time, for any reason or no reason at all, upon written notice to the Board of Managers. Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time is specified therein, at the time of its receipt by the Manager. The acceptance of a resignation shall not be necessary to make it effective unless expressly so provided in the resignation.

(d)     Any vacancy occurring in any office of the Company may be filled by the Board of Managers.

(e)     Subject to the limitations set forth in Sections 7.4 and 7.5, each Officer shall enjoy the full benefits of the limitation of liability provided in Section 7.4 and the indemnification provided in Section 7.5 that is given in favor of a Manager, an Advisory Board Member and the Members.

Section 7.8    Agreements with Affiliated Entities. The Members acknowledge that the Company intends to enter into one or more agreements with affiliated entities. No contract or other transaction between or among the Company and a Manager, or one or more of the Company's Members or any Affiliate of a Manager, a Member or any other Person in which a Manager or one or more of the Members are partners, members, managers, directors or officers, or have a substantial financial interest, shall be either void or voidable for this reason alone.

Section 7.9    Deadlock. If a Manager reasonably determines that a Deadlock exists, such Manager may, by written notice (a "Deadlock Notice") to the other Managers, submit such Deadlock to mediation. The terms and procedure for mediation shall be arranged by the Managers. If good-faith mediation of a Deadlock proves impossible or if an agreed-upon mediation outcome cannot be obtained by the Managers, a Manager may commence an arbitration pursuant to Section 11.5 of the Agreement (a "Deadlock Arbitration") by delivering written notice to the other Managers stating its intent to commence such Deadlock Arbitration. Any Deadlock Notice shall describe in reasonable detail the nature of the Deadlock.

14

QUANTRAN_00541992

## ARTICLE VIII
## TRANSFERS

Section 8.1   Withdrawal.  No Member may voluntarily withdraw his membership in the Company. Any Member who withdraws in violation of this Agreement shall not be entitled to receive any consideration therefor.

Section 8.2   Transfer Limitations.

(a)   Except as set forth in Section 8.2(d), Section 8.3, or Section 8.4, no Member may Transfer any Interest without the prior written consent of the Board of Managers.  Any purported Transfer in violation of this Agreement shall be void *ab initio* and shall not bind the Company.  The purported recipient of such Transfer shall be entitled only to the rights of an assignee (i.e., an economic interest in such Interest) of such Interest, and any distributions to which such Person may be entitled may be applied (without limiting any other legal or equitable rights of the Company) to satisfy any debts, obligations, or liabilities for damages that the transferor or transferee of any such Interest may have to the Company.

(b)   In the event of a Transfer consented to by the Board of Managers pursuant to Section 8.2(a), or a Transfer pursuant to Section 8.3, or the admission of an Additional Member pursuant to Section 3.2, the Transferee, and/or Additional Member, as the case may be, shall become a Member only if: (i) the Transferee (or Additional Member) accepts and agrees to be bound by this Agreement by executing a Joinder to LLC Agreement in substantially the form attached hereto as Exhibit 8.2(b), (ii) expressly assumes all of the obligations of the Transferor (in the event of a Transfer) hereunder, (iii) executes and delivers such other agreements, instruments, certificates, affidavits, opinions of counsel and other documents as the Board of Managers may reasonably require in order to admit such new Member, and (iv) takes such actions which the Board of Managers may deem necessary or desirable to maintain the status of the Company as a partnership for federal tax purposes and assure compliance with Federal and State securities laws.

(c)   Upon and contemporaneously with any Transfer by a Member pursuant to this Article VIII, such Member shall cease to have any further rights under this Agreement with respect to such transferred Interest. Any Transfer in compliance with this Article VIII shall be deemed effective as of the last day of the calendar month in which the Transferee completes compliance with Section 8.2(b). The Transferor agrees to execute such certificates or other documents and perform such other acts as may be reasonably requested by the Board of Managers from time to time in connection with such transfer or admission of the Transferee as a Member. The Transferor hereby indemnifies the Company, the Managers and the remaining Members against any and all loss, damage, or expense (including, without limitation, tax liabilities or loss of tax benefits) arising directly or indirectly as a result of any Transfer or purported Transfer in violation of this Article VIII.

(d)   Notwithstanding anything contained herein, a Member may transfer some or all of its Membership Interest to a member's spouse, parent, lineal or adopted descendants, executor, administrator, or other legal representative; the spouse of such descendants; the executor, administrator or other legal representative of any thereof, and the trustees of a trust of which any one or more of such individuals shall constitute all of the identifiable beneficiaries (the foregoing Persons being "Permitted Transferees"); and, without the consent of the Board of Managers, subject only to compliance with Section 8.2(b)(i) - (iv).

Section 8.3   Right of First Refusal.

15

(a)     Offer.  If at any time a Member ("Transferring Member") desires to Transfer any Interest then owned by such Member other than to (x) a Permitted Transferee, or (y) in a Transfer consented to by the Board of Managers pursuant to Section 8.2(a), such Member shall deliver a written notice (an "Offer Notice") to the Company and the other Members (the "Offeree Members"), setting forth the Interest proposed to be sold, the price, the identity of the transferee (the "Transferee"), and other terms of payment. The Offer Notice shall constitute an irrevocable offer to sell such Interest to the Company and the Offeree Members on the terms and conditions set forth in the Offer Notice.

(b)     Acceptance.  The Company and the Offeree Members shall be entitled to purchase all, but not less than all, of such offered Interest by delivering a written notice (the "Acceptance") to the Transferring Member within sixty (60) days after delivery of the Offer Notice. If the Company and any of the Offeree Members shall desire to purchase such Interest, the Company first shall be entitled to purchase any and all Interest desired to be purchased by it; and then the Offeree Members shall be entitled to purchase any or all Interest not purchased by the Company. The Interest to be purchased by each Offeree Member shall be equal to the Interest available for purchase by all such Offeree Members multiplied by a fraction, the numerator of which shall be the Percentage Interest owned by such Offeree Member and the denominator of which shall be the total Percentage Interest owned by all Offeree Members desiring to make such purchase; provided, however, that the Offeree Members shall have the right to agree to a different allocation.

(c)     Rejection.  If the offer set forth in the Offer Notice is not accepted by the Company and/or the Offeree Members within such 60-day period, such offer shall be deemed to be rejected and terminated, and the Transferring Member shall be free to Transfer all (but not less than all) of the Interest to the Transferee, but only upon the same or no more favorable terms and conditions to the Transferee than shall have been contained in the Offer Notice, and subject to compliance with Section 8.2(b)(i) - (iv); provided that as to any Interest for which the Transferring Member shall not have consummated such sale within 60 days after the termination of the 60-day period referred to in Section 8.3(b), the Transferring Member's right to sell such Interest shall terminate, and such Interest shall again be subject to this Agreement to the same extent as if never originally offered to the Company and the Offeree Members. Upon the consummation of such sale to the Transferee, notice of such sale shall be given by the Transferring Member to the Company and the Offeree Members.

(d)     Closing.  If no time for the closing of the sale of the Interest to the Company and/or the Offeree Members is specified in the Offer Notice, then the closing of such sale shall occur on a date mutually agreeable to the Transferring Member, the Company and, if applicable, the Offeree Members. If the purchase by the Company and/or the Offeree Members results from the Transferring Member's proposed sale of the Interests to a Transferee, the purchase price payable by the Company and/or any Offeree Members to the Transferring Member shall be due and payable on the terms and conditions specified in the Offer Notice; provided that, at the option of the Company and/or the Offeree Members who are purchasing the Interests, the purchase price shall be paid fifty percent (50%) on the closing date by certified or bank check, with the balance to be paid in eight consecutive installments, the first of which shall be due and payable 90 days after the closing date, and the remainder of which shall be due and payable on each 90th day thereafter, each such payment to be accompanied by all accrued and unpaid interest. The unpaid balance of the purchase price shall be evidenced by a promissory note in customary form which shall be delivered on the closing date, and which shall bear interest at the minimum rate of interest imputed by the Internal Revenue Service as of the closing date for loans of such duration (subject to a customary penalty rate of interest upon a failure to make payments in accordance with the terms of such rate). Such note shall provide that it can be prepaid at any time or from time to time in whole or in part, together with all accrued and unpaid

16

QUANTRAN_00541992

interest, without premium or penalty. At the option of the Transferring Member, such Interests shall be pledged to secure such deferred payments pursuant to a pledge agreement in form and substance reasonably acceptable to the parties, which pledge agreement shall be delivered on the closing date. At the closing the Transferring Member shall transfer the Interests purchased, free and clear of any and all liens, claims, charges, and encumbrances, and with any and all required transfer tax stamps affixed.

Section 8.4  Repurchase of Interest.

(a)  If a Triggering Event occurs, the Non-Triggering Event Member(s) shall have the right, but not the obligation, to purchase their pro-rata share (or in such allocation as they may agree) of all of the Interest of the Triggering Event Member, for the Fair Market Value (as defined in clause (b) below) of such Interest. The other Members may exercise such right by giving written notice of such election to purchase such Interest, such notice to be delivered to the Triggering Event Member, or such Member's executor, administrator or legal representative, as the case may be, and to the Company and the other Members no later than the first anniversary of the Company's receipt of notice of the occurrence of the Triggering Event. The other Members' purchase of the Interest shall be consummated at a closing which shall be held at the Company's office no later than 60 days after the Triggering Event Member, or such Member's executor, administrator or legal representative, shall have received the other Members' notice of election to make such purchase. The purchase price for the Interest shall be payable one-sixth (1/6) in cash at the closing, with the balance to be payable by means of a promissory note bearing interest at a per annum rate equal to the prime rate of interest as announced by Citibank, N.A. in New York, New York as of the date of closing, as adjusted on each annual anniversary date of the closing to such prime rate in effect as of such anniversary date. Such promissory note shall be payable in five equal annual installments of principal on the first five anniversary dates of the closing of the purchase, together with the interest accrued as of each such anniversary date, provided that such note may be prepaid in whole or in part at any time without premium or penalty.

(b)  If the Board of Managers determines it is in the best interests of the Company to re-purchase all, but not less than all of the Interest of a Member, then the Board of Managers has the right, at any time, in its sole discretion, after such determination, to have the Company re-purchase all, but not less than all, of the Interest of a Member (the "Re-purchased Member") for the Fair Market Value of such Interest (the "Re-purchase Option"). The Board of Managers may exercise the Re-purchase Option by giving written notice to the Re-purchased Member. The Company's re-purchase of the Interest shall be consummated at a closing which shall be held at the Company's office no later than 60 days after the Re-purchased Member, or such Member's executor, administrator or legal representative, shall have received the Board of Manager's notice of election to make such re-purchase. The purchase price for the Interest shall be payable one-sixth (1/6) in cash at the closing, with the balance to be payable by means of a promissory note bearing interest at a per annum rate equal to the prime rate of interest as announced by Citibank, N.A. in New York, New York as of the date of closing, as adjusted on each annual anniversary date of the closing to such prime rate in effect as of such anniversary date. Such promissory note shall be payable in five equal annual installments of principal on the first five anniversary dates of the closing of the purchase, together with the interest accrued as of each such anniversary date, provided that such note may be prepaid in whole or in part at any time without premium or penalty.

(c)  For purposes of this Section 8.4, the term "Fair Market Value" means the fair market value of the Interest of the Triggering Event Member or the Re-purchased Member (in each case, the "Selling Member") as agreed upon by the Board of Managers and the Selling Member or such

17

QUANTRAN_00541992

Member's executor, administrator or legal representative, or, failing such agreement, as determined by an independent Accountant. If the Board of Managers and the Selling Member or such Member's executor, administrator or legal representative, cannot agree on an independent Accountant, then the parties shall each propose an Accountant, and the Judicial Arbitration and Mediation Service, Inc. ("JAMS")or any successor organization shall determine which Accountant is more suitable, in accordance with the rules, regulations and procedures of the JAMS. In any of the foregoing cases the determination of Fair Market Value shall be final and binding on the Company and all Members, and the fees and expenses of JAMS and such firm shall be borne one-half by the purchasers of the Interest and one-half by the Selling Member (or his or her estate). In making its determination of Fair Market Value, such firm is hereby directed to take into account an appropriate discount for a minority interest and the distribution provisions of Section 5.4 and 10.2.

Section 8.5  Drag-Along Rights. Notwithstanding the provisions of Sections 8.3 and 8.4, if the Board of Managers and the Members holding fifty percent (50%) or more of the outstanding Percentage Interest, have voted, consented or proposed to effectuate a Sale Event with a third party pursuant to a definitive purchase and sale or merger agreement (the "Definitive Agreement"), such Members shall, upon fifteen (15) calendar days prior written notice to the ALL other Members (the "Remaining Members"), have the right to require the Remaining Members to participate in the Sale Event; *provided* that the consideration received in the Sale Event is distributed in the same manner required by Section 10.2 as if the Company were liquidated and the proceeds available for distribution upon liquidation equivalent to the aggregate consideration received by Members in the Sale Event. A copy of the Definitive Agreement shall be provided to each Remaining Members along with the notice described above. Each Remaining Member hereby agrees that he/she/it (i) will cooperate in good faith to effectuate the Sale Event pursuant to the Definitive Agreement; (ii) will consent to, raise no objections against, and take all actions necessary in order to consummate the Definitive Agreement (including the making of all customary representations, warranties, covenants, indemnities, and agreements); and (iii) hereby waives any and all dissenter's rights, appraisal rights or other similar rights in connection with the Sale Event.

## ARTICLE IX
## COVENANTS

Section 9.1  Confidentiality.

(a)  Each Member acknowledges and agrees that the Confidential Information (as defined below) is valuable property of the Company and undertakes that for so long as it is a Member, and thereafter until such Confidential Information otherwise becomes publicly available (other than through a breach of this Section 9.1), such Member and such Member's Affiliates shall:

(i)  treat the Confidential Information as secret and confidential;

(ii)  not disclose (directly or indirectly, in whole or in part) the Confidential Information to any third party, except with the prior consent of the Board of Managers;

(iii)  not use (or in any way appropriate) the Confidential Information for any purpose other than the performance and furtherance of the business of the Company and otherwise in accordance with the provisions of this Agreement; and

(iv)  limit the dissemination of and access to the Confidential Information to such of the Company's Officers, employees, agents or representatives as may reasonably require such

18

information for the performance and furtherance of Company business and ensure, to the extent practicable, that any and all such Persons observe all the obligations of confidentiality with respect to such Confidential Information as are contained in this Section 9.1. Notwithstanding the foregoing, a Member shall be entitled to disclose Confidential Information if such disclosure: (A) is made to attorneys, accountants and other advisors who are bound by contract or law to maintain the confidentiality thereof; (B) is required by law or pursuant to any order or rule of any court, governmental authority or other administrative body, provided that, to the extent permitted by law, such Member shall provide the Company with prompt notice of such request or order, including copies of subpoenas or orders requesting such Confidential Information, cooperate reasonably with the Company in resisting the disclosure of such Confidential Information via a protective order or other appropriate legal action, and shall not make disclosure pursuant thereto until the Company has had a reasonable opportunity to resist such disclosure, unless such Member is ordered otherwise, or (C) is required in connection with enforcing its rights under this Agreement.

(b)     As used herein, "Confidential Information" means, except as otherwise set forth below in this definition, all information, whether in tangible or intangible form and whether or not designated as "confidential", relating to the Company's or its licensee's profits, sales, personnel, pricing, product development, information, including the names of the Company's or its licensee's, customers or clients, plans for future developments, and any other information that a Member should reasonably understand is confidential. Notwithstanding anything in this Agreement to the contrary, the term "Confidential Information" shall not include any information, which is generally available to the public.

(b)     No Member, during such time in which he is a Member and at all times thereafter, shall issue any press release or advertisement, or take any similar action, with regard to the Company or its business or affairs without obtaining the consent of the Board of Managers.

(c)     Each Member shall be liable for any breach of this provision by its Affiliates.

(d)     No License. Each Member understands that this Agreement does not, and shall not be construed to, grant the Member any license or right of any nature with respect to any Confidential Information, materials, software or other tools made available to him/her by the Company.

Section 9.2   Injunctive Relief. Because of the difficulty of measuring economic losses to the Company as a result of a violation or breach of the provisions of Section 9.1, and because of the immediate and irreparable damage that could be caused to the Company as a result of such violation or breach for which the Company might not have another adequate remedy, each Member acknowledges and agrees that the provisions of Section 9.1 may be specifically enforced by the Company against such Member through injunctions, restraining orders and other orders of equitable relief issued by a court of competent jurisdiction, without any requirement for the securing or posting of a bond or other security by the Company in connection with any such equitable remedies described in the preceding sentence.

19

QUANTRAN_00541992

## ARTICLE X
## DISSOLUTION AND LIQUIDATION

Section 10.1 Dissolution. Subject to the provisions of applicable law, the Company shall be dissolved upon the first of the following events to occur:

(a)     the sale of all or substantially all of the Company's assets and the collection of all of the proceeds of such sale; or

(b)     with the prior written consent of the Board of Managers; or

(c)     the entry of a judicial decree of dissolution of the Company pursuant to the Act.

The termination of a Member's membership in the Company shall not result in the dissolution of the Company.

Section 10.2 Liquidation.

(a)     Upon a dissolution of the Company, the Liquidating Person shall take or cause to be taken a full account of the Company's assets, indebtedness and liabilities as of the date of such dissolution and shall proceed with reasonable promptness to liquidate the Company's assets and to terminate its business and affairs. The Company's assets, or the proceeds from the liquidation thereof, shall be applied in cash or in kind in the following order:

(i)     to the payment of all liabilities and obligations of the Company, including expenses of the liquidation and obligations and liabilities to the Members including compensation payments (other than on account of their Capital Accounts or liabilities for distributions under applicable law);

(ii)     to the establishment of such reserves for contingent liabilities of the Company as are deemed necessary or desirable by the Liquidating Person; provided, however, that such reserves shall be deposited in escrow with a bank for the purpose of disbursing such reserves for the payment of such contingent liabilities and, at the expiration of such period as the Liquidating Person may reasonably deem advisable, for the purpose of distributing the remaining balance in accordance with subparagraphs (iii) and (iv) below;

(iii)     pro rata to the Members until each Member has been repaid its Capital Contribution;

(iv)     to the Members in accordance with their respective Percentage Interests.

(b)     The Liquidating Person shall be allowed a reasonable time for the orderly liquidation of the Company's assets and properties and the discharge of indebtedness and other liabilities to creditors, so as to preserve and, upon disposition, maximize the value of the Company's assets and properties.

(c)     Following the liquidation of the Company, the Liquidating Person shall file a Certificate of Dissolution of the Company with the Office of the Secretary of State of the State of Delaware.

20

QUANTRAN_00541992

Section 10.3 Continuing Liabilities and Other Obligations. Except as otherwise expressly provided herein, no reconstitution, dissolution, liquidation or termination of the Company shall relieve, release or otherwise discharge any Member, or any of that Member's successors, assigns, heirs or legal representatives, from any previous breach or default of, or any obligation or other liability theretofore incurred or accrued under, any provision of this Agreement or applicable law, and any and all liabilities, claims, demands or causes of action arising from any such breaches, defaults, obligations and liabilities shall survive any such reconstitution, dissolution, liquidation or termination.

Section 10.4 Final Statement. As soon as practicable after the dissolution of the Company, the Liquidating Person shall cause a statement of the Company's assets and liabilities to be prepared as of the date of such dissolution and furnished to the Members.

## ARTICLE XI
## MISCELLANEOUS

Section 11.1 Notices. All notices and other communications required or permitted to be given pursuant to this Agreement shall be in writing, and shall be deemed duly given as follows: (a) on the date delivered if personally delivered, (b) on the date sent by telecopy with automatic confirmation by the transmitting machine showing the proper number of pages were transmitted without error, (c) on the next business day if sent by overnight mail by FedEx or other recognized overnight mail service, or (d) five (5) business days after mailing, if mailed by certified or registered mail, return receipt requested, in each case addressed to the parties at their respective addresses set forth on Exhibit A or such other address as may be specified in a notice given in accordance with the provisions hereof.

Section 11.2 Amendment. The Company's Certificate of Formation and this Agreement may be amended from time to time only with the approval of the Board of Managers and a Majority of Members; provided, however, that, except as otherwise expressly provided herein, an amendment (a) reducing a Member's Percentage Interest or number of Units in a manner which is disproportionately adverse to such Member relative to the rights of other Members holding the same class of Units; (b) increasing a Member's capital contribution; (c) increasing any other obligation of a Member to the Company; or (d) reducing a Member's rights in respect of any Units in a manner which is disproportionately adverse to such Member relative to the rights of other Members holding the same class of Units, shall in each case be effective only with such Member's approval; and provided, further, that an amendment reducing the required interest for any approval in this Agreement shall be effective only with the approval of Members having the interest theretofore required. Without such approval, the Board of Managers may amend this Agreement to (a) cure any ambiguity or to correct or supplement any provision herein that may be inconsistent with any other provision herein, if the correction will not adversely affect the rights of the Company or any Member disproportionately, (b) comply with the then existing requirements of the Code or the Service affecting the status of the Company as a partnership for federal income tax purposes, and (c) reflect the transfer of any Units or the issuance of any new class of Units or Unit Equivalents, including by amending Exhibit A. The Company will send notice of an Amendment to any Member that did not consent to such Amendment. The Members hereby ratify and approve any amendment to this Agreement authorized hereunder.

Section 11.3 Waiver. No course of dealing or omission or delay on the part of any party hereto in asserting or exercising any right hereunder shall constitute or operate as a waiver of any such right. No waiver of any provision hereof shall be effective, unless in writing and signed by or on behalf of the party to be charged therewith. No waiver shall be deemed a continuing waiver or waiver in respect of any other or subsequent breach or default, unless expressly so stated in writing.

21

QUANTRAN_00541992

Section 11.4 Governing Law. This Agreement shall be governed by, interpreted and enforced in accordance with the laws of the State of Delaware, without regard to choice or conflict of laws principles that would defer to the substantive laws of any other jurisdiction.

Section 11.5 Arbitration. In any dispute over the provisions of this operating agreement and in other disputes among the Members, if the Members cannot resolve the dispute to their mutual satisfaction, the matter shall be submitted to mediation. The terms and procedure for mediation shall be arranged by the parties to the dispute. If good-faith mediation of a dispute proves impossible or if an agreed-upon mediation outcome cannot be obtained by the Members who are parties to the dispute, the dispute may only then be submitted to arbitration. Any dispute arbitration arising under this Agreement shall be finally settled in accordance with the Comprehensive Arbitration Rules of the Judicial Arbitration and Mediation Service, Inc. ("JAMS") by arbitrators appointed in accordance with such rules. The arbitration shall take place in New York County, New York and the arbitral decision may be enforced in any court. The prevailing party in any action or proceeding to enforce this Agreement shall be entitled to costs and attorneys' fees.

Section 11.6 Jurisdiction. With respect to any Equitable Matter, each of the parties hereto hereby irrevocably consents and submits to the jurisdiction of the State and Federal Courts in New York County, New York, as the exclusive jurisdiction for any such matter, waives any objection to venue therein, and agrees that service of any summons, complaint, notice or other process relating to such proceeding may be effected in the manner provided by Section 11.1. In connection with any such proceedings, including appellate proceedings, each Member waives a trial by jury.

Section 11.7 Remedies. In the event of any actual or prospective breach or default by any party, the other parties shall be entitled to equitable relief, including remedies in the nature of injunction and specific performance, without any requirement for the securing or posting of a bond or other security. In this regard, the parties acknowledge that they will be irreparably damaged in the event this Agreement is not specifically enforced, since (among other things) the Interests are not readily marketable. All remedies hereunder are cumulative and not exclusive, and nothing herein shall be deemed to prohibit or limit any party from pursuing any other remedy or relief available at law or in equity for any actual or prospective breach or default, including the recovery of damages.

Section 11.8 Severability. The provisions hereof are severable and in the event that any provision of this Agreement shall be determined to be invalid or unenforceable in any respect by a court of competent jurisdiction, the remaining provisions hereof shall not be affected, but shall, subject to the discretion of such court, remain in full force and effect, and any invalid or unenforceable provision shall be deemed, without further action on the part of the parties hereto, amended and limited to the extent necessary to render such provision, as so amended and limited, valid and enforceable.

Section 11.9 Counterparts. This Agreement may be executed and delivered in counterparts (and transmitted by electronic copy, .pdf or telecopier), with the same effect as if the parties executing the counterparts had all executed one counterpart.

Section 11.10    Further Assurances. Each party hereto shall promptly execute, deliver, file or record such agreements, instruments, certificates and other documents and take such other actions as the Board of Managers may reasonably request or as may otherwise be necessary or proper to carry out the terms and provisions of this Agreement and to consummate and perfect the transactions contemplated hereby.

22

QUANTRAN_00541992

Section 11.11      Assignment. Except as otherwise provided herein, this Agreement, and any right, interest or obligation hereunder, may not be assigned by any party hereto except as otherwise provided herein. Any other purported assignment shall be void *ab initio* and without effect.

Section 11.12      Binding Effect. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and permitted assigns. This Agreement is not intended, and shall not be deemed, to create or confer any right or interest for the benefit of any Person not a party hereto.

Section 11.13      Entire Agreement. This Agreement constitutes the entire understanding and agreement among the parties hereto with respect to the subject matter hereof and supersedes all prior agreements relating thereto.

Section 11.14      Legal Representation. The parties acknowledge and agree that (a) they have participated in the negotiation of this Agreement and no provision of this Agreement shall be construed against or interpreted to the disadvantage of any party by any arbitrator, court, or government or judicial authority by reason of such parties being deemed to have structured or drafted such provisions; (b) the parties have had the opportunity to consult their own attorneys in the negotiation, preparation and execution of this Agreement; (c) the law firm of Riveles Wahab LLP has been engaged by the Company in connection with the preparation of this Agreement, and (d) no conflict of interest exists for Riveles Wahab LLP to have so acted as set forth above, and if such a conflict of interest does exist it is hereby waived by the Company and each of the parties hereto.

**IN WITNESS WHEREOF**, the Company, the Board of Managers and the undersigned Members will have duly executed and delivered this Limited Liability Company Agreement as of the date set forth above.

**Q3 HOLDINGS LLC**

_____
Michael Ackerman

_____
Quan D. Tran, M.D.

_____
James A Seijas

23

Exhibit A

Schedule of Members

of

Q3 HOLDINGS LLC

As of April 12, 2018

| Name and Address | Number of VOTING Units | Number of NON-VOTING Units | Percentage Interest |
|---|---|---|---|
| Michael Ackerman | 3,000,000 | | 33% |
| Quan D. Tran, M.D. | 3,000,000 | | 33% |
| James A Seijas | 3,000,000 | | 33% |
| RESERVED FOR SERVICE PROVIDERS | | 1,000,000 | 10% |

A-1

QUANTRAN_00541992

Exhibit 8.2(b)

Form of Joinder to Limited Liability Company Agreement

Q3 HOLDINGS LLC

Joinder to

Limited Liability Company Agreement

By affixing his, her or its, as applicable, signature hereto, the undersigned, as a Member of Q3 HOLDINGS LLC, a Delaware limited liability company (the "Company"), hereby joins in the execution of the Limited Liability Company Agreement of the Company dated as of April 12, 2018, as amended from time to time (the "LLC Agreement"), and as executed by its other Members (as defined in the LLC Agreement). Upon acceptance of this Joinder by the Company, the undersigned shall be a party to the LLC Agreement and shall be a Member of the Company.

The execution of this Joinder shall be a counterpart execution of the LLC Agreement, and the undersigned agrees to be bound by all the terms thereof as though he, she or it, as applicable, were an original party thereto.

**IN WITNESS WHEREOF**, the undersigned has executed this Joinder as of this _____ day of _____, 201_.

| If Member is an Entity: | If Member is An Individual: |
|---|---|
|  | Signature:_____ |
| a _____ | *Individually* |
| By:_____ | Print Name:_____ |
| Print Name:_____ |  |
| Title:_____ | Address:_____ |
|  | _____ |
|  | _____ |

The undersigned hereby accepts this Joinder, and accordingly, _____ is accepted as a Member of the Company.

Q3 HOLDINGS LLC,
a Delaware limited liability company

By:_____
Print Name:_____
Print Title:_____

2

QUANTRAN_00541992