# EXHIBIT 4

EXHIBIT
P 21

## AFFIDAVIT OF JAMES A. SEIJAS

1. My name is James Seijas. I am a resident of the State of New Jersey, am over the age of 21, and am competent to give this Affidavit. I have first-hand knowledge of the facts and circumstances set forth herein.

2. In 2017, Dr. Quan Tran ("Tran"), Michael Ackerman ("Ackerman"), and I started trading cryptocurrency without formalizing any association between the participants.

3. When the money passing through Tran's account had grown, it was determined that we should formalize the informal association.

4. Ackerman recommended that the participants of the informal association retain Riveles Wahab, LLP ("Riveles Wahab") to create formal entities and draw up and file the necessary documents.

5. Riveles Wahab was retained and was paid with what Tran and I believed to be the participants' profits from trading cryptocurrency.

6. Riveles Wahab knew or should have known that it was retained by the participants of the then informal association to formalize it into a legal entity and draw up the appropriate legal documents to protect the participants' interests.

7. In 2018, with Riveles Wahab's legal support, Q3 I, L.P., ("Q3I") and its general partner, Q3 Holdings, LLC ("Q3 Holdings"), were formed.

8. Riveles Wahab prepared the legal documents for Q3I and Q3 Holdings, including the Private Placement Memorandum ("PPM").

9. Riveles Wahab never asked to independently verify the representations in the PPM or to verify the exchange account balances.

ACTIVE 681730956v1

Vyas Polsinelli 00000577

10. I believed then, and still believe, that Riveles Wahab knew the participants in the informal trading association who hired them would rely on them to exercise diligence to confirm the representations they would be including in the PPM were correct.

11. Q3I was never a Ponzi scheme or otherwise meant to do anything but make Q3I's limited partners and general partner money through trading cryptocurrency.

12. Ackerman duped Q3I and Q3 Holdings.

13. Q3I was not complicit in Ackerman's scheme. Neither was I nor Tran, who are the majority members of the board of managers of Q3 Holdings.

14. Ackerman did not have any authority to individually act on behalf of or bind Q3I.

15. Ackerman did not have any authority to individually act on behalf of or to bind Q3 Holdings.

16. Q3I hired certain professionals, including Denis McEvoy ("McEvoy"), Polsinelli PC ("Polsinelli"), and Brandon Accountants, to help it manage its business and ensure the fund was run properly, including complying with certain regulatory requirements.

17. Rick Levin ("Levin") and the Polsinelli law firm were hired to protect Q3I and the limited partners of Q3I by ensuring Q3I had the appropriate safeguards and oversight in place to run the investment fund and to advise, among other things, on structure, operations, and registration requirements.

18. Q3I hired Levin and Polsinelli because they advertised themselves as experts in regulatory and compliance of digital assets. I understood then, and continue to believe, Polsinelli was Q3I's legal counsel.

19. McEvoy, who was hired as the Fund Administrator for Q3I, recommended Levin and Polsinelli to Q3I and connected Q3I with Levin and Polsinelli.

Vyas Polsinelli 00000578

20. Ackerman was supposed to trade Q3I's funds on the cryptocurrency exchanges.

21. When Ackerman moved the bulk of the trading from other exchanges to Bitfinex, he explained that he needed to use a VPN to access the account because of certain limitations in accessing the platform.

22. After Ackerman moved the trading to the Bitfinex account, neither Tran nor I physically accessed that account, but I spoke to Ackerman daily to get updates regarding the Q3 account status, ranges for trading, and necessary research for the algorithm that Ackerman purported to use to trade so successfully.

23. In addition, Ackerman regularly provided Tran and me screenshots of the account exchanges, at least once a month, and upon request. Ackerman also provided videos purporting to show the trading activity.

24. I relied on Ackerman's reported profits and screenshots and believed the Q3I's cryptocurrency accounts were incredibly profitable, housing over $300 million at one point.

25. In late November / early December 2019, Ackerman indicated that he was suffering from an illness and would be going to the hospital. I directed him to stop trading at that point.

26. When Tran and I went to Ackerman's house to check on his health, the log-in information he previously provided me with did not work, he refused to provide us with access to the cryptocurrency account, and it became apparent that something was wrong.

27. As soon as Tran and I realized that Ackerman may have engaged in wrongdoing, we called the authorities.

28. Until I left his house in December 2019, I believed that the profits that Ackerman reported were real and had absolutely no reason to believe that Ackerman had been lying.

Vyas Polsinelli 00000579

29. I was a Financial Advisor for Wells Fargo Clearing Services, LLC ("WFA") from 2013 through my resignation in March 2019. I understand that my experience as a Wells Fargo Financial Advisor was included in my bio in the offering memorandum used by Q3.

30. I put part of my share of the 2018 profits I earned from trading in my wife Donna Seijas' name. Upon formalizing Q3I in mid-2018, I changed that because Donna had no involvement with Q3I.

31. I submitted my report to WFA regarding outside business activities but did not disclose my involvement with Q3I or the cryptocurrency trading done prior to the creation of Q3I.

32. Siddhartha Pagidipati ("Sidd"), personally, or an entity he was associated with, 1010 Capital, Inc. ("1010 Capital"), was a limited partner in Q3I.

33. Sidd introduced potential limited partners to Q3I.

34. It is my understanding that in exchange for introducing potential limited partners to Q3I, Sidd negotiated to reduce the management fee he would pay.

35. On March 7, 2019, Sidd took a distribution of $500,000 in Q3I partnership assets, which did not reduce any initial capital contribution on Q3I's books. This distribution was booked in Q3I's records as a distribution of profit.

36. On October 3, 2019, Sidd took a distribution of $3 million in partnership assets, which did not reduce any initial capital contribution on Q3I's books. This distribution was booked in Q3I's records as a distribution of profit.

37. To the best of my knowledge, the distributions were paid to Sidd personally.

38. Neither transfer was considered to be or booked as a withdrawal of principal investment.

4

39. Had Sidd and/or 1010 Capital withdrawn the principal, they would have ceased being limited partners and would not have been allowed to keep their limited partnership interests or rights. This did not happen.

40. After the distributions of partnership assets, Sidd or 1010 Capital retained the limited partnership interests and remained a limited partner of Q3I.

41. Q3I used Signature Bank ("Signature") to convert the funds contributed by the limited partners from real currency to balances on the cryptocurrency exchanges.

42. Signature, through its employees with whom I corresponded, understood that the Q3I bank account was a trust/fiduciary account for Q3I's limited partners.

43. Signature knew that the Q3I account held funds contributed by investors for the purpose of being regularly swept into cryptocurrency exchanges for trading.

44. Signature sent me email notifications about the activities of the Q3I account funds.

45. Signature inquired as to why all the funds deposited into the fiduciary account were being transferred to the Q3 Holdings account and then to the managers of Q3 Holdings rather than for their intended purpose of being swept into a cryptocurrency exchange ("Ackerman's Transfer Method").

46. Signature was informed that Ackerman's Transfer Method was permissible. Signature Bank thereafter allowed transfers to continue directly from the Q3I fiduciary account to the Q3 Holdings account without further inquiry or investigation.

47. That Signature approved Ackerman's Transfer Method and did not object to or further inquire into the transfers being made gave me additional comfort that Ackerman's Transfer Method must have been above board.

5

48. McEvoy was hired as the Q3I Fund Administrator because Q3I needed a Fund Administrator and, as I understand, McEvoy had prior fund experience. Accordingly, I worked with McEvoy and Polsinelli regarding questions relating to fund regulation, operation, and registration.

49. I asked McEvoy whether Ackerman's Transfer Method was a legitimate way to handle Q3I's funds.

50. McEvoy never asked me to see the cryptocurrency exchange accounts or otherwise verify Ackerman's reported profits.

51. McEvoy approved Ackerman's Transfer Method as a viable method of handling Q3I's funds; McEvoy told me Polsinelli had advised him Polsinelli was completely comfortable with the way Q3I was running its bank account with Signature Bank, including Ackerman's Transfer Method.

52. McEvoy and Polsinelli's approval of Ackerman's Transfer Method provided us with additional comfort that it was above board.

53. It is my recollection that Q3I relied on McEvoy and Polsinelli's advice concerning its handling of its bank account with Signature.

54. Q3I also hired an accountant, Gary Chaddee of Brandon Accountants, to prepare tax returns for Q3I and Q3 Holdings.

55. Q3I also asked Chaddee whether Ackerman's Transfer Method was a legitimate way to handle Q3I's funds.

56. Chaddee never asked to see the cryptocurrency exchange accounts or otherwise verify Ackerman's reported profits.

Vyas Polsinelli 00000582

57. Chaddee approved Ackerman's Transfer Method as a viable method of handling Q3I's funds.

58. Chaddee's approval of the Ackerman's Transfer Method provided us with additional comfort that it was not part of a fraudulent scheme.

59. Q3I relied on Chaddee's advice concerning its handling of its bank account with Signature.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 30, 2022                                     _____
                                                                James Seijas

THE STATE OF NEW JERSEY

COUNTY OF MORRIS

On August, 30, 2022 before me, _Debra A. Donato_, Notary Public in and for said county, personally appeared James Seijas, (signer/witness) who has/have satisfactorily identified him/her/themselves as the signer(s) or witness(es) to the above-referenced document.

_____
Notary Public Signature

Print _Debra A. Donato_

My commission expires: _10/05/2025_

**DEBRA A. DONATO**
**NOTARY PUBLIC OF NEW JERSEY**
**My Commission Expires 10/5/2025**

7

ACTIVE 681730956v1

Vyas Polsinelli 00000583