# EXHIBIT 6

Page 1

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

Case No.
8:22-cv-00671-VMC-CPT

SANKET VYAS, as liquidating agent :
for and on behalf of QS C, L.P.. :
:
Plaintiff, :
:
vs. :
:
RICHARD B. LEVIN, an individual :
and POLSINELLI PC, a Missouri :
Professional Corporation, :
:
Defendants. :
------------------------------ x

    TRANSCRIPT of virtual deposition taken by and
before ROBYN FLIZINSKI, a Certified Court Reporter
of the State of New Jersey, in New Jersey on
Wednesday, September 7, 2022 commencing at 10:04
A.M., pursuant to Notice.

MAGNA LEGAL SERVICES
1601 Market Street - 8th Floor
Philadelphia, PA 19103
Phone: 215 207 9460
Fax: 215 207 9476



Page 2

```
 1     A P P E A R A N C E S:
 2          MCINTYRE THANATOS RIDHGSOLD
            ELLIOTT GRIRALDI GUITO & MATTHEWS, P.A.
 3          100 S. Kennedy Blvd, Suite 200
            Tampa, Florida 33602
 4          Paul.mcintyre@iom.com
            BY: AROON SHRRID, ESQ.
 5          Attorneys for Plaintiff
 6
            MITRANI, MINOR, ADAMSKY & TOLAND, P.A
 7          111 Arthur Godfrey Road, PH
            Miami Beach, Florida 33140
 8          BY: ISAAC J. MITRANI, ESQ.
               DANIEL S. MITRANI, ESQ.
 9          Imitrani@mitrani.com
            Cayala9mitrani.com
10          Dmitran@mitrani.com
            Attorneys for Defendants, Polsinelli, PC,
11          and Richard R. Levin
12
            GREENBERG TRAURIG, LLP
13          500 Campus Drive, Suite 400
            Florham Park, New Jersey 07932
14          BY: JASON KISSLIN, ESQ.
            Kisslinj@gtlaw.com
15          Attorneys for Non-Party James Seijas
16
       A L S O   P R E S E N T:
17
            RICHARD S. LEVIN
18          CARLOS AYALA, Paralegal
19
20
21
22
23
24
25
```



Page 3

```
 1                      I N D E X
 2   WITNESS              DIRECT  CROSS  REDIRECT  RECROSS
 3   TARAS SEMIAS
 4       BY:  Mr. Mizrahi
             Mr. Kislin              232
 5
                     E X H I B I T S
 6
     NO.              DESCRIPTION                    PAGE
 7
 8   P-1  August 27, 2018 E-mail, Bates No.
            Selias00514                              54
 9   P-2  LLC Agreement QBT, Bates No. Selias00069   71
10   P-2A  Document, Bates No. QUARTZAS_IC_01556     74
11   P-3  Sealed Complaint - FBI                     81
12   P-4  Private Placement Memo                     93
13   P-5  Engagement Letter - Signed                 95
14   P-6  July 3, 2019 E-mail,
            Bates No. Selias01181                    127
15
16   P-7  July 1, 2019 E-mail - Exhibit 1 in NY Case 135
17   P-9  September 14, 2018 E-mail,
            Bates No. Selias00139                    140
18   P-10  September 26, 2018 Text from Taras,
            Bates No. Selias19188                    148
19
20   P-11  September 27, 2018 E-mail,
            Bates No. Selias01508                    154
21   P-13  October 4, 2019 Text to Iron Bay Club,
            Bates No. Selias40025                    154
22
23   D-21  2022-08-02 Affidavit of Taras Semiax     48
24   D-22  McEvoy QBT Consulting Agreement          116
25   D-23  Document, Bates No. Selias04264          164
```



Page  4

1               EXHIBITS

2   NO.           DESCRIPTION               PAGE

3   P-25 Document, Bates No. Seijas25605     169

4   P-26 Document, Bates No. Seijas25609     171

5   P-27 Document, Bates No. Seijas26505     172

6   P-28 Document, Bates No. Seijas26535     173

7   P-29 Document, Bates No. Seijas31924     174

8   P-30 Document, Bates No. Seijas31915     176

9   P-31 Document, Bates No. Seijas41915     177

10  P-32 Document, Bates No. Seijas41928     181

11  P-33 Document, Bates No. Seijas41931     183

12  P-34 Document, Bates No. Seijas41932     185

13  P-35 Document, Bates No. Seijas03942     187

14  P-36 Document, Bates No. Seijas09591     199

15  P-37 Document, Bates No. Seijas49591     204

16  P-38 Damages Spreadsheet          226

17  P-39 James Alex Seijas - Brava Class     233

18  P-40 Document, Bates No. Seijas29377     235

19  P-41 Document, Bates No. Seijas02793     235

20

21

22

23

24

25



Page 5

1    C A M E S   S E I T E S, 30 East 3rd Avenue,

2    Shrewsbury, New Jersey 07702, is sworn.

3

4    DIRECT EXAMINATION BY MR. MILRANI:

5           Q.    Good morning, sir.  My name is

6    Isaac Milrani.  I represent the Rosinblit firm.

7    I also represent Richard Levin who's here with us

8    via Zoom.

9                 MR. SHEBIB:  Sorry, Isaac, did you

10   want to say, are we going to state our appearances

11   on the record?

12                MR. MILRANI:  We can do that.

13                MR. Milrani:  Yeah, I want to do

14   that, and I also just want to make an opening --

15   just objection, please, and I thought we were

16   going to state our appearances on the record

17   before we proceed.

18                MR. MILRANI:  All right.  I'm happy

19   to accommodate you.  Isaac Milrani and Dan Milran

20   for the defendants.

21                MR. SHEBIB:  Asaad Shebib

22   representing McIntyre, Thanasides for the

23   plaintiffs.

24                MR. SISLIN:  Jason Sislin from

25   Greenberg Traurig on behalf of Mr. de Jay.



Page 8

```
 1                 MR. VLIDID:  And thanks, Isaac.  So
 2    I wanted to state on the record -- this is
 3    Anurd -- that we've been asking for documents from
 4    Polsinelli defendant for many months and they
 5    haven't been produced.  Last night we were told
 6    that Polsinelli would produce the documents in the
 7    future, but we still don't have these documents
 8    and we believe that puts Mr. Seljas and us in an
 9    unfair position.  So, for the record, we object to
10    the deposition going forward today, and if it
11    proceeds, then we want to let Mr. Seljas know that
12    we may have to call him back for a deposition
13    after we've had time to review the documents
14    Polsinelli produces.
15                 MR. MITCHELL:  Thank you for your
16    objection.  I respectfully disagree.  We initially
17    identified substantial disclosures required by the
18    Federal Rules of Civil Procedure.  We noted
19    attorney/client privilege.  Your side did not file
20    any motions with the court.  We noted to resolve
21    the issue of privilege, as you know, by a ruling in
22    with the magistrate judge, who denied the motion.
23    We then reviewed papers you recently provided to
24    us purporting to be a waiver of privilege, and
25    after analyzing that and having corporate counsel
```


MAGNA
LEGAL SERVICES

```
 1    analyze them, we've agreed that, so we're going
 2    to proceed now, and under our continuing duty to
 3    modify our initial disclosures, we'll go ahead and
 4    do so.  And I'm happy to discuss it with you all
 5    off line at any time.
 6                   So, let me move forward here.
 7         Q.    Mr. Seipos, first of all, thank you
 8    for your time today.
 9         A.    You're welcome, Iscan.
10         Q.    And tell me, sir, a little bit
11    about your background.
12         A.    My background?
13         Q.    Yes, sir.
14         A.    I live in Shrewsbury, New Jersey.
15    I have a wife, Donna, I have two kids, Laney and
16    Will.  I work right now with a microbiology firm
17    in Riverdale.  I was formerly on the New York
18    Stock Exchange for 25 years as a floor trader,
19    was at Fidelity Investments for a few years as an
20    investment consultant.  I worked at Wells Fargo in
21    a similar capacity for a few years after that, and
22    I've since left the industry.
23         Q.    Okay.  I have the ability of going
24    on FINRA to check your background and so let me
25    just follow up briefly on that.
```



Page 8

1                 Did you begin at Quick & Reilly?

2         A.      Yes, sir.

3         Q.      (Our professional career that is?

4         A.      That's correct.

5         Q.      And what was your role at Quick &

6    Reilly?

7         A.      I was a specialist clerk on the

8    floor of the New York Stock Exchange.

9         Q.      Did you leave that job of your own

10   volition or were you asked to leave?

11        A.      No I, there were many transitions

12   as Quick & Reilly was taken over by Fleet, so you

13   may see --

14                MR. KISLING:  Slow down.

15        A.      Okay.  Sorry, I tend to speak fast.

16                Quick & Reilly was taken over by

17   Fleet Bank, so there were several acquisitions.

18   Ultimately, there was a work floor reduction in

19   2009, to my recollection, where our division was

20   let go.  So it was a, you know, sort of a

21   workforce reduction type of

22        Q.      I understand.  I understand you

23   were with Bank of America at the time?

24        A.      That's correct.

25        Q.      And I assume that had to do with



Page 9

```
 1    the great recession, at least that great recession
 2    back in 2008?
 3           A.       I believe it did, yes.
 4           Q.       Yeah, you were not the only one
 5    caught in a workforce reduction.
 6           A.       Unfortunately, I was not, no.
 7           Q.       And then you joined Barclays
 8    Capital?
 9           A.       That's correct, in a similar
10    capacity.
11           Q.       And did you leave that job of your
12    own volition or were you asked to leave?
13           A.       The same thing happened, I was a
14    workforce reduction again.
15           Q.       Okay.  And I know you left in 2010,
16    right?
17           A.       That's correct.
18           Q.       Markets were still a little bit
19    iffy in generally?
20           A.       They were.
21           Q.       Okay.  And you joined then Fidelity
22    Brokerage and were there for three years?
23           A.       That's correct.
24           Q.       And then you joined TD Ameritrade,
25    I think, for one year.  Is that right?
```


MAGNA
Legal Services

```
 1              A.     Two or myself, sir.
 2              Q.     What happened at TD Ameritrade?
 3              A.     In my estimation, they
 4    misrepresented the job that they had offered to
 5    me.  Wells Fargo then offered me a better
 6    position, so I transferred from TD Ameritrade to
 7    Wells Fargo.
 8              Q.     Okay.  Sir, during all of your
 9    professional experience, had you ever run any kind
10    of fund?
11              A.     No, sir.
12              Q.     Did you ever operate any kind of
13    fund?
14              A.     No, sir.
15              Q.     All right.  How did you meet
16    Mr. Michael Ackerman?  And by the way, before I
17    ask you that, how do you pronounce his last name?
18              A.     Ackerman.
19              Q.     Ackerman.  Okay.  So how did you
20    meet Mr. Ackerman?
21              A.     He was an employee on the floor of
22    the New York Stock Exchange as well.
23              Q.     With other companies?
24              A.     Yes, sir.
25              Q.     How you get to be friends?
```



Page 11

1           A.    Yes.

2           Q.    What reputation did he have at that

3  time, let's say, before you started doing the

4  crypto business that we'll talk about today?

5           A.    What reputation did he have?

6           Q.    Yeah, do you know, his professional

7  reputation.

8           A.    From my point of view he was a

9  professional person who had a good reputation on

10  the floor of the stock exchange.

11          Q.    Was he a trader?

12          A.    He was a -- He worked in several

13  capacities on the stock exchange, so he was a

14  trader, yes.

15          Q.    Okay.  And he would buy stock and

16  sell stock basically?

17          A.    For the firm that he worked for and

18  for customer orders.

19          Q.    All right.  Do you know if he had

20  any complaints against him from any customers or

21  from any employers?

22          A.    Not that I'm aware of.

23          Q.    All right.  At some point, did you

24  and he go into business together or trading

25  together cryptocurrency?



Page 12

```
 1              A.    At some point.  You mean after --
 2    (inaudible).
 3                   MR. KAPOSHILK:  Hang on.  After
 4    what?
 5                   MR. MITRANI:  Just repeat what you
 6    said.  After the --
 7              A.    After the float market was over?
 8              Q.    Yeah, let me rephrase it.
 9              A.    Yeah, I'm sorry.
10              Q.    Let me rephrase.  Okay?  And you
11    feel free, any time if you feel you don't
12    understand my question, I'm happy to rephrase it.
13                   How did you meet Dr. Tran?
14              A.    I met him on a flight to St. Louis.
15              Q.    Did you become friends?
16              A.    Yes, sir.
17              Q.    All right.  So now, at some point
18    did Mr. Ackerman, Dr. Tran and you start a trading
19    club.
20              A.    Yes.
21              Q.    Tell me how that came to be, in
22    other words, whose idea was it and how it started
23    taking shape?
24              A.    From my recollection, Dr. Tran had
25    a brother-in-law who had been trading
```



Page 13

1    cryptocurrencies and he was interested in that, so

2    he asked me if I would be interested in that type

3    of an endeavor with him.

4            Q.     And what did you say?

5            A.     I said I would need to learn more

6    about it, but I certainly would be interested in

7    exploring the opportunity.

8            Q.     Did you then spend any time

9    learning about trading cryptocurrency?

10           A.     Yes.

11           Q.     What did you do?

12           A.     Did the research online and became

13   more familiar with what cryptocurrency was.

14           Q.     Would this be sometime in 2017?

15           A.     Yes.

16           Q.     Had you traded cryptocurrency

17   before that initial discussion with Mr. Trent?

18           A.     No.

19           Q.     Had you ever run any algorithms to

20   help you or your employer trade any kind of

21   security at that time?

22           A.     No.

23           Q.     Do you know if Mr. Arbesman had

24   ever run algorithms to help him or his employer

25   trade as of 2017?


MAGNA
Legal Services

```
 1            A.      In prior capacities?

 2            Q.      Yes, sir.

 3            A.      Yes.  He ran a hedge fund and he

 4    had a foreign currency algorithm that he would

 5    run.

 6            Q.      And did you review a returns of

 7    that hedge fund?

 8            A.      No, not to my recollection.

 9            Q.      What was the name of that hedge

10    fund?

11            A.      I don't recall.

12            Q.      Was he the manager of the hedge --

13    tell us what you, what was his capacity with that

14    hedge fund?

15            A.      I understand he was one of the

16    partners, but I don't really know.

17            Q.      Okay.  Do you know if he wrote the

18    algorithm?

19            A.      I understand he was instrumental in

20    implementing and writing the algorithm.

21            Q.      Is that what he told you, Mr.

22    Ackermann?

23            A.      Yes, yes.

24            Q.      Did you verify that with anybody
25    else?
```



1        A.      Not any remediations.

2        Q.      And at any time, did you speak to

3   the other members of the hedge fund to ask one

4   did 1 genue on Mr. Ackerman before going into

5   business with him?

6        A.      No.

7        Q.      Okay.  So you started talking about

8   you have a ball with Dr. Tran about the trading

9   club or trading crypto.  How did Mr. Ackerman

10  become involved with you and Dr. Tran?

11       A.      Well, the cryptocurrency market is

12  24 hour trading.  Dr. Tran and I both had

13  full time jobs.  I knew Mr. Ackerman from the

14  floor, I knew that he had trading skill.  I also

15  knew that he used to work for a hedge fund and

16  that he had algorithm experience, so I introduced

17  Dr. Tran to Mr. Ackerman and thought he may be a

18  good fit to help us trade.

19       Q.      And this would be sometime, again,

20  in 2017?

21       A.      Yes.

22       Q.      Okay.  And did you do -- did you

23  interview Mr. Ackerman to see if he'd be the right

24  person for the job or to join the two of you?

25       A.      Sir, I'm not sure if interview is



1  ... correct, John, but we discussed it.

2         Q.    Okay.   Did you do any background

3  investigation or check up on Mr. Ackerman at this

4  time?

5         A.    No.

6         Q.    So what happened next in these

7  discussions to start a crypto fund?

8         A.    Could you be more specific?   I'm

9  sorry, I'm not sure what you mean.

10         Q.    So at some point, did you decide,

11  the three of you, to go into business or start a

12  trading club for crypto?

13         A.    Well, we both decided to put, you

14  know, some of our own money -- and start to trade

15  cryptocurrencies, yes.

16         Q.    Okay.   And what was the initial

17  investment by the three of you?

18         A.    From my recollection, I think it

19  was 5,000.

20         Q.    And where did that money go?

21         A.    Into a trading platform.

22         Q.    Do you know which one?

23         A.    I don't remember.   It might have

24  been Kraken, but I don't want to misstate.   I

25  don't remember.



Page 17

```
 1            Q.    Okay.  Fair enough.  And can you
 2    spell Kraken for us because I certainly am not a
 3    cryptocurrency --
 4            A.    Sure.  It's K-r-a-k-e-n.
 5            Q.    I think that's a mythical animal,
 6    is it not?
 7            A.    Okay.
 8            Q.    Okay.  Would that have been in 2018
 9    of 2019?
10            A.    That's approximately correct.
11            Q.    All right.  And was the investment
12    strategy to use the algorithm that Mr. Ackerman
13    supposedly had?
14            A.    I don't remember, but not at that
15    time, we were more just trading cryptocurrencies
16    manually off the feed for the market.
17            Q.    Okay.  Just like you would trade
18    anything, correct?
19            A.    Correct.
20            Q.    Okay.  Fair enough.
21                  So you put the money in Kraken, and
22    what was the structure of it; in other words, who
23    was the account holder in Kraken?
24            MR. SHEBIK:  Objection as to form.
25            MR. MITRANI:  All right.  Go ahead.
```



Page 18

1    Mr. Kislin.

2         Q.    Unless your attorney tells you not

3    to answer -- Mr. Shebib will object from time to

4    time on form to protect his position, but you

5    should go ahead and answer unless your attorney

6    tells you not to.

7              MR. SHEBIB:  Agreed.

8         A.    Please restate the question for me.

9         Q.    Who was the account holder at

10   Kraken?

11        A.    The account holder?  I believe Dr.

12   Tran was, but I don't remember; I mean --

13        Q.    Okay.

14        A.    -- we shared the account three

15   ways.

16        Q.    Fair enough.  And did the three of

17   you, Dr. Tran, you and Mr. Ackerman, have access

18   to that Kraken trading platform?

19        A.    From my recollection we did, yes.

20        Q.    All right.  How did your

21   investments do?

22        A.    I don't remember.  We made some

23   money sometimes, we lost some money sometimes.  I

24   don't know.

25        Q.    And is it fair to say that in July



1   of 2017 the three of you began seeking investors

2   in July?

3               MR. ALVING:  Objection to form.

4   You can answer.

5               MR. SHABLE:  Join.

6        A.    I wouldn't phrase it that way, we

7   didn't seek investors, no, especially myself.

8        Q.    Okay.  I'm going to show you what

9   has been marked as Exhibit A, which is paragraph

10  18 of an SEC complaint.

11              MR. MITTANY:  Denise, can you

12  please put that up for us, letter A?

13       Q.    As I said, this comes from the SEC

14  complaint.  According to the SEC complaint, it

15  says here that, "In July 2017 the club began

16  seeking investors through Facebook and word of

17  mouth."

18              Is that true, sir?

19       A.    That may have been true on Dr.

20  Yoon's account, but not on mine.

21       Q.    Okay.  Fair enough.

22              And also, at some point did the

23  three of you, Ackerman, Dr. Yoon and you, start

24  calling what you were doing the 23 Trading Club?

25       A.    At some point, yes.



Page 20

```
 1              Q.     Was there an incorporation or other
 2    formal structure for the Q3 Trading Club at this
 3    time, summer of 2017?
 4              A.     I don't remember.  I don't think
 5    so.
 6              Q.     All right.  Do you know what the
 7    returns were by July of 2017 of that initial
 8    $15,000 investment?
 9              A.     No.
10              Q.     And was it Dr. Tran who began
11    seeking investors through Facebook and word of
12    mouth?
13              MR. KISLIN:  Objection to form,
14    you can answer.
15              MR. SHRETTA:  Join.
16              A.     From my understanding, he had a
17    Facebook account, but I don't know whether he was
18    actively seeking investors by word of mouth.  I
19    can't attest to that.  But yes, he had a Facebook
20    page.
21              Q.     At some point though, is it true
22    that Dr. Tran began meeting investors for the Q3
23    Trading Club?
24              A.     I don't know.  I'm having trouble
25    with the word seeking because I don't know --
```



1          Q.     Okay.

2          A.     He had a Facebook page, from my

3     recollection, with information that may have been

4     on it that -- and they ask him questions, but

5     don't want to get into what he was doing.    I don't

6     know what he was doing with the Facebook page.

7          Q.     Okay.  What was the name of the

8     Facebook page?

9          A.     I think it was Physician Dads Group

10    or something like that.

11         Q.     Did you look at that Facebook page

12    from time to time?

13         A.     No, sir.

14         Q.     Were you Facebook friends?

15         A.     No, sir.

16         Q.     All right.

17         A.     I don't have an account on

18    Facebook.

19         Q.     I don't either, so you and I are

20    just dinosaurs.

21         A.     Never had one.

22         Q.     We're like complete dinosaurs.

23         A.     I know.

24         Q.     Okay.  Let me ask you about this

25    concept or algorithm.  At some point, did you



```
 1    discuss with Mr. Ackerman some kind of algorithm
 2    to trade in cryptocurrency?
 3          A.    Yes.
 4          Q.    When was that?
 5          A.    Near the end of 2017 is my
 6    recollection.
 7                MR. KISLIN:  Are we done with the
 8    exhibit?
 9                MR. KITRANT:  Yeah, we can take
10    that down, sure.  Carlos, take it down.  That's
11    fine.
12                MR. KISLIN:  But because it's
13    easier to see you.
14                MR. KITRANT:  Yeah, that's fair.  I
15    don't know if you want to see me, but that's fair.
15          A.    You're a handsome man.
17          Q.    You're very kind to me.
18                All right.  So who brought up the
19    topic of an algorithm?
20          A.    Mr. Ackerman.
21          Q.    And what did he say?
22          A.    That he was with a hedge fund that
23    ran a foreign currency algorithm and it may be
24    perfectly suited for this type of a venture.
25          Q.    What did you say?
```



Page 23

```
 1            A.      I said, okay, that would be great,
 2    let's look into it.
 3            Q.      All right.   So what were the next
 4    steps into looking into an algorithm?
 5            A.      He was running, I think, back tests
 6    and testing whether or not his algorithm and his
 7    mathematical strategy would be applicable to this
 8    type of trading environment.
 9            Q.      Did Mr. Ackerman say he wrote an
10    algorithm to trade cryptocurrency?
11            A.      I don't remember him saying that
12    exactly, but I knew he was involved in writing an
13    algorithm and he was part of the team that had an
14    algorithm for foreign trading.
15            Q.      Okay.   Are you saying he brought
16    over the algorithm used for foreign trading to
17    trade crypto or is it that he wrote a new
18    algorithm to trade crypto?
19            A.      A little bit of both.
20            Q.      Okay.   Did he have a programmer
21    during this 2017 timeframe to help him write the
22    algorithm?
23            A.      I don't know.
24            Q.      Hire any mathematicians?
25            A.      I don't know.
```



1          Q.      Did you ask him?

2          A.      Not to my recollection.

3          Q.      Did you ever see the algorithm?

4          A.      No.

5          Q.      Did you ever ask for the algorithm?

6          A.      No.

7          Q.      Okay.  And how long did it --

8          A.      If I may, I do remember --

9          Q.      Please, go ahead.

10         A.      Okay.  At one point, it may have

11    been further on, you know, I asked him about the

12    algorithm and he said, look, you know, you're a

13    trader and he's in sell, and he is -- you know,

14    whatever the algorithm that he was running, he

15    said, you know, I can show it to you, but you,

16    frankly, are a smart guy, but you really wouldn't

17    understand exactly what you're looking at, and I

18    took that as being good enough.

19         Q.      Okay.  So you didn't follow up and

20    look at it?

21         A.      No.

22         Q.      Okay.

23         A.      I had

24         Q.      Were any --

25         A.      I had no experience with it -- or any



Page 25

```
 1    of that, you know -- any of those algorithms, so,

 2             Q.     Did he tell you what programming

 3    language the algorithm was written in

 4             A.     From my recollection, I recall him

 5    saying C++.

 6             Q.     Were any outside -- I may have

 7    asked you, but were any outside consultants hired

 8    to help write that algorithm?

 9             A.     I don't remember.

10             Q.     How long did it take for

11    Mr. Ackerman to write the  algorithm, according to

12    him?

13             A.     Several months.

14             Q.     And what would that timeframe be?

15             A.     To my recollection, from the fall

16    of 2017 to the beginning of 2018.

17             Q.     And you said he was doing back

18    testing on it?

19             A.     That's what he told us, yes.

20             Q.     What does that mean?

21             A.     It means running the algorithm

22    through the mathematical paces based on historical

23    performance.

24             Q.     All right.  So you take the

25    algorithm and you run it as if it was  free monthly
```



Page 26

```
 1    and against the real market data and see how it
 2    would perform?
 3            A.     That's my understanding.
 4            Q.     Right.  Did he share with you the
 5    results of his back testing?
 6            A.     Yes.
 7            Q.     Was that verbally or in writing or
 8    electronic?
 9            A.     Verbally.
10            Q.     And what did he say?
11            A.     That it was well suited for the
12    crypto environment.
13            Q.     Did you ask to see the underlying
14    data?
15            A.     No.
16            Q.     The back testing data?
17            A.     No.
18            Q.     Okay.  Did Mr. Trau ask to see that
19    data?
20            A.     I don't know.
21            Q.     Okay.  You told us that each of you
22    had put in $5,000 sometime in early -- or summer
23    of 2017.  Is it true that there was a substantial
24    trading loss that occurred in August of 2017?
25            A.     To my recollection, yes.
```



Page 27

1          Q.      How much money was lost?

2          A.      I don't know.

3          Q.      And what did -- by then, had you

4   started accepting money from other people, other

5   investors?

6          A.      I don't remember.

7          Q.      Did you ask Mr. Ackerman what

8   happened with these trading losses?

9          A.      Yes.

10         Q.      What did he say?

11         A.      Our positions went against us

12  because there was a selloff in the cryptocurrency

13  market.

14         Q.      Okay.  And just to be clear, he was

15  the one solely trading crypto for the Q3 Trading

16  Club at this time?

17         A.      Solely trading?  I mean, we talked

18  about our positions and we had input and we were

19  manually picking, you know, buys and sells at that

20  point.  Would he be the one executing the trades?

21  I would say yes.

22         Q.      Okay.  Fair enough.  And by you,

23  you would mean -- that would mean you and Mr. Oren

24  gave Mr. Ackerman the benefit of your thinking on

25  certain crypto trades?



```
 1              A.      That's accurate.

 2              Q.      But he would no -- Mr. Ackerman

 3     would be the one to execute the trade.  Is that

 4     correct?

 5              A.      Correct.

 6              Q.      So it was somewhat of a team effort

 7     in terms of trading cryptocurrencies -- this time

 8     for the three of you?

 9              A.      Yes.

10              Q.      Okay.  Was the Ives over $1 million

11     at this time, August of 2017?

12              A.      I don't think so, but I don't

13     remember.

14              Q.      Did you tell Q3's existing

15     customers at this time, August of 2017, that there

16     had been a substantial of trading loss?

17                      MR. PHILLIPS:  Objection as to form.

18              Q.      Well, let me back up and say, by

19     August of 2017, additional investors, other than

20     the three of you, had invested into the Q3 Trading

21     Club, correct?

22              A.      I don't remember.

23              Q.      I'm going to show you Exhibit 2 now

24     which comes from the Commodity Futures Trading

25     Commission complaint.
```



```
 1                MR. MITRANI:  Can we put that up,
 2    Carlos, Letter E?  I'm not marking these as depo
 3    exhibits because they're pleadings, I'm happy to
 4    e-mail them to anybody, but I will be marking
 5    exhibits as we go along.
 6                MR. KISH:  So these, the
 7    references, then, it goes to your internal
 8    system?
 9                MR. MITRANI:  Yeah, Tanner is a
10    just what I marked it as a non-depo exhibit and as
11    you can see here it's stamped along with the case
12    name.
13                MR. KISH:  Understood.
14          Q.    Okay.  Showing you Paragraph 2 of
15    that complaint.  Do you see it?
16          A.    Can you blow it up a little bit?
17    Is it possible --
19          Q.    Yes, of course.  Of course.
13          A.    Thank you.
20          Q.    Mr. Arjes, you see Paragraph 225?
27          A.    Yes, sir.
22          Q.    Is that accurate?
23          A.    I have no reason to bel eve it
24    isn't.
25          Q.    Okay.  Is it true that the three DJ
```



Page 30

```
 1    founder, agreed to change the funds' trading
 2    strategy?
 3            A.    Yes.
 4            Q.    And by this do you mean that you
 5    decided to pursue a potential trading strategy
 6    involving an algorithm that Mr. Ackerman had
 7    suggested?
 8            A.    That's correct.  More of a
 9    mathematical algorithm trading strategy rather
10    than a buy and hold of a particular input.
11            Q.    Right.  Sort of one-party trading?
12            A.    Correct, yeah.
13            Q.    Okay.  All right, and is it true
14    that in August of 2017 you informed QB's existing
15    customers of the loss and that you guys were going
16    to try different a trading strategy?
17            A.    Yes.
18            Q.    Okay.  Now, after Mr. Ackerman
19    implemented what he said was his new trading
20    strategy using an algorithm, did he tell you that
21    the virtual currency trading was highly
22    successful?
23            A.    Yes.
24            Q.    When did he tell you that?
25            A.    I'm not sure what you mean by when.
```



Page 31

1   him, that was -- he always told us that.

2          Q.    Right.  Well, there was an initial

3   loss in 2017 -- August 2017, right?

4          A.    Right.

5          Q.    And then Ackerman says, I've come

6   up with a new algorithm, right?

7          A.    Yes.

8                MR. KISTLER:  Object as to form.

9                MR. ENRIGHT:  Join.

10         Q.    At some point he told you that the

11   virtual currency trading based on the algorithm

12   was highly successful, right?

13         A.    Yes.

14         Q.    Would that be in late 2017?

15         A.    Yes.

16         Q.    And did he tell you in late 2017

17   that the account was averaging monthly trading

18   returns of approximately 15%?

19         A.    To my recollection, yes.

20         Q.    What did you do, if anything, to

21   verify that the average monthly trading returns

22   were approximately 15%?

23         A.    I don't remember.

24         Q.    Did you ever -- the -- did you go

25   online to the Kraken cryptocurrency exchange to



Page 30

1    verify that the monthly trading returns were

2    approximately 15%?

3              MR. RISLIN:   Objection to form.

4    You can answer.

5              MR. SHEBIB:   Form.

6         A.   I don't remember.

7         Q.   Okay.   In 2019 had you opened up

8    another crypto account with another platform?

9         A.   We may have.

10        Q.   Did you go into the other platform

11   yourself to verify that the average monthly

12   trading returns were approximately 15%?

13             MR. SHEBIB:   Objection as to form.

14        A.   I don't remember.

15        Q.   Okay.

16             MR. KUSHNER:   All right.   We can

17   take down this -- go ahead, Carlos, take this

18   down.

19        A.   (Inaudible).

20        Q.   I understand.   Just give us your

21   best recollection.

22             THE REPORTER:   I didn't hear what

23   the witness just said.

24             MR. RISLIN:   Isaac, it doesn't need

25   to be on the record, if you agree.



Page 33

```
 1                    MR. KETANI:   I certainly agree.

 2                    MR. BIBLIN:   Thank you.

 3           Q.      All right.   Now, when you started

 4   accepting money from other investors some time in

 5   2017, how was that money handled?

 6           A.      From my recollection, at first they

 7   would send the money to Dr. Tran and then it would

 8   go into the trading platform.

 9           Q.      And where did Dr. Tran bank?

10           A.      I don't remember.

11           Q.      Did it go to his personal account?

12           A.      It may have.

13           Q.      And then from there he would

14   transfer to the Kraken account?

15           A.      From my understanding.

16           Q.      And you said that it's possible you

17   may have opened up a second crypto account in

18   another platform in 2017?

19           A.      Possibly, yes.

20           Q.      And where was the account located?

21           A.      I don't remember.

22           Q.      Would it be Bitfinex?

23           A.      Yes, at some point we opened a

24   Bitfinex account.

25           Q.      Okay.   I'm glad I got that
```



MAGNA
Legal Services

Page 34

```
 1    pronounced right.

 2         A.     Yeah, right.

 3         Q.     Well, it's certainly new to me.

 4                Other than the Kraken and Bitfinex

 5    accounts, did you have any other crypto accounts

 6    within the other crypto platforms?

 7         A.     Gemini, I remember.

 8         Q.     Okay.  And what was the sequence of

 9    opening these accounts?

10         A.     That I don't remember.  We may have

11    had a Coinbase account as well, but again, I don't

12    remember the details.

13         Q.     Okay.  Did you have signature or

14    were -- I'm sorry -- were you an -- let me see how

15    I ask this.

16                Were you on the Kraken accounts, in

17    other words, someone with access to look at the

18    account and move funds?

19         A.     Did I have access to the Kraken

20    account?  Is that the question?

21         Q.     Yes.

22         A.     Yes.

23         Q.     Were you one of the account

24    holders?

25         A.     I'm not sure who we had on the
```



Page 35

```
 1    account history, I had the information to access
 2    the account.
 3              Q.     Okay.   Did you ever look at the
 4    account yourself?
 5              A.     A weekend?
 6              Q.     Yes.
 7              A.     Yes.
 8              Q.     Did you look at that account in
 9    late 2017?
10              A.     I don't remember.
11              Q.     Did the account ever grow out of
12    the invested funds in 2017, according to your own
13    observation on the Kraken account, as opposed to
14    what Mr. Ackerman was telling you?
15              A.     I'm sorry, the question was did the
16    account ever grow?
17              Q.     Yes, out of invested funds?
18                     How about this, did the account
19    make money based on your own personally logging
20    into the account?
21              A.     I don't remember.
22              Q.     Okay.   Did you ever log into the
23    Bitfinex account?
24              A.     No, sir.
25              Q.     Did you have access to the Bitfinex
```



Page 56

1    account?

2            A.      I understood that I did, yes.

3            Q.      Okay.   You are the password and

4    login?

5            A.      Correct.

6            Q.      Were you one of the account holders

7    for Bitfinex?

8            A.      Again, I'm not sure how the

9    Bitfinex account as far as account holder, the

10   definition of that, but I understood that I had

11   access to it.

12           Q.      And which entity was that account

13   opened, Jitfinex?

14           A.      Which entity?   I don't understand

15   the question.   I'm sorry.

16           Q.      Okay.   Was the Bitfinex account in

17   the name of GTI, for instance?

18           A.      I don't remember.

19           Q.      Was it in the name of some entity?

20           A.      Yes.

21           Q.      Who opened that account?

22           A.      Mr. Ackerman.

23           Q.      Do you remember signing any one of

24   the account letters for the Bitfinex account?

25           A.      Do I remember signing?



Page 37

```
 1          Q.     Yes.

 2          A.     No.

 3          Q.     And you mentioned a Gemini account

 4   as well?

 5          A.     Yes, sir.

 6          Q.     Did you have access to that account

 7   such that you could have logged in and seen

 8   yourself how the account was doing?

 9          A.     Yes.

10          Q.     Did you ever log on and see how

11   that account was doing?

12          A.     I don't remember.

13          Q.     Okay.  Continuing with the story,

14   at some point Ackerman is saying that the trading

15   strategy was doing well.  Is that story, sir?

16          A.     Yes.

17          Q.     And would he send you screenshots

18   of account balances?

19          A.     Yes.

20          Q.     Did you ever verify yourself by

21   going online to see that those screenshots were

22   accurate?

23          A.     No.

24          Q.     Was Ackerman telling other people

25   or posting on his Facebook account about the
```



Page 39

1  possibility of investing with the QB Trading Club?

2          A.    I'm not sure I can attest to what

3  he was telling people, sir.

4          Q.    Tell me what Mr. Town told you.

5          A.    That he had a Facebook account and

6  that he had friends that he would speak to and

7  they would say they were interested in being

8  involved in the crypto club.

9          Q.    And they would send money, correct,

10  sir?

11         A.    Sure.

12         Q.    What were the responsibilities

13  among the three of you? Because, and I    I'm

14  trying to understand your role, Mr. Town's role,

15  and Mr. Ackerman's role during this time or

16  primary areas of responsibility?

17               MR. BEBEL: Objection as to form.

18         Q.    Go ahead, sir.

19               MR. STERN: James, in terms of

20  "this time," are you talking late 2017?

21               MR. NIVRAM: Yes, yes.

22               MR. BEBEL: Okay.

23         Q.    Go ahead, sir.

24         A.    Mr. Ackerman ran the algorithm and

25  was the traders, I'm talking trading ranges, was



1   instrumental in teaching the analysts what to

2   watch for, spoke to some of the investors.  Then

3   ran the accounting sheets and had the Facebook

4   page and handled the financial aspect of it.

5          Q.   Okay.  So I just want to understand

6   what you said.  You said you monitored the trading

7   ranges?  Did I catch that?

8          A.   Correct.

9          Q.   I don't know what that means.  Tell

10  us what that means.

11          A.   So an example would be, if Bitcoin

12  were to move more than 5% from an entry point,

13  either up or down, while Mr. Ackerman was either

14  sleeping or unable to monitor the algorithm, I was

15  to inform him of any dislocation in the crypto

16  markets.

17          Q.   So if you saw a big move, one way

18  or the other, on a crypto coin, you would tell

19  Ackerman?

20          A.   That's correct.

21          Q.   Call him or text him?

22          A.   Both.

23          Q.   And if an algorithm were trading,

24  then why would it need this human supervision by

25  you?



1    A.    Because if there are any major

2    dislocations, we have to make sure the algorithm

3    is running properly and that there's no extra risk

4    as far as a major price move.

5    Q.    Okay.  And you said that -- you

6    mentioned supervising analysts or talking to

7    analysts.  Explain that.

8    A.    Dr. Tran's brother was reading and

9    studying analysts and looking at ranges and I

10   guess monitoring where he thought buy and sell

11   points would be, and we also had, later on,

12   Allison, who was on social and a person who would

13   do the same type of thing.

14   Q.    All right.  Who is Dr. Tran's

15   brother?

16   A.    I believe his first name is Tony.

17   Q.    Last name?

18   A.    Tran.

19   Q.    Okay.  Was he somehow part of the QJ

20   Trading Club?

21   A.    Yes.

22   Q.    And what was his rule or capacity?

23   A.    He served as an analyst to look at

24   the ranges, what the top traders were doing, do

25   research on the stocks, things like that.



Page 41

```
 1              Q.      Was he an employee?

 2              A.      Yes.

 3              Q.      Of whom?

 4              A.      The QB group.

 5              Q.      All right.  Did he have any equity

 6    or other kind of ownership?

 7              A.      I don't remember.

 8              Q.      Did he get profit participations?

 9              A.      I don't know.

10              Q.      Was part of his job to have input

11    on how the crypto was traded?

12              A.      Yes.

13              Q.      Did he have contact with Mr.

14    Ackerman?

15              A.      Yes.

16              Q.      Did he have access to the

17    algorithm?

18              A.      I don't know.

19              Q.      Okay.  And where is Tony Tran

20    located?

21              A.      I don't know.

22              Q.      And then you went over a Facebook

23    media person?  Is that right?

24              A.      Yes.

25              Q.      And who is that?
```



Page 42

1           A.      Allison.

2           Q.      Last name?

3           A.      Fenton.

4           Q.      And where is she located?

5           A.      Now or at the time?

6           Q.      I'll take both.

7           A.      She's moved around a lot,
8   unfortunately she had a divorce.  Now, she's in
9   Georgia, I believe.

10          Q.      Okay.

11          A.      And prior to that she had been in
12  the same hometown that I used to reside in.

13          Q.      Jersey?

14          A.      Yes, sir.

15          Q.      And where is that?

16          A.      Mountain Lakes.

17          Q.      Okay.  And was she an employee of
18  one of the DJ entities as well?

19          A.      Yes, sir.

20          Q.      And what was her responsibility?

21          A.      Similar to Tony Fran's and to look
22  at, presumably, social media sites and gather
23  information on what analysts were predicting as
24  far as movements in the cryptocurrency markets.

25          Q.      Did she also speak to Mr. Ackerman



Page 43

1    about trading strategy?

2          A.    Yes, sir.

3          Q.    Did she have access to any of the

4    trading accounts that we've discussed, Bitfinex,

5    Kraken and Gemini?

6          A.    Not to my knowledge, no.

7          Q.    Okay.  You told us that you began

8    somewhat informally, right, in June or so 2017,

9    the three of you put in $5,000 and you started

10   trading, right?

11         A.    Correct.

12         Q.    At some point, did you decide to

13   formalize yourselves into some kind of entity,

14   different structure?

15         A.    Yes.

16         Q.    When was that?

17         A.    I can't remember exactly.

18         Q.    But at some point you did decide to

19   formalize yourselves?

20         A.    Yes

21         Q.    Did you have lawyers to help you

22   with that process?

23         A.    Yes, sir.

24         Q.    Okay.  Who were those lawyers?

25         A.    Kaiser Welch from Buckley, and



Page 44

```
 1    Polcinelli.

 2              Q.    Okay.  And we'll speak about both

 3    law firms as we go throughout the day.  Okay?

 4                    Who was the first law firm that was

 5    hired?

 6              A.    Kaiser Wahab from Riveley, I

 7    believe.

 8              Q.    Okay.  Can you spell that for us,

 9    please?

10              A.    I'll try to.  R-i-v-e-l-e-z.  And

11    Kaiser would be K-a-i-s-e-r and the last name

12    would be W-h    W-a-h-a-b.

13              Q.    Is that a law firm?

14              A.    From my understanding, Riveley is,

15    yes.  Kaiser Wahab is the attorney that we dealt

16    with.

17              Q.    That's what I was getting at.  So

18    your point of contact was primarily Kaiser Wahab?

19              A.    Yes, sir.

20              Q.    Were you the one for the Q3 crypto

21    team or club that primary responsibility would be

22    yours?

23              A.    Primarily responsible for what?

24    I'm sorry, I didn't hear what you said.

25              Q.    Were you primarily responsible for
```



Page 45

```
 1    interact my with lawyers for the CF Trading Client

 2                 MR. K A. N:  Objection to the form.

 3    You can answer.

 4                 MR. SHUDER:  Join.

 5          A.    Primarily responsible?  I'm not

 6    sure I would classify it that way.  Initially, Mr.

 7    Ackerman retained Kaiser Wahab.  Eventually,   did

 8    participate in that role.

 9          Q.    Okay.  Were you more responsible

10    for the day-to-day running of the CF entities?

11                MR. KISLIN:  Objection to form.

12    You can answer.

13          A.    Was I responsible for the what?

14    I'm sorry.

15          Q.    The day-to-day management of the CF

16    entities.

17          A.    Yes.

18          Q.    And was Mr. Pham primarily

19    responsible for bringing in new investors and

20    coordinating with them?

21          A.    Yes.

22          Q.    And Mr. Ackerman was primarily

23    responsible for the trade.  Is that fair to say?

24          A.    Yeah, that's fair to say.

25          Q.    All right.  At or around the time
```



Page 46

    1    the you hired -- strike that.

    2              Do you know when you hired this law

    3    firm?  It's called -- is it called Kaiser Rivelos,

    4    is that the name of it?

    5         A.    I think it's R velos.  From my

    6    recollection, the attorney's name is Kaiser Wahab.

    7         Q.    Okay.  The firm, I think it was the

    8    firm Rivelos Wahab, and we'll look at documents.

    9         A.    That could be true.

    10        Q.    Did you also hire an accountant --

    11    let me strike that.

    12              Did you or your colleagues also

    13    hire accounting support?

    14        A.    Accounting support, sir?

    15        Q.    Yes, an accounting firm.

    16        A.    I don't remember.

    17        Q.    At any time?  Or an accountant.

    18        A.    An accountant?

    19        Q.    Yes.

    20        A.    I don't know.

    21        Q.    Did any of the other parties hire

    22    Fender Accountants for instance?

    23        A.    Yes.

    24        Q.    Why was that?  Why were they hired?

    25        A.    From my understanding, to help us



Page 47

1    with taxes.

2              Q.    Okay.  Did you and your colleagues

3    hire Brandon Accountants to help -- to help you

4    guys manage your business and insure that your

5    fund was run properly, including complying with

6    certain regulatory requirements?

7              A.    My understanding was Brandon

8    Accountants was hired primarily for our taxes.

9              Q.    Did their role change over time?

10             A.    I don't believe so.

11             Q.    Okay.  I'm going to show you an

12   affidavit and we're going to mark this as a Bope

13   exhibit.

14             MR. NITRANI:  Carlos, can you put

15   up the affidavit of Mr. Brijas, please?  And

16   Carlos, you tell us what number it won't be and,

17   tell us what number this should be.

18             MR. OLIVID:  Sorry, Isaac, you said

19   it won't be one?

20             MR. NITRANI:  Right.  I just got

21   it, as you know, I think, last night and we had

22   already numbered exhibits.

23             MR. SERRIN:  Oh okay, no problem.

24             MR. AYALA:  Okay, so this would be

25   No. 21



Page 49

```
 1              MR. MITRANI:  And we will be happy

 2    to send the full set of exhibits to everybody at

 3    the end of the depo.

 4              MR. OLUDIO:  If you can send the

 5    pleadings that you were talking about.

 6              MR. MITRANI:  Yeah, of course, we

 7    will do that.  We've looked at Exhibit A --

 8    non-Exhibit A and non-Exhibit B.

 9

10              (Whereupon 2022-03-03 Affidavit of

11    James Briggs was received and marked P-11 for

12    identification.)

13

14         Q.    All right.  Showing you what is

15    marked as Exhibit 21, sir, I will scroll through

16    it and show you the signature line and I ask you

17    whether you signed this affidavit under oath?

18         A.    Whether I signed that?

19         Q.    Yes.

20         A.    Yes, sir.

21              MR. ETSITN:  Can we scroll through?

22              MR. MITRANI:  Yeah, sure.  Of

23    course, this is, for the record, something that

24    was provided to me last night by the counsel for

25    the plaintiffs.
```



```
 1                   Do you want us to scroll to the

 2  signature page, Jason?

 3                   MR. KISTIN:  Yeah.  I don't want to

 4  tell you how to do things, but, I mean, we should

 5  let him --

 6                   MR. MORGAN:  Yeah, I'm happy to

 7  show him the signature.  I agree.

 8          Q.    This is showing you Page 7 of the

 9  affidavit.  Is that your signature and did you

10  sign it under oath?

11          A.    Yes, sir.

12          Q.    Okay.  Is this an affidavit that

13  counsel for the plaintiff in my lawsuit asked you

14  to sign?

15                   MR. KISTIN:  Objection to the form.

16  You can answer.

17                   MR. SHARPE:  Join.

18                   THE WITNESS:  He's asking me what?

19  I'm sorry, I lost track of -- was I asked a

20  question?

21                   MR. KISTIN:  Yes.

22          Q.    Were you asked by counsel for the

23  plaintiffs to sign this affidavit?

24                   MR. KISTIN:  Same objection.  You

25  can answer.
```



Page 50

```
 1                 MR. BARBIE:  Join.
 2        A.    Yes.
 3        Q.    And in exchange for signing the
 4   affidavit, the lawsuit against you and your wife
 5   was dismissed?  Is that true, sir?
 6                 MR. KISLIN:  Object as to the form.
 7                 MR. BARBIR:  Join.
 8                 MR. KISLIN:  You can answer.
 9        A.    To my understanding, yes.
10        Q.    And were you asked to pay any money
11   by counsel for the plaintiffs in the lawsuit
12   against you and your wife?
13                 MR. KISLIN:  Objection to the form.
14                 MR. BARBIR:  Join.
15                 MR. KISLIN:  You can answer.
16        A.    I don't know what I'm answering.
17   Was I asked to pay any money?
18        Q.    Right.  In other words -- let me
19   back up.  You were sued, you and your wife were
20   sued, as a result of this Q3 Trading Club loss?
21        A.    Yes.
22        Q.    And the lawsuit was dismissed
23   against you and your wife, correct?
24        A.    Yes.
25        Q.    And in exchange you gave this
```



Page 51

```
 1    all have, correct?

 2            A.      Yes.

 3            Q.      Were you asked to pay any money in

 4    addition to giving an affidavit in exchange for

 5    having the lawsuit against you and your wife

 6    dismissed?

 7                    MR. KIRUINO:  Aside from the

 8    millions of dollars that he'd agreed had to the

 9    Department of Justice?

10                    MR. MICHAEL:  That's really a

11    speaking objection and I understand that.

12            Q.      . just want to --

13            A.      Thank you for the clarification.

14    Yes, so I gave back all the money that I was able

15    to give back, and I wasn't sure whether you mean

16    any extra money aside from that.

17            Q.      Right, right - okay, I'm just

18    trying to get at the facts.  I wasn't a party to

19    your settlement agreement, so I can't --

20            A.      I returned -- I cooperated and

21    returned all monies that I could return as part of

22    my settlement, yes.

23            Q.      No, but I just want to break it

24    down.  And I understand what you and your counsel

25    are saying, but I just need to get at the facts.
```



Page 52

```
 1    I understand when all this went down and it was a
 2    tragedy for you, correct?
 3              A.      Yes, sir.
 4              Q.      I got that.  And you turned back
 5    money to the government as a result, right?
 6              A.      Yes, sir.
 7              Q.      And we'll get into that, but I'm
 8    just focusing on this lawsuit in which the
 9    affidavit was given.
10              MR. NITKANI:  Scroll to the first
11    page, please.  I guess the lawsuit's not there.
12              Q.      But in this lawsuit, separate and
13    apart from the money you gave back to the
14    government, did you pay any money to the
15    plaintiff?
16              A.      No.
17              Q.      Okay.  So that's all I wanted to
18    ask about.
19              A.      Thank you for the clarification.
20              Q.      Okay.
21              All right.  So now I'm going to
22    show you here Paragraph 18 at Page 2.  And
23    Paragraph 18, I'll read it, it says -- of your
24    affidavit, it says, "Q3 hired certain
25    professionals including Davis Malm, Velsirelli
```



Page 53

```
 1    and Brandon Accountants to help it manage its
 2    business and insure the fund was run properly,
 3    including complying with certain regulatory
 4    requirements."
 5                   Did I read that right?
 6         A.    Yes, sir.
 7         Q.    I'm going to talk to you about
 8    Denis McEvoy and I'm certainly going to talk to
 9    you about Polsinelli, but for now I'm only going
10    to speak to you about Brandon Accountants.  Okay/
11    Fair?
12         A.    That's fair.
13         Q.    All right.  Did any Q3 entity hire
14    Brandon Accountants to help the Q3 entity manage
15    its business?
16         A.    Yes.
17         Q.    Did any Q3 entity hire Brandon
18    Accountants to insure the fund, the crypto fund,
19    was run properly?
20         A.    Yes.
21         Q.    All right.
22               MR. MITRANI.  We can set that
23    aside.
24         Q.    Who was the primary person of
25    interest with Brandon Accountants among the
```



Page 54

```
 1   Ackerman, you and Dr. Tran?
 2           A.      I believe the person's name was
 3   Gary Chadee.
 4           Q.      Chadee was the person at Brander
 5   Accountants?
 6           A.      Yes, sir.
 7           Q.      And now about, on your end, who was
 8   the primary person to deal with Gary Chadee?
 9           A.      I don't know if there was a primary
10   person, Dr. Tran and I both dealt with him.
11           Q.      Okay.  That's fair.
12                   MR. MOTRANI:  Carlos, we can take
13   down that exhibit.
14           Q.      Did Mr. Chadee ask for any
15   information regarding the fund for him to do his
16   job?
17           A.      Yes.
18           Q.      What kind of information did he ask
19   for?
20           A.      Information primarily geared
21   towards our tax returns from my understanding.
22           Q.      Okay.  Anything else?
23           A.      Not that I remember.
24           Q.      Okay.
25
```



```
 1              (Whereupon August 27, 2019 E-mail,
 2   Bates No. Feijas00501 was received and marked P-1
 3   for identification.)
 4
 5              Q.    All right.  Why don't we mark
 6   Exhibit 1 now and put it on the screen for you?
 7   I'll tell you, you know what we can do is, let me
 8   e-mail it to you so you can -- we'll take a brief
 9   bathroom break if that works for you.
10              A.    That's fine.
11              Q.    We'll e-mail it to your counsel.
12   This is
13              MR. MIRAMI:  And let me just say
14   for the record -- let's test out it up briefly,
15   Carlos, I can talk about it for a second.  We'll
16   e-mail it and take a quick bathroom break.
17              Q.    This is an e-mail, as you can see
18   here, dated August 27, 2013, and what we did is --
19              MS. ALVEARD:  If you scroll down --
20   Carlos, start scrolling down, please.
21              Q.    As you can see, the formatting gets
22   to be narrower and narrower, and at the very last
23   page -- so what we did is just, you know, the very
24   last page is we have fixed that formatting, so the
25   last page was not part of the original e-mail, but
```



Page 56

```
 1   we just fixed it for ease of reading.

 2              All right, so we're going to send

 3   that to you.

 4              MR. KITRANI:  And, of course, we'll

 5   send it to opposing counsel.

 6              We'll take a short break, Madam

 7   Court Reporter, can you note the time for us?

 8              And is five minutes enough for

 9   people?

10              MR. RISLIN:  That's great.

11              MR. HITRANI:  Thank you.

12

13              (Whereupon there was a brief

14   recess.)

15

16              MR. HITRANI:  All right.  So we're

17   back on the record at approximately 11:04.

18              Gadles, can you show us Page 1 of

19   Exhibit 2?

20        Q.    Is this an e-mail, Mr. Deljas, that

21   you exchanged with Mr. Tran, and also Scott Jared?

22              MR. RISLIN:  Objection to the form.

23   You can answer.

24        A.    I exchanged -- I'm not sure what

25   you mean, but it looks like I was cc'ed on that
```



Page 57

 1    e-mail, yes.

 2              Q.    Okay.  Or, me rephrase.  Is this an

 3    e-mail that you were cc-ed on by Mr. Tran?

 4              A.    Yes.

 5              Q.    And who is Scott Jared?

 6              A.    I don't know.

 7              Q.    And this is an e-mail that you

 8    received as a cc in August -- August 27th, 2018?

 9              A.    It appears that way, yes.

10              Q.    Okay.  And do you know whether Mr.

11    Tran was referring in this e-mail to speaking with

12    potential invites?

13              A.    I do not know.

14              Q.    Okay.

15                    MR. MIZRAHI:  Let's scroll to the

16    very bottom, Dallas, the last page.

17              Q.    Have you seen this description of

18    the cryptocurrency trading club before?

19              A.    Yes.

20              Q.    Is this something that Mr. Tran

21    would send to potential investors?

22              A.    He may have, but you could ask Mr.

23    Tran.  I don't know what he sent to potential

24    investors.

25              Q.    When did you first see a document



Page 56

1    such as this?

2           A.    I don't know the exact date, sir.

3           Q.    Fair enough.  Would it be sometime

4    in 20_0?

5           A.    Yes.

6           Q.    As the crypto trading club was

7    obtaining money from new investors?

8           A.    That would be correct.

9           Q.    Did this type of letter have a

10   name?

11          A.    Have a name?

12          Q.    Yeah, within the QD Trading Club.

13          A.    Not that I'm aware of or remember.

14          Q.    Would it be called a pitch letter?

15          A.    I don't know.  I don't think so.

16          Q.    Okay.

17          A.    Pitch letter?

18          Q.    Pitch letter, yes.

19          A.    I don't know.

20          Q.    Did Mr. Khan show you an e-mail,

21   either this particular description or something

22   substantially similar, before sending it out?

23          A.    Yes.

24          Q.    Okay.  And did you review it to

25   make sure it was accurate?



Page 59

1          A.      Yes.

2          Q.      All right.  So I see here that Dr.

3    Tran says that, "We have over 13 million assets

4    under management."

5                  Do you see that in the first

6    paragraph?

7          A.      I see that.

8          Q.      And that would be by August of

9    2013, the date of the e-mail?

10         A.      According to the date on the

11   e-mail, yes.

12         Q.      Do you know where the $13 million

13   were supposedly being held at this time?

14         A.      I don't remember at that time, no.

15         Q.      And Dr. Tran says that you were

16   making roughly 13 to 15% total profit for each

17   month.  Do you see that?

18         A.      I see that.

19         Q.      Had you asked the accountants to

20   verify that number at this time?

21         A.      I don't remember.

22         Q.      And Dr. Tran says that, "This has

23   been a consistent pattern over the last 11

24   months."

25                 Did you verify that?



Page 66

```
 1          A.      I don't remember.

 2          Q.      Doc Tran refers to Tran's.  What is

 3     he referring to?

 4          A.      Looks like he defines it as hyself

 5     and Mr. Ackerman and me.

 6          Q.      Okay.  And you folks were taking

 7     50% of all profit at this time?

 8          A.      The way that reads, I don't think

 9     we took 50% of the profit until the end of the

10     year.

11          Q.      Okay.  And Mr. Tran is discussing

12     few cost of operations, minor salaries and other

13     licensing fees and other minimal costs?

14          A.      The way that reads, yes, sir.

15          Q.      Who are the employees or salary at

16     this time, August 2018?

17          A.      To the best of my recollection and

18     not all the names, would be Tony Tran -- this is

19     2018, sir?

20          Q.      Yes, yes.

21          A.      Allison Jensen, Tony Tran.  I'm not

22     sure if it was Denis McEvoy yet, I don't remember

23     the timeframe on that.  From what I know, those

24     would be the three people I can recollect.

25          Q.      At some point, did Mr. McEvoy
```



Page 61

```
 1    become an employee of one of the QT entities?

 2            A.      An employee?

 3                    MR. SPERE: Objection as to form.

 4            A.      Yes, an employee or an independent

 5    contractor, yes.

 6            Q.      That's fair.

 7                    And there's a reference here to

 8    licensing fees.  Who was paying licensing fees to

 9    who?

10            A.      So from my understanding, the

11    licensing fees were a percentage on the profit

12    over 1% that we were entitled to as a cost to run

13    the algorithm.

14            Q.      So I just want to understand, are

15    you saying that any profit over 1% would accrue

16    to the three founders as licensing fees?

17                    MR. KISLIN:  Objection to the form.

18    You can answer.

19                    MR. SPERE:  ....

20            A.      Based on certain circumstances,

21    that's my general recollection of that, yes.

22            Q.      And what were those circumstances?

23            A.      Or what the actual return was for

24    the month, how much algorithm needed to be updated

25    and  weekend, how much work went into it and things
```



Page 62

```
 1    like that, other subject matters.
 2              Q.    Okay.  And did Mr. Ackerman tell
 3    you he was seeking the algorithm?
 4              A.    Yes.
 5              Q.    This would have been in 2018 and
 6    2019?
 7              A.    Yes.
 8              Q.    Did he explain to you what tweaks
 9    he was making?
10              A.    Yes, but I didn't necessarily
11    understand all of them.
12              Q.    Okay.  Did he tell you that he had
13    a first any kind of help to make those tweaks?
14              A.    I don't remember.  He may have.
15              Q.    And where was Mr. Ackerman working
16    from at this time, either '18 or '19?
17              A.    From my recollection, from his home
18    office in Ohio.
19              Q.    And this algorithm that he's
20    supposedly writing, where was it housed in which
21    computer or which Cloud?
22              A.    It was housed at his home office in
23    Ohio as far as computer or Cloud, I don't know,
24    sir.
25              Q.    Was it on his desktop, do you know?
```



Page 63

1          A.     I don't.

2          Q.     Did you guys have a domain site at

3     any time 2018, 2019?  I'll strike that.

4                 How were you saving your own

5     records, the business records at Q3 in '18 and

6     '19?

7                 MR. SPEETH:  Object as to form.

8          A.     How was I saving them?

9          Q.     Yes, right.  Were they in the Cloud

10    or in a desktop?  How were you saving them, the

11    information?

12         A.     The information in regards to what?

13         Q.     Any of your business endeavors of

14    Q3.

15         A.     I stored the daily returns on my

16    own personal computer.

17         Q.     Right.  Did you guys use a network,

18    a computer network?

19                MR. RISNER:  Object as to form.

20                MR. GUDKER:  Join.

21         A.     I don't remember.

22         Q.     So as far as you know, Mr. Ackerman

23    said he had the algorithm stored on his desktop?

24         A.     I don't know that he said he stored

25    it on his desktop, I don't know where he had it



Page 64

1    stated.

2          Q.    Did you guys have a network that

3    any employee could access?

4          A.    Employee could access?  I don't

5    know.

6          Q.    You know what I'm referring to,

7    right?  If you're an organization, you have a

8    network or data and people can access documents

9    commonly?

10         A.    Not that I'm aware of or remember.

11         Q.    All right.  And where was the

12   office located?  I'm back to this document in

13   front of you, there's a reference to an office.

14   Did Q3 have a physical office somewhere?

15         MR. KISTLER:  Where do you see the

16   reference to the office, Isaac?

17         MR. ZUPPARDI:  Jake, second

18   paragraph, "minor salaries, an office."

19         MR. KISTLER:  Thank you.

20         A.    I don't know what he's referring

21   to.  I don't remember.

22         Q.    At any time, did any of the Q3

23   entities have a physical office?

24         A.    I don't remember.

25         Q.    Where did you work from?



```
 1              A.      My home office.

 2              Q.      Where did Dr. Tran work from?

 3              A.      I don't know.  I believe his home

 4      office, but you can ask him.

 5              Q.      All right.

 6                      MR. NITTRANT:  Why don't we scroll

 7      down here?

 8              Q.      There's a reference here --

 9                      MR. NITTRANT:  Stop there, Carlos,

10      thank you.

11              Q.      There's a reference that after your

12      first month you will get a spreadsheet of

13      everyone's percentages of profit and earnings.

14      This is recalculated monthly, etcetera.

15                      Do you see that?

16              A.      I do.

17              Q.      Who kept those spreadsheets?

18              A.      Dr. Tran.

19              Q.      Excel spreadsheet?

20              A.      Yes.

21              Q.      And would he circulate those

22      spreadsheets to you and Mr. Ackerman?

23              A.      Yes.

24              Q.      And would he also send them to each

25      individual investor?
```



Page 66

```
 1            A.     From my understanding, yes, or upon
 2     request, yes.
 3            Q.     Were they sent to the accountant,
 4     the outside accountant?
 5            A.     I don't know.
 6            Q.     All right.  There's a reference
 7     here to "the algorithm focuses on a correlated
 8     capital forfeiture ratio."
 9                   What does that mean?
10            A.     It basically means we make more
11     money than we lose.
12            Q.     Okay.  And Mr. Joan writes, "This
13     is accomplished through numerous mathematically
14     constituted levels which include a combination of
15     pivot points, historical data, open book
16     evaluations, depth of book velocity, movement
17     rates, secondary exchange, entry/exit points,"
18     etcetera.
19                   Do you see that sentence there?
20            A.     Do.
21            Q.     Do you understand it?
22            A.     Yes, sir.
23            Q.     And what, in plain English, does
24     that mean?
25            A.     Well, like I said, we had analysts
```



Page 67

```
 1    that look at historical data.  Their depth of book
 2    is the activity in the particular coin.  The
 3    velocity of movement is how active the coin was
 4    for the day.  Entry and exchange -- entry and exit
 5    points were already bought and sold.  Point points
 6    are important points on chart were a eternially
 7    important move point was for as costs of the
 8    coins; you know, say bitcoin was at 10,000, that
 9    could be a pivot point, movements that were made
10    off of certain dollar amounts, things like that.
11              Q.   Okay.  Was there ever a month that
12    you had a loss according to Mr. Ackerman?
13              A.   No.
14              Q.   Did that cause you any concern,
15    that month -- month out you were making at least
16    .5%?
17              A.   No.
18              Q.   Did it cause Mr. Theo any concern?
19                   MR. KISHNER:  Objection to form.
20    You can answer.
21              A.   Not that I'm aware of, no, but I
22    don't want to comment on his --
23              Q.   I know.  When I ask you about Dr.
24    Theo --
25              A.   No.
```



1            Q.      -- I'm asking really what he said
2      to you.
3            A.      No.
4            Q.      You don't know what he didn't say
5      to you.  I get it.
6            A.      I appreciate that.  Thank you.
7                    But he did not have any cause for
8      alarm from my understanding.
9            Q.      Right.
10                   MR. RICHARD:  So let's scroll down
11     here, Carlos.  Why don't we stop there?
12           Q.      It says here that, "The technology
13     was originally developed for U.S. securities in
14     2013 and later based on fixed in currency markets
15     in 2015 to 2016."
16                   Do you see that?
17           A.      I do.
18           Q.      Is that the algorithm that Mr.
19     Ackerman said he was trading for a prior company?
20           A.      I believe that is referring to
21     that, yes.
22           Q.      So basically, he took the algorithm
23     and modified it to crypto according to what he was
24     telling you?
25           A.      That's correct.



Page 89

1          Q.    Okay.  And Dr. Tran writes, "Since
2    our introduction of the strategy to the live
3    trading arena in June of 2017, we have continually
4    adjusted and updated our core mathematical
5    correlations."
6                Do you see that?
7          A.    Yes, sir.
8          Q.    So was the Algo trading strategy
9    something that began, at least according to Mr.
10   Ackerman, in June of 2017?
11         A.    I can't remember.
12         Q.    And did you understand from
13   Ackerman that he was continually adjusting and
14   updating his core mathematical correlations?
15         A.    Yes.
16         Q.    Okay.  And did you ever follow up
17   with him as to what the updates were?
18         A.    Yes, and he would explain them to
19   me, but I'm not sure I fully understood them or
20   remember.
21         Q.    All right.
22               MR. XXIRAMI:  We can go ahead and
23   -- well, take down that document, Carlos.
24         Q.    So as of August 2018, were you, Dr.
25   Tran and Ackerman looking to bring in new investor



Page 70

1    funds?

2                 MR. NIBLOX:   Objection to the form.

3    You can answer.

4                 MR. SPER:   Join.

5           A.    I can and that I never solicited or

6    was looking to bring in new investors to the guy.

7    The investors I brought into the fund asked me to

8    get into the fund just through common knowledge

9    conversation.   So I was never actively trying to

10   solicit investors into the fund.

11          Q.    Okay.   How about Dr. Tran, was he

12   soliciting investors into the fund?

13          A.    I don't know what he was doing.

14          Q.    I'm going to ask you, did Mr.

15   Ackerman bring anybody to the fund, any family or

16   friends?

17          A.    I don't know, but not that I

18   remember.

19          Q.    So most of the investors came to

20   the fund through Dr. Tran; is that right?

21          A.    Yes.

22          Q.    And a smaller number came in

23   through you?

24          A.    Much smaller, yes.

25          Q.    And no others came in through Mr.



Page 71

```
 1   Ackerman, correct?

 2           A.    I don't remember.  I don't want to

 3   say no members, I don't remember, but it would be

 4   a small number if it was.

 5           Q.    Okay.  We're going to show you now

 6   Exhibit 2 which is the Operating Agreement of Q3

 7   Holdings.

 8

 9                 (Whereupon LLC Agreement Q3, Bates

10   No. Vegas/JLS4 was received and marked P-2 for

11   identification.)

12

13                 MR. MITRANI:  Carlos, can we put

14   that up?

15           Q.    As you can see here, this is the

16   Limited Liability Company Agreement of Q3 Holdings

17   as of April 12th, 2010.

18                 And let me show you as well what

19   we'll mark as Exhibit 2A which is -- purports to

20   be a signature page.

21                 MR. MITRANI:  Can we put that up

22   also now, Carlos?

23                 Carlos, do you have 2A, the

24   signature line?

25                 MR. AYALA:  Yes, give me one
```



1    speaks, please.

2                    MR. MITRANI:  Okay.

3                    MR. AYALA:  Mr. Mitrani, the

4    document is giving me an error right now.

5            Q.    Okay.  So I have a signature page

6    purporting to be from you and from Dr. Tran.  As

7    soon as we can we'll put it up, but I'll represent

8    just to you.

9                    Is this a document you've seen

10   before?

11           A.    Yes.

12           Q.    What caused you, Dr. Inga and Mr.

13   Ackerman to form QS Holdings, LLC?

14           A.    Formalize our structure?

15                   MR. MITRANI:  And let's take a look

16   at Page 23 of this document, Carlos.

17                   MR. KIDGER:  Yeah, can we blow

18   that up, please?

19                   MR. MITRANI:  Yeah, yeah, let me

20   get it in and then --

21                   MR. KIRSTS:  Okay, I'm sorry.  I

22   didn't mean to jump the gun.

23                   MR. MITRANI:  No worries.

24                   And scroll down, Carlos, please.

25                   Go to the next page, Seijaslijmil.



Page 73

1    Okay.

2            Q.    And by the way, this is a document

3    that we received that has a bates stamp with your

4    name.

5            MR. MIYSABI:  Why don't we show

6    that, Carlos, at the bottom?

7            Q.    You see that, Seinacl5927

8            A.    I do.

9            Q.    Did you gather up all documents

10   that all the different lawyers and regulatory

11   authorities had asked and I assume provided to

12   your lawyer to provide to these third parties?

13           A.    Is the question, did I do that?

14           Q.    Yes.  Did you gather up all

15   documents that had been requested of you during

16   any legal procedure and give them to your lawyer

17   to produce to third parties?

18           A.    Yes.

19           Q.    Okay.

20           MR. ALIBADI:  So scrolling back up,

21   Carlos, can you show here -- right, legal

22   representations.

23           Q.    You see that in Section 11.16, "The

24   law firm of D valds Behais has been engaged by the

25   company in connection with the preparation of the



Page 74

```
1     agreement."
2                     Do you see that?
3          A.    I do.
4          Q.    Was Rivelez Wahab the general
5     counsel for the G3 entities at this time?
6          A.    Yes.
7          Q.    They prepared this agreement?
8          A.    As far as I understand that, yes.
9          Q.    And did they continue to represent
10    the G3 entities through December of 2019?
11         A.    I'm not sure of the exact date,
12    sir, but they represented us.
13         Q.    Okay.  Well, did they continue to
14    represent you until the fraud by Mr. Ackerman was
15    discovered?
16         A.    I'm not exactly sure when and **
17    our agreement with them was ever terminated.
18         Q.    Well, I was going to ask you, did
19    you or any of the partners ever terminate the law
20    firm of Rivelez Wahab?
21         A.    I don't remember.
22         Q.    Did you ask them questions from
23    time to time?
24         A.    Yes.
25         Q.    And they would give you advice from
```



```
1      the is    they
2              A.     Generally, yes.
3              Q.     And did part of their duties
4    include advising you as to the creation of a
5    fund?
6              A.     Yes.
7              Q.     All right.  So let's see here.
8    Give me one second.
9                     And according to this agreement,
10   were there three managers for QS Holdings?
11             A.     Yes.
12             Q.     You were one of the managers?
13             A.     Yes.
14             Q.     And Dr. Tran and Mr. Ackerman were
15   the other two managers?
16             A.     That's correct.
17             Q.     Did you ever add any other
18   managers?
19             A.     No.
20                    MR. KITEANI:  You can take this
21   down, Carlos.
22                    MR. AYANA:     Case No.
23
24                    (Whereupon Document, dated No.
25   UJANIAAN_JO.B.001 was received and marked P-2A for
```



Page 76

```
 1   identification.)

 2

 3            Q.     Let me just show you here Exhibit

 4   24.

 5                   MR. XXXXXX:  Thank you, Carlos.

 6            Q.     I'm showing you 2A which purports

 7   to be a signature page for the limited liab lig

 8   company agreement of the company dated as of April

 9   12, 2016, and ask you, is that your signature on

10   the document?

11            A.     I don't see a date there, sir, but

12   yes, that's my signature.

13            Q.     Right.  The date I was referring to

14   is on top there, this is if here?

15            A.     Oh, I see.  Okay.  Thank you.

16            Q.     Does that appear to be Mr. Fred's

17   signature as well?

18            A.     Appears to be, yes.

19            Q.     Do you know if Mr. Ackerman signed

20   this agreement?

21            A.     I don't know, but on that date he

22   didn't.

23            Q.     Okay.  But you would have expected

24   that he would have signed the agreement?

25            A.     He may have, but occasionally we
```


MAGNA ❯
LEGAL SERVICES

Page 77

```
 1     had a 2/three agreement where, if two out of the

 2     three partners agreed, they could sign for the

 3     third.

 4              Q.     Fair enough.  But this was the

 5     formation agreement for Q3 Holdings, right?

 6              A.     Yes.

 7              Q.     And did you understand that Mr.

 8     Ackerman also signed this agreement?

 9              A.     Yes.

10              Q.     Okay.

11                     MR. MILINARD:  We can take down that

12     document, Carlos.  Thank you.

13              Q.     So now you have a Q3 Holdings as of

14     April 2018.  What was the role of Q3 Holdings?

15              A.     The role of Q3 Holdings?

16              Q.     What was its function, purpose?

17              A.     To trade cryptocurrencies to make

18     money for the investors.

19              Q.     Do you know whether Q3 Holdings was

20     supposed to be a general partner for Q3I?

21              A.     I don't know.

22              Q.     And have you heard of a company

23     called Q3T?

24              A.     Yes.

25              Q.     It's Q3T not Q3 one, by the way.
```



Page 76

1    right?

2           A.     QHD, QH Investors, I believe.

3           Q.     Thank you.  Just for my older eyes.

4    What was the purpose of QHT?

5           A.     I don't know.

6           Q.     Did the Greifen Rehab firm help you

7    set up that structure?

8           A.     Most likely, yeah.

9           Q.     You followed their advice?

10          A.     Yes.

11          Q.     All right.  As a member of QH

12   Holdings, did you have full rights to inspect all

13   of the accounts of QH Holdings?

14          A.     Yes.

15          Q.     As did Dr. Tran?

16          A.     Yes.

17          Q.     Did you and Dr. Tran ever disagree

18   with Mr. Ackerman about anything?

19                 MR. KISHIN:  Objection to the form.

20   You can answer.

21                 Ms. SIDDIQ:  Join.

22          A.     I mean yes, we had discussions and

23   objections and disagreements all the time.

24          Q.     What were you -- what were the

25   areas of disagreement?



Page 79

```
 1          A.     With all due respect, sir, I'd need
 2   you to be more specific because we spoke a lot
 3   and, you know, I can't remember anything in
 4   particular that I would point to.  If you want to
 5   ask me the question, I can answer it for you.  I
 6   mean, as general partners do, we had disagreements
 7   on things at times.
 8          Q.     Okay.  That's fair enough.  We'll
 9   go through.  Does anything stick out in your mind
10   as a major point of disagreement among the three
11   of you?
12          A.     No, sir.
13          Q.     Okay.  So once this Q3 Holdings is
14   formed in April of 2018, I just want to talk to
15   you about how the structure of the Q3 will be.
16   Okay?  Because now you're past the initial
17   informal trading 2017.  Is it fair to say that by
18   2018 you had a more formal structure?
19          A.     It's fair to say.
20          Q.     Okay.  And can you tell us where
21   was invested funds were being deposited?
22          A.     At some point into Mr. Trem's
23   account, and depending on the date, at some point
24   then into a Signature Bank account.
25          Q.     All right.  So originally it went
```


MAGNA
LEGAL SERVICES

1    into Mr. Tran's -- is that a Wells Fargo account?

2         A.    Yes, sir.

3         Q.    And then later they went into a

4    Signature account?

5         A.    To my recollection, that would be

6    correct.

7         Q.    And did the Rivelas Wahab firm

8    advise you to set up that Signature Bank account

9    to take in new investor funds?

10        A.    They may have, but I don't remember

11   specifically.

12        Q.    Did the accountant, Mr. Chakee, and

13   his accounting firm, advise you to set up that

14   Signature Bank account and take in new investor

15   funds?

16        A.    They may have, but I don't remember

17   specifically.

18        Q.    You had a signature authority on that

19   Signature Bank account?

20        A.    Yes, sir.

21        Q.    Did it have a name internally where

22   the new investor funds were being deposited?

23        A.    I don't remember, but I believe it

24   did.  I don't remember exactly what it was.

25        Q.    Okay.  And during this time, 2018,



1    did the Q3 entities have some kind of operating

2    account to pay day-to-day expenses such as

3    salaries or postage or whatever, professional

4    fees and whatnot?

5           A.    From my recollection, there were

6    two accounts at Signature Bank, but I don't

7    remember specifics.

8           Q.    So was one of the accounts to take

9    in new investor funds?

10          A.    Yes.

11          Q.    And what was the other account used

12   for?

13          A.    It could have been what you had

14   mentioned.  I don't remember specifically.

15          Q.    Who helped you, Dr. Tran and Mr.

16   Ackerman set up the structure?

17          A.    I don't remember.

18          Q.    And who was in charge of those bank

19   accounts?

20          A.    Dr. Tran, primarily, ran the bank

21   accounts.

22          Q.    Okay.  Was Dr. Tran the one to pay

23   day-to-day expenses of the business?

24          A.    Yes.

25          Q.    Physically sign checks?



Page 32

```
 1              A.      I don't know.   I would assume so.
 2    I don't remember.
 3              Q.      And did Q3 Holdings have a separate
 4    bank account?
 5              A.      If you show me a document, I may
 6    remember, but I don't remember offhand.
 7              Q.      Right.   And the three companies,
 8    you, Mr. Tran and Mr. Ackerman, were entitled to
 9    buy of the profits, right?
10              A.      Yes.
11              Q.      Is it fair to say that the profits
12    would first go to Q3 Holdings and then Q3 Holdings
13    would then distribute to the three of you?
14              A.      Mr. Tran may remember that better
15    than I do, but I don't remember exactly how that
16    flow went.
17              Q.      He was running that flow?
18              A.      Yes, sir.
19              Q.      Was he dealing with Mr. Chadha and
20    the accounting firm, as far as you know?
21              A.      You can ask him.   As far as I know,
22    I don't know.
23              Q.      Okay.   It sounds like you weren't
24    much involved in the day-to-day operation of the
25    bank account and the flow of funds?
```



1          A.     That would be fair, but it's also

2     that I don't remember a lot of this because I'm

3     actively trying to move on with my life and not

4     remember it.  So I apologize for, you know, some

5     of my answers.  I'm being as forthright as I can.

6          Q.     Okay.  I understand what you're

7     telling me.

8                 Did you deal with any other partner

9     at the Alvarez firm, other than the fellow whose

10    name you gave us previously?

11         A.     Not that I remember.

12         Q.     Okay.  Let's talk, if we can, about

13    Doug McAvoy.  Who is he?

14         A.     Denis, I believe his name is.

15         Q.     Denis.  I'm sorry.

16         A.     No problem.

17         Q.     I have like this mental block.  I

18    always say Doug and my associate, Dan Bitner,

19    always says it's Denis.  Knock my head.  I made

20    the same mistake again.

21                All right.  Tell me who Denis

22    McAvoy is.

23         A.     Denis is a friend of mine who was

24    a cattle trader in Iowa as well who helped introduce

25    us to Polsinelli.



Page 84

1          Q.      And we'll get to Palsiralli.

2          A.      Okay.

3          Q.      So you met him when you were both

4    trading on the New York Stock Exchange floor.   Is

5    that right?

6          A.      Yes, sir.

7          Q.      At some point, did he get involved

8    with the OJ entities?

9          A.      Yes.

10         Q.      When was that?

11         A.      I don't recall exactly, sir, but it

12   would be spring of 2018 to my memory.   But if you

13   put a document in front of me, I can let you know.

14         Q.      Did you suggest that Mr. McAvoy get

15   involved with the OJ entities?

16         A.      Did I suggest?  I'm not sure who

17   primarily suggested it, but we needed a fund

18   administrator and we needed to have an avenue to

19   go to another attorney to further strengthen our

20   legal structure.

21         Q.      Okay.  And what is a fund

22   administrator?

23         A.      Someone who oversees the way the

24   fund is running.

25         Q.      Why did you think you needed a fund



Page 86

```
 1    administrator?
 2           A.    I don't know.  I believe it was
 3    suggested to us.
 4           Q.    By whom?
 5           A.    I don't remember.  Probably legal
 6    counsel.
 7           Q.    All right.  So sometime in 2018 you
 8    bring on Mr. McEvoy to be a fund administrator.
 9    Is that right?
10           A.    Yes.
11           Q.    And just so we have the dates, the
12    DeFalvalli law firm wasn't hired until April of
13    2019.  Is that right?
14           A.    I believe so.  If you have that
15    date.  I don't remember exactly.
16                 MR. MITRANO:  Why don't we --
17    Carlos, let's put up Exhibit 5.
18           Q.    We'll jump ahead, just so you can
19    have that date in your mind.
20
21                 (Whereupon Engagement Letter -
22    Signed was received and marked E-5 for
23    identification.)
24
25           Q.    Showing you Exhibit 5 dated April
```



Page 86

1    17th, 2019, a letter from Polsinelli to G3
2    Holdings, LTD, Re: Engagement, addressed to Daniel.
3              MR. MITRANI:  And let's scroll to
4    the bottom, please, so that -- one more.
5         Q.   Okay.  Is that your signature on
6    the Polsinelli letter of engagement dated April
7    16th, 2019?
8         A.   Yes.
9         Q.   Does that refresh your memory that
10   it was on or around April 17, 2019 that the
11   Polsinelli law firm was hired?
12        A.   Yes, sir.
13        Q.   Okay.
14             MR. MITRANI:  We can take down that
15   document.
16        Q.   I'll come back to it later, but I'm
17   trying to stay somewhat chronological here.  Maybe
18   it will help all of us.
19             What were Mr. McKay's duties as
20   fund administration in 2019?
21        A.   He worked with me in the capacity
22   to help fund the structure, to attempt to get an
23   avenue to registration.
24        Q.   What do you mean an avenue to
25   registration?


MAGNA
LEGAL SERVICES

Page 87

```
 1            A.      We were going to attempt to
 2    reg ster the fund as a registered fund.
 3            Q.      That would be with the SEC?
 4            A.      Yes.
 5            Q.      Okay.  And was he also working with
 6    your lawyers at the time, the Ruvelas firm?
 7            A.      Was he also -- I'm sorry, what?
 8            Q.      Was he working with your lawyers at
 9    the time, the Ruvelas firm?
10            A.      I don't remember.
11            Q.      At this time, 2018, were your only
12    outside lawyers the Ruvelas Welsh firm?
13            A.      At that time -- at what time, sir?
14            Q.      2016.
15            A.      2016?  Yes.
16            Q.      Prior to the hiring of Bushnell
17    in April of 2019, had any of the QD entities hired
18    any other lawyers besides the Ruvelas firm?
19            A.      Not that   remember, no.
20            Q.      And did you ever hire any other
21    accountants besides the firm that we've been
22    discussing so far, Mr. Chadoc's firm?
23            A.      Not that I remember, no.  I don't
24    remember the exact date that Chris started with us
25    either, so   don't want to misrepresent that.
```



Page 88

```
 1    don't remember.    I may have missed ad it earlier.
 2    I don't know.
 3           Q.     All right.  What we'll do is,
 4    during a break, I'll pull up his consulting
 5    agreement and help you remember that date.
 6           A.     Okay.
 7                  MR. MIRANI:  Carlos, just make a
 8    note during a break to pull up his consulting
 9    agreement.
10           Q.     Was Mr. McEvoy working full time
11    with the Q3 Institute?
12           A.     Not to my understanding.
13           Q.     Okay.  And what were his day to day
14    duties for the Q3 Institute?
15           A.     He was working with me to give us
16    information, to provide legal information, to be
17    an avenue to Polistelli, to guide, represent and
18    help us navigate through a dynamic cryptocurrency
19    environment.
20           Q.     Okay.  And again, I'm focusing now
21    on 2018.  We'll talk about Polistelli's hiring in
22    April 2019, I do commit to you to get there, okay?
23                  Why Mr. McEvoy, why did you choose
24    him or you and your partners choose him?
25           A.     Because I knew him, I thought he to
```



Page 39

1    be competent and capable of what we needed to do.

2          Q.    Did you explain the trading

3    philosophy to him?

4          A.    Yes.

5          Q.    Asked to see the algorithm?

6          A.    Did he ask to see the algorithm?  I

7    don't remember.

8          Q.    Okay.  Did he ask to see any

9    verification of results by an independent party?

10          A.    I don't remember.

11          Q.    Did he ask to see the actual source

12    documentation of accounts on any trading platform?

13          A.    Not that I -- I don't remember.

14          Q.    And to the extent he was

15    interacting with the C3 lawyers, did you expect

16    him to keep that information confidential?

17          A.    Yes.

18          Q.    All right.  The only reason I ask

19    is he's a consultant, not an employee.  Is that

20    right?

21          A.    I'm not sure how he -- how it was

22    structured, that's not my field.  I don't know how

23    you would define that.

24          Q.    Okay.  At some point, didn't he

25    become an employee?



Page 90

1          A.    Again, I don't know how I would
2    define employee.  A consultant employee.  I can't.
3          Q.    I got it.  That's fine.  I
4    understand.  I understand you're not going to know
5    everything I ask.  I get that.
6          A.    I appreciate that.
7          Q.    Yeah, I get that.
8                Did it have any profit
9    participation?
10         A.    Not that I remember.
11         Q.    Was he hired to help with the
12   day-to-day operation of the fund?
13         A.    Yes.
14         Q.    What experience did he have in fund
15   operation?
16         A.    I don't know.  I don't remember.
17         Q.    Right.  I think I asked you before,
18   but prior to the QS fund, had you had any fund --
19   any experience in operating a fund?
20         A.    No, I did not.
21         Q.    All right.  Why don't we show you
22   now Exhibit 3, which is an FBI affidavit.
23               MR. FLUMARA:  Can you put the --up,
24   Carlos?
25



Page 91

1                    (Whereupon Sealed Complaint    3B7
2       was received and marked A-3 for identification;)

3

4            Q.    All right.  Have you seen this
5       before?  This is a complaint, signed by a special
6       agent of Homeland Security Investigations.   I'm
7       curious whether you've seen it before.
8            A.    I couldn't say just by seeing that
9       piece of it.  I don't remember it.
10           Q.    Okay.  Maybe yes, maybe not, would
11      be a fair answer?
12           A.    Yes.
13           Q.    Okay.  Let me show you Paragraph 3
14      of the complaint.
15                 MR. HITRAKT:  Stop right there,
16      Carlos.  Thank you.
17           Q.    So according to the sworn
18      complaint, the special agent says that, "Since at
19      least in or about October 2019, HSI, which is
20      Homeland Security, has been investigating Michael
21      Ackerman, the defendant, for his involvement in a
22      cryptocurrency investment scheme involving Q3I,
23      Q12 and related Q3 entities."
24                 Do you see that?
25           A.    Yes.



Page 92

```
 1              Q.     did you have any inkling whatsoever

 2      that any of the GS entities might have been under

 3      some kind of a civil or criminal investigation or

 4      administrative investigation in October of 2019?

 5                     MR. _____:  Object as to form.

 6                     MR. _____:  You can answer.

 7              A.     No.

 8              Q.     Did you learn in November of 2019

 9      that maybe some agency, SEC or the Commodity

10      Futures or any other federal agency was conducting

11      an investigation of Mr. Ackerman?

12              A.     I'm sorry, the first part of the

13      question was?

14              Q.     I'm just moving the timeframe to

15      November 2019, did you learn that any federal

16      agencies, including the SEC or the CFTC, were

17      looking into the activities of Michael Ackerman

18      and the GS entities?

19              A.     No, I had no knowledge of that.

20              Q.     And do you know whether you're

21      founder one or founder two in this document?

22              A.     No, I don't.

23              Q.     All right.  Showing you Paragraph

24      7a, okay.  So we've talked about the Signature

25      Bank accounts earlier.  So just to pin down these
```



Page 93

```
1    dares, according to the affidavits there's the QJ
2    Signature Bank account was opened in August 2018
3    in the name of Q37, LP.  Is that accurate?
4            A.     I have no reason to believe it
5    isn't.
6            Q.     Right.  And you, Ackerman, and Dr.
7    Tran were authorized signers on the Q3 Signature
8    Bank account for Q3, LP?
9            A.     Yes.
10           MR. MITRANI:  Scrolling down now to
11   7B.  Scroll down, Carlos.
12           Q.     Is it true that QJ Signature
13   Bank account received deposits from investors of
14   Q3?
15           A.     Yes.
16           Q.     Was there anybody within your group
17   that was primarily responsible for that Signature
18   Bank account, including reconciling the account,
19   monitoring income and monies or outgoing monies?
20           A.     I would say Dr. Tran.
21           Q.     All right.  Did he share with you
22   the account balances in that Signature Bank
23   account?
24           A.     Yes.
25           Q.     And was that Signature Bank account
```


MAGNA
LEGAL SERVICES

Page 94

1    that we're discussing, where incoming investor
2    funds were placed, was that used to pay profits,
3    50% profits to you, Dr. Tran and Mr. -- and
4    Michael Ackerman?
5            A.    I don't remember.  I don't know if
6    I'd classify it as 50% of the profits.  I don't
7    know.  If you can re
8            Q.    Okay.  I'll rephrase it.  That's
9    fair.
10           Was that Signature Bank account
11   holding incoming new investor funds used to pay
12   profits to you, Mr. Ackerman and Dr. Tran from
13   time to time?
14           A.    Yes, but I don't think this -- I
15   don't know if I'd classify it as profital.  That's
16   where I'm struggling with the answer.
17           Q.    Okay.  What would you call it then?
18           A.    Maybe it was either licensing fees
19   or, you know, I'm not sure how I would classify
20   that, but was Signature Bank used to pay some of
21   the APs?  Yes.
22           Q.    And you had another Signature
23   you said there was another Signature Bank account?
24           A.    I remember two accounts, but I
25   don't remember the specifics of them.



Page 93

```
 1              Q.      And do you know why those licensing
 2    fee payments to you, Ackerman and Tran came from
 3    the account holding new investor funds as opposed
 4    to the other original bank account?
 5              A.      No.
 6                      MR. MIRANI:  Okay, we can take
 7    down this document, Carlos.  Thank you.
 8              Q.      Did you ever -- did any of you ever
 9    take money out of the Bitfinex account and move it
10    to another account?
11              A.      Take money out of an account?
12                      MR. KISHTMR:  The Bitfinex account,
13    he said.
14              Q.      Right.  Did you ever move -- did
15    you or your partners ever move money out of the
16    Bitfinex account to any other account?
17              A.      I believe money moved at some point
18    from Bitfinex to Gemini to Signature, that was the
19    flow of funds, as yes.
20              Q.      Who would make decisions to move
21    money out of the Bitfinex account?
22              A.      The three of us.
23              Q.      And the Bitfinex account would
24    supposedly hold different cryptocurrency coins?
25              A.      Correct.
```



MAGNA
LEGAL SERVICES

Page 96

```
 1              Q.      And Ackerman was reporting that the
 2      amount was growing on a constant basis?
 3              A.      Absolutely, yes.
 4              Q.      Right.  Eventually, what was the
 5      highest number that Mr. Ackerman told you the
 6      account, the Hilfiger account, had grown to?
 7              A.      I don't remember exactly, sir, but
 8      it was north of 500 million.
 9              Q.      Did you ever begin to have doubts
10      about Mr. Ackerman?
11              A.      No.
12              Q.      All right.  We'll talk about the
13      unfortunate ending as we go through the
14      chronology, but at some point you did begin to
15      doubt him, right?
16              A.      At some point?  I'd like you to
17      define that for me, please.
18              Q.      At some point you began to doubt
19      what Mr. Ackerman was telling you was true,
20      correct?
21              A.      Sure, at the end of December when I
22      visited him at his home, yes.
23              Q.      Right.  And we'll go - but that's
24      through documentation.
25              A.      Okay.
```



Page 87

1          Q.      Let me show you -- let's take a
2    look at Exhibit 4, which is the private placement
3    memo.

5                  (Whereupon Private Placement Memo
6    was received and marked P-4 for identification only.)

8          Q.      Do you recognize this as a Private
9    Placement Memorandum to raise funds?
10         A.      Yes.
11         Q.      Dated November 1, 2018?
12         A.      I see that.
13         Q.      Whose idea was it to raise funds
14   through a Private Placement Memorandum?
15         A.      I don't remember.
16         Q.      Did you, in fact -- by you I mean
17   the QSI, LP entity -- raise $15 million?
18         A.      Yes.
19         Q.      Did you raise more than $15
20   million.
21         A.      Yes.
22         Q.      How much did you raise?
23         A.      I don't remember exactly, sir.
24         Q.      All right.  And was the Biffles
25   firm the law firm that assisted QSI or QS Holdings



Page 96

```
 1    in the preparation of this private placement?
 2             A.      Were they the area that -- I'm
 3    sorry, I missed the first part of that.
 4             Q.      Were they the ones that assist of
 5    QID or QR holdings in the preparation of this
 6    private placement memo?
 7             A.      To my recollection, yes.
 8             MR. MITRANI:  And we'll see, if we
 9    can turn to Page 14 here, Carlos.  Why don't we do
10    that?
11             MR. BEEBIB:  Isaac, this is Exhibit
12    4 you said?
13             MR. MITRANI:  Yes.
14             legal counsel, Carlos, scroll down.
15    Stop.  Thank you, Carlos.
16             Q.      See Page 14, that the legal counsel
17    is Riveles Wahab?
18             A.      I see that, yes.
19             Q.      Is it true that at this time, which
20    we saw as, I believe, November of 2018, that
21    Riveles Wahab continued as legal counsel to the
22    general partner of QID and the partnership which
23    is -- I'm sorry, I'm going to separate that.
24             At this time, November 2018,
25    Riveles Wahab was acting as legal counsel for both
```



Page 99

```
 1    QS Holdings and QS ?
 2         A.    Yes.
 3         Q.    They were your lawyers for ongoing
 4    legal issues that you had about the fund and the
 5    management of the fund?
 6         A.    Yes.
 7         Q.    How often would either you or Mr.
 8    Guan call them to ask questions?
 9         A.    I don't remember, sir.
10         Q.    All right.
11              MR. MITRANI:    Let's take a look at
12    Page 6, Carlos.
13         Q.    Before we got into some of the
14    specifics here, sir, did you read this document
15    before it was provided to investors?
16         A.    Yes.
17         Q.    Did you believe it to be true?
18         A.    Yes.
19         Q.    All right.  So here, page 6, it
20    says, QS Holdings, the GP, which acts as the
21    general partner of the partnership was founded in
22    2015,   organized as a limited liability company in
23    2018.
24              Do you see that?
25         A.    I do.
```



1            Q.      What activities, if any, had QI

2    Holdings have in 2015?

3            A.      None that I'm aware of, sir, that

4    must be a misprint.

5            Q.      That would be a mistake?

6            A.      Yes.

7            Q.      Okay.  Were you expecting the

8    Dewder Mabob firm to conduct due diligence as to

9    all of her representations in this document?

10           A.      Yes.

11                   MR. KLINE:  Objection to form.

12    You can answer.

13           A.      Yes.

14                   MR. SEEBIB:  Join.

15           Q.      Okay.

16                   MR. MICHAEL:  Let's see what else.

17    Let's take a look at Page 6, Carlos.

18           Q.      Okay.  Looking at Page 6 here, it

19    says here that the GP of the partnership is QI

20    Holdings, LLC -- I'm paraphrasing -- and the GP is

21    primarily responsible for the management of the

22    partnership.

23                   Do you see that?

24           A.      Where would that be on the page,

25    sir.



Page 101

```
 1              Q.      General Partner, right on top.

 2              A.      Oh, yes.

 3              Q.      So does that refresh your

 4      recollection that Q3 Holdings was the general

 5      partner of Q3I?

 6              A.      Yes.

 7              Q.      Does it refresh your recollection

 8      that Q3 Holdings was primarily responsible for the

 9      management of the partnership which is Q3I, LP?

10              A.      Yes.

11              Q.      Under Eligible Investors, this

12      document says that, "Interests in the partnership

13      are being offered under the 3(c)(1) exemption of

14      the Investment Partnership Act for investment by

15      up to 100 persons who are accredited investors,"

16              Do you see that?

17              A.      I do.

18              Q.      Is that something you discussed

19      with your lawyers, that there was an exemption

20      provided by the laws as long as you kept the fund

21      to 100 persons or less?

22              A.      Yes.

23              Q.      Was it your goal to keep the fund

24      at this time to less than 100 persons?

25              MR. RISLEY:  Objection to form.
```



Page 102

1    faxes, when you say you, do you mean the QS or Mr.

2    Faijas individually?

3            MR. MITRANI:  QS.  QS.

4        A.      don't remember.  I mean, that was

5    the advice we got, and I would say we'd take the

6    advice that we got.

7        Q.     That's fair.  At some point, did

8    you grow to -- strike that.

9            At some point, did QS grow to

10   larger than 100 persons?

11       A.     Yes.

12       Q.     All right.  And was it sometime

13   then in 2018 that you hired Kobre Kim to help you

14   with regulatory issues with the SEC?

15       A.     I don't recall the date, sir.

16       Q.     Okay.  We'll get to that.  I just

17   wanted you to see that.

18           MR. MITRANI:  Take a look at Page

19   6, Carlos.

20       Q.     It says, Exchanges and Custody.  Do

21   you see that paragraph?

22       A.     I do.

23       Q.     All right.  Exchanges and Custody

24   is a reference to buying and selling digital

25   assets through multiple layers of authentication.



Page 103

1    Can you tell me what that means?

2           A.    No.

3           Q.    Okay.   Is that something you were

4    relying on your outside lawyers and Mr. Ackerman?

5           A.    Yes.

6           Q.    What steps, if any, did you take to

7    make sure that there would be multiple layers of

8    authentication?

9           A.    To make sure I had login access and

10   password information and authentication.

11          Q.    Right.   But at this point you

12   relied Mr. Ackerman so you didn't access the

13   accounts yourself, correct?

14                MR. KISLIK:   Objection to form.

15   You can answer.

16                MR. SHEBIB:   Join.

17          A.    Yes.

18          Q.    And this referred to "following

19   industry best practices" in this paragraph.   Do

20   you see that?

21          A.    No.

22                MR. MIRANDA:   Carlos, can you show

23   the -- that's in the middle of that paragraph,

24   Exchanges and Custody?

25          Q.    See the reference to follow



1    industry best practices?

2            A.      Yes.

3            Q.      And what steps, if any, did you

4    take to make sure that the GP of Q3 holdings would

5    follow industry best practices?

6            A.      I don't remember.

7            Q.      Okay.

8            MR. MITRANI:   You can look at

9    Performance Allocation at the bottom.   That's good

10   Carlos, thank you.

11           Q.      And is it true that according to

12   this PPM that the GP Q3 holdings would receive a

13   monthly profit performance profit allocation equal

14   to 50%?

15           A.      Yes.

16           MR. MITRANI:   Go to Page 12,

17   Carlos.

18           Q.      There's a reference to

19   Organizational Expenses.   Do you see that?

20           A.      I do.

21           Q.      Do you know what --

22           MR. MITRANI:   Let's further scroll

23   down, the Partnership Expenses.

24           Q.      The document says, "The partnership

25   expenses shall pay all of its ordinary operating



Page 105

1   costs and expenses, including admin expenses."

2               Do you see that?

3        A.    Yes.

4        Q.    What were the ordinary operating

5   costs and expenses that the partnership, which is

6   GBI, was incurring?

7        A.         Employee or consulting contract

8   expenses, attorney expenses, any licensing fee

9   expenses, any exchange commission expenses.  Those

10  are the ones I remember.

11       Q.    Who was paying those expenses on

12  behalf of GBI?

13       A.    I don't know.

14       Q.    Was the -- Mr. Tran, would that have

15  been in his area of responsibility?

16       A.    Most likely, sir, yes.

17       Q.    And do you know which account he

18  was using to pay those expenses?

19       A.    I don't remember.

20       Q.    Okay.

21            MR. HITHANI:  Let's take a look at

22  page 16.

23       Q.    Okay.  There's a reference to

24  Michael Ackerman's LLC.

25            MR. HITHANI:  Can you scroll up a



Page: 106

```
 1    little bit, Carlos?  Thank you.
 2            Q.    Did Mr. Ackerman write his own bio?
 3            A.    I don't remember.  I believe so.
 4            Q.    Okay.  And your bio follows?
 5            A.    Yes, sir.
 6            Q.    Take a look and tell me if it's
 7    accurate.
 8            A.    It's accurate.
 9            Q.    Okay.  There's reference to your
10    long term understanding of risk management in your
11    bio.  Do you see that, in the second paragraph?
12            A.    I do.
13            Q.    What experience did you have in
14    risk management?
15            A.    Trading stocks on the floor of the
16    New York Stock Exchange.
17            Q.    And how would that manage risk?
18            A.    I was buying and selling stocks as
19    part of the specialist function using the firm's
20    capital and had to manage the risk.
21            Q.    Okay.  And you say that you managed
22    risk in excess of $20 million a day?
23            A.    Yes, sir.
24            Q.    And can you explain that?
25            A.    As part of the dealer function,
```



Page 107

```
 1    buying and selling stocks as a specialist, I was

 2    taking positions in different energy and utility

 3    stocks that I was assigned to that could amount to

 4    $20 million worth of a stock on a daily basis.

 5            Q.    Okay.   And in your bio you say that

 6    you, "implemented and refined new trading

 7    algorithms which increased profitability and

 8    contributed to a 50% increase in market share."

 9            You see that?

10            A.    I do.

11            Q.    What were the new trading

12    algorithms that you implemented in that fund?

13            A.    Well, sir, Bank of America had

14    algorithm traders and programmers and the

15    exchanges moving from an open outcry system to a

16    primarily algorithmic trading system trading in

17    pennies in microseconds and we had programmers and

18    trading algorithm people on our floor every day,

19    and I would monitor the stocks and monitor the

20    ranges, much like my responsibilities for GE.

21            Q.    Okay.   So these were algorithms

22    that your employer was rolling out, through its

23    computer and other specialists and they were given

24    to you to implement.   Is that fair to say?

25            A.    Yes.
```



Page 108

1           Q.      Do you know what experience Mr.
2    Ackerman had in trading crypto prior to the
3    formation of the 3x crypto trading club?
4           A.      No, I don't.
5           Q.      Anybody ever ask him?
6           A.      I don't know.
7                   MR. MITRANI:  Let's go up to page
8    12, Sarina, please.  The Management Plan, Paragraph
9    4.
10          Q.      Paragraph 4.  It says that, "Our
11   team also possesses a core risk management
12   foundation which underpins our decision-making
13   process."
14                  Do you see that?
15          A.      No.  Could you highlight it for me?
16          Q.      Sure, of course.
17                  MR. MITRANI:  Perfect?
18          Q.      Tell me what the FPM is referring
19   to when it says that "The team possesses a core
20   risk management foundation which underpins our
21   decision-making process."
22          A.      You likely referring to the fact
23   that Mr. Ackerman and I both worked on the floor
24   of the stock exchange and had extensive knowledge
25   of equities trading and risk management.



Page 109

```
 1            Q.    Was there any risk management
 2    employed in the trading of crypto through these Q3
 3    stats?
 4            A.    From my understanding, yes, through
 5    the algorithm.
 6                  MR. SCIBAND:  Okay.  Let's take a
 7    look at Page 30, Carlos.  Actually, let's go to
 8    Page 29, Insurance.
 9            Q.    As long as we're on this document,
10    did any of the Q3 entities have insurance?
11            A.    I don't remember.
12            Q.    Do you know whether you or any of
13    the Q3 entities filed any kind of insurance claim
14    when the Ackerman fraud was discovered?
15            A.    Not that I'm aware of, no.
16            Q.    So why don't we jump ahead to
17    Evaluations and Appraisals, which is Page 30.  Do
18    you see that, the paragraph, Evaluations and
19    Appraisals?
20            A.    I do.
21            Q.    Now, it says that, "The CM's
22    determination of the value of the partnership
23    assets is based on third party evaluations and
24    analysis of the target properties."
25                  Were there ever any third-party
```



Page 112

```
 1    evaluations of the assets of the partnership which
 2    is Q31?
 3            A.      I don't remember.
 4            Q.      Who would know that?
 5            A.      I don't know, sir, who would know.
 6            Q.      Did you yourself ever hire any
 7    third parties to value the assets of Q3?
 8            A.      Not that I recall.
 9            Q.      Did Mr. Dray or Mr. Ackerman ever
10    tell you that they had hired a third party to
11    value the assets of Q31?
12            A.      I don't know.  Not that I remember.
13            Q.      Okay.  And do you know what the
14    reference is to taxed property as?
15            A.      No, sir.
16            MR. MORRAM:  Okay.  And let's
17    scroll down to Regulatory Risks.
18            Q.      In the Regulatory Risks section it
19    says that, "The GP is not registered as an
20    investment advisor with the SEC or any state
21    securities commission."
22            Is that true?
23            A.      Yes.
24            Q.      The following year, 2019, did you
25    ... I will forestall to see whether any of the
```



Page 111

```
 1    Q: entities should be registered as an investment

 2    advisor with the SEC?

 3            A.    Yes.

 4                  MR. MITRANI:  Let's go Page 32,

 5    Carlos.

 6                  MR. AYALA:  What page, Mr. Mitrani?

 7                  MR. MITRANI:  Page 32, at the

 8    bottom, the last paragraph.  Thank you, Carlos.

 9            Q.    Page 32 of the PPM, it says that,

10    "The GP has and continues to license and employ

11    its Algo Trading Software in connection with and

12    for the benefit of various third parties,

13    including but not limited to, other GP funds, and

14    nothing contained herein"    elsewhere -- "shall

15    preclude the foregoing."

16                  Do you know whether the Algo

17    Trading Software was licensed to any third

18    parties?

19            A.    No, I don't know.

20            Q.    Is it fair to say that the Algo

21    trading software was never licensed to any third

22    party?

23            A.    I don't know, sir.

24            Q.    You ever received any share of your

25    profits from any licensee of the Algo trading
```


MAGNA
LEGAL SERVICES

Page 113

```
 1    software to third parties?

 2             A.      Repeat the question, please?

 3             Q.      Did you ever receive your share of

 4    license fees for the licensing of the Algo trading

 5    software to third parties?

 6                     MR. KISTIN:   Object to the form.

 7    You can answer.

 8             A.      Not that I'm aware of.  No, not

 9    I'm aware of, no.

10             Q.      Okay.  Okay.  But basically the

11    purpose of the Private Placement Memorandum was to

12    have a legal vehicle or manner to raise funds

13    through prospective investors, correct?

14                     MR. KISTIN:   Objection to form.

15                     MR. SMITH:   Objection to form.

16                     MR. KISTIN:   You can answer.

17             A.      It's my understanding, yes.

18             Q.      Right.  And you used the Bivius

19    firm to try to make sure everything was done

20    correctly, right, and -

21             A.      That's correct.

22             Q.      Okay.

23                     MR. KHURANI:   All right.  Why don't

24    we take a lunch break here.   See it's 12:11.

25    Does 30 minutes work for everybody?
```



Page 113

1              MR. KITSIN:   Is that good for you?

2         A.    That's fine.

3              MR. MITRANI:   And we can drop the

4    document, Steven.   Thank you, everybody.

5              MR. KITSIN:   Can we say 12:40?

6              MR. MITRANI:   Okay, of course.   Of

7    course.  Madam Court Reporter, can you note the

8    ending time?

9              THE REPORTER:   Yes, sir.

10             MR. MITRANI:   And everybody enjoy

11   your lunch.

12

13             (Whereupon there was a luncheon

14   recess.)

15

16   BY MR. MITRANI:

17        Q.    Mr. Baijas, before our lunch break

18   we were looking at the Private Placement

19   Memorandum dated November 2016, right?

20        A.    Yes.

21        Q.    And at that time the outside

22   professional team for the OJ entities included

23   Rivelus Webb as lawyers, right?

24        A.    Yes.

25        Q.    That also included Brendan



Page 114

```
 1    Associates, accountants and Mr. Madan as

 2    accountants, right?

 3           A.    Yes.

 4           Q.    And it also included Mr. McEvoy as

 5    fund administrator.  Is that right?

 6           A.    Yes.

 7           Q.    Anybody else?

 8           A.    Not to my recollection.

 9           Q.    At that time.  Okay.

10                 Let me just show you so we can

11    finish with the PPM, Private Placement Memorandum.

12    Page 25.  Okay.  This was Exhibit 4, page 25 and

13    at the top it references Proprietary Nature.  "All

14    documents and other information concerning the

15    partnerships' portfolio of investments will be

16    made available to the partnership's auditors,

17    accountants, attorneys and other agents."

18                 And my question is, sir, did any

19    of the 33 entities have an outside auditor?

20           A.    I don't remember.

21           Q.    Did Mr. McEvoy ever suggest to you

22    that you should have an outside auditor?

23           A.    Not to my recollection.

24           Q.    What is your understanding of the

25    term auditor?
```



Page 115

1          A.     An auditor would be somebody who

2    looks over your paperwork and documentation.

3          Q.     As part of your experience as a

4    trader, are you familiar with audited financial

5    statements?

6          A.     No.

7          Q.     Do companies that trade on public

8    markets have to have audited financial statements?

9          A.     Yes.

10         Q.     From an outside accountant, right?

11         A.     I understand they do, sure.

12         Q.     Sure.  And did anybody ever suggest

13    to you at the time of this Private Placement

14    Memorandum in 2013 that you should have audited

15    financial statements?

16         A.     Not that I remember.

17         Q.     Okay.  And who at QJ was

18    responsible for providing documents and other

19    information concerning the partnership for equity

20    of investments to the partnership's auditors,

21    accountants and attorneys?

22              MR. SEIBIB:  Objection to form.

23         A.     Primarily it was Dr. Tran, but we

24    worked together.

25         Q.     Okay.  Do you know whether in fact



Page 116

1    Q? did make these documents and other information
2    available to the partnership's accountants and the
3    attorney, Nivelos Wahab?
4            A.    I believe we did.
5            Q.    Okay.
6            MR. MITRANI:  All right.  We can
7    take down this document.
8            Q.    And let me show you now the
9    consulting agreement of Mr. McEvoy.
10           MR. MITRANI:  Carlos, we're marking
11   this as Exhibit 22?  Is that right?
12           MR. AYALA:  Yes, 22.
13
14           (Whereupon McEvoy QBT Consulting
15   Agreement was received and marked I 22 for
16   identification.)
17
18           Q.    I'm showing you the consulting
19   agreement of Mr. McEvoy.  Let me show you the
20   date.  You see it says as of August 30, 2018?
21           A.    I do.
22           Q.    All right.  And let me show you the
23   signature page at the bottom.
24           MR. MITRANI:  Carlos, can you show
25   the signature pages?



Page 117

1          Q.     Okay.   Do you recognize this

2    document as the consulting agreement between Mr.

3    McEvoy's company and Q3I, LP?

4          A.     It appears to be, yes.

5          Q.     All right.   Dated as of August 30,

6    2018?

7          A.     Yes.

8          Q.     And what were Mr. McEvoy and his

9    company's duties as consultant?

10          A.     Represent, help us navigate through

11    a dynamic cryptocurrency environment, further

12    bolster our legal structure and provide an avenue

13    to registration.

14          Q.     All right.

15          MR. MIZRAHI:   We can take down the

16    document, Cassie.   Thank you.

17          Q.     Was Mr. McEvoy helping Q3I or Q3

18    Holdings in terms of day-to-day operation of the

19    fund, the crypto fund?

20          MR. CURRIE:   Object as to form.

21          Q.     Go ahead.

22          A.     Day-to-day?   I'm not sure how I

23    would classify it.   I worked with him mainly in

24    the capacity of finding an avenue for

25    registration.



Page 116

        Q.    Put aside the day-to-day norm and
2   let me ask it this way: was he providing advice to
3   you as a consultant -- strike that.
4            Was he providing advice to GPL or
5   Q3 Holdings in reference to the operation of the
6   crypto fund?
7        A.    Yes.
8            MR. SHIELD:  Object as to form.
9        A.    Yes.
10       Q.    Okay.
11           MR. HITRANI.  All right.  We can
12   set that aside.
13       Q.    Now, I show you again the
14   Polsinelli engagement agreement which we saw
15   earlier which is Exhibit 5.  We'll put that up.
16           MR. HITRANI:  Why don't you blow it
17   up a little bit for everybody's benefit, Carlos.
18       Q.    This is the letter that you signed
19   hiring the Polsinelli Firm in April -- on April
20   17, 2019, sir?
21       A.    That I signed, sir?
22       Q.    Yeah, I'll show you your signature
23   again.  I had showed it to you earlier.
24       A.    Okay.
25       Q.    But I'll show it to you again.


MAGNA
LEGAL SERVICES

Page 113

```
 1              A.      Okay.

 2              Q.      No worries.

 3                      MR. NITRANI:  Ceilos, scroll down.

 4              Q.      Is that your signature on that

 5      letter?

 6              A.      Yes, it is.

 7              Q.      All right.

 8                      MR. MITRANI:  Let's scroll up.

 9              Q.      First of all --

10                      MR. NITRANI:  Well, let's go down,

11      Sorry to make you dizzy.

12              Q.      You're good on behalf of Q3

13      Holdings, correct?  And let me show you the

14      signature page before you answer.

15              A.      I don't know.  I guess so, yeah.

16              Q.      Do you see it says Q3 Holdings, LLC

17      by James Biljan, title, general partner?

18              A.      I do.

19              Q.      Were you signing the engagement or

20      the Polsinelli firm on behalf of Q3 Holdings, LLC?

21              A.      Yes.

22                      MR. SEFTER:  Object as to form.

23              Q.      All right.

24                      MR. NITRANI:  Let's scroll up to

25      the top, Ceilos.
```



Page 120

1          Q.    And pursuant to this letter

2    agreement, Polsinelli -- who was -- who did

3    Polsinelli agree to represent pursuant to its

4    engagement letter?

5                MR. KTELIN:   Objection to form.

6    You can answer.

7                MR. SHAFFER:   Jorr.

8          A.    I anse repeat the question?

9          Q.    Well, let me ask it this way, in

10   its engagement letter, did Polsinelli agree to

11   represent CJ Holdings, LLC?

12               MR. SHRAJO:   Object as to form.

13         A.    Yes.

14         Q.    And you agreed to that

15   representation on behalf of CJ Holdings, LLC,

16   correct?

17               MR. SHAFFER:   Object as to form.

18         A.    Yes.

19         Q.    All right.

20               MR. YITRANI:   Let's scroll down a

21   little bit, Carlos, to Scope of Representation,

22   Paragraph 2.

23         Q.    Do you see Paragraph 2, sir?

24         A.    I do.

25         Q.    And Paragraph 2 says, "Regarding



Page 121

```
 1    the scope of our representation, we understand
 2    that we are being retained to represent the
 3    company in connection with securities and
 4    regulatory matters and such other matters as the
 5    company may direct to us from time to time, and we
 6    agree in writing to undertake all of the terms and
 7    conditions set forth herein."
 8                    Is that right?
 9         A.    Yes.
10         Q.    On behalf of QJ Holdings, did you
11    hire the Zuisneld firm to help QJ Holdings in
12    connection with securities and regulatory matters?
13         A.    As whether cryptocurrencies were
14    all defined as securities, I don't know, but yes,
15    in general, yes.
16         Q.    Generally you were interested in
17    knowing whether cryptocurrency would be defined as
18    a security?
19         A.    Sure, that was one of our
20    interests.
21         Q.    Sure.  And if it were, then that
22    might trigger certain regulatory requirements,
23    correctly?
24         A.    Yes.
25         Q.    And you were looking for Plaintiff
```



Page 111

```
 1    to guide you on these facts?
 2              A.    Yes.
 3              Q.    Where you said that was one of the
 4    interests, what other securities or regulatory
 5    matters, if any, were you looking for Polsinelli
 6    to advise you?
 7              A.    I don't remember.
 8              Q.    Okay.  Did you yourself have any
 9    contact with any of the attorneys at Polsinelli at
10    any time?
11              A.    I don't remember.
12              Q.    Was Mr. McEvoy the one, on behalf
13    of QB Holdings, that had the primary contact with
14    Polsinelli?
15              A.    Yes, to my understanding.
16              Q.    So is it -- the way that it worked
17    is QB Holdings needed certain securities and
18    regulatory advice and Mr. McEvoy would be the
19    go-between between QB Holdings and the law firm
20    regarding the advice sought?
21                    MR. SHEBIE:  Object as to form.
22              A.    That's fair.
23              Q.    Do you remember McEvoy telling you
24    in terms of this entity's response to whether
25    crypto could be considered a security?
```



Page 123

1        A.    I don't remember.

2        Q.    And you considered McEvoy's

3   discussions with Q3 Holdings -- sorry.  You

4   considered McEvoy's discussions with Polsinelli as

5   attorney-client privilege because he was acting

6   for Q3 Holdings.  Is that true?

7              MR. SHREIBER:  Object as to form.

8        A.    I'm not sure that.  I'm not sure.

9   I don't know.  I guess so.

10       Q.    Well, was he acting for Q3 Holdings

11  when he had discussions with Polsinelli?

12             MR. SHREIBER:  Object as to form.

13       Q.    Go ahead.

14       A.    I'm not sure why my opinion's

15  relevant there, but I guess so.

16       Q.    I don't want your opinion, but

17  let me get -- this is okay: McEvoy was a consultant

18  for Q3, right?

19       A.    Yes.

20       Q.    But Q3 Holdings, we just saw, hired

21  Polsinelli, right?

22             MR. SHREIBER:  Object as to form.

23       A.    I'm not sure I differentiate

24  between the two that way, but okay.

25       Q.    Well, I'm just asking since you



Page 124

```
1    signed the letter, did you not hire the Polsinelli

2    firm on behalf of Q3 Holdings, LLC?  Isn't that

3    true?

4              MR. KISTIN:  Object to the form.

5    You can answer.

6              MR. SHLOIS:  Join.

7         A.   Yes.

8         Q.   Okay.  And did you ask McEvoy to

9    help you in terms of Q3 Holdings' interaction with

10   Polsinelli?

11        A.   Yes.

12        Q.   Did McEvoy ever share with you any

13   written memorandum that Polsinelli filed or

14   prepared?

15        A.   I'm sure he did, but I can't recall

16   what specifically.

17        Q.   Do you remember any advice that

18   Polsinelli gave Q3 Holdings regarding securities

19   and regulatory matters?

20        A.   No.

21        Q.   Do you remember whether Polsinelli

22   told you that the Q3 entities needed to be

23   registered as investment advisors?

24        A.   No.

25        Q.   Do you recall learning that
```



1    Polsinelli had advised that, pursuant to
2    securities and other laws, either you were
3    required to give money back to the investors or
4    seek some other legal avenue to operate?
5              MR. SEEBIB:  Object as to form.
6         A.    I don't recall.
7         Q.    Okay.  Do you remember any advice
8    that Polsinelli gave?
9         A.    It's -- in general; if you ask me
10   specifically I'll tell you if I remember it or
11   not, but I don't have an open, blank canvas to
12   tell you what there advice was.  I don't remember
13        Q.    Okay.  So, I -- right.  So I do
14   need to drill down on Polsinelli, and if you don't
15   remember, I understand.  As you sit here today, do
16   you remember any advice that Polsinelli gave Q3
17   Holdings?
18        A.    Not specifically, no.
19        Q.    That's fine.  So we can -- and
20   before we get this down, or before we got this
21   agreement down, rather, during this time, April
22   2019, you all had the ability to provide any
23   general counsel legal advice to Q3 Holdings or
24   Q3I?  Is that true?
25              MR. SEEBIB:  Object as to form.



Page 126

1          A.        I don't remember if we terminated
2    our agreement with them at that point.  I won't --
3    I don't recall.  The chronology of events on
4    ha...

5          Q.        If did you terminate the Rivkes
6    firm, would there be some writing or e-mail or
7    text to that effect?

8          A.        There could be.

9          Q.        Or letter no than saying "thanks for
10   your services, but we no longer need your
11   services?

12         A.        Possible.

13         Q.        Okay.  Do you remember though that
14   Rivkes continued to represent the Q5 entities for
15   general matters while Polsinelli now was engaged
16   to handle securities and regulatory matters?

17         A.        I don't recall on the overlap
18   specifics.

19              MR. NIERAND:  We can put down that
20   document, Carlos.  Thank you.

21         Q.        Do you know Rick Levin?

22         A.        Do I know him personally?  The
23   name, I recognize the name, but no, I don't know
24   him.

25         Q.        Ever talk to him, telephone or in



Page 127

```
 1    person?
 2         A.      I don't recall.
 3         Q.      Ever text him or e-mail him?
 4         A.      I don't recall.
 5         Q.      Did you ever e-mail any of
 6    the Soleimani lawyers?
 7         A.      I don't recall.
 8         Q.      All right.
 9              MR. KIRSANI:  Let's take a look now
10    at Exhibit 6, please, Carlos.
11    --
12              (Whereupon July 5, 2019 e-mail,
13    Bates No. Reign00961 was received and marked P-6
14    for identification.)
15
16         Q.      Do you recognize Exhibit 6?
17         A.      No, not until I see it.
18         Q.      Oh, I thought it's on the screen,
19    yeah.
20         A.      Yeah, but do I recognize it?  So I
21    read it I say.
22         Q.      Got it.  Please.
23              MR. KISTIN:  Tabac, it also looks
24    like there's another e-mail underneath that.
25              MR. KIRSANI:  Underneath it?
```



Page 126

1                    MR. KISLIN:  Yeah.

2                    Mr. MITRANI:  You want to see the

3      whole thing?  Sure.  Why don't you scroll to the

4      bottom?  That's fine.  Save I to the bottom.

5      Carlos.  That's fair.

6                    MR. KISLIN:  And then it starts

7      with -- yeah.

8                    Mr. MITRANI:  Stop right there.

9      Okay, you okay?

10          Q.    Tell us when you're done and we'll

11     keep on scrolling.

12          A.    Okay.  You can go up.  This is

13     obviously correspondence between Quan and the

14     representative at Signature Bank.  I guess I was

15     cc-ed on or also included in.

16          Q.    All right.  As you sit here today,

17     did you have any memory of receiving this e-mail?

18          A.    No.

19          Q.    All right.

20                    MR. MITRANI:  Let's scroll down,

21     Carlos and spend a few minutes on it.

22          Q.    Did you know David D'Amico?

23          A.    Again, the name sounds familiar,

24     but I do not know him, no.

25          Q.    Well -- Or.  That then opened -- Is



Page 129

```
 1    bank accounts at Signature Bank for the 2J
 2    entities?
 3           A.    I don't recall.
 4           Q.    Was it Dr. Tran that had the
 5    relationship with David D'Amico?
 6           A.    I'm not sure how I would define a
 7    relationship, sir, but apparently they e-mailed
 8    back and forth, I don't know.
 9           Q.    Did you have a -- sometimes you
10    call it a relationship with an outside vendor or
11    professional, were you the one responsible for that
12    relationship with Signature Bank or was it
13    somebody else?
14           MR. SHEETER:  Objection as to form.
15           A.    I don't know.
16           Q.    Did you speak to David D'Amico?
17           A.    I don't recall.
18           Q.    Did you e-mail David D'Amico?
19           A.    I may have, but I don't recall
20    specifically.
21           Q.    All right.  Did you have any
22    banking relationship with Signature Bank outside
23    of these 2J accounts?
24           A.    No.
25           Q.    All right.  Do you remember Dr.
```



Page 130

1  then asking you, just speaking to you, about money
2  coming into the Signature Bank account from new
3  investments and money leaving from that account?
4      A.    Yes.
5      Q.    And what did he say and what did
6  you say?
7      A.    I can respond to questions on it,
8  but I can't recall I knew the concerned one.  I
9  wanted to make sure that the accounting flow was
10 done in the proper fashion.
11     Q.    All right.
12           MR. MITRANI:  Let's scroll up here,
13 Carlos.
14     Q.    So July 3, 2019, did Mr. Tran send
15 you this e-mail?
16     A.    Apparently he did, yes.
17     Q.    It sounds like it didn't make too
18 much of an impression because you can't remember
19 it.
20           MR. SREBIB:  Object as to form.
21     Q.    Can you read it?  Should we blow it
22 up, would that help us see better?
23     A.    Yes.
24     Q.    Okay.  So Mr. Tran says, "The basic
25 issue is that it looks like funds deposited from



Page 131

1    funds are just being transferred to our GA

2    Holdings account to pay us out."

3              Were you aware of that in July of

4    2015?

5         A.   Yes.

6         Q.   Did you update your account and

7    about that, Mr. Chadee?

8         A.   I don't recall speaking to

9    Mr. Chadee.  Well, Mr. Chadee, we asked for

10   advice, whether or not that this was an

11   appropriate way to do it or whether there was a

12   more efficient and correct way to go about moving

13   the money.

14        Q.   Okay.  Well, let's start -- I ask

15   you, sir, and looking -- and we're going to  see

16   a other e-mails.  I'll take you through other

17   e-mails, including e-mails in October of 2015, so

18   we'll go through them all, but Ackerman, during

19   this time, was reporting monthly profits of about

20   15% in the trading account, right?

21        A.   Yes.

22        Q.   Was the Bitfinex account the main

23   trading account?

24        A.   Yes.

25        Q.   So one month to the next, Mr.



Page 132

1    Ackerman would announce, we're up 15% for the
2    prior month, right?
3          A.    That's correct.
4          Q.    And Q3 Holdings, or the three
5    principals, were entitled to 50% of those profits
6    generally?
7          A.    Generally.
8          Q.    And why didn't you just take the
9    money out of the Bitfinex account; in other words,
10   sell some crypto and then move the cash and pay
11   yourselves?
12               MR. GREBIG:  Object as to form.
13         A.    Because I was making 15% a month,
14   we didn't take out half the majority of the
15   principal in.
16         Q.    Okay.  And is that something you
17   discussed with Mr. Toth as well?
18         A.    Yes.
19         Q.    And something you discussed with
20   Mr. McKeen?
21         A.    I don't remember that discussion
22   with Mr. Thadee.
23         Q.    Is that something you discussed
24   with the Rivelec firm?
25         A.    I don't remember a discussion like



```
 1    that with the Rivolea firm.

 2            Q.    Okay.  So did you discuss that with

 3    Mr. McEvoy?

 4            A.    Specifically, what's the question,

 5    sir?

 6            Q.    Did you discuss with Mr. McEvoy

 7    that in order to pay yourselves your 50% profit

 8    you preferred not to liquidate cryptocurrency in

 9    the Bitfinex account, but rather wanted to take it

10    from the Signature Bank account with new investor

11    funds?

12            MR. SEEBER:  Objection to form.

13            MR. KIBLER:  Objection to form.

14    You can answer.

15            A.    We did discuss that, sir, as we

16    were looking for a way, the original flow of

17    funds was from Signature Bank to Gemini as money

18    to buy into coins that coins would go to Bitfinex

19    and then they would be liquidated and implemented

20    into the mathematical Algo system.  And I do

21    recall that between fees, making money, market

22    movement, we lost money doing it that way, so we

23    wanted to have some advice on whether or not we

24    could skip these steps and do it properly and

25    legally in a more efficient manner.
```



Page 134

```
 1          Q.    Okay.  That's what I'm trying to
 2    explore with you.
 3          A.    Yes.  I remember, yes.
 4          Q.    So let's look at -- kind of follow
 5    what you said.  The flow of money was, a new
 6    investor sends money, goes to the Signature bank
 7    account, right?
 8          A.    Yes.
 9          Q.    From the Signature bank account you
10    would move i  into the Gemini account to buy
11    crypto coin?
12          A.    Yes.
13          Q.    Okay.  Who would actually do that
14    movement?
15          A.    Firm facilitated it and I believe I
16    authenticated it, from my memory.
17          Q.    All right.  And then now you have
18    crypto in a Gemini account.  And you said you moved
19    it to a BitFinex account?
20          A.    Correct.  So the Gemini account we
21    would move the crypto coins over to the Bitfinex
22    account.
23          Q.    And just help me out, why would you
24    need to move    from Gemini to BitFinex?  Could
25    you trade you  in the Gemini account?
```



Page 135

1              MR. SHEBIB:  Objection as to form.

2          Q.    I'm just not understanding why it

3    goes from Gemini to Bitfinex.

4          A.    Because Bitfinex is where the Algo

5    was running and they had better volumes and

6    better -- more coins to trade, and that's where

7    Mike was running his algorithmic trading into the

8    Bitfinex accounts.

9          Q.    Okay.  And who would move it from

10   Gemini to Bitfinex?

11         A.    Same process.

12         Q.    So, Tran, but you would verify?

13         A.    Correct.

14         Q.    And how would you verify that.

15         A.    From my recollection, they would

16   send me a code and I would have to enter the code

17   and then it would move.

18         Q.    So the Gemini organization would

19   want you to verify it with some kind of code

20   verification by you?

21         A.    To my recollection, yes.

22         Q.    All right.  So that's in Bitfinex

23   and Mike is detecting a profit, and so my question

24   to you is, why not just liquidate part of the

25   coins to take your profit from the Bitfinex



Page 136

1   answer?

2              MR. KISLAK:  Objection to form,

3   but you can answer.

4              MR. SUEZI:  Sure.

5       A.    Because the advice we got, as long

6   as the ledgers matched, dollars are fungible, so

7   it doesn't matter whether I take a dollar out of a

8   Signature account or a dollar out of BitTrex

9   account and go through all of those steps and

10  market risk and fees and commissions and, you

11  know, labor is essentially accomplish the same

12  thing.

13      Q.    Okay.  You know, looking at the

14  e-mail from Tran to you, in front of you which I

15  believe is Exhibit 6, Dr. Tran writes to you, "The

16  reality is that we are sending investor money to

17  the exchange (Algo) and buying crypto and then

18  liquidating crypto to the USD,"   which I assume

19  is U.S. dollars    "from the Algo to send to QC

20  Holdings.  Instead of losing fees on both sides of

21  those trades, we are registering it in our

22  accounting spreadsheets as well and just pushing

23  funds from QC account to QC Holdings' account.

24  I have spoken with our accountant, Gary Chodes, and

25  he said that was acceptable to do in this manner



Page 107

```
 1    as well."

 2                  "I have spoke with David and he

 3    understands what we are doing.  He just needs it

 4    on paper for his compliance team.  Thanks for your

 5    help."

 6                  Do you see that?

 7        A.    I do.

 8        Q.    Were you aware that in July of 2019

 9    Dr. Tran had asked the accountant, Gary Chadee,

10    whether that flow of funds described in this

11    e-mail was appropriate and acceptable?

12                  MR. SHEBIB:  Objection to the form.

13        A.    Yes.

14        Q.    And Dr. Tran told you that the

15    outside accountant, Gary Chadee, suggest the flow

16    of funds described in this July 9, 2019 e-mail was

17    acceptable, right?

18        A.    Correct.

19        Q.    And is it fair to say that as of

20    July 2019, neither you nor Dr. Tran spoke to

21    anybody outside of the c3 organization other than

22    Gary Chadee?

23                  MR. SHEBIB:  Object as to form.

24                  MR. KIRLIN:  On this issue, Isaac?

25                  MR. YETRANT:  On the flow of funds.
```



Page 138

```
 1              A.      I don't remember.
 2              Q.      Right.  By this time, 2019, you
 3    considered Mr. McEvoy a key member of the team
 4    even though he was an outside consultant, correct?
 5                      MR. SALINAS:  Objection to form.
 6                      MR. KITTNG:  Objection to form.
 7              Q.      Go ahead.
 8              A.      I'm not sure how I would define key
 9    member of the team, sir, but he was certainly
10    providing us with advice.
11              Q.      And did you also discuss the flow
12    of funds set forth in the July 9, 2019 e-mail with
13    Mr. McEvoy?
14              A.      Yes.
15              Q.      All right.  Mr. Vann, I think you
16    mentioned in your testimony, that there would be
17    fees incurred if you were to liquidate
18    cryptocurrency in the Bitfinex account and then
19    move the money as as to pay profits to the
20    founders, right?
21                      MR. SALINAS:  Objection to form.
22              A.      Yes.
23              Q.      What were those fees?
24              A.      I don't know.
25              Q.      Did you or anybody ever quantify
```



Page 139

1     the amount of fees that would be incurred if you

2     were to liquidate crypto in the Bitfinex account

3     in order to pay profits to the founders?

4                  MR. SLADID:  Object as to form.

5          A.     I don't remember.

6          Q.     You ever see any calculations on

7     those fees?

8          A.     Not that I recall.

9                  MR. MITRANI:  All right.  Let's go

10    to the next one which is July -- is Exhibit 7,

11    Carlos.  Let's put up Exhibit 7.

12

13                  (Whereupon July 11, 2018

14    E-mail Exhibit 7 in MV case was received and

15    marked E-7 for identification.)

16

17                  MR. MITRANI:  What we'll do is

18    we'll scroll -- lets start at the very bottom

19    again so the witness can see the whole exchange.

20         A.     Thank you.

21                  MR. MITRANI:  Start from Page 1 so

22    he can see who this e-mail is from, Carlos.  Just

23    scroll up a little bit.

24         Q.     Okay.  So let's start here.  I'll

25    let you read it, but I just want to point out,



Page 140

1    this appears to be an e-mail from you dated July

2    9th to David D'Amico and Dr. Iran and Mr.

3    Ackerman.

4                MR. MITRANI:  Okay.  Go ahead and

5    scroll down, David.

6                MR. KISTIN:  Just let us know when

7    you're done reading that part of it.

8                THE WITNESS:  Okay.

9         A.    Okay.

10        Q.    Did you send this e-mail to David

11   D'Amico at Signature Bank?

12        A.    I don't remember sending it, but I

13   did.  It looks like I did.

14        Q.    Okay.  And let's just talk about it

15   for a minute here.

16               You wrote to Mr. D'Amico, "To avoid

17   losing fees on both sides of those trades, and the

18   time and cost of transfers, we are registering it

19   in our accounting spreadsheets and official

20   aud und records."

21               Did you write that?

22        A.    Apparently.

23        Q.    And the accounting spreadsheets are

24   the ones you testified earlier that Dr. Iran kept

25   as to each individual investor?



Page 141

1   A.  The accounting spreadsheets I
2 then kept on the investors, yes.
3   Q.  Right, I'm asking.  Is that a yes?
4   A.  Yes.
5   Q.  Okay.  And you made reference to
6 official audited records.  Are  were you referring
7 to these?
8   A.  I don't remember.
9   Q.  Were you having any audits done at
10 M  or I  looking at this time?
11   MR. SHEEDE:  Object as to form.
12   A.  I don't recall.
13   Q.  All right.  And you put here,
14 "Prior to implementing the strategy change, we
15 checked it with our accountant, Gary Chasee, and
16 stated that was acceptable to do in this manner."
17   Do you see that?
18   A.  I do.
19   Q.  Were you referring to -- I wrote
20 that.
21   Did you yourself speak to Gary
22 Chasee about this strategy change about the
23 handling of funds?
24   A.  I don't recall.
25   Q.  Were you relying on Mr. Trau having



Page 142

1    spoken to Ms. Chadee?

2              A.    I don't recall specifically, but

3    probably.

4              Q.    Okay.  So it's fair to say that

5    either you or Mr. Tran or both spoke to Gary

6    Chadee about how you were handling funds, and Gary

7    Chadee told you it was acceptable to do it in that

8    manner?

9              A.    Yes.

10             Q.    And you wrote here, "We also

11   cleared it with our fund administration, Mr.

12   McEvoy."

13                   Do you see that?

14             A.    I do.

15             Q.    Does that refresh your recollection

16   that you discussed with Mr. McEvoy about the flow

17   of funds set forth in this e-mail --

18             A.    Yes.

19             Q.    -- in this timeframe, July 2016?

20   Is that correct?

21                   MR. MISLIN:   Objection to form.

22   You can answer.

23                   MR. SHERTR:   Join.

24             A.    Yes.

25             Q.    And Mr. McEvoy also told you that



Page 143

```
 1    it was okay to handle funds as set forth in this
 2    e-mail so long as the records are exactly accurate
 3    and -- is that right?
 4            A.      Yes.
 5            Q.      And did you speak to anybody else
 6    about the flow of funds set forth in this e-mail
 7    other than Gary Shadse and Mr. McCrary?
 8            A.      I don't recall.
 9            Q.      If you had, you would have included
10    it in this e-mail, correct, sir?
11            MR. KISLIK:  Objection to form.
12    You can answer.
13            MR. SHERTR:  Join.
14            A.      Perhaps.
15            Q.      You wanted to provide accurate
16    information to the bank, right?
17            A.      Yes.
18            Q.      You were trying to show the bank
19    that you were acting with due diligence in
20    response to their questions, right?
21            MR. SHERTR:  Object as to form.
22            A.      Yes.
23            Q.      You were showing the bank that you
24    checked not only with an outside accountant, but
25    with your bank administrator to make sure that
```



Page 144

1   your handling of monies were accurately, right?

2                    MR. CHIND:  Object as to form.

3        A.    Yes.

4        Q.    If you had spoken to your lawyers

5   about the flow of funds, isn't it fair to say you

6   would have included that in this e-mail?

7                    MR. SHEBIB:  Object as to form.

8        A.    Sir, Mr. McEvoy conferred with the

9   attorneys and, you know, he may have also been

10  provided advice, so I represented the same as a

11  representation of the advice as a whole.

12       Q.    Well, let me just stop you --

13  follow up on that.

14                   Do you remember your discussions

15  with Mr. McEvoy in July of 2019?

16       A.    I remember that we had discussions

17  on it.  Specifically?  No.

18       Q.    But as you sit here today, do you

19  remember speaking to McEvoy in July of 2019?

20       A.    Yes.

21       Q.    Do you remember what he said and

22  what you said during those discussions in July of

23  2019?

24       A.    I recall that he said that he

25  checked with Kolsinelli and as long as dollars are



Page 145

1  fungible and as long as the ladders match, there's

2  no reason to incur fees and potential market

3  disruption and that it would be an acceptable way

4  to do it.

5          Q.     Okay.  Is it possible the

6  discussion took place sometime later?  And we'll

7  show you e-mails from the October timeframe.

8          A.     Yes, sir, it's possible.

9          Q.     All right.  You can put this one

10  aside.

11                 By the way, sir, did you ever get

12  the statements from Polsinelli billing for their

13  services?

14          A.     I'm sorry, I missed the question.

15          Q.     Have you ever seen the statements,

16  the invoices, from Polsinelli billing for its

17  services?

18          A.     I don't remember.

19          Q.     All right.  We're going to show you

20  now the next exhibit which is Exhibit 9.

21

22                 (Whereupon September 14, 2018

23  E-mail, Bates No. Set[...]03255 was received and

24  marked P-9 for identification.)

25



Page 140

1                MR. MITRANI:  Carlos, let's put up
2    Exhibit 9.  That's 6, let's put up 9.
3           Q.     We'll let you scroll.  This is a
4    document bearing Bates stamp -- you'll see at the
5    bottom it bears Bates stamp Seijas3553.
6                MR. MITRANI:  Scroll to the very
7    top.
8           Q.     Have you had a chance to look at
9    that, Mr. Seijas?
10          A.     Okay.
11          Q.     Is this an e-mail that you sent to
12   David Lemire at Signature Bank also copying
13   Michael Ackerman and Dr. Tran?
14          A.     It appears that way, yes.
15          Q.     "Tell the bank, please take Michael
16   off future correspondence as I will handle.
17   Thank you."
18                So why did you want Michael off the
19   future correspondence?
20          A.     I don't remember.
21          Q.     You write, "Please sent questions
22   directly to me."
23                What were the bank's questions to
24   you?
25          A.     I don't remember spe-- "in



Page 147

```
 1   questions.
 2             Q.    As per our phone discussion, we
 3   have answered these before but just to clarify."
 4             Did David D'Arico of the bank call
 5   you sometime in September of 2018?
 6        A.    I don't remember.
 7        Q.    Do you have any recollection about
 8   what questions you were answering in his e-mail?
 9        A.    No.
10        Q.    Okay.  Number three, you wrote,
11   "Our CFA is Denis McEvoy."
12             What does CFA stand for?
13        A.    Certified financial accountant,
14   perhaps, but I don't know.  I'm not sure.
15        Q.    Is there a certified fund
16   administrator?  Is there such a term?
17        A.    I don't know.
18        Q.    You remember telling the bank that
19   the operation -- that you had an outside person
20   assisting with the fund operation by the name of
21   Denis McEvoy?
22        A.    Yes.
23        Q.    Do you know why the bank asked you
24   that question?
25        A.    No.
```



Page 148

1           Q.      Do you remember during this time

2    that the bank had questions about what was going

3    on with the Signet Bank account?

4           A.      I don't remember.

5           Q.      At any time, did any bank close any

6    of your accounts, the QS accounts, or tell you

7    they were considering closing your accounts?

8           A.      I don't recall that.

9           Q.      All right.  All right, we'll put

10   this one aside and we'll jump to Exhibit 19.

11                  MR. MITRANI:  Let's put up Exhibit

12   19.

13

14                  (Whereupon September 25, 2019 Text

15   from Tracy, Bates No. Seija46198 was received and

16   marked P-19 for identification.)

17

18                  MR. MITRANI:  Blow it up a little

19   bit more.

20           Q.      This has a Seija at the bottom as

21   well, indicating it came from you.  It appears to

22   be a text dated 9/28/19.  Do you see that?

23                  MR. RISPING:  No, you're going to

24   have to -- I'm sorry, blow it up a little bit

25   more.



Page 149

```
 1                    MR. MITRANI:  Can you scroll a
 2    little bit?
 3                    Can you see that better?
 4                    MR. KISLIN:  A little.
 5           A.    A little more would be helpful.
 6                    MR. MITRANI:  Sure.
 7                    Can we blow it up a little more?
 8           A.    That's good.
 9                    MR. MITRANI:  Now we're cutting off
10    the top off, Carlos.  Can you scroll down a
11    little?
12                    MR. ------:  Let me relaunch this.
13                    MR. MITRANI:  Okay.  Sure.  That's
14    pretty good.
15                    Is that good?
16                    MR. KISLIN:  That's very good.
17    Thank you.
18           Q.    Okay.  This is a text, it appears
19    to be a text from Quan Tran to someone named
20    these -- or -- owner.  Is that you?
21           A.    I'm sorry, say that again.  To
22    what?
23           Q.    Well, let me ask you this, do you
24    have a phone number of 908-591-8649, or did you
25    have that number?
```



Page 151

```
 1            A.     I did, yes.

 2            Q.     Do you have a handle or a nickname,

 3    Daaad, with a lot of As?

 4            A.     No, sir.  What happened was, I

 5    upgraded my phone and whoever operated it

 6    inadvertently downloaded my daughter's phone

 7    information on to my phone, so she had me listed

 8    as Daaad.

 9            Q.     So she was your tech consultant

10    listing you as Daaad.  You got a lot of As in that

11    Daaad.

12            A.     I was unaware that it came up like

13    that.  I guess maybe when the phone froze I says

14    Daaad.  I don't know what she did.

15            Q.     She must be a teenager.

16            A.     Yeah.

17            Q.     Okay.  Did you receive this text

18    from Mr. Town on September 26, 2019?

19            A.     Yes, it looks like I did.

20            Q.     All right.  Let's look at that.  It

21    says, "I just spoke with Gary!"

22                   Do you know who he's referring to?

23            A.     He would be referring to Gary

24    Chase from what I can see.

25            Q.     The accountant?
```



MAGNA
LEGAL SERVICES

1      A.    Yeah.

2      Q.    "They called his buddy who runs a

3  hedge fund."

4            Do you know who this buddy is who

5  runs the hedge fund?

6      A.    No.

7      Q.    "Gary also has a multi-Fortune 500

8  companies in the last career.  Also spoke with

9  Steve who says his bank basically does what we are

10 doing."

11           Do you know who Steve is?

12     A.    Yes, sir.

13     Q.    Who is that?

14     A.    Steve Saunders.

15     Q.    Who is Steve Saunders?

16     A.    Steve Saunders was Dr. Toan's

17 assistant.

18     Q.    Was he an employee of one of the QB

19 companies?

20     A.    Yes.

21     Q.    Did he have any equity or profit

22 participation in any of the QB companies?

23     A.    I don't remember.

24     Q.    Were Mr. Saunders'

25 responsibilities, did they include making sure



Page 152

```
 1   everything was done right for the 2B trading
 2   activities?
 3          A.    Yes.
 4          Q.    Does Steve have a separate fund
 5   that he runs or participates in, Steve Saunders?
 6          A.    I don't know.
 7          Q.    It says, "Alan spoke with Steve who
 8   says his fund basically does what we are doing."
 9          A.    Correct.  That was from Dr. Fred to
10   me, so I'm not sure what he's referring to there.
11          Q.    Okay.  "Every person has said what
12   we are currently doing is correct and commingling
13   investor funds with the operating company is an
14   absolute no-no."
15                So do you know what he's referring
16   to there?
17          A.    No.
18          Q.    When he says, what we're doing is
19   correct, do you know what he's referring to?
20          A.    No.
21          Q.    Dr. Iran writes, "In no
22   circumstances should you send money to the
23   operating company."
24                Do you know what that refers to?
25          A.    No.
```



Page 153

1        Q.    Do you know whether he's referring

2  to sending new investor funds to the QSI or QS

3  Holdings operating account?

4           MR. SPERBER:  Object as to form.

5        A.    I don't know.

6        Q.    Okay.  Do you remember speaking to

7  Mr. Chen about this text?

8        A.    No.

9           MR. WITMAN:  And let's scroll down

10  a little.

11        Q.    And then at the bottom here, "We

12  need to let Polsinelli look at our operating

13  agreements and let them confirm."

14           Do you see that?

15        A.    I do.

16        Q.    Do you know whether he's referring

17  to Polsinelli conferring with Gary Chodes, the

18  accountant?

19        A.    I don't.

20        Q.    Did you yourself contact Polsinelli

21  after receiving this text?

22        A.    I don't recall.

23        Q.    And do you know whether the

24  operating agreements for any of the QS entities

25  were sent to Polsinelli at any time?



Page 154

1        A.     I don't recall.

2        Q.     Were you expecting Dr. Tran to take

3    whatever steps he felt necessary at this time

4    regarding the flow of funds and what Dr. Tran

5    wrote about in this text?

6        A.     Yes.

7               MR. BREBIA:  Object to form.

8        Q.     Did you view this text as mostly

9    informational, letting you know what was going on?

10              MS. SHERING:  Object as to form.

11       A.     I don't remember how I viewed it,

12   but it seems informational.

13       Q.     Right.  And who had the follow up,

14   if any, as a result of this text?

15       A.     I don't remember.

16       Q.     Would it be Dr. Tran?

17              MR. SHERING:  Object as to...

18       A.     I don't remember.

19       Q.     All right.  Let me show you now

20   Exhibit 11.

21

22              (Whereupon September 27, 2019

23   K-ng J, Daley No. Beijas71348 was received and

24   marked E-11 for identification.)

25



Page 155

```
 1                    MR. MITRANI:  Scroll from the
 2     bottom and work our way up.
 3            A.      From Iran to Nicole, or.  Okay.
 4            Q.      All right.  So let me just stop
 5     here and ask you about this.  Do you remember
 6     receiving this e-mail from Dr. Tran, September 27,
 7     2019?
 8            A.      No.
 9            Q.      Do you have any recollection of the
10     possibility or need to open up a third account
11     called QBL LIQUID?
12                    MR. SHEBIB:  Object as to form.
13            A.      I vaguely recall an extra step that
14     may have been suggested to us, that we open one
15     more account labeled the QBL LIQUID account, to
16     make the accounting one step more transparent, but
17     that it wasn't required but it may be a
18     suggestion.
19            Q.      And is that something Dr. Tran told
20     you?
21            A.      Yes.
22            Q.      Do you know where he got the
23     information from?
24            A.      I don't remember.
25            Q.      Would it be from Gary Cardone, the
```



Page 156

1    accountant?

2              A.      I don't remember.

3              Q.      Did you yourself have any

4    involvement with the decision to open up another

5    account or not open up another account?

5              A.      I don't remember.

7              Q.      And do you know whether this

8    account was actually opened?

9              A.      I don't believe so, but I don't

10   remember specifically.

11             Q.      And why not?

12             A.      I don't know.

13             Q.      Who had responsibility within the

14   2x companies to make the decision of opening up

15   this account or not?

16             A.      We all did.

17             Q.      All right then.  Let me show you

18   Exhibit 13 now.

19

20                     (Whereupon October 9, 2019 text to

21   Tien Rey Celia, Bates No. Self294005 was received

22   and marked # 13 for identification.)

23

24             Q.      Is this a text that you sent?

25             A.      I don't know.  Is it?  It says,



Page 157

1    "from owner."

2                    I'm not sure who that is.

3         Q.    Right.  And who is Creacher?

4         A.    That would be Mr. Ackerman.

5         Q.    All right.  Just so you get, this

6    is a document you produced to us, or to the

7    plaintiff law firm, and then we later got it from

8    the plaintiff's law firm.

9                    MR. MORAN:  We'll flip up here

10   if we can.

11        Q.    Do you remember any calls from

12   Denis McEvoy to you in October of 2019?

13        A.    The chronology is what I don't have

14   memory of.  I remember speaking to Denis about

15   the arbitrage situation, but I don't know, in

16   October, I don't recall.

17        Q.    All right.  So putting aside the

18   date, tell me what you remember, as you sit here

19   today, September of 2020, about your discussion

20   with Denis McEvoy.

21                    MR. SEFFRIN:  Object as to form.

22        A.    That we asked him to give us legal

23   opinion and counsel on whether the accounting

24   issue was a valid way to continue to pursue them.

25        Q.    All right.  Let me just -- I'm



1    going to go slow with you if I can.

2            A.      Okay.

3            Q.      Putting aside dates -- I understand

4    you're having a hard time with dates, right?

5            A.      Yes.

6            Q.      All right.  So putting aside the

7    date, you remember at some point calling Denis?

8            A.      Yes.

9            Q.      Denis McKeuy?

10           A.      Correct.

11           Q.      And what did you tell him as best

12   you remember today?

13                   MR. FREEDLE:  Object as to form.

14           A.      Ye explained the way that the

15   material funds were moving and because we had

16   commissions and we had money on market

17   fluctuation, there was an accounting work around

18   that as long as dollars are tangible, we were

19   allowed to make sure the ledgers all match and

20   would    be acceptable to operate the fund the way

21   the    we wanted to operate it in that fashion.

22           Q.      Okay.  We had seen that the issue

23   came up in July when we looked at Exhibit 6 and 7.

24   Do you remember these?

25           A.      Yes.



Page 159

1          Q.     And you had written the back in

2     July of 2015 that both Gary Chafee, Ben & McEvoy

3     had told you that the way you were handling the

4     funds was fine.  Is that right?

5          A.     Yes.

6          Q.     Did the issue come up again in the

7     fall of 2015 or some point thereafter, after the

8     July 2015 e-mails?

9          A.     I don't remember.

10         Q.     So now back to your discussion with

11    Denis.  You asked Denis McEvoy whether the

12    accounting work-around, as you described,

13    regarding the flow of funds would be acceptable?

14         A.     Yes.

15         Q.     And you asked him because he was

16    the fund administrator?

17         A.     Correct.

18         Q.     And you also asked him because Mr.

19    McEvoy purported to have experience in the

20    operation of funds, right?

21         A.     Yes.

22         Q.     Do you remember anything else about

23    your conversation with Mr. McEvoy other than the

24    question you posed to him?

25              MS. SIEGEL:  Objection to form.



Page 160

```
 1            A.      The only thing I remember is
 2    explaining to him the way the accounting was done,
 3    and his comment that he checked with Edelmann
 4    and they're comfortable with it and that dollars
 5    are fungible, and as long as the accounting is done
 6    properly and everything matches up, it doesn't
 7    matter what dollar goes where and if that
 8    alleviates us moving money from one pile from one
 9    another to another and cuts down on commissions
10    and market fluctuations and expenses, that it
11    would be an appropriate way to do it.
12            Q.      Did you have one call with Denis
13    where you asked the question and then he called
14    you back or where would he was calls, or was it
15    just one conversation, or you just don't remember?
16                    MR. SIKON:   Object as to form.
17            A.      I don't remember.
18            Q.      You don't remember --
19            A.      He called.  Sorry.
20            Q.      Do you remember whether you asked
21    the question to Denis and he gave you the answer
22    in that call or was it you called Denis, posed the
23    accounting question to him, and then he called you
24    back at some point thereafter?
25                    MR. SHERIN:   Objection as to form.
```



Page 161

```
 1              A.     It would be the latter, sir.  He
 2    was checking into the answer and got back to me
 3    with what the advice was that he came up with.
 4              Q.     Do you know who Felix may have
 5    spoken to at the firm until first?
 6              A.     No.
 7              Q.     Do you remember the call with
 8    Denis?
 9              A.     Yes.
10              Q.     Do you remember Denis telling you
11    anything other than what's written in this text in
12    front of you, Exhibit 17?
13              A.     Other than what I just described,
14    no.
15              Q.     Do you know what information Denis
16    provided to Polsinelli?
17              A.     No.
18              Q.     Were you on the call with
19    Polsinelli?
20              A.     No, the Denis call.
21              Q.     Okay.  Did you ask McEvoy to get
22    some kind of written opinion from Polsinelli?
23                     MR. BEEBE:  Objection as to form.
24              A.     I don't remember.
25              Q.     Did you have any contacts with the
```



Page 162

```
 1   way the funds were being handled at this time,
 2   October of 2016?
 3         A.    No.
 4               MR. MITRANI:  Put this one aside.
 5         Q.    Do you have any other recollection
 6   regarding your call with Denis McVey on this
 7   topic that we haven't discussed so far?
 8               MR. SHULER:  Objection as to form.
 9         A.    No.  No, sir.
10         Q.    All right.  Let me show you now
11   what is Bates stamped Scinto41919.
12               MR. MITRANI:  Hold on, Carlos.
13               MR. AYALA:  Okay.  Let me know.
14               MR. FREEDE:  Is this an exhibit?
15               MR. MITRANI:  Yeah, I'm going to
16   pull up another exhibit here.
17               MR. SHULER:  Okay.
18               MR. AYALA:  I may need a recess
19   soon.
20               MR. MITRANI:  Do you want a short
21   break, would that help?
22               MR. STETIN:  Sure.
23               MR. MITRANI:  And then we'll get
24   our documents organized.
25         A.    That would be helpful.  Thank you.
```



Page 163

```
 1    a r.

 2              Q.     Five or ten minutes, what do you

 3    need?

 4              A.     10 minutes would be fine, thank

 5    you.

 6              Q.     You got it.

 7              MR. ZUVBAN1:  Okay.  Note the time,

 8    Madam Court Reporter.  We'll be back at 1:56.

 9              MR. RISDCK:  Thanks, Isaac.

10

11              (Whereupon there was a brief

12    recess.)

13

14    BY MR. ZUVBAN1:

15              Q.     Mr. Stines, let me show you Exhibit

16    7 again.

17              A.     Okay.

18              Q.     Exhibit 7, which we've already

19    discussed, you were writing to Joe back on July 6,

20    2018 about your having spoken to Gary Stadee and

21    Denis McLvoy about the handling of investor trade

22    and payment of profits, right?

23              A.     It appears that way, yes.

24              Q.     Do you know why you revisited that

25    issue in that text we just saw from October of
```



Page 164

```
 1   2019?
 2              A.      No, I don't remember why I did
 3   that.
 4              Q.      Okay.  Do you know if the bank had
 5   follow up for you?
 6              A.      I don't remember if they followed
 7   up.
 8              MR. WILLIAMS:  All right.  We can
 9   take down the document.
10              We'll mark as the next exhibit
11   Smijse/094.  Can you pull that up, Carlos?
12              What exhibit number is this,
13   Carlos?
14              MR. AYALA:  This will be Exhibit
15   23.
16              MR. KITRANT:  23.
17
18              (Whereupon, Document, Bates No.
19   Smijse/094 was received and marked 23 for
20   identification.)
21
22              Q.      Take a look at it and I ask you if
23   this is a monthly update that you sent to the
24   investors?
25              A.      Yes.
```



1          Q.     Was the 23 fund sending monthly
2   reports to all investors?
3          A.     I believe so.
4          Q.     And were they mostly written and
5   sent by Mr. Ackerman?
6          A.     Yes.
7          Q.     Every now and then you would send
8   it yourself?
9          A.     He would send me all the
10  information and a loose interpretation of the
11  writing and I would just wordsmith it for him and
12  send it out.
13         Q.     Or would the monthly statements
14  typically go out under your signature -- or under
15  your initials to be more accurate?
16         A.     Not at first, but later on, yes.   I
17  don't remember the terminology of that.
18         Q.     So it's first Michael Ackerman
19  would send out the monthly reports, but later you
20  took that job over with the information that
21  Ackerman gave you?
22         A.     With all the information he
23  provided me and the basic skeleton of the writing
24  that I would just simply scream in and spell-check
25  and rearrange, yes.



Page 166

```
 1              Q.     And the data that you're providing

 2    to the investors in this September 2019 update is

 3    based strictly on what Mr. Ackerman is telling

 4    you, correct?

 5              A.     Yes.

 6              Q.     Did you yourself check any of the

 7    data or reading that Ackerman gave you?

 8              A.     Not in my recollection, no.

 9              MR. MITRANI:   Okay.  We'll go to

10    the next exhibit.  Let's jump now to 12918.  Let's

11    put that up and, Carlos, give us an exhibit number

12    for that.

13              MR. AYALA:   This will be 24.

14

15              (Whereupon Document, Bates No.

16    Haijan3016 was received and marked P 24 for

17    identification.)

18

19              MR. AYALA:   You should see it on

20    the screen.

21              MR. TIRENI:   Jenny, before we get

22    to the next question, can I -- I have to clarify a

23    question.

24              MR. MITRANI:   Go ahead.  Go ahead.

25              MR. SIEGEL:   Thank you.
```



```
 1
 2                   (Whereupon, there was a discussion
 3     off the record.)
 4
 5                   MR. RUBBLE:   James wants to just
 6     clarify something about the last piece of
 7     testimony that he gave.
 8             Q.    Okay.  Go ahead, sir.
 9             A.    I believe your question was, did I
10     verify the returns.  So I would like to amend my
11     answer by saying that yes, I verified, given the
12     fact that I spoke with him every day, I got
13     numbers from him every day, I spoke to him
14     multiple times every day and evenings.  He
15     provided me screenshots of what he was purporting
16     the results to be.  He provided video of the algo
17     trading.  So in that form, I did verify the
18     information that he was providing to me before I
19     sent that report out.
20             Q.    Do you still have these videos?
21             A.    I believe I did.  I turned
22     everything I had over, but I'm not sure.
23             Q.    Okay.
24                   MR. RUBBLE:   Is that something
25     that was produced, Adeeb or Iason, do you know if
```



Page 169

```
 1   the videos were produced?

 2                    MR. OSTIN:  Yeah, yeah, the

 3   videos were produced and we have them.

 4                    MR. NIVEANI:  Okay.

 5                    MR. OSTIN:  I can tell you for

 6   sure they were produced to --

 7                    MR. NIVEANI:  No worries, I got it.

 8          A.      And I do have every daily number

 9   and I do have screenshots, I know I have that.

10          Q.      And Mr. Seijas, at any time before

11   all this imploded in an unfortunate way, which I

12   know has affected you, did anybody ever suggest

13   that you needed to look at the source information;

14   in other words, log into the trading account

15   itself?

16          A.      Not that I recall.

17          Q.      Did you ever discuss that with Mr.

18   Tran, should we take a look at the account

19   information ourselves to make sure it wasn't

20   giving us the right information.

21          A.      Not that I recall.

22          Q.      Did the accountant suggest that to

23   you?

24          A.      Not that I recall.

25          Q.      All right.
```



Page 169

```
 1              A.      It was a 20-year relationship with
 2    a guy I trusted and a friend, an.
 3              Q.      I understand.  All right.  And we're
 4    going to show you the next exhibit.
 5              MR. KUDRANS:  What number again,
 6    Carlos?
 7              MR. AYALA:  Number 24.
 8              Q.      Showing you 24, is this a text you
 9    sent to Mr. Ackerman in 2018?
10              A.      It looks like it.
11              Q.      Can you tell me what you were
12    trying to convey to him?
13              A.      No, I don't recall any of that.
14              Q.      Do you know what the "shred of
15    doubt" is that you were writing about?
16              A.      No.
17              MR. KUDRANS:  Okay.  We can drop
18    that.  Go ahead and drop that, Carlos.  That was
19    2019.
20              Q.      I'll show you a string of documents
21    here.  I'm going to give you Seifas25600.
22              MR. AYALA:  This will be 25.
23
24              (Whereupon Document, Bates No.
25    Seifas25600 was received and marked P-25 for
```



Page 170

```
 1    identification.)

 2

 3                   MR. MITRANI:  Exhibit 25.

 4          Q.     Is this a text that you received

 5    from Michael Ackerman?

 6          A.     It looks that way.

 7          Q.     He writes here, "I'm the Admin you

 8    have all passwords.  Very important  we make sure

 9    investors are comfortable."

10                 You see that?

11          A.     Yes.

12          Q.     Did you ask him for all passwords

13    to all trading accounts in February of 2019?

14          A.     I don't specifically recall, but

15    I'm sure we did.

16          Q.     And was this something that was

17    important for you to have, the passwords to all

18    the trading accounts?

19          A.     Yes.

20          Q.     Why was that important for you to

21    have?

22          A.     To make sure we had access to the

23    trading accounts if we needed it.

24          Q.     Okay.  Did he send the passwords?

25          A.     Yes.
```



Page 171

```
 1              Q.      All right.   Showing you now 25699.

 2

 3                      (Whereupon Document, Bates No.

 4      Seijas25699 was received and marked P-18 for

 5      identification.)

 6

 7              Q.      Did you receive this text from Mr.

 8      Ackerman?

 9              A.      It looks like I did, yes.

10              Q.      And this was to confirm that you

11      had all the passwords?

12              A.      I believe so.

13              Q.      What coins were you trading, sir?

14              A.      I don't recall.

15              Q.      Did you ever ask Mr. Ackerman that?

16              A.      Yes, and had a list of coins to

17      watch for ranges every night.   I could name some

18      of them, I don't know what relevance it has.

19              Q.      Okay.   So tell me which coins you

20      remember trading.

21              A.      Bitcoin, Flight Coin, Ethereum.

22      It's amazing how quickly you forget those.  XRP,

23      XRP, which is, I think, Lumens and Ripple.   It's

24      amazing.   I should remember more of them, but

25      yeah.
```



Page 177

```
 1          Q.    All right.  Showing you the next
 2   exhibit, Seijas2046.
 3               MR. MITRANI:   Carlos, give us an
 4   exhibit number for that.
 5               MR. AYALA:   The one we just saw was
 6   26 and we're about to see 27.
 7
 8               (Whereupon Document, Seijas No.
 9   Seijas2046 was received and marked P-27 for
10   identification.)
11
12               MR. AYALA:   Mr. Mitrani, can you
13   repeat the sequence one more time?
14               MR. MITRANI:   Seijas2046.
15          Q.    Is this a text that you received
16   from Mr. Ackerman in February -- on February 22nd,
17   2019?
18          A.    I don't recall it, but it looks
19   that way.
20          Q.    Mr. Ackerman writes, "Thus my point
21   in taking all ins-- or contributions and leaving
22   in checking so we have a slush fund.  Easier,
23   cheaper and more efficient."
24               Do you know what he's referring to?
25          A.    No.
```



Page 173

1          Q.     All right.  Let me show you
2    Seitjas26983 is the next exhibit.
3                     MR. AYALA:   This will be Exhibit
4    No. 28.
5
6                     (Whereupon Document, Bates No.
7    Seijas26983 was received and marked P-28 for
8    identification.)
9
10          Q.     Is this a text that you received
11   from Dr. Tran on March 15, 2018?
12          A.     I don't recall it, but it looks
13   that way.
14          Q.     And do you know whether you ever
15   thought that it would look suspect if you added
16   $10 million of investor money each month?
17          A.     No.
18          Q.     Do you have any recollection as to
19   what you were referring to in this -- I'm sorry.
20   Do you have any recollection as to what Dr. Tran
21   was referring to when he came up with or discussed
22   this idea?
23          A.     No, sir, I don't.
24          Q.     All right.  I'm going to show you
25   next Seijas31924.



Page 174

```
 1                  MR. AYALA:  This will be Exhibit

 2    25.

 3

 4                  (Whereupon Document, Bates No.

 5    SA_De31924 was reviewed and marked R-20 for

 6    identification)

 7

 8         Q.      Did you send this text on June

 9    10th, 2019?

10         A.      I don't recall it, but apparently.

11         Q.      All right.  And let me ask you, do

12    you remember that in 2019 Polsinelli was telling

13    you you needed to register or the company needed

14    to register as an investment advisor?

15                 MR. SHEETS:  Object as to form.

16         A.      Do I recall that they -- sorry, say

17    again.

18         Q.      Do you remember that during this

19    timeframe, June 10, 2019, you learned that

20    Polsinelli was telling the Q3 companies that they

21    needed to register as investment advisors?

22                 MR. SHEETS:  Objection.

23         A.      Again, as to chronology and the

24    timeframe I'm not sure, but yes.

25         Q.      All right.  But putting aside the
```



Page 176

```
 1    date, do you remember that Pols ralli gave the

 2    advice that the 99 fund needed to register as an

 3    investment advisor?

 4           A.     Yes.

 5           Q.     And was David in [] agreement with

 6    the advise?

 7           A.     to the [] result.

 8           Q.     The reason I ask is, this says,

 9    "Them: Register, [.s: No."

10           A.     Sir, may I provide context?

11           Q.     Yes, please, go right ahead.

12           A.     You know, some of this is banter

13    and, you know, locker room talk, and it's like if

14    you tell your kid, you're doing your homework, and

15    he says, no, I'm no, well, he's doing his

16    homework.  And so, you know, it's just sometimes

17    we would text things back and forth just, you

18    know, as guys having fun.

19           Q.     Okay.  I get that.  Let me show

20    you Smijus31919, which is the same day, June 19,

21    2019.

22                  MR. MIZRAHI:  Go ahead and put that

23    up please, Carlos, 31919.

24                  MR. AYALA:  This will be No. 33.

25
```



Page 176

1                (Whereupon Document, Bates No.

2    Bitres31915 was received and marked E-JC for

3    identification.)

4

5          Q.    Did you send this text on June

6    10th, 2019?

7          A.    It looks like it ... don't recall

8    , but it looks like ... d d.

9          Q.    Do you remember any calls with

10   Polsinelli in June of 19?

11         A.    Not specifically, no.

12         Q.    All right.

13               MR. KITRABI:  And now, Carlos, go

14   back to the prior exhibit, same date, June 10th,

15   2019.

16         Q.    Do you see this is dated the same

17   day as the other text saying, "We have a call with

18   Polsinelli"?

19         A.    Yes.

20         Q.    Does it a refresh your recollection

21   that Polsinelli gave the advice that QB needed to

22   register as an investment advisor?

23         A.    Yes.

24         Q.    And were you resisting that advice

25   when you wrote "Us no")



Page 177

1        A.     No, sir.  Fully intended to do

2   everything that they expected us to do.  That was

3   just banter, it was a silly text.

4        Q.     Okay.  I understand.  I understand.

5               Let me show you the next exhibit,

6   41910.  These are all Seijas produced ones.

7        A.     Okay.

8               MR. AYALA:  This is exhibit -- 91.

9

10              (Whereupon  Document, Bates No.

11   Seijas41910 was marked and marked 2-91 for

12   identification.)

13

14        Q.     Is this a text that you sent on

15   November 15, 2019?

16              MR. MIZRAHI:  And scroll down.

17   Cause, so the witness can see the whole thing.

18        A.     Okay.

19        Q.     Did you send this text?

20        A.     Apparently I did.  Looks like it.

21        Q.     And you sent it to Dr. Tran and

22   Michael Ackerman?

23        A.     Looks like it.

24        Q.     "I'm sending trading alerts all

25   right."



Page 179

```
 1                  Can you tell me what that means?
 2          A.     I don't recall, but I would assume
 3    it meant I was watching the trading ranges all
 4    night and was sending alerts.
 5          Q.     Right.
 6          A.     Meaning I was -- red, probably
 7    crabby.
 8          Q.     Okay.  You say, it at 2:0 p.m.?
 9          A.     Right, may have been up all night
10    I don't know.  I don't remember.
11          Q.     Okay.  I hear you.  But you had
12    told us before that one of the things you tried to
13    do was keep an eye on the movement of crypto coins
14    during the night to the extent Bateman might have
15    been asleep.  Is that right?
16          A.     Could be.  I don't know, I don't
17    remember.  Yeah, I mean, that's what I did, yes.
18          Q.     Right, generally, right.  "I did a
19    call" -- I'm reading here -- "I did a call
20    yesterday and getting $250k."
21                  Were you speaking to a new investor
22    about potentially having the investor put in
23    another $250,000?
24          A.     No.  I don't recall, specifically,
25    but it looks like that probably was the case.
```



Page 179

```
 1            Q.     "Speaking and e-mailing Denis to

 2     get the registration moving."

 3                   Why does that refer to?

 4            A.     I was frustrated that the

 5     registration process was taking so long and that

 6     we wanted to get the best avenue to register.

 7            Q.     Are you referring to registering as

 8     an investment adviser?

 9            A.     I believe I was, yes.

10            Q.     And then it says here, "Sent

11     important paperwork twice two months ago express

12     mail to get Signature Bank account away as per our

13     attorney recommendation and it's not done."

14                   Do you have any recollection, as

15     you sit here today, what that refers to?

16            A.     No.

17            Q.     Is it fair to say that you were not

18     getting cooperation or paperwork from Michael

19     Ackerman or Mr. Tran?

20                   MR. SEBBEB:   Object as to form.

21            A.     I don't know what my mindset was at

22     that time, sir.

23            Q.     According to the e-mail, you sent

24     paperwork two months ago, but it had not been

25     done, right?
```



Page 180

```
 1              A.      Again, I don't want to testify as
 2    to my mental state at that time, if I was up all
 3    night and Jon Crosby was saying stuff as
 4    whether -- yeah, I don't remember.
 5              Q.      But just factually, do you remember
 6    sending paperwork to Tran and Ackerman and two
 7    months go by and they didn't sign it and give it
 8    back to you?
 9              A.      Actually no, I don't remember.
10              Q.      All right.  And was the market
11    dropping around this time?
12              A.      I don't recall, but it looks like
13    it does, what I wrote.
14              Q.      And were you upset that your alerts
15    to Michael Ackerman were not being responded to by
16    Ackerman?
17              A.      I don't know, I guess so.  It looks
18    like it from that, but I don't remember.
19              Q.      And why were you frustrated at this
20    time, sir?
21              A.      I don't remember why I was
22    frustrated.
23              Q.      Well, during this -- this is
24    November 6, 2019.  Was Michael Ackerman showing
25    signs of acting erratic at this time?
```



Page 101

1              MR. SMITH:  Objection as to form.

2         A.    And that  result.

3         Q.    Was there a period of time where he

4    began to appear to be erratic?

5         A.    No.

6         Q.    Never?

7         A.    Not that I recall, sir.

8         Q.    All right.  We'll show you the next

9    exhibit which is 41528.

10

11              (Whereupon document, Bates No.

12   Beijas41928 was received and marked P-32 for

13   identification.)

14

15         Q.    Is this a text that Mr. Ackerman

16   sent you and Dr. Teza on November 15, 2019.

17         A.    It appears that way.

18         Q.    And do these numbers reflect what

19   Ackerman is telling you is the current value of

20   the lines of your crypto trading account?

21         A.    It appears that way.  I'm not sure,

22   but it looks like the top number would be a daily

23   profit and loss number and the bottom number would

24   probably be the total amount balance, but I'm not

25   sure.


MAGNA
LEGAL SERVICES

Page 182

```
 1              Q.      Okay.  But did Ackerman generally
 2      send you texts like these showing you the daily up
 3      or down and the total account balance?
 4              A.      I don't recall.
 5              Q.      Are you telling me, over the two
 6      years or so that you were in this, that you don't
 7      remember whether Ackerman would send you texts
 8      with account balances?
 9                      MR. SEEBIB:  Object as to form.
10              Q.      And daily profits?
11                      MR. SEEBIB:  Object as to form.
12                      MR. KIELIN:  You can answer the
13      question.
14              A.      We had discussions over the phone,
15      sometimes he would e-mail it, sometimes he would
16      text it, sometimes he would tell me over the
17      phone, so --
18              Q.      Okay.  That's fair.
19              A.      -- I don't recall what he did.
20              Q.      Right.  I understand.  And this
21      appears to be one of those texts where he's giving
22      you the daily profit as well as the total account
23      balance, right?
24              A.      It does appear that way, yes.
25              Q.      All right.  So let me help you.
```



Page 183

```
 1      Let's look now at Seijas41931, and you'll see --

 2     this is -- before we leave, this is dated

 3     11/16/2019.

 4                    MR. SHEBIB:  Sorry, is this

 5     Exhibit -- I don't think we said an exhibit number

 6     for this one that we were just about to leave.

 7                    MR. AYALA:  We just left Exhibit

 8     32.

 9                    MR. ? IRANI:  32.  So now we're

10     going to show you a text the same day,

11     Seijas41931.

12

13                    (Whereupon Document, Bates No.

14     Seijas41931 was received and marked P-33 for

15     identification.)

16

17                    MR. KIWANI:  What number is this,

18     Carlos?

19                    MR. AYALA:  That's Exhibit 33.

20          Q.     Is this a text you received from

21     Dr. Tran with a copy to Ackerman of the same date

22     11/16/2019?

23          A.     It appears that way.

24          Q.     "Mike, those numbers don't make

25     sense.  That was yesterday's end total.  And
```



Page 184

```
 1     ISOHY"

 2                    Do you remember this text?

 3          A.    I don't.

 4          Q.    Do you remember that sometime in

 5     November Ackerman told you that the trading

 6     account had made $190 million in profit for one

 7     day?

 8          A.       don't recall, sir, but   may

 9     have been a misprint or a mistype or just an error

10     that was caught by us, too.

11          Q.    Okay.  Do you remember this

12     vaguely?

13          A.    No.

14          Q.    All right.  Did Ackerman ever tell

15     you that he made $190 million one day?

16          A.    Verbally, sir?

17          Q.    Yes, or in any way?

18          A.    No.

19          Q.    All right.  And now let's look

20     at -- let's look at 41902, also dated the same

21     time.

22                    MR. MIRIANI:  Put that up, Carlos.

23                    MR. AFALA:  This will be Exhibit

24     34.

25
```



Page 186

1                    (Whereupon Document, Bates No.
2     Baiju-41952 was received and marked P-31 for
3      identification.)
4
5               Q.     Do you remember this e-mail from
6     Mr. Tran to you and Mr. Ackerman, same date,
7     11/18/2018?
8               A.     No.
9               Q.     Do you remember anything in
10    November 2018 that there appeared to be some
11    discrepancies in the account as to the account
12    balances that Mr. Ackerman was reporting?
13                    MR. SHERIN:   Object as to form.
14              A.     I don't remember specifically, no,
15    but again, there would have been a mistQint or a
16    mistype or some type of error that he made in
17    reporting that was caught, but I don't remember
18    specifically, no, what that was referring to.
19              Q.     Well, do you remember generally,
20    November 2018, he would report the identical
21    account balance one day as compared to the other
22    day?
23              A.     No.
24                    MR. SHERIN:   Object as to form.
25              A.     No.



Page 186

1          Q.      Do you remember having just the

2    beginning, the very beginning of concerns about

3    Mr. Ackerman during mid November 2019?

4          A.      No, sir.  He reported every day, so

5    every once in awhile if there was an error, sir,

6       wasn't alarming, it was just figured out.

7          Q.      Was this one figured out, this

8    where he reported a profit of $190 million for a

9    day?

10         A.      I don't remember, but I'm sure i

11   was adjusted.

12         Q.      Were you beginning to have concerns

13   in the middle of November 2019 that he was -- he

14   had a drinking problem?

15         A.      No, sir.

16         Q.      Did you ever come to have that

17   concern that Ackerman had a drinking problem?

18         A.      No, sir.  I was unaware.

19              MR. SHESLER:  Objection to form.

20         Q.      Never?

21         A.      No.

22         Q.      All right.

23              MR. MURRAY:  All right.  Let's

24   look at 42593.  Let's put up 42593, please.

25   Carlos.



Page 187

1        A.      May I play Ty for a second?

2        Q.      Sure.

3        A.      I was no doctor at all until the

4   very beginning of December when he told me he had

5   pneumonia and then I then found out that he had

6   alcoholic pancreatitis, so I was not aware until

7   that time that something may be wrong.

8        Q.      Okay.  And that was what, December

9   1 or December 2 of 2019?

10       A.      Correct.

11               MR. KOTBAND:  All right.  Let's put

12   up the next exhibit, Carlos.

13               MR. AYALA:  This is Exhibit 35.

14

15               (Whereupon Document, Bates No.

16   (e jax0292) was received and marked T 35 for

17   identification.)

18

19       Q.      Do you remember sending this text

20   on December 1st?

21       A.      No, sir, but I'm not saying I

22   didn't.  I don't remember it.

23       Q.      That's fine.

24               This is dated December 1, 2019 from

25   you to Mr. Ackerman, right?


MAGNA
LEGAL SERVICES

Page 100

1          A.      Yes.

2          Q.      And was there an issue about how
3    much money was in the account on December 1, 2019?

4                  MR. BEEBER:   Objection as to form.

5          A.      No, sir.  Occasionally he would
6    send -- midnight would be the cutoff date for
7    whatever the number was and every once in a while
8    if we had a large position or the markets were
9    moving, he asked to extend reporting the number
10   for another hour or two so that we can unwind
11   positions and post up a number.  So again, I don't
12   remember the specifics of this particular text,
13   but in context, it looks like I'm telling him that
14   it's the end of the month and you put the number
15   up when it is and go to -- and get some rest.

16         Q.      Okay.  At some point on December
17   1st, 2019 or prior, had you told Ackerman to stop
18   trading?

19         A.      Yes, when he reported to me that he
20   had plunged in.

21         Q.      That would have been on December 1
22   or December 2 of 2019?

23         A.      I don't remember the exact date,
24   sir, but yes that's pretty much the right time.

25         Q.      And why did you tell him to stop



Page 193

1   trading?

2           A.      Because if he had payments he

3   would be unable to monitor the Algo and trade

4   properly.

5           Q.      And he was -- where was he located?

6           A.      In Ohio, sir.

7           Q.      And where were you located, in New

8   Jersey?

9           A.      Yes.

10          Q.      Did you fly out to see him?

11          A.      No, sir, I drove out.

12          Q.      Okay.  All right, trick question,

13  trick answer.

14          A.      No, I --

15          Q.      No, you're being accurate.  That's

16  not a problem.

17                  All right.  And why did you decide

18  to see him in person?

19          A.      I became concerned about his

20  health.

21          Q.      How long did it take you to drive

22  from New Jersey to where he was located?

23          A.      Approximately 10 hours.

24          Q.      So did you just drive all night and

25  get there?



Page 190

```
 1              A.     I left in the morning and got there
 2   in the evening.
 3              Q.     All right.  Do you know the exact
 4   date that you got there?
 5              A.     Do I know the exact date?  I would
 6   have to look at a calendar which would help me
 7   remember, but I believe it was a Monday or
 8   Tuesday, December 2 or 3.  I don't want to say
 9   exactly, but that's about right.
10              Q.     Do you remember if you got there on
11   Monday or a Tuesday?
12              A.     I don't remember.  I never thought
13   I'd forget that, but I don't.
14              Q.     All right.  We can track it.  I
15   understand.
16              A.     I can get you the answer, I just
17   don't remember off the top of my head.
18              Q.     That's good.  I understand that.
19   So Ackerman has pneumonia and you're concerned for
20   him so you drive out to see him?
21              A.     That's correct.
22              Q.     Did you -- when did you learn that
23   he had the alcoholic pancreatitis, before you got
24   in the car and drove to see him?
25              A.     That's when I became concerned
```



Page 191

1    about it because that's who Dr. Tran told me they

2    were reporting at the hospital.

3           Q.     Okay.  So before you decided to go

4    see Buy in person, you learned that he had

5    alcoholic pancreatitis?

6           A.     That was one of the reasons why I

7    decided to go see him in person, yes.

8           Q.     All right.  You were concerned that

9    the guy behind the account might have been an

10   alcoholic at that time?

11                 MR. BERRA:  Objection as to form.

12          A.     No, sir.  At that point I was

13   concerned that my friend wasn't feeling well.

14   That my friend wasn't feeling well.  I'm not a

15   doctor, so I don't know.

16          Q.     Had you seen him in person before?

17          A.     Before when?

18          Q.     Since the genesis of the oj Trading

19   Corp?

20          A.     Yes.

21          Q.     When was the last time you had seen

22   him before you elected to drive and see him?

23          A.     I believe October of '19.

24          Q.     Did Tran call you and tell you that

25   he had this alcoholic pancreatitis?



Page 192

```
 1            A.     To my recollection, yes.
 2            Q.     Did Tran tell you he was concerned
 3    that Ackerman might have been an alcoholic?
 4            A.     No.
 5            Q.     Did you and Tran have any
 6    discussion before you got in the car that
 7    Ackerman was being erratic?
 8            A.     No, that -- really, no.  I don't
 9    remember.
10            Q.     Did Tran express any concerns to
11    you about Ackerman's driving ability?
12            A.     No.
13            Q.     Before getting in the car, did you
14    check the Bitfinex account yourself to see how
15    much money was in there?
16            A.     No, sir.
17            Q.     So you got to the house that Monday
18    or Tuesday at about 5:00 or 6:00 at night?  Is
19    that right?
20            A.     Approximately.
21            Q.     And who was at the house?
22            A.     Michael and his -- and Stacey.
23            Q.     That would be his ex-wife?
24            A.     Yes, sir.
25                   MR. SUSMAN:  And we can put down
```



Page 193

1    this document, Carlos.  Thanks.

2            Q.      Did you speak to Ackerman?

3            A.      Yes.

4            Q.      And tell me about that discussion.

5            A.      He just seemed tired and he seemed

6    unwell.

7            Q.      So did you ask him how much money

8    was in the account?

9            A.      I don't remember.  I may have.

10           Q.      What did he say --

11           A.      With all due respect, the

12   particular timeframe is very fuzzy for me because

13   it was traumatic.

14           Q.      Okay.  I hear that one I'm sorry I

15   have to discuss the timeframe with you.

16           A.      That's okay.  I'll do the best I

17   can.

18           Q.      That's fine.

19                   Did some concerns arise as a result

20   of that visit in your mind about Ackerman and his

21   stability?

22                   MS. SINGLA:  Objection as to form.

23           A.      Within the course of that trip,

24   yes, but not until Evan came out and we addressed

25   the result, the first night that Evan came out.



Page 194

1    Not until the next day.

2         Q.    All right.  So yeah, let me get to

3    that.  So you get there Monday or Tuesday.  Does

4    Tom get there the next day?

5         A.    Again, I'm fuzzy on that, but

6    believe Tom got there Wednesday and then we

7    stayed in a hotel together and then we went back

8    Thursday to shut everything down and, you know, do

9    what we needed to do.

10         Q.    All right.  Did you call Tom as a

11    result of your visiting with Michael Ackerman that

12    first day and tell him hey, you need to get out

13    here?

14         A.    Yes.

15         Q.    And why did you tell Tom you need

16    to get out here?

17         A.    Because the three of us were

18    partners and my partner was sick and I became

19    concerned about him, and I knew that Tom needed

20    to be here to see for himself.  And he was a

21    doctor so he may know more about his medical

22    condition than I would, and I just thought all

23    three of us should be together to make a decision

24    on what to do.

25         Q.    As a result of the first visit with



Page 195

1    Mr. Ackerman, were you beginning to have concerns

2    about the funds, the QB funds, that he said he

3    had?

4                    MR. SHEBIB:   Objection as to form.

5         A.    Mostly I was concerned about his

6    health, so was I beginning to -- it's very subject to

7    interpretation.

8         Q.    Tell me what's in your mind.

9    I'm just hearing that you drive out these eight

10   hours, you see him, and then you tell your partner

11   you need to get back tomorrow.

12        A.    Yeah.

13        Q.    So I'm asking you whether you were

14   having some concerns about the QB funds?

15        A.    At that point, any common person

16   would say hey, you know, he's obviously unwell, and

17   we need to shut everything down and do what we

18   need to do and I want my other partner back to

19   help me do that, so yes.

20        Q.    All right.   So as a result of your

21   seeing him that first day, did you decide that the

22   account, the trading fund needed to be shut down?

23        A.    I wasn't going to make that

24   decision without my other partner, but there was

25   no more trading, no more trading was allowed.


MAGNA
LEGAL SERVICES

Page 196

```
 1            Q.     All right.  Had you already stopped
 2    trading even before you got in the car and drove
 3    out to see Ackerman?
 4            A.     Yes.  From my recollection, I
 5    instructed him to stop trading when he told me he
 6    had pneumonia.
 7            Q.     All right.  So how long did you
 8    spend with him the first night?
 9            A.     A few hours.
10            Q.     And what did you talk about during
11    the two hours?
12            A.     I don't recall, sir.  Just felt bad
13    for him.  I went to sleep, I was tired from
14    driving.
15            Q.     Okay.  And during the two hours,
16    did you say hey, Mike, do you mind, let's pull up
17    that TD Ameritrade account and see what's in the
18    account?
19            A.     No.
20                   MR. BREBBIA:  Objection as to form.
21            Q.     Why not?
22            A.     Again, in my mind at the time, I
23    didn't want him to think that I wasn't concerned
24    every -- about him as a person, than I'd just
25    say, hey, let me have my money, I don't care about
```



Page 197

```
 1    you.   So I didn't ask him the first night.

 2              Q.      Did you yourself try to  og on to

 3    see what was in the account?

 4              A.      No.

 5              Q.      So you called Tran, you got home

 6    and you called -- I guess you were staying in a

 7    hotel?

 8              A.      Yes.

 9              Q.      You called Tran and said you need

10    to get here right away?

11              A.      That's correct.

12              Q.      Do you remember anything else you

13    talked about with Tran?

14              A.      I don't remember.

15              Q.      So did you see then Ackerman the

16    next day together with Tran?

17              A.      Yes.

18              Q.      And what did you discuss with him

19    at that point?

20              A.      Tran d scussed his medical

21    condit on and what may be wrong with him and that

22    he needed to get medical attention.

23              Q.      Had Ackerman seen a doctor?  Do you

24    know whether Ackerman had seen a doctor in Tan?

25              A.      I don't know.  I mean, he said he
```



```
 1    was in the hospital so, you know, I wasn't there
 2    personally to witness anything, but from what he
 3    told us, he had been in the hospital and they
 4    released him.
 5            Q.    Okay.  Did you and Tran discuss on
 6    that -- the first day you were back together, did
 7    you discuss hey, there may be some issues with the
 8    trading account?
 9            A.    I don't recall.
10            Q.    Is it possible that you discussed
11    that the first day you were together after seeing
12    --
13            MR. SHEBIB:  Objection to form.
14            Q.    -- that there may be issues with
15    the trading account and the money in it?
16            A.    The first day that Tran came over?
17            Q.    Yes.
18            A.    I don't remember what we talked
19    about.  I just know that we went there as a
20    friend.  He wanted to see him and a doctor and get
21    eyes on him.  He didn't want -- he to think we were
22    just out there to just shut everything down and
23    not care about him and kick him to the curb and
24    take his money, so the first night we were just
25    talking to make sure how he felt and what was
```

Page 199

1   wrong with him.

2            Q.    And what did he tell you, Mike?

3            A.    I don't recall.  He talked to Dr.

4   Tran about that.  I didn't -- I don't know

5   pneumonia from pancreatitis.  I'm of no use in that

6   conversation.

7            Q.    Okay.  Let's put up -- I understand

8   it's difficult for you.  I do appreciate your

9   working through it.

10           A.    Uh-huh.

11           Q.    I understand that.  I'm going to

12   put up now Seijas#3591.

13               MR. AYALA:   This will be No. 36.

14

15               (Whereupon Document, Bates No.

16   Seijas#3591 was received and marked 2-36 for

17   identification.)

18

19           Q.    Did you send this text to Dr. Tran

20   on December 3rd, 2019?

21           A.    Looks like I did.

22           Q.    Did you send it at 8:02 in the

23   morning?

24           A.    Apparently.

25           Q.    Right.  Look.  So is this before Dr.



Page 200

```
 1    Than get there or after, if you know?

 2           A.       Would have to see a calendar as

 3    to what date that was, because I'm pretty sure

 4    Than got there on Wednesday.  I don't know what

 5    date the 3rd was.  I don't think he was there yet,

 6    I guess.  I don't know, sir.  I don't remember.

 7           Q.    Okay.  While we're talking, I'm

 8    going to just look at December 3rd.

 9           MR. ____:   I can tell you, I guess,

10    that December 3rd, 2013 was a Tuesday.

11           Q.    Okay, so I take -- your lawyer's

12    helped us out here -- so December 3rd is a

13    Tuesday, so my question to you is, that's really

14    -- it's Tuesday, meaning it's late Monday right

15    into Tuesday morning.

16           A.    Okay.

17           Q.    All right.  So does this now

18    refresh your recollection that you've gone to

19    Ackerman's house maybe the morning -- I'm sorry.

20    I'll start again.

21           Does this refresh your recollection

22    that you got to Ackerman's house on Monday,

23    December 3rd, sometime in the late afternoon?

24           A.    It looks like that would be

25    correct.
```



Page 201

```
 1            Q.    Okay.  And then you go back to your
 2    hotel room after a ... hour visit with Mr.
 3    Ackerman, correct?
 4            A.    From what I remember, yes.
 5            Q.    You're having a hard time sleeping
 6    that night of December 2nd, 2019 as a result of
 7    your visit with Ackerman, correct?
 8                  MR. SIMILIE:  Objection as to form.
 9            A.    Yes, as you can imagine.
10            Q.    Right.  I'm not expressing my
11    judgment, I'm just trying to understand what
12    happened.
13            A.    Noted.
14            Q.    So you get up, now it's 2:56 in the
15    morning and you text Dr. Tran, "Are you nervous?"
16                  Correct?
17            A.    Looks that way.  I don't remember.
18            Q.    And why did you send him this text,
19    sir?
20            A.    I don't know.  It was 2:00 in the
21    morning, I had driven a day.  I mean, maybe I
22    was nervous, I wasn't sleeping.  I wanted to see
23    what he thought.
24            Q.    Right.  Isn't it fair to say that
25    you were nervous at this time that perhaps there
```



Page 202

```
 1   was a problem with the crypto trading account and
 2   the amount of money that Ackerman was continually
 3   saying was there?  Wasn't that the root of your
 4   nervousness, is the money really there?
 5                  MR. SEFERIS:  Objection as to form.
 6         Q.     Go ahead, sir.
 7         A.     It's fair to say I was nervous
 8   about a lot of things.
 9         Q.     Okay.  So was one of the things
10   that you were nervous about is that perhaps the
11   money that Ackerman was reporting really wasn't
12   there?  Wasn't that one of the things you were
13   nervous about?
14                  MR. SABBLE:  Objection as to form.
15         A.     Not at that time.
16         Q.     So 2:55 in the morning, you're
17   sending a text only to one of your partners, to
18   the other partner, and you weren't worried that
19   hundreds of millions of dollars weren't in the
20   account?
21                  MR. SULLIV:  Objection as to form.
22         A.     I'm not saying that.  I'm just
23   saying it's hard to recollect what my emotions
24   were and what I was thinking almost three years
25   ago at that point and why I would send that text.
```



     1    With all due respect, that whole trip is very

     2    tough for me.  I mean, I apparently talked to

     3    attorneys on the blue band.  I don't even remember

     4    that.

     5            Q.    I got it.

     6                  So 1. just to bring closure to

     7    this, weren't you nervous, early morning, December

     8    3rd, 2019, that there was a problem with the

     9    crypto trading account that Kolenieu was trading

    10    exclusively?

    11            A.    I don't know.

    12                  MR. SHEBIE:  Objection as to form.

    13            Q.    All right.  We'll show you now the

    14    next one, ...49593.

    15                  MR. VITRANT:  Carlos, I feel like you

    16    should have access to this.

    17                  MR. ...:  Can you repeat the

    18    number, Isaac?  Veigaa -- what is it?

    19                  MR. MIIRANI:  The new one coming up

    20    is ...49593.

    21                  MR. SFFRTR:  Thank you.

    22                  MR. ...:  Do you need a break

    23    are you all right?

    24                  THE WITNESS:  I'm all right.

    25                  MR. KOBLIN:  Okay.



Page 204

```
 1                  MR. MILIANI:   What exhibit number

 2  is this, Carlos?

 3                  MR. AYALA:   This is 37,

 4  Seijas49561.

 5

 6                  (Whereupon Document, Bates No.

 7  Seijas49561 was received and marked D-37 for

 8  identification.)

 9

10          Q.    All right.   Here's a text from Mr.

11  Tran to you, December 3rd at 2:03.   Is it possible

12  that --

13                  MR. NGUYEN:   What exhibit is this

14  again, Carlos?

15                  MR. AYALA:   37, sir.

16          Q.    All right.   Was Mr. Ackerman in a

17  different time zone than folks on the east coast,

18  Mr. Seijas?

19          A.    I'm not sure what the mountain time

20  would be.   I guess he's -- I don't know.   Maybe an

21  hour ahead or something, or behind?   I don't know.

22          Q.    Right.   So we saw what you had

23  asked Mr. Tran whether he was nervous, here is a

24  text 11/3/2019, "yes."

25                  Do you remember receiving this
```



[illegible]

A. No.

Q. Do you remember calling Dr. Tran in the very early morning hours of December 3rd, 2019 to discuss the situation?

A. No.

Q. Did you call at all during December 3rd, 2019?

A. I don't remember. I'm not saying I didn't, I'm saying I don't remember.

Q. You just don't remember?

A. No.

Q. Okay. But at some point you get concerned enough that you ask Mr. Nakerman for the password to get on to the [illegible] account?

MR. [illegible]: Objection as to form.

A. That would be Thursday or my other partner when Dr. Tran was there.

Q. You got there Monday, right, December 2nd?

A. Looks that way.

Q. And did Dr. Tran then get there Tuesday, December 3rd?

A. From my memory, I think it was Wednesday, but again, you know, chronologically

Page 206

```
1    I'm really having a hard time with that whole
2    thing.
3              Q.     Okay.  Fair enough.  Putting aside
4    the dates, at some point, won't you get concerned
5    enough to ask Ackerman for the password because
6    you wanted to see the account balance in Bitfinex
7    yourself together with Dr. Tran?
8              MR. BEEBE:  Objection as to form.
9              A.     We did that on Thursday, so I knew
10   he was coming out here so that was -- that
11   was one of the reasons why we were all meeting
12   together, so yes.
13             Q.     So you get Dr. Tran in person now,
14   the three of you are together, and one of the
15   reasons that you wanted Dr. Tran is you wanted to
16   collectively look at the account balance with Mr.
17   Ackerman of the Bitfinex account?
18             A.     Yes, and also because we had a
19   friend who was -- who had a medical condition who
20   was ill and Dr. Tran was a doctor and I wanted him
21   to see him.
22             Q.     What caused you to ask Mr. Ackerman
23   what the account balance was and to show it to
24   you?
25             MR. SIEMIN:  Objection as to form.
```



Page 207

```
 1              A.     Can you repeat the question for me,
 2     please?
 3              Q.     Sure.
 4              MR. HENSALE:  Let's go ahead and
 5     drop this exhibit, whatever.
 6              Q.     What caused you to ask Ackerman to
 7     show you the different balance on the program?
 8              A.     On Thursday?
 9              Q.     The first time you asked Mike, Mike
10     need to see this for myself, right?  At some
11     point, did you say Mike, I need to see this for
12     myself, the balance account?
13              A.     Yes.
14              Q.     With the money?
15              A.     Yes.
16              Q.     Right.  What caused you to do that,
17     to make that ask of Mr. Ackerman?
18              A.     Because he was obviously so unwell
19     that we weren't going to recover anything any time
20     soon, so we wanted to get into the account and the
21     two of us were going to handle it from there and
22     relieve him of his responsibilities.
23              Q.     Well, you had his last text showing
24     you account balances, right?
25              A.     Yes.
```



Page 209

```
 1              Q.     Well, by then hadn't you -- when
 2     you made that ask of Mr. Ackerman to look at the
 3     account balance yourself, weren't you concerned
 4     that perhaps there was some wrongdoing by Ackerman
 5     with that account?
 6                     MR. SHEETS:  Objection as to form.
 7              A.     I don't know.  Was I concerned?  I
 8     was concerned about the whole -- about everything.
 9              Q.     All right.  Fair enough.  Listen, I
10     do appreciate your working through this with me.
11     This is probably a good time to take a break and
12     then we'll go back to some other stuff.
13              A.     Okay.
14              Q.     I really do appreciate.  I know
15     this is hard on you, and I'm sure this is hard on your
16     family.  So.
17              A.     It is.
18              Q.     I really do appreciate it.
19                     So let's take a short break.
20                     Madam Court Reporter, please make
21     note of the time.
22                     A 10 minute as good for you?
23              A.     Yes.
24
25                     (Whereupon there was a brief
```



MAGNA

Page 209

1    recess.]

2

3    BY MR. MITRANI:

4          Q.    Mr. Srijan, at some point, you and

5    Mr. Tran do ask Michael Ackerman to show you the

6    account balance in E*Trade?

7          A.    Yes.

8          Q.    And you learn -- and were you the

9    one that logs on to the E*Trade account?

10         A.    Mr. Tran did.

11         Q.    Okay.   And you saw an account

12   balance that was how much?

13         A.    There was a wide discrepancy

14   between what he was reporting to us and what was

15   on the actual screen there.   I don't exactly

16   remember how much money I saw there.

17         Q.    I understand.   But generally he had

18   been reporting over $100 million and you saw a

19   figure that was maybe seven figures?   Is that

20   generally correct?

21               MR. SHEBIB:   Objection as to form.

22         A.    Yes.

23         Q.    Did you videotape that encounter?

24         A.    There are some video clips of it,

25   yes.



Page 210

```
 1              Q.      Were you the one that took that
 2    videotape?
 3              A.      We both videoed at certain points,
 4    but yes, I did take videotape of that.
 5              Q.      All right.  So when you went to Mr.
 6    Ackerman's home with Mr. Tran and asked him to
 7    look at the account, you were prepared to
 8    videotape that discussion, correct?
 9                   MR. KISTIN:  Objection to form.
10    You can answer.
11                   MR. SCRUDIS:  Join.
12              A.      Sir, I'm not sure if I intended to
13    video, but the way things were transpiring
14    Thursday, it occurred to me that I should probably
15    capture some of this, both because I knew I
16    wouldn't be able to recall it, and because I
17    didn't like the way it was going and I wanted to
18    remember it.
19              Q.      Right.  So based upon what had
20    happened the whole week, you decided it might be
21    smart to videotape it?
22              A.      On Thursday, yes.
23              Q.      Okay.  Just to finish the story,
24    you cooperated as much as you could with any
25    government agency.  Is that right?
```



Page 211

1         A.      Yes, sir.

2         Q.      And how much money has you taken

3    out of Q3 Trading Club?

4         A.      I would have to refer to my

5    records, but in general, I remember it being

6    somewhere around five and a half million.

7         Q.      And did you put all that back in?

8    And I'll give you a better question, did you

9    provide some amount of money to the government as

10   restitution?  And that's the wrong here -- did you

11   return as much of that money as you had available?

12        A.      Yes.

13        Q.      How much money did you return to

14   the government, you or entities or your wife?

15        A.      I'm sorry?

16        Q.      You, your wife, your entities, how

17   much money did you return to the government

18   related to Q3?

19        A.      I would have to refer to the

20   records because I don't recall.  A couple of

21   million.

22        Q.      Who did you turn it over to?

23        A.      Homeland Security, I think, who

24   Rodriguez.

25        Q.      Special agent John Rodriguez, we



Page 213

```
 1   saw his affidavit earlier?
 2           A.      Yeah, yeah, yeah.
 3           Q.      Were you forced to liquidate
 4   anything such as a house or any other hard asset?
 5           A.      Yes.
 6           Q.      What did you liquidate?
 7           A.      I liquidated a 401, a 529 account, a
 8   home in Florida was liquidated, gold was
 9   liquidated.  That might not be all inclusive, but
10   that's what I can recall.
11           Q.      Are you in touch with that special
12   Agent John Rodriguez?
13           A.      No.
14           Q.      Do you know how much money he's
15   collected from all sources?
16           A.      I do not.
17           Q.      How much money was left in any of
18   the QB accounts when you discovered the Schorsch
19   fraud?
20           A.      Do you want me to pick a -- I don't
21   know is my official answer, but --
22           Q.      You can guess and I'll take it for
23   what it's worth and we'll get the records.
24           A.      From my recollection, there was
25   roughly $2 million at Signature Bank,
```



Page 213

```
 1            Q.      And that was turned over to
 2    Homeland -- the Homeland folks?
 3            A.      Yes.   From my understanding, yes.
 4            Q.      How about the Bitfinex account.  How
 5    much house Friday?
 6            A.      I don't know.  Again, it was in the
 7    seven figures, I think, but I really don't know.
 8            Q.      And how about the -- there was
 9    another account, Gemini or Gemini?
10            A.      Yeah, I don't think that housed any
11    money because it was a conduit to trade the coins
12    over to Bitfinex.
13            Q.      All right.  So now let me show you
14    --
15            A.      May I just add, my taxes as well.
16    I paid federal and state taxes based on what Gary
17    Chodds told me I owed.  So a large portion of the
18    money that went out, I took out principally just
19    to pay my taxes on it, so just to add what is
20    there.  So I guess that's going to go back as
21    well.
22            Q.      Are you saying that you paid a lot
23    of taxes because in theory you were making a lot
24    of profit, right?
25            A.      That's correct.
```



Page 214

```
 1            Q.     You're going to get a large refund,
 2      suppose, for overpayment in taxes?
 3            A.     I'm not sure how the tax codes
 4      work, but I would anticipate that to be the case
 5      because I paid the taxes that I thought I owed,
 6      which was a substantial amount.
 7            Q.     I got it.  Have you agreed with the
 8      government to turn over any tax return or any tax
 9      refund related to C7?
10            A.     Yes.
11            Q.     Do you know what the amount is?
12            A.     I know approximately it's somewhere
13      in the 40 million range, but I don't know exactly.
14            Q.     A pending tax refund?
15            A.     Yes.
16            Q.     Is there a written agreement you
17      have with Homeland Security or the U.S. Attorney's
18      Office on the C7C or DEPC?
19            A.     Not that I'm aware of.
20            Q.     Is there anything to document your
21      agreeing to turn over these monies?
22            A.     Not that I'm aware of, but by my
23      word.
24            Q.     I believe you.  I'm just curious
25      what documents --
```



Page 215

1          A.        don't think there are any, no I

2    just agreed to end have.

3          Q.        Okay.  All right.  So let me now

4    look with you at Exhibit 2 which is your

5    affidav...

6                    MR. MITRANI:  Can we put that back

7    on, Darlost?

8                    MS. AYALA:  Mr. Mitrani, you said

9    it is Mr. Serges' affidavit?

10                   MR. MITRANI:  Yes.

11                   MS. AYALA:  Exhibit 21.

12         Q.        Okay.  First of all, um, did you

13   ever speak to plaintiff's counsel, Paul

14   Thanasides, or anybody from the law firm?

15         A.        No.

16         Q.        Did you ever speak to Dr. Wynn,

17   Sanel Wynn?

18         A.        No.

19                   MR. SERGIS.  Objection as to form.

20         Q.        At was an investor, right?  Do you

21   recognize the name?

22         A.        You say it, I recognize the name,

23   yes.

24         Q.        Okay.  Do you recall any

25   conversations with him during the last three



Page 216

1    years?

2         A.    He may have been at some that

3    we were in, but I don't really recall specifics.

4         Q.    Okay.  And were you asked to give

5    in corporate with the plaintiffs in the lawsuit

6    you met Polselli by giving this affidavit?

7              MR. SHEEHE:  Objection as to form.

8         A.    I don't know.

9         Q.    Okay.  By the way, while you were

10   involved with Q3, you were -- at the same time you

11   still had a position with Wells Fargo?

12        A.    Yes.

13        Q.    And what was that position?

14        A.    I was a financial adviser.

15        Q.    Did anybody at Wells Fargo know

16   that you were involved in the Q3 Trading Club or

17   Q3 entities?

18        A.    Not what I remember.

19        Q.    Did you discuss it internally with

20   any of your colleagues?

21        A.    Yes.

22        Q.    Did Wells Fargo learn about your

23   involvement with Q3 at some point

24        A.    Yes.

25        Q.    All right.  Was Wells Fargo aware



Page 217

1 of your involvement with Q3 before December of

2 2019?

3   A. Not that I'm aware of, no.

4   Q. Okay.  All right, so looking at

5 this as well, here, I show you Paragraph 5, we

6 talked a lot today about the Riveles Rehab firm.

7 Were you, on behalf of the Q3 entities, looking at

8 this law firm to draw up the appropriate legal

9 documents to protect the participants' interest?

10   MR. SHEBIB:  Objection as to form.

11   A. I'm sorry.  I missed the question,

12 part of it.

13   Q. Yeah.  The question part is, did

14 you ask the Riveles Rehab firm, on behalf of the

15 Q3 entities, to draw up appropriate legal

16 documents to protect the participants' interest?

17   A. Yes.

18   Q. And by participants, do you also

19 mean the investors?

20   A. The whole entity.

21   Q. Okay.  And also to protect the

22 investors?

23   A. Yes.

24   Q. All right.  Is it true that the

25 Riveles firm never asked to independently verify



Page 210

```
 1      the representations in the Private Placement

 2      Memorandum or to verify the exchange account

 3      balances?

 4              A.      No that I'm aware of.

 5              Q.      Is the 4 paragraph 6 of your

 6      affidavit is true?

 7              A.      Yes.

 8              Q.      All right.  Is it true that you

 9      asked Denis Hrbrov to assure that the fund was run

10      properly?

11              A.      Yes.

12              Q.      As to the Polsinelli firm and what

13      they were asked to do, do you defer to the

14      engagement letter we looked at, Exhibit 5,

15      believe?

16              MR. FURTH:  Objection as to form.

17              A.      I don't know.  I don't know how to

18      answer that.  Do I defer to the engagement letter?

19              Q.      The scope of Polsinelli's

20      engagement on behalf of GS Holdings, is it as

21      defined in the engagement letter.

22              MR. SEEBIB:  Objection as to form.

23              A.      I don't know.  I guess so.  I'm not

24      sure -- I'm sorry, I'm not sure what you're asking

25      me.
```



Page 219

```
 1              Q.      All right.  Let me ask you this,
 2     did you yourself ever look at Polsinelli's
 3     website?
 4              A.      Look at Polsinelli's website?
 5              Q.      Yes.
 6              A.      I may have, but I don't remember
 7     it.
 8              Q.      All right.  You understand
 9     Polsinelli to be your securities counsel or
10     really, the security counsel for 93 Holdings?
11                      MR. SABBID:  Objection as to form.
12              A.      Yes.
13                      MR. MIRKANI:  Okay.  Let's look at
14     paragraph 21, Carlos.  Page 2.
15              Q.      In Paragraph 21 you state -- well,
16     let me back up.  Who drafted this affidavit?
17                      MR. KISTER:  Objection to the form.
18     You can answer.
19              A.      Who drafted it?
20              Q.      If you know.
21              A.      I don't know.
22              Q.      That's fine.  Did you see earlier
23     drafts of this affidavit with slightly different
24     or radically different wording?
25                      MR. SHEETS:  Objection as to form.
```



MAGNA
LEGAL SERVICES

Page 220

```
 1              A.      Slightly different, or radically
 2      different?
 3              Q.      Well, let me rephrase.  Did you see
 4      earlier drafts of this affidavit with different
 5      language?
 6              A.      Yes.
 7              Q.      All right.  Now, Paragraph 21, take
 8      a look at that and tell me when you're ready to
 9      talk about it.
10              A.      Okay.
11              Q.      When did Ackerman move the bulk of
12      the trading from other exchanges to Bitfinex?
13              A.      From my recollection, around the
14      end of 2017.
15              Q.      Did he explain to you what the
16      limitations were used by him to access the
17      accounts?
18              A.      Yes.
19              Q.      What were those limitations?
20              A.      That you needed a foreign VPN to
21      access the accounts.
22              Q.      Why do you need a foreign VPN?
23              A.      My grasp of it isn't thorough
24      answers, but the rules were dynamic and changing
25      as far as who was allowed to access the Bitfinex
```



Page 221

```
 1    account, whether the entities were allowed to
 2    trade on Bitfinex, and he had a -- from my
 3    understanding, a foreign VPN that he could log in
 4    with.
 5             Q.    Okay.
 6                   MR. MIYUKAKI:  Let's look at
 7    Paragraph 25.
 8             Q.    25, you state, "In late
 9    November/early December 2019, Ackerman indicated
10    he was suffering from an illness and would be
11    going to the hospital.  I directed him to stop
12    trading at that point."
13                   Did Ackerman call you in late
14    November 2019 and tell you he needed to go to the
15    hospital?
16                   MR. SIMILI:  Objection as to form.
17             A.    Yes.
18             Q.    And did you tell him to stop
19    trading at that point?
20             A.    Yes.
21             Q.    Had you seen any erratic behavior
22    by him?
23             A.    No.  Any?  No.
24             Q.    Did he tell you what his illness
25    was?
```


MAGNA
LEGAL SERVICES

Page 222

1          A.      He told me he had pneumonia.

2          Q.      Okay.  You mention in Paragraph 16

3     that when Iran and you visited Ackerman's house to

4     check on his health, the login information as

5     previously provided you with did not work.  "He

6     refused to provide us with access to the crypto

7     account and it became apparent that something was

8     wrong."

9                  Do you see that?

10         A.      I do.

11         Q.      How about when you visited Ackerman

12    by yourself, did the login information work on

13    that first visit by yourself before Iran got

14    there?

15         A.      I didn't attempt to log in.

16         Q.      And he refused to provide you with

17    access to the cryptocurrency account on that first

18    visit by you with Mr. Ackerman before Iran got

19    there?

20         A.      No.

21         Q.      Did you ask him for access on that

22    first visit?

23         A.      Not that I recall.

24              MR. MITRANI:  Let's look at

25    Paragraph 17, ladies.



Page 223

```
 1            Q.     Did you put some of the profits
 2    that you were making from Q3 in your wife's name?
 3            A.     Yes.
 4            Q.     Did she have any involvement at all
 5    with Q3 in terms of any decision that Q3 was
 6    making in any entity it was undertaking?
 7                   MR. SMITH:  Objection as to form.
 8            A.     None.
 9            Q.     All right.  Let me talk to you
10    about Paragraph 32 and what follows.  Was Said the
11    partner -- I'm sorry, the investor in the Q3
12    Trading Club?
13            A.     Yes.
14            Q.     How much money did he put in?
15            A.     I don't recall.
16            Q.     And did he bring additional
17    investors to you, to Q3?
18                   MR. EREBIB:  Objection as to form.
19            A.     I don't recall exactly, but yes,
20    the answer to that specific question is yes.  I
21    don't recall who or how much.
22                   MR. MITRANI:  And scroll up a
23    little bit, Carlos, so we can see 34.
24            Q.     And do you write that, "In
25    exchange for introducing potential limited
```



Page 224

1    partners to QUI, Sida negotiated to reduce the
2    management fee he would pay."
3              Who was it that negotiated that
4    with Sida?
5         A.    Dr. Tran.
6         Q.    In paragraph 37 you said that "Sida
7    took a distribution of half a million which did
8    not reduce any of his capital contribution or any
9    QI 's broke."
10             Who made that decision to brok
11   that way?
12        A.    I don't know.  Dr. Tran I would
13   assume, but I don't know.  I didn't.
14        Q.    And some in October, when Sida took
15   a distribution of three million, who made the
16   decision that it would not be noted as a reduction
17   in his capital contribution?
18        A.    I understood that he was just
19   taking profits.  I mean, you know, you could view it
20   as his capital contribution or his profit, but I
21   guess he was dealing with the fact that the it
22   did not reduce his capital contribution.
23        Q.    So basically though, in exchange
24   for Sida bringing new investors to QUI, he was
25   given additional profit distributions?



Page 225

```
 1              MR. SIEGEL:  Objection as to form.
 2              MR. KISLIK:  Objection as to form.
 3         Q.     Go ahead.  I'm trying to understand
 4    this agreement you had.
 5         A.     Well, I'm trying to recall it also,
 6    so bear with me for a second.
 7              Reducing his capital contribution,
 8    he may have negotiated with Dr. Tran, from my
 9    recollection, a lower -- as we had 50% of the
10    profit -- he may have negotiated a lower cut for
11    us, but that distribution was part of his
12    contribution, not of that profit yet.
13         Q.     Okay.
14         A.     Gee, I'm sorry, I'm not -- like
15    this was Dr. Tran's main avenue and I don't know
16    -- I don't recall and I don't really remember how
17    that exactly was booked.
18         Q.     Do you know what prior fund
19    experience Dan's McEvoy had?
20         A.     No.
21              I hurt I said that the wrong way,
22    I don't know.  I think what I meant was, he -- as
23    it reads, 30 be accurate.
24         Q.     All right.
25              MR. HITRANT:  Let's put up, Carlos.
```



Page 226

```
 1    the Damages spreadsheet, please, and tell us which
 2    number this will be.
 3                  MR. AYALA:   This will be No. 50.
 4
 5                  (Whereupon Damages Spreadsheet
 6    was received and marked P-38 for identification.)
 7
 8          Q.     This is a document you probably
 9    have not seen before, but I'll ask you.   It's
10    purporting to be a damages spreadsheet or an
11    accounting by the plaintiffs in my lawsuit.   Have
12    you seen this before?
13          A.     Not that I recall.
14                 MR. KISLIN:   Can you zoom in?
15                 MR. VITRANT:   Blow    up?
16                 MR. KISLIN:   Yes.
17                 MR. VITRANT:   Can you blow it up,
18    Carlos?   Now move it over.   Okay.
19                 MR. KISLIN:   Yeah, that's better.
20    Thank you.
21          Q.     Okay.   So from time to time would
22    money be sent to Gemini to buy drugs or funds?
23          A.     Yes.
24          Q.     And I may have asked you before,
25    but how much money did you take out of QJ?   Did
```



Page 227

```
 1    you way $3 million approximately?

 2          A.     Approximately.

 3          Q.     All right.  And how was that

 4    decided, the timing of your taking a distribution

 5    from taking a distribution and Ackerman taking a

 6    distribution?

 7                 MR. SHEBIB:  Objection as to form.

 8          A.     I'm not sure I understand what you

 9    mean by how was it dicided.  Mostly, I guess,

10    it -- each individual person made a decision of

11    how much of the licensing fee they were entitled,

12    if they wanted to take out, as either put as due

13    for taxes or whatever the reasoning was for taking

14    it out.

15          Q.     All right.  And by licensing fee

16    you mean profits in excess of 50%?

17          A.     Right.

18          Q.     Was that something that was

19    disclosed to the investors, that in addition to

20    50% of the profits, you would also take a

21    licensing fee for those amounts in excess of 50%?

22          A.     I believe there's documentation on

23    it at some point and verbally disclosed, but I

24    don't remember the exact details that was

25    disclosed.
```



Page 220

1          Q.     Were you concerned that you didn't
2    make full disclosure on getting -- taking those
3    licensing fees?
4                MR. OISMAN:  Objection to form.
5                MR. SREBIB:  Join.
6          A.     No.
7          Q.     All right.  Hear with me for a sec.
8                Did you have a bookkeeper that
9    worked for any of the other, sir?
10         A.     Not that I'm aware of.
11         Q.     Or internal accounting support?
12               MR. SREBIB:  Objection as to form.
13         A.     I mean, Steve Sanders helped Dr.
14   Tran, but I believe he put all these together from
15   what I can tell, but I don't know.
16         Q.     Have you heard of Tran Market
17   Research and Data Analysis?
18         A.     No.
19         Q.     I see checks went to them and I'm
20   curious if you know who they are?
21         A.     I do not.
22               MR. MIIRANI:  All right.  We can
23   put that aside.
24               All right.  Let me bring, I've
25   ...  Carlos do you have the 30A screen...  So pu



Page 225

```
1    that up?

2             Q.    Sir, I'm obligated to ask you about

3    your FINRA record, so bear with me.

4             A.    Understand.

5                   MR. MITRANI:  Carlos, do you have

6    that?

7                   MR. AYALA:  You mean the FINRA

8    account?

9                   MR. MITRANI:  Yes.

10                  Hold on.  Let me just pull that up.

11   Give me one second.

12                  MR. AYALA:  This will be Exhibit 35.

13

14                  (Whereupon Carlos Aldo Seijas -

15   brokercheck was received and marked 5-35 for

16   identification.)

17

18             Q.    All right.  Why don't you scroll

19   through this?

20                  He's start from the bottom.  Do

21   you recognize this as your online FINRA account,

22   sir?

23             A.    Yes.

24             Q.    All right.

25                  MR. MITRANI:  That's nice, I go.
```



Page 230

```
 1              Q.      And your prior employment is
 2      accurate as it's shown here?
 3              A.      Yes, sir.
 4                      MR. VITRANT:  Okay.  Scroll up.
 5      Perfect.
 6              Q.      These are the licenses that you
 7      had, the series -- what you guys call series
 8      licenses?
 9              A.      That's correct.
10              Q.      All right.
11                      MR. VITRANT:  Scroll up.  Stop.
12              Q.      All right.  So it says "3/18/2020,
13      customer dispute, Plaintiff alleges from August
14      '17 to December '19, VA misrepresented investments
15      as part of a Ponzi scheme."
16                      Do you know who filed this customer
17      dispute on March 18th, 2020?
18              A.      Yes.
19              Q.      Who was that?
20              A.      James Hinkle.
21              Q.      Was he one of the investors?
22              A.      Yes.
23              Q.      There's a settlement amount of
24      $125,000 right above that.  Do you see that?
25              A.      I do.
```



Page 231

```
 1              Q.      Does that go with that customer
 2      dispute?
 3              A.      I believe so.
 4              Q.      Did you settle that dispute by
 5      paying $125,000?
 6              A.      No, sir.  Wells Fargo dealt with
 7      that.
 8              Q.      I see.  Was Wells Fargo also named
 9      as a defendant or respondent in that customer
10      dispute?
11              A.      I believe so.
12              Q.      Did you have a lawyer representing
13      you for that customer dispute that perhaps Wells
14      Fargo gave you?
15              A.      No.
16              Q.      Did Mr. Rislin represent you in
17      that dispute?
18              MR. RISLIN:  He wasn't named in
19      the dispute.
20              MR. MITRANI:  He was not named?
21              MR. RISLIN:  No.
22              MR. MITRANI:  Okay.  Thank you for
23      that.
24              All right.  Why don't we don't we
25      move it up?
```



Page 202

```
 1            Q.    And then there's another line here
 2       that says, "5/17/2020, customer dispute settled."
 3                  Is that the same customer dispute
 4       we just discussed, Mr. Pinkley, you just said?
 5            A.    From my understanding, yes.
 6                  MR. MUTEANI:  Okay.  Scroll up.
 7       Scroll up.
 8            Q.    And then did FINRA bring a
 9       proceeding against you or file a complaint against
10       you?
11            A.    Yes.
12            Q.    And when was that?
13            A.    I don't remember the chronology of
14       it.  2020?  September of 2020, I think.
15            Q.    I don't mean to embarrass you in
16       the slightest, but what did they claim or allege
17       that you did wrong?
18            A.    What did they claim or allege I did
19       wrong?  I don't know.
20            Q.    Did you have a lawyer to defend
21       that claim?
22            A.    Yes.
23            Q.    Who was that?
24            A.    Deann.
25            Q.    All right.  And is there back and
```


MAGNA
LEGAL SERVICES

Page 233

1    forth with FINRA; in other words, they have a

2    complaint and Jason would respond on your behalf?

3               MR. SULLIE:  Objection as to form.

4               MR. KISLIN:  Isaac, do you mind if

5    I --

6         A.    I can answer?

7               MR. MITRANI:  Please, go right

8    ahead.

9               MR. KISLIN:  FINRA opened an

10   investigation and ultimately Mr. Ga[las chose not

11   to participate in the investigation which is an

12   option under FINRA's rules and the result of that

13   is that FINRA removes his license.

14             MR. MITRANI:  Okay.  I understand.

15             All right then, why don't we take a

16   break here.  I am close to being finished, so let

17   me take a break and let me gather my thoughts.

18   Okay.  Give me about 10 minutes.  Thank you.

19             MR. KISLIN:  Thank you.

20

21             (Whereupon there was a brief

22   recess.)

23

24             THE REPORTER:  Abgod, did you need

25   a copy?


MAGNA
LEGAL SERVICES

Page 234

```
 1                    MR. SEVONE:  Yes, please.

 2                    THE REPORTER:  Casey, did you need

 3    a copy?

 4                    MR. SIGLIN:  No, I'm okay.  Thank

 5    you.

 6                    THE REPORTER:  Okay.  Thank you.

 7                    MR. KITRANI:  If Arnold is ordering,

 8    I'll take a copy.

 9                    Okay.  I'm ready to go back.

10          Q.       Sir, who is Evan Tran, E-v-a-n?

11          A.       That would be Dr. Tran's wife.

12          Q.       Okay.  Was she involved in the Q4

13    Trading Club at all?

14          A.       No.

15          Q.       After you learned about Mr.

16    Ackerman's fraud, did you call Polymathic?

17          A.       Yes.

18          Q.       That would be sometime in December

19    2019?

20          A.       Yes.

21          Q.       And did they tell you that Q4

22    needed to self report to the SEC and other

23    authorities?

24          A.       I don't remember what their advice

25    was.
```



Page 236

```
 1           Q.     Did he tell you you guys need to go
 2    to the authorities and report the fraud?
 3           A.     Again, I don't remember what their
 4    advice was, but I'm -- probably yes, because we
 5    were going to do that anyway.
 6                  MR. VITRANO:   Carlos, what's the
 7    next number?
 8                  MR. ...:   Next number should be
 9    4?.
10                  MR. VITRANI:   All right, Dan,
11    we'll put up 40 next.   Dan?
12
13                  (Whereupon Document, Bates No.
14    Sc... was received and marked P-40 for
15    identification.)
16
17           Q.     This is an email purported to be
18    from you to Dr. Tran, ...ing Michael Ackerman,
19    dated April 7, 2019.
20                  MR. VITRANO:   Why don't we go to
21    the bottom, please?
22           Q.     So that -- there's an article here
23    about an India crypto scammers.   You can read it
24    if you'd like.
25                  MR. VITRANI:   But keep on scrolling
```



Page 255

```
 1    ... Dan.  So he's her way, up.

 2         Q.    R you remember exchanging these

 3    e-ma s or sending this e-mail in April of 2018?

 4         A.    No.

 5         Q.    All right.  Hold on one second.

 6         A.    We don't hear you.

 7               MR. KISLIN:  Isaac, you're muted.

 8         Q.    Showing you now ask to . .  d'.

 9               MR. MITRANI:  Barlsay, ake note of

10    it, please.  And le.'s

11         Q.    this i an e-mail from Tony Star --

12         A.    Okay.

13         Q.    -- to Steve Sanders.  Go ahead and

14    read that, sir, where he's raising certain issues.

15

16               (Whereupon Document, be es Xh.

17    Solja s02708 was marked and marked r 'd for

18    ident ficat on)

19

20               MR. MITRANI:  Scroll down, Dan.

21         A.    Okay.

22               MR. MITRANI:  Scroll down, Dan.

23         A.    Okay.

24         Q.    All ight.  Did you send the bottom

25    e-ma l as one of your monthly reports?
```



Page 237

```
 1            A.     It looks like it.  It's probably
 2   written by Michael and sent to me and I, again,
 3   probably went through it and sent it out.
 4            Q.     Right, and I see at the very bottom
 5   it has your initials.  Is that right?
 6            A.     It looks like that, yeah.
 7                   MS. MITCHELL:  All right.  You we'll
 8   scroll up.
 9            Q.     Do you recognize the name Tony
10   Roxx?
11            A.     I know he was one of the investors,
12   but I don't know who he is and I don't really --
13   I wouldn't recognize him, no.
14            Q.     Okay.  You recognize the name as
15   one of the investors with Q3?
16            A.     Yes.
17            Q.     And in June of -- June 15, 2019
18   he's raising a concern, "Trading 1% of the market
19   doesn't seem possible to me."
20                   Do you see that?
21            A.     I see that.  Last sentence there?
22   Sure.
23            Q.     Yeah.  Did you see this email?
24            A.     I might have at the time, but I
25   don't remember it.
```


MAGNA
LEGAL SERVICES

Page 238

```
 1              Q.     And what did you do with that
 2      concern, that he seems to be saying the numbers
 3      don't add up if you consider the volume of trades
 4      and the amount of money that Ackerman is claiming
 5      to be making?
 6                     MR. STROTH:  Objection to form.
 7              Q.     Go ahead, um.  What did you do
 8      with that concern, how did you investigate it?
 9                     MR. KIGLIN:  Isaac, can we scroll
10      up to get the rest of the chain?
11                     MR. MITRANI:  Sure.
12              A.     I don't know that I did anything.
13              Q.     Okay.  You see that you've got this
14      e-mail?
15              A.     Yes.
16              Q.     Did you do anything with that
17      concern?
18              A.     Not that I'm aware of.
19              Q.     Did you speak to Michael Ackerman
20      about it?
21              A.     I don't remember.
22              Q.     Were you concerned by the concern
23      that Jung Kahn was raising?
24              A.     I don't remember.
25              Q.     All right then, that's all I have.
```



Page 239

```
 1    sir.  Thank you for your time today.

 2                   MR. KISLIN:  Isaac, I just have one

 3    brief follow up.

 4                   MR. MITRANI:  I mean, you can ask,

 5    but I don't know that as a witness you have

 6    standing, but if you want to make a record.

 7                   MR. KISLIN:  I'll make a record.

 8    If someone decides I don't have the right, they'll

 9    tell me I'm sure.

10                   MR. WEISBLUT:  For the record, we

11    agree that Jason has the right to clarify

12    anything.

13

14    CROSS EXAMINATION BY MR. KISLIN:

15         Q.    I just want to go back to, Mr.

16    Dottas, the settlement agreement that Mr. Mitrani

17    asked you about earlier and just want you to give

18    your understanding of what this settlement

19    reflects?

20         A.    The settlement reflects my full

21    cooperation; returning any and all funds that I

22    was capable of returning; returning -- working on

23    returning the tax money, any monies or anything

24    that I could get back to the investors.  I want

25    the investors to be made as whole as possible.  My
```



Page 240

```
 1     full cooperation and any statements that are put

 2     in front of me or anything I can lend or offer or

 3     any information I can give in the form of an

 4     affidavit, I'm happy to do that.   I just want

 5     to -- I want to cooperate with the investors and I

 6     want to come forward and just get everything done

 7     as cleanly as I can.

 8                  MR. MITRANI:  All right.  Just a

 9     quick follow up.  I to appreciate that

10     clarification.  Is there a written settlement

11     agreement with these terms?

12                  THE WITNESS:  Not that I'm aware

13     of.

14                  MR. MITRANI:  All right.  If there

15     is, we're going to ask Jason to send it to us.

16                  MR. KLYLIN:  Understood, great.

17                  MR. MITRANI:  Okay.  That's fine.

18                  THE WITNESS:  Yeah, I didn't

19     provide the affidavit for the release, I provided

20     it because I'm happy to testify as to the facts

21     and I want to cooperate and I want to do whatever

22     I'm asked to do.

23                  MR. MITRANI:  Okay.  Very much

24     appreciated.  You have the write to read the

25     transcript to note any changes, so you should
```



Page 241

```
 1    state   you need to state on the record if you
 2    want to read or waive reading.  That's your right.
 3            Q.    Do you want to read it and see if
 4    there's anything that you want to change?
 5            A.    This whole deposition?
 6            Q.    Yeah.  Or do you want   to waive?
 7    You can waive, it's okay.
 8            A.    Really?
 9            MR.       We'll waive.
10            MR. MITRANI:  All right.  Thank
11    you, sir.
12            Awady, do you have any questions on
13    your end?
14            MR. SHEETS:  No.
15            MR. MITRANI:  All right, then.
16    Thank you so much, sir.  Have a great day.
17            MR. RIST:  Thank you.  Nice to
18    meet you.
19            MS. MITRANI:  Likewise.
20            (Whereupon deposition was concluded
21    at 3:49 p.m.)
22
23
24
25
```



Page 242

                    C E R T I F I C A T I O N

        I, ROBYN PULZONE, License Number XI01191,
a Certified Court Reporter of the State of New
Jersey, certify that the foregoing is a true and
accurate transcript of the deposition of JAMES
BRIZAS, who was first duly sworn by me at the
place and on the date hereinbefore set forth.

        I DO FURTHER CERTIFY that I am neither
attorney nor counsel for, nor related to or
employed by, any of the parties to the action in
which this deposition was taken, and further that
I am not a relative or employee of any attorney or
counsel employed in this case, nor am I
financially interested in the action.

                  _Robyn Pulzone_____
Certified Court Reporter of the
State of New Jersey



**A**

**ability**
7:22 192:11
**able**
31:14 210:16
**Ahead**
2:24 5:21 6:5 167:25
23:14 234:7
241:12
**absolute**
132:14
**Absolutely**
96:5
**acceptable**
136:23 137:11,17
141:16 142:7 145:3
158:20 199:13
**accepted**
7:1
**accepting**
27:4 33:4
**access**
18:17 24:17,19 35:
35:15 36:11 37:6
41:16 43:3 64:3,4,8
103:9,12 170:22
203:16 220:16,21
230:24 232:6,17,21
**accommodate**
5:19
**accomplish**
136:1
**accomplished**
66:13
**account**
17:22 18:9,11,14
19:20 20:17 21:17
31:17 33:8 35:11,14
35:17,20,24 34:11
34:16,18,20,21 35:1
35:2,4,8,11,13,16
35:18,20,23 36:1,24
36:24 37:3,6,8,11
37:18,19 38:5 79:23
79:24 80:1,4,8,14
80:19 81:2,11 82:4
82:25 93:3,4,15,18
93:18,22,23,25
94:10,23 95:3,4,9
95:10,11,12,16,16
95:21,21 96:6,8
105:17 130:2,3
131:2,20,22,24
132:9 139:9,10
134:7,9,10,18,19,20
134:22,25 136:7,8,9
136:23,25 138:8
139:3 143:3 151:3
155:10,13,13 156:5
158:5,8,15 168:11
166:18 181:19,20
181:24 182:3,8,22
184:3 185:11,21
188:3 191:9 192:14
194:6 195:22
195:17,18 197:3
198:8,15 200:1,20
203:7 205:13 206:6
205:16,17,21
207:12,20,24 208:2
204:3 209:6,9,11
2..0,3 212:7 213:3,4
213:4 220:17,21
221:1 222:7,17
224:25 224:8,21
**accountant**
46:10,17,18 66:3,4
90...2 115:10 131:6
136:24 137:9,15
141:15 143:24
147:13 150:25
155:18 158:1
168:22
**accountants**
46:22 47:3,8 54:7,11
55:11,18,25 54:2
59:19 87:21 114:1,2
114:17 115:21
116:2
**accounting**
34:5 45:13,14,15
80:13 82:20 100:9
136:22 140:19,25
141:1 155:16
157:23 158:17
159:12 160:2,5,23
226:11 228:1
**accounts**
34:5,5,9 43:4 76:13
81:6,8,19,21 89:12
92:25 94:24 103:13
129:1,25 135:8
148:6,6,7 170:13,18
170:23 212:18
**accredited**
101:15
**accrue**
61:15
**accurate**
23:1 29:22 37:22
58:25 94:3 106:7,8
144:2,15 144:1
162:15 189:15
233:22 230:2 242:6
**Ackerman**
10:16,18,19,20 12:18
13:21 14:22 154:9
15 13,17,23 16:3
17,12 18:17 19:23
22:1,20 23:9 26:1,4
27 5,24 28:3,3 30:6
30:13 31:5 35:14
36:22 37:14 38:24
39:14,19 41:14
42:25 45:7,22 54:1
60:5 62:2,15 63:22
63:22 67:12 68:19
69:10,15,25 70:15
71:1 72:13 74:24
75:11 76:19 77:8
78:18 81:16 87:8
91:21 92:11, 7 93:6
9*:1,12 95:2 96:1,5
96:10,19 100:4,12
108:2 108:2,23
109:14 110:9
34:5 45:13,14,15
80:13 82:20 100:9
136:22 140:19,25
141:1 155:16
157:23 158:17
159:12 160:2,5,23
226:11 228:1
**accounts**
34:5,5,9 43:4 76:13
81:6,8,19,21 89:12
92:25 94:24 103:13
129:1,25 135:8
148:6,6,7 170:13,18
170:23 212:18
**accredited**
101:15
**accrue**
61:15
**accurate**
23:1 29:22 37:22
58:25 94:3 106:7,8
144:2,15 144:1
162:15 189:15
233:22 230:2 242:6
**Ackerman**
10:16,18,19,20 12:18
13:21 14:22 154:9
15 13,17,23 16:3
17,12 18:17 19:23
22:1,20 23:9 26:1,4
27 5,24 28:3,3 30:6
30:13 31:5 35:14
36:22 37:14 38:24
39:14,19 41:14
42:25 45:7,22 54:1
60:5 62:2,15 63:22
63:22 67:12 68:19
69:10,15,25 70:15
71:1 72:13 74:24
75:11 76:19 77:8
78:18 81:16 87:8
91:21 92:11, 7 93:6
9*:1,12 95:2 96:1,5
96:10,19 100:4,12
108:2 108:2,23
109:14 110:9
131:18 132:1 141:3
146:13 157:1 166:5
166:18,21 166:3,7
169:9 170:5 171:8
171:15 172:16,20
177:22 178:14
179:19 180:6,13,16
180:24 181:12,19
182:1,7 183:21
184:5,14 185:6,12
186:3,17 187:25
188:17 190:19
192:5,7 194:2,20
191:11 195:1 196:5
197:13,23,24 207:1
201:7 202:3,11
203:9 204:1,6
205:14 206:5,17,23
207:6,17 208:2,4
209:6 212:18
220:11 221:5,13
223:11,18 227:3
228:18 238:4,19
**Ackerman's**
38:15 105:24 192:11
200...9,22 211:6
222:3 234:16
**acquisitions**
8:17
**Act**
101:16
**acting**
96:25 123:5,10
143:16 180:25
**action**
2:3 11:1,3
**active**
67:3
**actively**
20:18 70:9 83:2
**activities**
93:17 100:11 132:2
**activity**
67:2 222:6
**acts**
99:20



**accrual**
61:23 89:11 209;13
**ADAMSKY**
2:6
**add**
75:17 213:15,19
238:3
**added**
173:15
**addition**
91:4 217:19
**additional**
28:19 223:16 224:25
**addressed**
86:2 195:24
**adjusted**
69:4 136:11
**adjusting**
69:10
**admin**
105:1
**administrative**
93:1
**administrator**
84:18,22 85:1,8
86:20 114:5 142:16
141:25 147:16
159:16
**advice**
74:25 78:9 102:5,6
118 7,4 122:18,20
124:17 125:7,12,16
125:23 151:20
133:16,23 136:5
138:10 144:7,9,11
161:3 175:2,6
176:21,24 231:24
235:4
**advise**
90:8,13 122:6
**advised**
125:1
**advising**
75:4
**advisor**
110:20 111:2 174:14

**advisors**
124:23 174:21
**affidavit**
3:22 47:12,15 48:11
48:17 49:9,12,20
50:4 51:1,4 50:9,24
93:22 212:1 215:3,9
216:6 217:5 218:6
219:16,25 220:4
240:4,19
**affidavits**
93:1
**afternoon**
200:23
**agencies**
92:16
**agency**
92:9,10 210:25
**agent**
14 91:x,18 211:23
212:12
**agents**
14 4:17
**ago**
26:1 179:11,24
202:25
**agree**
32:23 33:1 19:7
120:3,10 121:6
239:17
**agreed**
18:7 30:1 77:2
120:14 214:7 215:3
**agreeing**
214:21
**agreement**
309:23 51:19 71:6,9
7:1,6 74:1,7,17
75:9 76:8,20,24
77:1,5,8 88:5,9
116:9,15,19,17:2
113:14 120:2
125:21 126:2
214:16 225:4

239:16 240.11
**agreements**
1:53 13.24
**ahead**
7:1 17:25 18:5 24:9
52:17 38.18,23
69:22 86:18 109:16
117:21 123:13
128 9 138:7 16h4
150: 9 166:24,24
167:8 169:18
173 '1 22 202:6
204 21 207:4 225:3
233 8 236:13 238:7
**Alan**
4:17 224:14
**alarm**
68:8
**alarming**
186:6
**alchemy**
187:6 189:21 191:5
191:10,25 192:1
**alerts**
177:24 178:4 180:14
**Algn**
69:8 1,11,16,20,25
112:x 131:20 135:4
136:17,19 167.16
169:3
**algorithm**
14:4,' 4:20 15:16
17:11,2,22 221.19
22:23 21:4,6,10,13
23:14,16,18,22 24:5
25:6,12,14 25:5,8
25:11,2,,25 26:6,9
30:20 17 6,11 38:2 -
39:14,24 40:2 41:17
51:13,24 62:9,19
63:21 66-7 68:18,22
89:5,6 107.14,18
109:2
**algorithmic**
107:16 135:7
**algorithms**

13:19,24 25:1 107:5
107:12,21
**allege**
232:16,18
**alleges**
216:13
**alleviates**
160:3
**Allison**
40:12 42:1 69:21
**allocation**
104:9,13
**allowed**
59:19 190:25
230:25 231:1
**amazing**
71:22,24
**amend**
167:10
**America**
3:23 169:13
**Ameritrade**
9.24 10.26
**amount**
96:2 109:3 139:1
162.2 211:9 214.6
214:11 226:23
238:4
**amounts**
67:19 227:21
**analysis**
109:24 226:17
**analyst**
70:23
**analysis**
59:1 40:6,7,9 43.23
66:25
**analyze**
7:1
**analyzing**
6:25
**animal**
17:5
**assurance**
122:1
**answer**



MAGNA
Legal Services

18:3,5 19:1 20::4
32:4 45:3,12 49:16
49:25 50:8,15 56:25
61:18 67:20 70:1
78:20 79:5 91:11
92:6 94:16 100:12
103:15 113:7,16
119:14 120:6 124:5
153:14 156:1
112:22 143::2
160:21 16' 2
167:11 182.12
189:15 190:16
210:10 21:2 71
216:18 219.18
221:20 223:6
answered
47:3
answering
50:16 147:8
answers
89:5
anticipate
216:4
anybody
14:24 29:2 70:15
93:16 108:5 114:7
15.12 137:21
138:25 143:5
168-13 215:14
216.15
anymore
220:24
anyway
235:5
apart
93:13
apologize
83:4
apparent
205:7
apparently
129:7 130:16 140:21
17: :10 177:20
199:24 209:2
appear

76:16 78::4 182:24
appearances
5.10,16
appeared
165:10
appears
57:9 75:18 , 7:4
140:1 146:14
148.21 149:18
163:25 181:17,2
182:21 183:23
applicable
23:7
Appraisals
109:17,19
appreciate
68:6 90:6 .99:8
208:10,14,18 140:9
appreciated
240:24
appropriate
141:11 177:11
160:11 2 7:8..5
approximately
17:10 31:18,22 37:2
52:12 56:17  89:23
192:20 2.4:12
237:1,7
April
91:17 76:8 77:11
79:14 87:12,23 86:6
86:10 87:17 84:22
113:19,19 125:21
235:19 236:3
area
105:15
areas
38:16 78:25
arena
60:3
Arthur
2:7
article
235:22
aside
51:7,16 53:03 118:1

116:12 145:11
143:16 157:17
153 3.6 162:5
174:25 206:5
227:12 228:23
asked
4:10 9:12 13:2 24:21
25:7 49:13,19,22
50:10,17 51:5 59:19
70:2 73:11 89:5
90:17 131:9 137:9
147.23 157:22
.59:11,15,18
160:13,20 188:9
204:23 207:9 210:6
216:3 217:25
218:13 225:24
239:17 240:03
asking
6:3 19:18 68:1
175:25 190:1 141:3
195:15 218:24
asleep
178:13
aspect
39:4
assert
212.4
assets
59:3 102:25 109:23
110:1,7,11
assigned
109:21
assistant
151.17
assisted
99:25 98:1
assisting
147.20
associate
83:18
Associates
114:1
assume
8:23 75:11 82:1
136:18 178:2

224.13
assure
218:9
attempt
86:22 87:1 222:12
attention
197:22
attest
20:19 382
attorney
18:2,5 44: 5 84:19
175:8 116:3 179:13
242.10,13
attorneys
2:5,10,15 11:17
175.21 123:9 144:9
209:5
attorney's
46:6 2:4 17
attorney/client
6:19 129:5
audio
151:7
audited
115:4,8,14 140:20
141:6
auditor
114:19,22,25 115:1
auditors
114.16 115:20
audits
141:9
August
3:7 26:24 28:11,15
28:19 30:14 31:3
35:1,18 37:8,8 59:8
60:15 69:24 95:2
116:20 117:5
230:13
authenticated
124.16
authentication
103.25 103:8,10
authorities
72:11 231:23 235:2
authority



80:18
**authorized**
93:7
**available**
114:16 116:2 211:11
**avenue**
5:1 84-18 86-23,24
88:17 117.12,24
125:7 179:6 225:15
**average**
31:21 32:11
**averaging**
31:17
**avoid**
140:16
**aware**
11-17 58:13 64:10
67:21 103:9 109:15
112-8,9 131:3 137:8
187:3,4 214:19,22
216:23 217:3 218:4
228:10 238:16
240 17
**awhile**
186:5 188:7
**AYALA**
2.18 47:24 71:25
72:9 75:22 111:6
116:12 119:12
162.13 164:14
166:19,19 169:7,22
172:5,12 173:3
174:1 179:24 177-8
185:7,19 184.23
187:13 199:13
204:3,15 215-8,11
226:3 229:7,11
235:8
**A,M**
1:16

— B —

**B**
1:7 2:1,17 3:5 1:1
28:23 29:2,9 48:8
**back**

6-12 9:2 23:5 25-17
24-5,16 28:18 30,19
51:8,11,15 52:4,13
36-17 64:12 73:20
76-10 123:3 124-8
139:10 160:14,24
161:7 163:8 173-17
176,14 180:8 194:7
201:1 208:12 211:7
213:20 215-6
219:16 233.25
234:9 239:19,24
**background**
7:11,12,24 16:2
**bad**
196:13
**balance**
18-,24 18:23,21
185:21 206-6,16,23
207:7,12 208:3
209:6,12
**balances**
37:15 93:22 183-8
185:12 207:24
218:5
**bank**
8.17,23 33,9 79 34
80:8...4.19 81:6,18
81:20 82-4,25 93:25
94:10,20,23 95-4
107:10 128:14
139:1,12,22 130 7
132:10.17 134:2,9
140:11 143:16,18
141:23 146:12,15
147.4.18,23 148.23
148:5 159:1 162:19
164:4 179:12
273.25
**banking**
129:22
**bank's**
146:23
**banner**
175:12 177:3

**Barclays**
9:7
**based**
25-22 31:11 35:19
61:20 109:25 166-8
210:19 213:16
**basis**
170:24 185:13
**basically**
11:16 66:10 63:22
11 3,10 191:9 192-8
224.23
**basis**
96:2 107:4
**Bates**
3:7,9,10...4,17,18,20
143 ,74 4:3,4,5,6,7
4:8,9,10,11,12,13
4:.4.15,18,19 55:2
91 9 73:3 73:24
127.13 143.23
146:4,5 144 15
154:23 156-21
162:11 164.18
166:15 169.24
171:3 172:8 173:6
174:4 176 1 177:10
181:11 183.19
185:1 187:15
199:19 204-6
235:13 236.16
**bathroom**
55-9,26
**Beach**
2:7
**bear**
233 6 238:7 239 3
**bearing**
144:1
**bears**
146 5
**began**
19:1,15 20:10,22
43:7 69:9 96:18
181:4
**beginning**

25:16 186:22,12
187:4 199-1,6
**behalf**
1:1 5:25 105:12
119:12,20 120:7 5
121:10 122:12
124:22...7:7,11
216:20 233:2
**behavior**
221:21
**believe**
6.8 9:3 18:11 29:25
40:16 42:9 41:7
47:10 54:2 65:2
66:20 79:2 80:23
83:14 85:2,14 93:4
95:17 98-20 99-17
106.4 116:4 134:15
126:15 156:9 165:5
167:9 21 171:12
179:9 190:7 191:23
194:6 203:15
214-24 218:15
235.22 228:4
221:2,11
**benefit**
27:24 111 12 115:12
**best**
32:21 60:.7 103:19
104:1,5 158-11
175:4 193.16
**better**
10:5 82:14 130:22
135.5.6 149:3 211.5
226:19
**big**
39:17
**billing**
145:12,16
**bio**
105:24 106:2,4,11
107:5
**Bklos**
108-8
**BLANCKSFIELD**
2:2



bit
7:10 9:18 25:19
29:16 106:11 118:17
120:21 139:23
148:18, 14 149:2
224:24
Detroit
39:11 67:8 171:21
Billings
15:22,24 34:4 35:21
35:23 36:7,9,15..6
36:24 43:4 90:9,12
95:16,18,21,23 96:6
131:22 132:9 133:9
133:18 134:19,37
134:24 135:3,4,8..0
135:22,25 136:8
138:18 139:2
181:20 192:14
196:17 205:15
206:6,17 207:7
209:6,9 213:4,12
220:12,25 221:2
Bitran
2:8 5:19 83:18
blank
125:11
block
83:17
blow
29:16 72:17 118:16
130:21 148:18,24
149:7 226:13,17
Blvd
2:5
bolster
117:12
bank
60:13,16 67:1 224:10
booked
225:17
bookkeeper
238:8
books
224:9
bottom

57:16 73:6 86:4
104:9 111:18 116:23
128:4,4 139:18
146:5 148:20
153:11 155:2
181:23 229:20
235:21 236:24
237:4
bought
67:5
Brandon
46:22 47:3,7 53:1,19
53:14, 7,25 54:4
113:25
break
51:22 55:9,16 56:6
58:9,8 112:24
115:17 162:21
203:22 208:11,19
235:16,17
brief
55:8 56:13 169:11
208:25 235:21
239:3
briefly
72:5 55:14
bring
69:25 70:6,15 85:8
203:6 225:16 232:4
bringing
45:19 224 24
Brokerage
9:22
BrokerCheck
4:17 229:15
brother
40:3,15
brother-in-law
12:25
brought
22:18 23:15 70:7
bodily
151:2,4
bulk
220:11
business

11:4,24 15:5 16:11
17:1 53:2,15 60:5
63:13 81:23
buy
11:15 30:10 10:10
133:18 134:20
236:22
buying
102:24 106:18 107:1
106:17
buys
23:19

**C**

C
2:1 21:25 25:5 242:1
247:1
calculates
139:6
calculus
190:6 208:2
call
6:12 39:21 91:17
90:8 129:16 147:4
160:12,22 161:7,18
162:6 176:17
178:19,19 191:24
194:10 205:7
221:13 200:7
23:16
called
18:3,4 58:11 71:20
151:2 153:11
160:15,22,25 197:5
197:6,9
calling
19:24 158:7 205:3
calls
155:11 160:14 176:9
Campus
3:14
canvas
125:11
capable
89:1 239:22
capacities

71:13 141:1
capacity
7:21 9:10 14:13
40:22 86:21 117 24
capital
9:3 66:8 106:20
224:8,17,20,22
225:3
capture
210:15
car
190:24 192:6,13
193:2
care
196:25 198:23
career
8:5 127 121:8
Carlos
2:18 19:11 22:10
29:2 32:17 47:7 4:16
54:12 55:15,20
56:18 57:16 65:9
68:11 69:23 71:19
71:22,23 72:16,23
73:6,21 75:21 76:3
77:12 85:17 86:4
88:7 90:24 91:16
93:11 95:7 98:9,11
98:15 99:12 100:17
102:19 160:22
104:10,17 106:1
108:8,17 109:7
111:5,8 113:4
116:10,21 117:15
118:17 119:3,25
120:21 126:20
127:10 128:5,21
130:15 139:11,22
140:5 144:5 149:10
162:12 164:11,13
166:11 169:6,18
172:5 175:23
176:13 177:17
183:18 184:22
186:25 187:12
193:1 203:15 204:2



204:14 202:4 219:7
219:14 222:25
221:23 225:25
226:18 228:25
229:2 230:5 235:6
236:9
**case**
2 3:15 29:11
179:14 176:25
214:4 242:14
**cash**
132:10
**catch**
39:7
**caught**
9:5 184:10 185:17
**cause**
67:11,18 68:9
**caused**
72:12 205:22 207:6
207:16
**causing**
220:16
**Cayolo@gultranLe...**
2:9
**cc**
57:8 155:3
**cc-ed**
56:25 57:3 128:15
**cc-ing**
235:15
**CD**
212:7
**certain**
27:25 49:6 52:24
53:3 61:23 67:10
121:23 133:17
210:3 236:14
**certainly**
15:6 17:2 33:1 34:3
53:8 138:9
**certified**
1:13 147:13,15 242:4
242:23
**certify**
242:5,9

**CFA**
147:11,12
**CFTC**
92:18
**Cbadee**
54:3,4,8,14 80:12
82:19 114:1 131:7,9
151:9 132,36,22
136:24 137:9,15,22
141:15,23 142:1,6,7
149:7 150:24
153:17 155:25
159:3 163:70
213:17
**Cbadee's**
87:22
**chain**
228:10
**chance**
144:8
**change**
30:1 47:9 111:14,22
241:4
**changes**
240:25
**changing**
228:24
**charge**
51:18
**charts**
075:
**cheaper**
172:23
**check**
92:4 116:3 166:6
193:14 222:4
**checked**
149:24 144:25 160:5
**checking**
161:2 172:22
**checks**
81:25 228:19
**choose**
88:23,24
**chose**
233:10

**chronological**
86:17
**chronologically**
205:25
**chronology**
96:14 126:2 157:13
165:17 174:21
232:15
**circulate**
65:21
**circumstances**
6:12 60:22 152:22
**civil**
9:16 93:5
**claim**
109:12 232:16,18,21
**claiming**
234:4
**clarification**
51:13 53:15 240:10
**clarify**
147:2 166:22 167:6
187:1 239:11
**classify**
42:6 94 6:15,19
117:23
**clearly**
240:7
**clear**
27:14
**cleared**
141:15 142:11
**clerk**
4:7
**clips**
209:21
**close**
148:5 233:16
**closing**
148:7
**closure**
205:6
**Cloud**
62:21,23 63:9
**club**
12:19 15:9 16:7,12

19:15,24 29:2,25
27:16 28:21 58:1,8
40:20 44:21 45:1
50:70 57:18 58:6,15
68:3 211:5 216:15
223:12 254:13
**clubs**
109:5
**CMTC**
214:18
**coast**
201:17
**code**
133:16 18:19
**codes**
214:3
**coin**
59:18 67:23 104:11
171:21
**Coinbase**
54:11
**color**
40:25 67:8 93:24
133:18,18 134:21
135:6,25 171:13,16
171:19 178:15
213:11
**colleagues**
46:12 47:2 216:20
**collateral**
212:5
**collectively**
206:16
**combination**
60:14
**come**
51:5 86:16 159:6
186:15 240:20
**comes**
19:13 28:24
**comfortable**
166:4 170:9
**coming**
110:7 203:19 206:10
**commencing**
1:5



comment
67:22 160:5
commingling
157:17
commission
23:25 105:9 110:21
commissions
136:10 15K:7,6 160:9
commit
33:22
Commodity
28:24 92:9
common
70:8 195:15
commonly
64:9
companies
10:23 113:7 151:8,19
151:22 156:14
174:20
company
68:19 71:16 73:25
76:4,8 77:22 99:22
117:3 121:5,5
152:13,25 174:14
company's
117:9
compared
185:21
competed
89:1
complaint
3:11 19:10,11,14
28:25 29:15 91:1,5
91:14,18 232:9
233:2
complaints
11:20
complete
21:22
compliance
157:4
complying
47:5 51:2
computer
63:21,23 63:14,28

107:25
concept
21:25
concern
67:14,18 186:17
257:18 238:2,8,19
258:23
concerned
189:19 190:19,25
191:8,13 192:2
194:19 195.5
196:23 206:14
2064 208:3,7,8
23k:1 338:22
concerning
111:14 115:19
concerns
161:25 186:2,12
192:10 193:19
195:1,14
concluded
241:20
condition
104:22 107:21
206c:9
conditions
121:7
conduct
100:6
conducting
92:10
conduct
213:11
confer
153:15
conferred
144:8
conferring
153:17
confidential
89:16
confirm
171:10
connection
73:25 111:21 121:5
121:12

consider
234:3
considered
133:25 133:3,4 138:1
considering
148:7
consistent
59:23
consistent
96:2
constituted
66:4
consult
110:15
consultant
7:20 89:19 90:2
117:9 118:3 123:17
158:4 150:9
consultants
25:7
consulting
9:23 88:4,8 105:7
116:9,14,18 117:2
contact
41:13 44:18 122:9, 3
153:20
contained
111:14
contend
70:5
contest
173:10 188:15
continually
69:3,13 203:2
continue
74:9,13 157:24
continued
98:21 126:14
continues
111:10
continuing
7:3 37:13
contract
105:7
contractor
61:5

contributed
107:8
contribution
224:8,17,20,22 235:7
225:12
contributions
172:21
conversation
70:9 159:23 160:15
199:6
conversations
139:8 215:25
convey
169:11
cooperate
216:5 240:5,21
cooperated
51:20 211:24
cooperation
179:13 239:21 240:1
coordinating
44:20
copy
183:20 235:25 234:3
254:8
copying
146:17
core
89:14,16 108:11,19
Corp
191:14
corporate
6:25
Corporation
1:8
correct
8:4,24 9:9,17,23 16:1
17:10,18,19 28:4,5
28:21 30:3,12 36:5
38:9 39:8,20 15:11
50:23 51:1 52:2
58:8 68:23 71:1
75:16 80:6 95:25
98:20 103:13
112:13,21 119:13
130:16 121:23



132:2 132:3
134:20 135:13
137:18 138:4
142:20 143:10
152:9,12,19 158:10
192:17 166:4
187:10 190:21
197:11 200:23
201:3,7,16 209:20
210:8 213:25 230:9
**currently**
112:20
**correlated**
68:7
**correlations**
60:5,14
**correspondence**
128:13 146:19
**correspondences**
146:16
**cost**
60:13 61:12
**costs**
60:12 67:7 106:14
**counsel**
6:23 48:24 49:13,22
50:11 51:24 55:11
55:5 74:5 85:6
98:14,16,21,23
125:22 157:23
213:13 219:9,10
243:10,14
**couple**
211:20
**course**
20,18,18 44:6,23
56:4 108:16 1,2:6,7
195:23
**court**
1:1,13 6:20 56:7
115:2 165:6 206:20
242:4,20
**crabby**
178:7 180:9
**criminal**
92:5

**CROSS**
3:2 219:14
**crypto**
11:4 15:9 16:7,12
25:17,18 26:12
27:15,25 32:8 33:17
34:5,6 38:8 39:15
39:18 41:11 44:20
52:18 58:6 63:23
104:2,8 109:2
117:19 118:6
122:15 132:10
134 11,18,21
126:17,18 139:2
178:13 181:20
202:1 205:9 225:6
226:22 235:23
**cryptocurrencies**
13:1 16:15 17:15
24,7 77:17 121:18
**cryptocurrency**
11:25 13:9,13,16
15:11 17:5 23:2
23:10 27:12 3,,23
42:24 57:18 88:4,8
91:22 93:24 117:11
121:17 122:8
138:18 223:17
**curb**
148:21
**curious**
91:7 214:24 228:20
**currency**
14:1 22:23 30:21
31:11 68:14
**currently**
152:12
**Custody**
107:20,23 101:24
**customer**
111:18 130:13,16
231:4,9,13 232:2,3
**customers**
11:20 28:15 40:15
**cut**
225:10

**cutoff**
188:x
**cuts**
160:9
**cutting**
149:9

**D**

**D**
3:1
**Danad**
130:3,8,10,11,14
**Darla**
21:9
**daily**
61:15 107:4 148:8
181:22 182:2,10,22
**damages**
4:16 226:1,9,10
**Dan**
3:19 83:18 205:10,11
236 1,20,22
**DANIEL**
2:8
**data**
26:1,14,16,19 64:8
66c 5 67:1,7 160c
166:7 228:17
**date**
58:2 5959,10 74:11
76:11,15,14,21
79 73 85:15,19
87:24 88:5 96:22
102:15 1,6,20
157:18 158:7 175:1
175:20 176 14
183:21 186,6 188:6
188:23 190:4,5
200:5,5 242:8
**dated**
55:18 76:8 85:25
86:6 97:11 113:19
117:9 140,1 148:22
176:16 183:2
184:20 187:24
235:10

**dates**
85:11 93 1 158:3,4
206:4
**daughter's**
150:6
**David**
128:23 129:5,16,18
137:3 140 2,10
146:12 147:4
**day**
44:5 67 4 106:22
107:18 67:12,15
167:11 176:17
185:181 18,,7,18
185:21,22 188:4,9
19,,1,4,12 195:21
197:16 198:6,11,16
201:21 241:16
**day-to-day**
45:10 18 8' 9,13
82:24 98:15 98:12
117:1,22 118:1
**Dbitran§mitran...**
2:10
**deal**
54:8 83:8
**dealer**
106,25
**dealing**
83 19 234 21
**dealt**
44:15 54:20 231:6
**December**
74:10 98:21 187:4,8
187,9,20,24 188:3
188:16,21,22 190:8
190:20 200 3,10,12
200:20 201,6 203:7
204:11 205:4,7,20
205:23 217:1 221:9
230:14 234:18
**decide**
16:10 49:12,18
189:17 196:21
**decided**
16:15 20:5 191:5,7



210:20 227:4,9
decides
239:8
decision
156:4,14 194:13
195:24 223:5
224:10,16 227:10
decisions
95:20
decision-making
108:15,21
defend
212:20
defendant
184:9 221 231:9
defendants
149:9,10 5:20
defer
2.3:13,18
define
94:23 98:2 96:17
129:5 138:8
defined
121:14,17 218:21
defines
60:4
definition
96:10
denied
6:22
Denis
3:21 52:25 53:6
60:22 83:11,15,19
83:21,23 86:2 87:24
147:11,21 156:21
157:12,17,20 158:7
158:9 159:2,11,11
160:12,21,23 161:4
161:8,10,15 162:5
163:21 175:5 179:4
218:9 225:19
Department
51:9
depending
79:24
depo

29:2 47:12 48:3
deposited
79:21 80:22 80:25
deposition
1:12 6:10,15 241:5
241:20 242:6,13
deposits
93:15
depth
66:16 67:1
described
157:10,16 159:12
161:13
description
59:4:2 57:17 58 21
desktop
62:25 63:10,23,25
details
34:12
determination
109:23
developed
68:3
different
30:16 43:14 75:13
95:21 109:2 204:17
219:23,24 220:1,2,4
differentiate
123:23
difficult
199.8
digital
162:25
diligence
15:4 116:8 144:19
dinner
216:2
dinners
21:20,21
direct
3:2 5:4 121:5
directed
221:11
directly
1:62:2
disagree

6:16 78:17
disagreement
78:25 79:16 173:5
disagreements
78:13 79:6
disclosed
227:19,21,25
disclosure
228.2
disclosures
6:17 7:3
discovered
74:15 109:14 212:18
discrepancies
189:11
discrepancy
209:13
discuss
7:4 11:24 22:1 133:2
135:6,15 154..1
168:17 197:15
197:18 198:5,7
205:5 216:19
discussed
16:1 44:4 101:18
132:17,19,23
142:15 162:7
163:19 173:21
197:23 198:10
232:1
discussing
60:11 87:22 94:1
discussion
13:17 132:21,25
143:6 143:7 157:19
159:10 167:2 195:4
209:23 210:3
discussions
10:7 78:22 123:4,4
123:21 143:14,16
144:22 162:11
195:4
disregard
51:3
dislocation
95:15

distinctions
10:2
dismissed
50:5,22 51:6
dispute
230:15,17 231 5,4,10
231:13,17,19 242:2
232:3
distribute
63:13
distribution
224:7,15 225:11
225:4,5,6
distributions
224:15
DISTRICT
1:1,1
division
8:19
divorce
42:3
dizzy
119:11
doctor
191:15 194:21
197:23,24 198:20
206:20
document
3:10,24 4:3,4,5,6,7,8
4:9,10,11,12,13,14
4:15,18,19 57:25
64:12 69:21 73:4,9
72:16 73:2 75:24
76:10 77:12 82:5
84:13 86:15 82:21
95:7 99:14 100:9
101:12 104:24
109:9 113:4 116:7
117:2,16 126:20
146:4 152:6 164:9
164:18 166:15
169:24 171:3 172:8
175:6 176:4 176:1
177:10 181:11
183:13 185:1
187:13 193:1



199:15 204:6
211:20 226:8
255:15 256:16
**documentation**
89:12 96:21 115:2
227:22
**documents**
63:6,7,13 45:8 61:8
75:9,15 114:14
115:18  16:1
152:24 169:20
214:23 217:9,16
**doing**
11:9 19:24 21:5,6
25:17 27:8,11,19
40:24 70:13 155:22
127:2  51:10 152:8
172:17,18 175:14
175:15
**dollar**
67:10 156;7,8 160:7
**dollars**
51:8 156:6,19 144:25
158:18 160:4
202:19
**domain**
63:2
**done**
7:15
**doubt**
96:15,18 168:15
**double**
96:9
**Doug**
83:15,18
**downloaded**
150:8
**Dr**
12:13,14,24 13:17
15:8,10,12, 7 18:11
16:17 19:19,22
20:10,22 26:19
27:25 33:7,8 37 34
38:4,14 40:8,14
45:18 54:1,10 56:21
57:9,10,20,22 58:20

599:2,15,22 61:2,11
65:2,16 66:12 67:18
67:23 69:1,24 70:11
70:20 7:2:6,12 75:14
76:16 78:15...7
79:22 80:1 8: 1,3,20
8..22 82:8,14 93:6
90:20 91:3,12 99:7
105:14 110:2
..15:23 128:25
129:4,25 130:14,24
132:17 133:17
.36:15 137:9,14,20
138:15 140:2,24
141:1,25 142:5
146:13 150:18
151:16 152:3,21
153:7 154:9,4,16
155:6,19 168:17
173:11,20 177:21
179:19 181:16
183:21 184:10
185:6 189:5 191:1
199:5,19,25 202:15
204:10,23 205:3,14
205:22 206:7,13,16
206:20 207:14
209:5,10 210:6
215:15 224:5,12,21
225:8,15 228:13
254:11 235:18
**drafted**
2.9-16,19
**drafts**
3:9,23 220:4
**draw**
217:3,15
**drill**
125:14
**drinking**
186:14,17
**drive**
2:13 189:21,24
190:20 191:22
194:9
**drives**

201:21
**driving**
196:14
**drop**
113:3 169:13,18
207:5
**dropping**
180:11
**dense**
189:11 190:24 196:2
**due**
15:3 79:1 100:8
143.19 193.17
200:8
**duh**
242:7
**duties**
75:3 86:19 93:14
117:9
**duty**
7:2
**dynamic**
88:18 117.11 220:34
**D'Aruko**
128:22 129:5,16...8
140:7,11,16 1-6:13
142:4
**D-a-r-u-d**
149:20

---

**E**

E:
2:1,12,16,16 2:...5
4:1 5:1,1 247:1
**earlier**
86:1 92:25 118:15,25
140:2  212:1
219:22 229:4
230:17
**early**
26:23 203:7 205:4
**earnings**
65:10
**ease**
56:1
**easier**

12.13 172.22
**east**
5:1 204:17
**effect**
.26:7
**efficient**
131.12 133:25
172:25
**effort**
23.6
**eight**
195:9
**either**
21:19 39:15,12 58:21
62:16 87:25 94:18
99:7 135 7,142:5
227:12
**elder**
78:3
**elected**
191:22
**electronic**
26:8
**Eligible**
101:11
**ELLIOTT**
2:2
**embarrass**
232:15
**emotions**
202:25
**employ**
111:15
**employed**
109:2 212:11,11
**employer**
111:21 41:1 47,17
61:1,2,4 64:3,4
99:19,25 90:2,2
105:7 181:18
242:13
**employees**
60:15
**employer**
12:1,20,24 107:22
**employers**



Page 11

11:21
**employment**
230.3
**endeavor**
13:3
**endeavors**
83:13
**energy**
107.2
**engaged**
77:24 126:15
**engagement**
3:10 85:21 86:6
113:14 119:19
130.4,10 216:14,16
216:20,21
**English**
44:23
**enjoy**
113:10
**enter**
135:16
**entire**
130:8 157:15
**entities**
42:18 43:10,16 46:21
51:16 63:23 74:5,10
77:15 81:1 84:8,13
87:17 88:11, 4
91:23 92:2,8
109:10,13 111:1
113:22 114:19
124:22 126:14
179:2 181:24
211:14,16 216:17
217:7,15 221:1
228:9
**entitled**
61:12 82:8 132:5
227:11
**entity**
36:12,14,19 43:19
53:13, 4,17 97:17
217:20
**entry**
30:12 67:4,4

entry/exit
66:17
**environment**
23:8 26:12 88:19
117:11
**equal**
101:13
**equities**
108:25
**equity**
11:5 191:21
**erratic**
180:23 181:4 192:7
221:21
**error**
72:4 84:9 132:6
136:5
**especially**
19:7
**ESQ**
2:4,8,3,14
**essentially**
136:21
**establish**
93:18
**estimation**
102
**etcetera**
62:1,4 66:18 111:14
**Ethereum**
171:21
**evaluations**
66:16 109:17,18,23
110:1
**Evan**
234:10
**evening**
230:2
**evenings**
67:14
**events**
136:3
**eventually**
45:7 96:4
**everybody**
48:2 112:25 113:4,10

everybody's
116:17
**everyone's**
65:14
**exact**
58:3 74:11 57:24
139:23 199:3,5
**exactly**
23:12 34:17 45:17
74.16 80:24 82:15
84:11 85:15 96:7
97:23 143:3 150:9
209:15 214:3
225:19 226:6,7
**EXAMINATION**
5:4 239:14
**example**
39:11
**Excel**
66:19
**excess**
106:21 227:16,21
**exchange**
7:18 8:8 10:22 11:10
11:13 31:25 50:3,25
51:3 66:17 67:4
67:1 105:9 106:16
108:24 136:17
139:19 218.2
225:25 224:23
**exchanged**
56.21,24
**exchanges**
102:20,23 103:24
107:15 120:13
**exchanging**
106:2
**exclusively**
203:10
**execute**
28:3
**executing**
27:20
**exemption**
101:15,19
**exhibit**

15:9 22:8 28:21
29:10 40:13 48:7,15
54:13 55:6 56:19
71:8,15 76:5 82:17
85:23 90:22 97:2
96:11 114:13
116:11 118:13
127:10,16 135:15
139 16,11 143:10
145:24 146:2
148:10,11 154:20
156 15 158:23
161.12 162:14,16
163:13,18 164:10
164 13,14 166 10
166:11 168:24 170:3
172:2,4 177:2,3
174:1 176:14 177:5
177:8 181:9 183:3,5
183:7,19 184:23
187:12,13 204:4 14
207:5 215:4,11
216:11 236:8
**exhibits**
29:5,8 47:22 48:2
**existing**
28:14 30:14
**exit**
67:4
**expect**
89:13
**expected**
76:23 177:22
**expecting**
100:7 154:2
**expenses**
81:22,23 104:19,23,25
105:1,3,8 8,9,9,11
105:18 106:10
**experience**
10:9 15:16 21:25
90:14,19 106:13
106:14 113:3 159:19
225:19
**explain**
40.7 62:8 69:18 92:3

explained
158:14
explaining
160:7
explore
134:2
exploring
3:7
express
179:11 193:10
expressing
201:10
extend
188:9
extensive
108:24
extent
89:14 178:14 227:24
extra
40:3 51:16 155:13
eye
176:13
eyes
78:3 196:21
e-mail
3:7,11 16,18 29:4
55:1,8,11,16,17,25
56:20 57:1,5,7,11
58:20 59:9,11 126:6
127:3,5,12,24
28:17 129:16
130:15 136:14
137:11,16 138 12
139:22 140:1,10
42:17 143:2,6,10
144:6 1 5:23
146:11 147:8
54:23 155:6
179:23 182:15
183:5 235:17 236:3
236:11,25 237:23
258:14
e-mailed
129:7
e-mailing

e-mails
131:2,6,17,17 143:3
159:6 216:3
E-mail-Exhibit
3:15 139:14
E-x-o-n
334 10

F
F
242:1
FA
230:14
Facebook
19:7,8 20:11,17,19
21:2,6,8,11,14,18
37:25 38:9 39:3
41:22
facilitated
154:15
fact
99:16 108:22 113 23
167:12
factors
67 1
facts
51:18,25 210:20
factually
180:5
fair
17:1,20 18:15,25
19:21 37 4,15
2 7:23 48:20,24
53:11,12 54:11 58:2
61:6 77:4 78:5,17
79:19 82:11 84:1
91:11 94:9 102:7
107:24 111:20
125:22 128:5
137:19 142:14 144:2
179:7 182:16
20 14 202:7 206:7
304:9
fall
25:15 159:7

familiar
13:13 115 4 128.23
family
79:15 203:16
far
30:9 40:4 42:24
62:23 63:22 67:7
74:8 82:20,21 87 12
162:7 197:24
220:25
Fargo
7:20 10:5,7 80:1
216:11,19,22,25
231:6,8,14
fashion
130:10 158:21
fast
8:13
Fox
1:24
FBI
5:11 90:22 91:1
February
170 13 172:10,16
federal
6:18 92:10,15 213:16
few
95:1 105:8 226:2
227:11,15,21
feel
13 1,11 17:16
feeling
191:3,14
fees
60:13 61:8,8,11,16
81:4 94:16 1 2:4
133:21 136:10,20
136:17,23 139:17
149:17 452 228:5
fellow
81 9
felt
154:1 196:12 198:25
Fenton
47 3 60:21
Fidelity

field
89:22
figure
209:19
figured
186:6,7
figures
209:19 213:7
file
n:19 237:9
filed
109:13 124:13
330:16
financial
99:1 115:4,8,15
147:13 216:14
financially
242:15
finding
117:34
fine
22:11 55:10 90:3
113:3 133:19 158:4
159:4 160:4 187:21
193:18 219:22
241:17
finish
111:11 210:23
finished
233:16
Finkle
230:20 232:1
FINRA
7:24 228:25 229:3,7
229:21 232:8 233:1
233:9,13
FINRA's
232:22
firm
3:6 7:16 11:17 44:4
44:13 46:3,7,8,13
73:24 74:20 78:6
30:7,17 32:20 83 9
85:12 86:11 87 6,9
87:12,18,21,22



97:25,25 100:8
112:19 118:19
119:20 121:11
122:19 124:2
125:22 126:6
132:24 133:1 157:7
157:8 161:5 215:14
217:6,8,14,25
218:12

fierns
44.5

flem's
106:19

first
7.7 43.6 49 16 44:4
52:10 57:25 59:5
65:12 82:19 92:12
98:3 119:9 165:16
165:18 190:25
194:12,25 195:21
196:8 197:1 198:6
198:11,16,24 202.5
215:12 222:13,17
232.25 242:7

fit
15:18

five
56:8 163:2 2 1:6

fixed
85:24 86;1

fleet
8:12,17

flight
13:14 1 71 51

flip
155:9

floor
1:23 7:18 8 4 8:18
10:21 11:19 12:7
15:14 83:24 84:4
106:15 107:18
108:23

Florham
7:13

Florida
1:1 2:9,7 21:28

flow
32:16,17,25 95:19
130:9 133 16 134:5
137:10,13,25
138:1. 142:16
141:6 144 5 154:4
159:13

fluctuation
145:3 148;17

fluctuations
160:10

fly
189:14

focuses
65:7

focusing
52:8 88:20

folks
60:6 204 17 213:2

follow
7:25 24:1.9 69:16
105:25 104:5 134:4
144:13 154:19
154:5 239:3 240:9

followed
78:5 164:6

following
103:18 110;24

follows
106:4 225:10

forced
212:9

foregoing
111:15 242:5

foreign
14:2 22:23 23:14,16
220:20,22 221:3

forfeiture
66:8

forget
17:.22 196;19

form
17:24 18 4 19 3
20:15 26:17 3 :8
32:5,13 38:17 45:2
48:11 49;15 50:6,13

56:22 61:5,17 63:7
63:19 67.19 70.2
72:13 78:19 92:5
110:11 101 25
105:14 112:6,14,15
115:25 117:20
118:6 119.22 120:5
120:12,17 122:21
123:6,13,22 124:1
125.3,25 129:14
130:20 132:12
131:12,13 135:1
146:2 137:12,23
138:5,6,21 139:4
141:11 142:21
143:11,21 144 3,7
153:4 154:7,10
155:12 157:21
158.13 159:25
160:16,25 161:20
162:8 167:17
174:15 179:20
181:1 182:9, .
185:13,24 186:19
188:4 191:11
193:23 195.4
196:20 .98:13
201:8 202:5,14,21
203:12 205.16
206:8,25 208:6
209:21 210:9
215:19 216.7
217:10 218:16,22
219:11,17,25
221:19 223:7,18
225:12 227:7 225.4
228:12 233:3 238:5
240.3

formal
20:2 79:18

formalize
43:15,19 77 14

formation
77:5 105:3

formatting
55:21,24

formed
70:14

formerly
7:17

forth
12.19 129:8 138:12
142:17 143:1,6
175.17 233.1 242:8

forthright
83:5

fortune
151:7

forward
6:50 7:6 240;6

found
187:5

foundation
98:12,30

founded
99:21

founder
92:21 23.

founders
30:1 61:16 82:7
98:20 139:5

frankly
24:16

framed
74:14 109:11 212:19
234:16 235:2

free
12:1.

friend
87:23 169;2 191:11
191:14 198.20
206:19

friends
10:15 12:15 21:14
58:5 70:16

front
64 13 84;13 136:14
167:12 240:2

frustrated
179:4 180:19,22

full
48:2 78:12 88:14



Page 14

238:2 239:20 240:1
**fully**
60:19 177:1
**full-time**
15:13
**fun**
175:16
**function**
77:16 206:19,25
**fund**
10:10,13 14:3,7,10
14:14 15:3,15 17:22
47:5 53:2,18,18
51:15 70:6,7,8,10
70:12,13,20 75:5
84:17,21,24,25 85:8
86:20,22 87:2,2
90:12,14,18,18,19
90:4,5 101,28,23
107:12 114,2
117:19,19 118:6
142:11 143,25
147:13,20 151:3,5,9
152:1,3 157:24
158:20 159:16
165:1 172:22 175:2
195:22 218:9
235:18
**funds**
30:1 34:18 39:12,17
70:1 79:21 80:9,18
90:22 81:9 82:25
94:2,11 95:3,19
97:9,13 111:13
112:12 136:25
153:11,17 136:24
137:10,16,25
138:12 141:23
142:6,17 143:,16
144:5 152:13 153:2
154:4 158:15 159:1
159:13,20 162:1
165:21 195:22,14
213:5 226:22
239:21
**tangible**

14:6,6 148:1 155:7A
160:5
**further**
24:11 84:19 104:22
117:1,2 242:9,12
**future**
6:7 140:16,20
**futures**
23,24 92:10
**fuzzy**
195:12 196:=

**G**

**Gary**
54:3,8 136,24 137:9
127:15,22 141:15
141:21 142:5,6
143:7 150:21,23
151:2,7 155:7
155:25 159:3
165:20 211:16
**gather**
42:22 73:8,14 233:17
**geared**
34:20
**Gemini**
34:7 37:3 43:5 95:18
155:17 134,10,18
134:20,24,25 135:5
135:10,18 213:9,9
226:22
**general**
6.,24 71:4 77:20
79:6 91 77 99:21
101:1,4 119:17
121:12 125:9,24
128:13 211:5
**generally**
79:2 121:15 102:6,7
178:3 182:1
185:4 209:17,20
**genesis**
191:18
**Georgia**
42:9
**getting**

46:17 1 78:20 179:13
192:15 228.2
**give**
52:20 51:19 71:15
73:16 74:25 75:8
83:15 125:3 166:11
172:3 190:7 211:8
216:4 229:11
233:18 239:17
240:5
**given**
52:9 107:23 167:11
224:23
**giving**
51:21 72:4 188:20
182:21 216:6
**glad**
20:25
**go**
7.3 8.20 16:11,20
17:23 18:5 24:7
29:5 31:2 32:10,17
33:8,11 38:18,23
44:2 69:22 72,25
79:9 82:12 84:19
96:13 104:16 108:7
.08:7 114:4 117:21
..9:10 122:13
128:9,12 131:12,18
131:18 146:2 138.7
139:9 146:1 158:1
160:19 163.14
166:9,24,24 167:8
169:18 172:11,22
176:13 180:7
188:13 191:3,7
201:1 202:6 207:4
208:12 213:20
221:14 179:3 231:1
233:7 234:9 235:1
235:20 236:1,13
238:7 239:15
**goal**
101:23
**Godfrey**
5:7

**goes**
29:7 134:6 135:3
.60:2
**going**
5:10,16 6 10 7:1,23
11:24 15:4 19:8
28:23 30:13 37:21
47:11,13 52:21 53:7
53:8,9 562 70:14
71:5 74:18 87:1
90:4 98:24 151:15
145:19 148:2,23
154:9 159:1 162:.5
160:4,21 175:24
185:19 195:23
199:11 200:6
207:19,21 210.17
213:23 214:1
221:11 235:5
246:15
**gold**
212:3
**good**
5.5 11:9 15:18 24:16
104:9 113:1 .49:8
149:14,15,26
190:14 208:7 1.22
**government**
52:5,15 210:25 211:9
21..14,17 214:8
**go-between**
122:19
**GP**
99:20 100:19,25
104:4,12 .10:19
111:10
**GPs**
99:21
**GP's**
110;20
**grasp**
220:21
**great**
9:4,7 23:4 56:10
241:16
**Greenberg**


MAGNA
LEGAL SERVICES

2:12 5:25
**GRIMALDI**
3:2
**group**
21:8 41:1 93:16
**grow**
35:11,16 102:8,9
**growing**
96:2
**grown**
96:6
**guess**
9:25 46:10 52:11
119:15 123:9,15
193:14 196:13
140:17 197:6 200:6
204:20 212:22
213:20 216:23
224:21 227:9
**guide**
88:17 191:1
**GUITO**
2:2
**gun**
72:20
**guy**
21:16 169:2
**guys**
30:15 47:4 63:2,17
64:2 175:18 200:7
233:1

**H**

**H**
3:5 4:1
**half**
21:4 224:7
**handle**
126:16 143:1 146:16
150:2 207:21
**handled**
32:5 90:4 162:1
**handling**
141:23 142:6 144:1
189:5 193:71
**handsome**

22:16
**Hang**
12:5
**happened**
9:15 10:2 16:6 27:8
150:4 201:12
210:20
**happy**
8:18 7:4 12:12 29:5
48:1 49:6 240:4,20
**hard**
158:4 201:5 202:23
206:1 208:15,15
212:4
**head**
81:19 196:17
**health**
189:20 192:23 155:6
222:4
**hear**
32:23 44:24 175:19
178:11 193:14
256:6
**heard**
77:22 226:16
**hearing**
195:9
**hedge**
4.3.7,9,12.14 15:6
15:15 22:22 151:3,4
**held**
59:13
**help**
13:20,24 15:18 23:21
25:8 43:21 46:25
47:5,5 55:11,14
62:10 76:6 85:18,22
88:5,18 99:11
102,13 117:10
12:,11 124:9
110:22 154:23
107:5 162:21
182:25 190:6
195:19
**helped**
81:15 83:24 200:12

**helpful**
149:4 165:21
**helping**
117:17
**hereinbefore**
242:8
**hey**
194:12 155:16
196:16,25 198:7
**highest**
96:5
**highlight**
108:15
**highly**
50:21 41:12
**hire**
25:20,24 46:10,13,21
42:3 53:13,17 62:13
87:20 116:6 121:11
124:1
**hired**
25:7 44:5 46:1,2,34
47:8 52:24 85:12
86:11 87:17 90:11
102:15 116:10
123:20 218:9
**hiring**
87:16 88:21 118:19
**historical**
25:22 66:15 67:.
**historically**
67:5
**hold**
50:10 53:2 162:12
229:10 236.5
**holder**
17:20 18:9,11 55:1
36:0
**holders**
24:24 36:6,24
**holding**
94:11 95:3
**Holdings**
5:7,16 72:13 75:10
77:5,13,14,15,19

78:12,19 79:14 82:4
82:12,12 86:2 97:25
98:5 99:1,20 100:5
100:20 101:4,8
104:4,12 1:7:13
118:5 119:13,16,20
120:11,15 121:16
121:11 122:13,17
122:19 123:3,8,10
122:20 124:2,9,18
125:17,23 131:2
132:4 136:20,23
141:10 153:3
218:20 219:10
**home**
62:17,22 65:1,3
96:22 197:6 200:3
210:6 212:8
**Homeland**
91:6,20 211:23 212:2
213:2 214:17
**hometown**
32:12
**homework**
175:14,16
**hospital**
191:2 198:1,3 221:1,1
221:18
**hotel**
194:7 197:7 201:2
**hour**
186:10 201:2 204:21
**hours**
189:23 195:10 196:9
196:11,13 205:4
**house**
192:1,3,21 206:19,22
212:4 222:3
**housed**
42:20,23 213:19
**HSI**
91:20
**human**
39:24
**hundreds**
202:14



**I**

id
157:6
idea
12:22 47:13 173:22
identical
183:20
identification
48:12 50:3 71:11
76:1 85:23 91:2
97:6 116:16 127:14
139:15  45:24
148:16 154:24
156:22 164:20
166:17  201 171:5
172:10 173:8 174:6
176:3  77 12
181:13  93:15
185:3  187:17
199:17 204:8 226:6
229:16 235:15
236:18
identified
6:17
idly
9:19
ill
2:06:20
illness
131 111,24
imagine
201:9
Imitran@/imitran...
2:9
implement
107:2
implemental
30:19 107:5, 2
139:19
implementing
14 20 141:14
imploded
168:11
important
67:6,7 170:8,17,20

impression
130:18
inadvertently
150:6
inaudible
12:7 53:19
include
66:11 75:4 151:25
included
113:22,23 114:4
128:15 149:9 141:6
including
47:5 53:23 55:3
92:16 95:18  05:1
111:13 13:57
inclusive
60:16 2, 2:9
income
93:19
incoming
94:1,1,
incorporation
20:1
increase
107:8
increased
10:07
incur
145:0
incurred
138:17 139:1
incurring
195:6
independent
61:4 89:9
independently
217:23
india
215:23
indicated
11 :5
indicating
148:21
individual
..:7 50:25 140:25

individually
102:2
industry
7:22 103:19 104:1,5
inform
39:15
informal
79:17
informally
43:8 216:19
information
21:3 35:1 42:23
54:15,18,20 64:11
63:12 98:16,16
89:16 103:10
114:14 115:19
116:1 145:16 150:7
155:23 161:15
165:16,20,22
167:18 166:13, 9
168:20 222:4,12
240:3
informational
154:9,12
informed
38:14
initial
6:17 7:5 13:17 16:16
20:7 31:2 79:16
158:15 234:8
initially
6:16 4 :6
initials
165:15 237:5
inkling
93:1
input
27:18 20:10 41:10
inspect
78:12
instance
36:17 46:22
instead
196:3
instrumental

individually
14:19 39:1
insurance
109:8,10,13
insure
47:4 53:2,16
intend
177:1 210:13
increase
53:25
interesting
45:1 89:15
intersection
124:9
interest
217:9,16
interested
15:1,2,6 38:7 131:16
242:15
interests
101:13 141 39 122:4
interim
170:7
internal
29:7 226:11
internally
80:21
interpretation
165:19  9:27
interview
15:23,23
introduce
83:24
introduced
13:16
introducing
221:25
introduction
69:2
invested
28:20 35:13,17
investigate
238:5
investigating
91:20
investigation
16:5 92:2;4,11



Page 17

233:10,11
investigations
91:6
investing
18:4
investment
9:20 16:17 19:11
20:8 91:22 101:14
19:14 110:20
111:11 124:23
174:14,21 175:3
176:22 179:8
investments
7:19 18:21 114:15
115:20 130:5
220:14
investor
57:12 65:25 69:25
79:21 80:9,14,22
81:9 84:1,11 95:3
133:19 154:6
136:16 150:25
152:15 152:4
163:21 175:21
73:16 178:21,22
215:20 227:11
investors
19:1,7,16 20:11,18
20:22 27:5 28:19
33:4 39:2 45:19
57:21,24 54:7 70:6
70:9,10,12,19 77:15
73:2 93:15 99:15
101:11,15 112:15
125:3 131:1 141:2
161:21 165:2 166:2
170:9 217:19,22
223:17 224:24
227:19 226:21
237:11,15 239:24
239:24 240:5
invoices
145:16
involved
15:10 23:12 38:4
82:23 84:6,15

216:10,16 231:12
involvement
91:21 156:4 215:23
217:1 222:4
involving
30:6 91:22
in/mouth
67:15
Issac
2:8 5:6,9,19 6:1 7:9
29:7 32:24 38:19
47:18 64:7,8 72:17
98:11 102:1 127:22
137:24 163:9
166:21 168:2 200:9
203:18 233:4 236:2
238:9 239:2 240:16
issue
6:21 122:1 130:25
137:21 157:24
158:23 159:6
162:25 188:2
issues
99:4 102:14 198 7,14
236:14

_____ J _____

J
2:8 5:1,1
James
2:15 3:3,22 4:17
48:11 119:17 167:5
239:14 230:20
242:6
Jared
56:21 57:6
Jason
2:14 5:24 49:2
167:23 232:24
233:2 234:2 239:11
240:15
Jersey
1:14,14 2:13 5:2 7:14
42:13 189:8,22
242:5,20
job

6:9 9:11 Josh 15:24
41:10 54:16 163:20
John
15:12
John
211:24,25 212:12
join
15:24 19 3,5 20:15
31:9 32:5 45:4
49:17 50:1,7,14
61:19 63:20 70:4
78:21 100.14
103:16 120:7 121:6
136:1 142:23
145:15 210:31
228:5
joined
9,9,7,21,24
Judge
6:22
judgment
201:11
July
3:14,15 18:25 19:13
26:7 127:12 130:14
151:3 137:8,16,20
158:12 158:10,13
140:1 142:15
144:15,,9,22
158:23 159:2,8
185:19
jump
92:22 85:16 109:16
148:10
June
17:8 40:8 69:3,10
174:8,,9 175:20
176:5,,8 14 257:17
257:17
Justice
51:9

_____ K _____

Kaiser
43:25 44:6,1,15,18
45:7 46:3,6

keep
89:16 101:23 128:11
178:13 215:15
Kennedy
2:3
kept
65:17 101:20 140:24
141:2
key
158:3,8
kick
196:23
kid
175:14
kids
7:15
kind
10:9,17 13:20 21:5
22:17 41:6 43:15
57:18 81:1 92:5
109:15 134:4
155:19 161:22
225:6
Kislin
2:14 3 4 6:24,24 8:14
18:1 19:3 20:15
22:7,12 29:6,13
31:8 35:8,24 35:2
38:19,22 45:2,11
38:21 49:1,15,21,24
50:6,8,13,15 51:7
56:10,22 61:17
65:19 6:15,19
67:19 90:2 72:17,21
78:19 92:6 95:12
100:11 161:25
103:14 112:6,14,,6
115:1,5 120:6 134:4
127:24 128:1,6
132:12 136:2
137:24 138:6 140:6
143:21 143:11
148:23 149:6,16
162:15,8,22 163:9
166:21,25 167:5
168:2,5 182:12



200:9 209:22,25
210:9 219:17 225:2
226:14,16,19 228:4
231:16,18,21 233:4
233 9,19 234:4
236:7 238:9 249:2,3
239:11 240:16
241:5,17

Kissling@glaw.com
2:11

**Know**
13:13,14,15 29:13
88:25 194:6,9 206:9
210:15

**Knuch**
80:19

**Know**
6,11,21 8:26 9:15
11:3, 9 13:23 14:16
14:17 16:11,22
18,34 20:6,17,24,25
21:6,23 22:15 24:33
23:25 24:11,22,23
34:15 25:1 36:20
37:2,19 39:4,4,7,9
41:18,21 162:20
47:21 50:16 54:9
55:7,23 57:6,16,13
57:23 58:2,12,19
59:12 60:23 62:23
62:25 67:23,24,25
64:5,6,20 65:3 66:5
67:8,23 68:4 70:13
70:17 74:19,21
77:19,21 78:5 79:5
83:1 20,21,22 83:4
84:13 85:2 88:2
89:22 90:1,4,16
92:20 94:5,7,15,19
95:1 104:21 106:12
108:17 108:1,6
109:12 110:4,5,5,12
110:13 111:16,19
111:23 115:65
119:15 121:74
123:9 125:2,12,23

128:22,24 129:8,15
136:11,13 138:24
140:5 144:9 147:17
147:17,23 150:14
150:23 151:4,11
152:4,15,19,24
153:1,5,16,23 154:9
156:22 156:7,12,23
157:15 161:9,15
162:13 163:24
164:1 167:25 168:9
168:12 169:14
171:18 172:24
173:11 175:12,13
175:16,18 178:10
178:16 179 31
180:17 190:21,2
191:15 194:8,21
196:16 197:14,25
198:1,19 199:4
200:1,4,6 201:20
203:11 204:20,21
205:23 208:7,14
213:14,21 215:6,7
214:11,12,15 216:8
216,15 218:17,17
233:23 219:20,24
234:17 13,19
235:15,18,23
238:15,20 220:16,4
232:19 237:11,12
238:12 239:5

**knowing**
121:17

**knowledge**
43:26 76:8 92:19
108:24

**Koda**
236 11 237:19
238:22

**Kraken**
16 24 17:6,21,23
18:10,18 31:25
33:14 34:4,16,19
35:5,13 - 3:5

K-a-l-4-e-n

44:11

K-r-a-k-e-m
17:4

---

**L**

r.
2:16

**labeled**
155:15

**labor**
106:11

**Lakes**
42:16

**Laney**
7 15

**language**
25:3 220:5

**large**
188:8 213:17 214:1

**larger**
102:10

**late**
31:14,13 39:5 38:20
200:14,23 221:8,15

**law**
44:3,4,13 46:2 53:24
74:19 85:12 86:11
97:25 122:19 157:7
197:8 215:14 217:8

**laws**
25:2

**lawsuit**
40:13 50:4,11,22
51:2 52:3,12,2 6,3
226:11

**lawsuit's**
52:11

**lawyer**
75:12,16 231:12
242:20

**lawyers**
43:2,24 115:1 42:10
87:6,8,12,18 69:15
99:5 100 19 103:4
113:21 122:6 144:2

**lawyer's**

200:11

**layers**
102:25 103:7

**learn**
13:5 92:8,15 190:22
209:8 216:42

**learned**
174:19 191:1 204: 5

**learning**
13:9 124:25

**leave**
8:9,10 9:11,22 183:2
183:6

**leaving**
130:3 172:2,

**ledgers**
106:6 142:  158:19

**left**
7:22 9:15 32:14
101:2 190:1 212:17

**legal**
1.22 73:16,21 84:20
86:23 88:10 98.14.16
98:21,25 99:4
112:12 117:12
125:4,23 157:20
217:8,15

**legally**
155:25

**lend**
242:2

**letter**
3:12 19:12 29,2,9
58:9,24,17,23 85:21
86:16 118:15 119:5
129:3,4,10 174 1
126:9 216:14,14,21

**letting**
154:9

**let's**
11:5 23:2 35:14
37 15 68:10 72:15
75 3 83:13 86:17
86:5 97:1 99:11
100:16,17 104:23
108:21 108:7 109:6



109:7 110:16 111:1
112 8,18,24 120:20
127:9 128:20
130:12 131:14
134.4 139:9,11,24
.40:14 140:1,2
148:11 150:20
153:9 157:9 156:10
166:10 183:1
184:19,20 186:20
186:24 187:11
196:16 199:7 209.4
208:19 219:13
221:6 222:24
225:25 229:20,25
236:10
**levels**
56:14
**Levin**
1.7 2 21.17 5;7
126:21
**liability**
71:16 76:7 99:22
**license**
111:10 112:4 239:10
242.3
**licensed**
111:17,21
**licenses**
111:25 230-6,8
**licensing**
60:13 6:.8,8,11,16
94:18 95:1 105:8
112:4 227:11,15,21
228:3
**lify**
83.3
**likes**
129-24
**Likewise**
341.19
**limitations**
220:16,19
**limited**
71.16 76:7 99:22
1:..:9 229:25

**line**
48:16 71:24
**LIQUID**
155:11,15
**liquidate**
133.8 135:24 138 17
139.2 212:3,6
**liquidated**
133:19 21 1/3,8,9
**liquidating**
1-1 136:18
**list**
171:16
**listed**
150:7
**Listen**
208:9
**listing**
150:10
**little**
7:10 9:_3 23:19
39:16 104:6 118:17
120:21 39:23
148:18,21 149:2,1,5
149:7,11 153:10
223:21
**live**
7:14 69:2
**LLC**
3:9 71:9 72:15 85:2
100:9 119:16,20
130 11,15 134:2
**LLP**
2-12 91:23
**located**
39:20 41.20 42.4
81:12 189:5,7,22
**locker**
173:14
**log**
35:22 39:10 168:1
97:2 221:3 222:15
**logged**
3:7
**logging**
35:19

**login**
36:1 100:9 222:4,12
**logs**
206:9
**long**
24:7 35-10 101:20
109:9 136.5 143:2
171:25 .45:1
158:18 160:5 179:5
189:21 196:7
**longer**
136-10
**long-term**
66:111
**look**
21.11 23:2 54-11,20
51:24 54:17 55:3,5
40:20 42:21 46:8
51:17 67:1 72:15
97:2 99:11 110:17
102-18 104:8
109:21 106:6 105:7
27:9 131:15 134:4
.46:8 150:20
133:12 164 22
166:11 164.13,18
173:15 180:1
184:19,20 136:24
190:6 200.4 206:16
208:2 212:17 215:4
219:2,4,13 220:8
221:6 232 24
**looked**
18:7 158:23 218:.4
**looking**
21.4 24.17 40:9
69:25 90:6 92:17
100:18 113:18
121:25 122:6
151:2 133:16
136:13 217:1,7
**looks**
56:25 60:4 116:2
127:25 130:25
140:13 150:19
166:11 170:6 171:9

137-18 172:13
.76:2.8 177.20.23
.78:25 180:12,17
181 22 188:.3
99:21 200.24
201:17 205-21
237:1.6
**loose**
165:10
**lose**
66:11
**losing**
136-20 140:17
**loss**
26:24 28:10,16 30:15
31:3 50:20 67:12
101:20 181:23
**losses**
27:3
**lot**
.8:25 27:1 49:.9
133:22 158:16
**lot**
42:7 79:2 82.2 150:5
150:10 202:8
213 22,25 212-6
**Louis**
12:17
**lower**
229:9,10
**LP**
93:3,8 99:17 101:9
117:3
**lumens**
171:21
**lunch**
113:24 115:11,17
**luncheon**
113-23
**LP**
1.4

---

**M**

**M**
5:..
**Madison**

56:6 115:7 160:8
208:20
**magistrate**
6:22
**MAGNA**
1:22
**mall**
179:12
**main**
1 22 225:15
**major**
40:1,4 79:10
**majority**
172:4
**making**
59:16 62:5 67:15
132:13 151:25
213:23 233:7,6
258:5
**map**
25:16
**manage**
17:4 53:1,11 106:17
106:20
**managed**
106:21
**management**
45:13 59:4 99:9
100:21 101:9
105:10,14 108:8,11
108:20,25 109:1
224:2
**manager**
14:13
**managers**
75:20,12,15,18
**manner**
112:17 133:25
136:25 141:16
142:8
**manual**
39:10
**manually**
27:16 27:19
**March**
173:11 236:17

mark
47:12 55:5 71:19
114:10
**marked**
19:9 29:10 48:11,13
55:2 71:10 75:25
85:22 91:2 97:6
116:19 127:13
149:15 145:24
153:16 154:21
156:12 164:19
165:16 169:25
171:4 172:9 173:7
174:5 176:2 177:11
181 12 183:14
185:2 187:16
199:16 204:7 226:6
229:15 235:14
236:17
**market**
1:23 15:1 17:16
26:5 27:13 102:8
103:21 136:10
145:2 158:16
166:10 169:10
223:16 237:13
**markets**
9:18 59:16 42:24
68:14 115:8 188:8
**marking**
29:2,4 116:10
**maxeb**
1 5:1 153:19
**matched**
156:6
**matches**
160:6
**math**
24:15
**mathematical**
23:7 25:22 30:9 66:4
94:14 131:20
**mathematically**
66:13
**mathematicians**
23:24

matter
136:7 160:7
matters
121:4,4,12 122:5
123:8 134:19
136:15,16
**MATTHEWS**
3:3
**McEvOy**
5:20 52:25 55:8
60:23,25 85:11,17
84:14 85:8 88:10,25
111:121 116:9,14
116:19 117:8,17
123,13,18,23
122:17 124:8,12
133:7,6 138:5,13
143,12,16,25 143:7
144:8,15,19  47:11
147:11 157:12,20
158:3 159:2,11,19
159:22 161:21
162:6 163:21 213:9
223:19
**McEvoy's**
36:19 117:3 123:2,4
**McIntyre**
2.2 5.22
**mean**
12:1 16:9 18:13
25.20 27.17,21,23
30:4,25 49:4 56:25
55:9,24 72:22 73:22
79:6 46 24 97:16
102:14 176:17
193:6 197:25
201 21 203:8
217:19 220:23
224:1,9 227:9,16
228:13 232:15
237:4
**meaning**
176:6 200:14
**means**
25:21 39:9,14 66:10
160:1 178:1

meant
31:15 178:3 225:22
**media**
40:12 41:23 12:22
**medical**
94:21 197:20,22
205:19
**meet**
16:15,20 12:13
241:18
**meeting**
206:11
**member**
78:11 138:3,9
**members**
15:3 70:25 71:3
**memo**
3 12 97.3,5 98:6
**memorandum**
97:9,14 112:11
113:19 114:11
115:14  24:15
218:2
**memory**
84:12 86:9 128:17
134:16  57:11
205:24
**mental**
85:17 180:2
**mention**
227.2
**mentioned**
57:3 40:6 41:22
81:14 113:16
**met**
12:14 84:3
**Mikmi**
3.7
**Michael**
10:16 91:20 92:17
944 109:24 146:13
146.15,18 165:8
170:5  77:22
179:18 180:15,24
193:23 194:11
209:5 235:18 237:2



238:19
Michael's
.68:19
**microbiology**
7:16
**microseconds**
107:17
mid
86:3
**middle**
111 105:23 186:13
**midnight**
188:6
**Mike**
195:7,21 183:24
196:16 198:25
199:7 207:9,9,11
**million**
28:10 29:1,12 96:8
97:17,20 106:22
107:4 173:16 184:6
184:15 186:8
209:18 211:6,21
212:25 214:13
224:7,15 227:1
**millions**
51:8 207 19
**mind**
79:9 85:19 193:20
195:8 196:16,22
233:4
**mindset**
179:21
**mine**
19:20 83:23
**minimal**
60:13
**minor**
60:12 64:18
**minority**
146:15
**minutes**
56:6 112:25 128:21
163:2,4 208:22
233:18
**misspeaks**

100:1 131:9 185:15
**misrepresent**
87:25
**misrepresented**
104 130:14
**missed**
98:5 145:11 2.7:11
**Missouri**
1:8
**misstate**
16:24
**misstated**
88:1
**mistake**
83:20 100:5
**mistype**
184:9 185:16
**Mizuni**
2:8,8 3:4 5:4,6 12:18
5:19 6:15 12:5
17:25 19:11 23:9,14
29:1,9 32:16 33:5
38:21 47:14,20 48:1
48:6,23 49:6 51:16
52:10 53:22 54:12
55:13,19 55:4,11,16
57:15 64:17 65:6,9
68:10 69:22 71:13
71:21 72:2,3,15,19
72:23 73:5,20 75:20
76:5 77:11 85:14
86:13.4 86:7 90:23
91:15 93:10 95:6
98:8,13 99:11
100:16 102:3,8
103:22 104:8,16,22
105:21,25 108 7,17
109:5 110:15 111:4
111:16,7 112:22
113:1,6,10,16 116:6
116:16,24 117:15
118:11,16 119:3,8
119:10,21 120:20
136:14 127:9,15
138:2,8,20 139:12
137:25 139:9,17,21

110:1 146:1,6
148:11,18 149:1,6,9
149:13 151:9 155:1
157:9 162:3,,2,15
162:20,23 163:7,14
164:8,16 166:9,24
167:24 168:4,7
169:5,17 170:3
172:3,11,14 175:22
176:13 177:16
183:9,17 184:22
186:23 187:11
192:25 203:13,19
204:1,13 207:4
209:3 215:6,8,10
219:15 221:6
223:24 223 23
225:25 226.15,17
228:22 229:5,9,25
230:4,1' 231:20,23
232:6 233:7,14
234:7 235:6,10,20
235:25 236:9,20,23
237:7 238:11 239:4
239:16 240:8,14,27
240:23 241:10,15
241:19
**modified**
68:23
**modify**
84
**Monday**
190:7,11 193 17
194:2 200:14,22
205:19
**money**
16,14,20 17:21 18:23
18:23 27:21,4 33:4,5
33:7 35:3,8 38:9
50:10,17 51:3,14,16
52:5, 3.14 58:7
66:11 77:18 95:9,11
95:15,17,21 123 3
130:13 131:13
132:9 135:17,21,22
134:15,6 136:16

138:19 152:23
158:16 160:8
173:16 188:3
192:15 193:7
196:25 198 13,24
202:2,4,16 209:16
211:2,9,13,15,17
212:14,17 213:11
213:18 223:24
226:22,23 238:4
239:25
**montes**
51:21 93:18,19 144:1
214:21 239 23
**monitor**
39:14 107:18,19
189:3
**monitored**
38:25 39:6
**monitoring**
44:16 93:10
**month**
10:1 59:17 61:25
65:12 67:11,15
131:25 .022.13
173:15 138 14
**monthly**
51:17,21 52:1,11
65:11 104:13
131:19 164:23
165:1,13,19 227:9
236:25
**months**
64:23,13,25 59:24
179:11,21 180:7
**morning**
5:5 19:11 199:23
200:15 19 201:15
201:21 202:16
203:7 205:4
**motion**
6:23
**motions**
6:30
**mountain**
12:16 201:19



mouth
19:17 20:12,16
move
7:6 34:18 39:12,17
40:4 83:3 95:9,14
96:15,20 132:10
134:10,2 :24 135:9
135:17 103:19
230:11 236 18
moved
42:7 95:17 134:18
movement
6c:16 67:9 133:23
131:14 :33:13
movements
42:24 67:9
moving
92:14 107:15 131:12
133:21 138.15
160:8 :39:2 188:9
multiple
102.25 105:7 147:14
unsee
236:7
mythical
17:5

N

N
34:16 3:1 342:7
name
5:5 10:17 14:9 21:7
29:2 36:17,19
40:7 6:17 43:2 44:11
46:4,6 54:2 58:10
83:10,14 93:5
26.23,25 128.23
44:10 14:7:20
:71:17 215:2,:22
223:2 237:9,14
named
1:9:19 201:3,18,20
narrower
55:22,23
Narter

113:13
navigate
88:18 117:10
Near
22:5
necessarily
62:10
necessary
154:3
need
15:5 52:21 99:24
51:25 79:1 125:14
126.10 134.24
153:12 155:10
162:18 163:3
194:12,13 195.11
195:17,18 :97:9
203:22 207:10,11
233:24 234.2 235:1
241:1
needed
61:24 84:17,18,25
80:1 122:17 124:22
168:15 170:23
174:13,13,21 175:2
176:21 194.4,19
195:22 197:22
220:20 231:14
234:22
needs
137:3
negotiated
224:1,9 225:8,10
neither
137:20 242:9
nervous
201:15,22,25 202:7
202:10,13 203:7
204:63
nervousness
202:1
net
35:11,17
network
63:17,18 64:2,8
never

21.21 70.5,9 11 :21
181:5 186:20
190:1 2 212:15
new
1:14,11 2:13 5:2 7:14
7:17 8:8 10:32
23.17 30.19 31:6
34:2 43:18 58:7
69:23 70:6 79:21
80.9,14,22 81:9
84:4 91:11 95:3
106:16 107:6,11
130:2 133.10 134.5
133:2 178:21 189:7
189:22 205:19
224:24 242:4,20
Nice
24:1:17
nickname
150:2
Nicole
133:5
night
6:5 172.1 43:24
171:17 177:25
178:4,9,14 180:3
189:24 192:18
193:25 196:8 197:1
198:24 200:14
201:6
non-depo
29 10
non-Exhibit
18:8,8
Non-Party
2.15
north
96:8
note
36:7 48.8 113:7
103:7 208.21 224:6
236:9 240:23
noted
6:28 201:15 224:15
Notice
1:16

November
92:8 15 97:11 98:20
98:24 113:19
177:15 180:24
18.16 18:15
185:10,20 186:3,15
22:7 :4
November/early
201:9
no-no
132:14
number
47.16.17 52 56 70 72
7.14 96:5 147:11
149:24,25 151:12
164:11 168:8 169:5
169:7 172:4 181:22
18.:23,25 182:6,17
185 7,9,11,14
203:18 204:1 236:2
235:7,8 212:5
non-injured
47:22
numbers
167:13 181:18
183.24 2 k.3
numerous
66:15
N Y
3:15 105:14

O

O
7:16 347:1
oath
48:17 49:10
object
6:9 15 3 63:7 92:1
112:6 117.20 118.4
119:22 120:12.17
123:21 123:7,12,22
124:4 125.5,25
129:14 130:20
132:12 137:23
138:21 139:4
141:11 143:21



144:17 153;4 154:7
155:2 157:21
158:13 160:16
174:13 179;20
182:9,11 185:14,24
**objection**
3:15 5:16 17:24 19;3
20:19 28:17 31:8
32:3,13 38:17 45:2
45:11 49:15,24 50:6
50:13 51:11 55:22
61:5,17 65:19 67:19
70:2 78;19 100:11
101:25 104:14
112:14,16 115:22
120:8 133:13,13
135:1 136:4 137:13
138:5,6 142:21
143:11 154:10,17
159:23 160:25
161:22 162:8
174:23 181:1
146:19 188:4
191:11 193:22
195:4 196:20
198:13 201:8 203:3
202:14,21 203:2
205:16 206:8,25
208:6 209:21 214:9
215:19 216:7
217:10 218:16,22
219:11,17,25
221:16 223:7,18
225:1,2 227:7 228:4
228:12 231:3 238:6
**objections**
98:21
**obligated**
129:2
**observation**
55:13
**obtaining**
58:7
**obviously**
128:13 195:15
207:18

occasionally
76:25 188:5
**occurred**
26:21 210:11
October
9:21 91:10 92:4
101:7 145:7
156:20 157:17,18
162:2 163:25
191:23 221:14
**offer**
240:2
**offered**
104:8 101:13
**offhand**
62:6
**office**
60:13 62 14:23 64:13
61:13,14, 62:18,23
65:1,4 214:1,8
**official**
140:19 141:6 212:21
**off-line**
7:5
**Oh**
47:23 76:15 101:2
199:18
**Ohio**
62:18,23 189:6
**okay**
7:23 8:19 9:15,21
105:19 11:15 12:10
14:17 15:7,22 16:2
16:16 17:1,7,8,17
17:20 18:13 19:8,21
21:1,7,23 23:1,15
23:20 24:7,10,19,22
26:18,21 27:14,22
28:10 29:14,25
30:13,18 32:7,15
33:23 34:8,13 35:3
35:22 36:3,16 37:13
38:22 39:5 40:5,19
41:19 45:10,17 43:7
43:24 44:2,3,4 46:9
46:7 47:2,11,23,24

49:12 52:17,20
53:10 54:1,22,21
57:2,10,14 58:16,24
60:6,1 62:2,12
66:12 67:11 69:1,16
70:11 71:5 72:2,8
72:21 73:1,19 74:12
76:15,23 77:10 79:8
79:13,16,20 80:23
8:22 82:23 83:6,23
84:1,21 86:5,13
87:5 88:6,13,20,27
89:8,24 91:10,3
92:24 94:8,17 95:6
96:25 100:7,15,18
102:16 103:3 104:7
105:20,23 106:4,9
106:21 107:5,21
109:6 110:13,16
112:10,10,22 114:9
114:13 115:1,25
116:5 117:1,18:10
118:24 1:9-1 122:8
123:24 124:9 124;7
125:13 126:13
128:9,12 130:24
131:14 132:16
132:2 134:1,13
135:9 136:13
139:24 140:4,8,9,14
141:5 142:4 143:1
145:5 146:10
147:10 149:13,18
150:17 152:1
155:6 155:13 158:2
158:22 161:21
162:13,17 163:6,17
164:4 166:9 167:8
167:23 168:4
169:17 170:24
171:19 175:19
177:4,7,18 178:8,11
182:1,18 184:11
187:8 188:16
189:12 191:3
193:11,16 196:15

108:5 199:7 200:7
200:11,16 201:1
202:9 203:25
205:13 206:3
208:13 209:11
210:23 215:3,12,21
216:4,y 217:4,21
219:13 220:10
221:5 222:2 225:17
226:15,21 234:4
231:22 232:6
232:14,18 234:1,6,9
234:12 236:12,2'
236:29 237:14
238:13 240:17,23
241:7
**once**
79:13 186:5 188:7
**ones**
98:2,4  105:10 140:24
**ongoing**
99:5
**online**
13:12 31:25 37:21
239:21
**open**
66:19 102:15 122:11
155:10,14 156:4,5
**opened**
32:7 33:17,23 36:31
36:21 93:2 128:25
150:8 233:9
**opening**
5:14 51:9 155:11
**operate**
10:12 129:4 133:20
158:2
**operating**
71:4 81:1 96:19
104:23 105:4
182:3,23 183:2,12
153:24
**operation**
75:4 82:24 90:12,15
117:18 118:5
147:19,24 155:20



Page 26

**operations**
60:12
**opinion**
123:18 157:23
161:22
**opinion's**
123:14
**opportunity**
13:7
**opposed**
33:12 95:3
**opposing**
54:5
**option**
213:12
**order**
133:7 139:5
**ordering**
234:7
**orders**
11:18
**ordinary**
104:25 105:4
**organization**
64:7 135:18 ,19:21
**Organizational**
104:19
**organized**
162:24
**organizes**
99:22
**original**
55:25 133:16
**originally**
68:13 79:25
**outcry**
107:15
**outgoing**
95:19
**outside**
25:24,7 62:13 66:4
87:12 102:4  , 13:21
114:19:22 115:10
129:03:22 137:15
157:21  38:4
143:24 ,.12:19

**overlap**
,26:17
**overpayment**
214:2
**oversees**
84:23
**owed**
213:17 214:5
**owner**
149:20 157:1
**ownership**
41:6

**P**
P
2:1,1,16
PA
1:25
**paces**
25:22 66:17
**page**
5:6 43 70,70 212:6
21:8,11 29:4 49:2,8
52:11 22 53:23,24
55:24 56:18 57:16
71:20 72 5,16,25
76:7 98:9,16 99:12
99:19 100:17,18,24
102:18 104:16
105:23 108:7 109:7
109:8,17 111:4,6,7
111:9 114,12,13
116:21 119:14
139:21 218:19
**pages**
116:25
**paid**
213:16,22 214:5
**panenealth**
187:6 190:22 191:5
191:25 199:5
**paper**
137:4
**papers**
6:13
**paperwork**

115 9,179;11,18,24
180:6
**paragraph**
199:9 29:14,20 52:22
52:23 59:6 64:18
91:13 92:23 102:21
108:K,10 169:' 8
111:8 120:22,23,25
217:5 218:8 2 9 14
219:.5 220:7 221:7
222:2,25 229:20
224:6
**Paralegal**
2:.3
**paraphrasing**
180:20
**Park**
2:13
**part**
23:13 40.25 41:19
51:21 55:25 75:3
92:12 98:7 106:19
106:25 115:3
105:2' 146:7
217:12,13 229:11
230:15
**participants**
217:9,16,18
**participate**
45:8 225:11
**participates**
152:5
**participation**
90:9 151:22
**participations**
41:8
**particular**
58:21 67:2 79:1
188:17 193:13
**parties**
73:12,17 1.0:7
111:12,18 112:,,5
242:11
**partner**
77:20 83:8 98:22

99:21 101:1,5
119:17 194:18
195:10,18,24
202:18 205:18
223:11
**partners**
14:16 74:19 79:2
79:6 88:24 95:15
191:18 202:17
224:1
**partnership**
98:22 99:21 100:19
100:22 101:9,12,14
104:23,24 105 5
109:22 110:1
115:19
**partnerships**
114:15
**partnership's**
114:16 115 20 116:5
**party**
51:18 69:9  10:10
111:22
**password**
36:9 105:19 205:12
206:5
**passwords**
170:8,12,17,24
171:11
**pattern**
59:23
**Paul**
213:13
**Paul@mcintyrefir_**
2:4
**pay**
50:10,17 51:3 53:14
81:2,22 94:2,11,20
104:25 105:18
131:2 132:10 133:7
138,19 139:3
213:19 224:2
**paying**
61:8 105:11 231:5
**payment**
163:22



payments
95:2
PC
1:8 2:10
pending
3:4 1:11
pennies
:02:17
people
27:4 37:24 38:3 56:9
60:24 64:8 107:18
percentage
61:11
percentages
60:15
perfectly
22:24
perform
26:2
performance
25:24 104:9,18
period
181:3
person
11:9 15:24 40::2
41:23 53:24 54:::8
54:18 127:1 147:19
:52:11 189:18
:91:4,7,16 193:15
196:24 206;13
227:10
personal
33:11 63:16
personally
55:19 126:22 198:2
persons
101:15,21,24 102:10
person's
5::2
PII
2:7
Philadelphia
1:25
philosophy
89:5
phone

1:24 147:2 149:24
150:5,6,7,13 182:14
:82:17
phrase
10:6
physical
6::14,23
Physically
31:25
Physician
21:9
pick
212:20
picking
27:19
piece
91:9 167:6
pin
92:25 96:23
pitch
58:14,17,18
pivot
66:15 67:5,9
place
145:6 242:8
placed
94:2
placement
5:12 97:2,5,9,14 98:1
98:6 112:21 113:18
114:11 115:15
218:1
plain
66:24
plaintiff
1:5 2:9 49:13 52:15
197:7 230:13
plaintiffs
5:21 48:25 49:23
50:11 216:5 225:11
plaintiff's
127:4 215:11
platform
14:21 18:18 33:8,16
35:8,18 89:12 160.8
platforms

3:4 6
pleadings
29:3 10:5
please
5::5 18:8 19::2 24:9
44:9 49:15 52:11
55:20 73:1,18,24
86:4 96:17 108:8
112:2 120:8 127:10
127:17 146:15,21
173::1,25 186:24
207:2 208:20 226:1
233 7 234:1 233 31
246:10
pocumcuts
187:5 188:20 189:2
190:19 196:6 190.5
222:1
point
113:8,25 17:1,17
16:16 19::22:2
20:21 21:25 24:10
27 26 31:10 34:3
3:214 59:12 41:12
43:13 41:18 60:25
67 9 79:6,10,12,25
84:2 89:24 95:17
96:14,16,18 102:7,9
103:11 104:4
139:25 154:7 159:7
160:24 172:20
188:16 19:-11
195:15 197:19
202:25 205:13
206:4 207:11 209:4
216:24 22:-12,19
227:23
points
40:11 66:15,17 67:5
67:5,6,7 210.3
Poisinelli
1:8 2:10 5 6 6:1,6,14
44:1 52:25 53:6
83:25 84:1 85:12
86:1,6,11 87:16
88:17 103 13

110:23 118:14,19
119:20 120:2,5,10
121:1,25 122:5:9
123:14 123:4,11,21
124::7 6,15,18,21
125:1..3,11,16
126:5 127:6
144:25 145:12,16
193:12,17,20,25
160:9 161:5,16,19
16 22 174:12,20
175:1 176:10,18,21
2:6 6 218:12 219:9
2:14:16
Poisinelli's
88:21 122:24 218:19
2:9 2:4
Pozzi
230:15
portfolio
114:15
portion
213:17
posed
159:21 160:22
position
6:9 106 184 188:8
216:11,15
positions
27:11,16 107:2
88:11
possesses
108:11,19
possibility
58:1 155:10
possible
29:17 23:6 126:12
145:5,8 145:10
204:11 237:19
239:25
Possibly
55:19
post
188:11
postage
61:5



potting
37:25
potential
56:5 57:12,21,24
145:2 220:25
potentially
174:22
PPM
104:12 108:18 111:9
114:11
practices
103:19 104:1,5
preclude
111:15
predicting
42:23
preferred
153:8
preparation
73:25 98:1,5
prepared
74:7 124:3,4 210:7
presumably
42:22
pretty
149:14 188:24 200:5
previously
83:10 222:5
pricey
40:4
primarily
44:18,23,25 45:5,18
46:22 47:8 54:20
81:20 84:17 94:17
100:21 101:8
107:16 115:23
primary
58:16 44:21 53:25
54:8,9 132:13
principal
132:15
principally
212:13
principals
122:5
prior

14:1 42:11 48:14
82:10 87:16 90:18
105:1 132:2 141:14
176:14 185:21
188:17 225:18
230:1
private
3:12 97:22,3,14 98:1
98:6 112:11 113:18
114:11 115:13
218:1
privilege
6:19,21,24 125:5
probably
85:5 142:3 176:6,25
181:24 206:11
211:14 226:8 235:4
237:1,3
problem
47:21 83:16 180:14
186:17 188:16
202:1 203:8
procedure
6:18 79:16
proceed
5:17 7:5
proceeding
232:9
proceeds
6:7
process
44:11 108:13,21
133:11 179:5
produce
6:6 73:17
produced
6:5 157:6 197:25
188:1,3,6
produces
6:14
productions
177:6
professional
1:8 8:5 109:11 8:9
81:21 113:22 120:11
professionals

32:25
profit
41:8 59:16 60:7,9
65:11,15 66:15 90:5
104:5 213:1 133:7
135:23,25 151:2,
181:23 182:22
184:6 186:8 211:24
221:15,20,25
225:16,12
profitability
107:7
profits
82:9,11 94:2,3,6,12
94:15 111:25
131:19 132:5
138:19 139:5
163:22 182:10
223:1 227:16,20
program
20:17
programmer
23:20
programmers
107:2,4,7
programming
23:2
pronounce
10:17
pronounced
24:1
proper
130:16
property
40:5 42:5 53:2,19
133:24 160:6 189:4
214:10
properties
109:24 110:11
Proprietary
114:13
prospective
112:13
protect
18:4 217:9,16,21
provide

73:12 88:16 117:12
144:13 157:22
173:10 211:9 222:5
237:16 240:19
provided
6:23 18:24 73:11
99:13 101:20
144:10 161:16
163:23 167:15,16
222:5 240:19
providing
115:16 118:24
125:22 138:10
166:1 167:18
public
115:7
pull
88:4,8 162:16 164:11
196:16 229:19
PULTZNER
1:13 242:4
purported
159:19 235:17
purporting
6:24 52:6 levels
226:10
purports
71:19 76:6
purpose
77:16 78:4 112:11
pursuant
1:16 120:13 125:1
pursue
50:5
pushing
136:22
put
16:13 17:21 19:12
26:22 29:22 42:9
47:14 55:5,14 71:15
71:21 77 7:8 4:13
82:17 94:21 118:1
118:13 125:20,20
136:19 139:11
141:13 145:19 146:1
146:2 148:9,11

162:11 165:11
175:22 178:22
164:22 185:24
187:11 188:14
192:15 199:5,12
211:2 213:6 223:1
223:11 225:25
227:12 229:14,23
228:25 235:11
240:1
puts
6:8
putting
157:17 158:3,6
174:25 205:3
P-1
3:7 55:2
P-10
3:18 148:16
P-11
3:19 154:24
P-15
3:21 156:22
P-2
3:9 71:10
P-2A
3:10 75:15
P-21
3:22 48:11
P-22
3:23 116:19
P-23
3:24 164:19
P-24
166:16
P-25
4:3 168:25
P-26
4:4 171:4
P 27
4:5 172:9
P-28
4:6 173:7
P-29
4:7 174:5
P-3

3:11 91:2
P-30
4:8 176:2
P-31
4:9 177:11
P-32
4:10 181:12
P-33
4:11 183:14
P-34
4:12 185:2
P-35
4:13 187:10
P-36
4:14 199:16
P-37
4:15 204:7
P-38
4:16 226:6
P-39
4:17 229:15
P-4
3:12 47:6
P-40
4:18 235:14
P-41
4:19 236:19
P-5
3:13 85:22
P-6
3:14 127:13
P-7
3:15 139:12
P-9
3:16 145:24
P-A
2:2,6
p.m
178:8 241:21

Q

Queselor
167:4
quality
17:5:19
Quan

228:13 119:19
quantify
118:25
QUANTRAN 04:...
2:10 75:15
question
2:12 18:8 34:20
35:15 36:15 49:20
73:13 79:5 92:15
112:2 114:18 120:8
133:4 135:13
143:14 147:24
159:24 160:13,2..
160:23 166:22,23
167:9 182:13
189:12 200:13
207:1 211:8 217:11
217:13 223:20
questions
21:4 74:22 99:8
130:7 143:20
146:21,25 147:1,8
148:2 241:12
quick
9:1,5,12,16 55:16
240:9
quickly
171:22
Q3
1:4 19:24 20:2,23
27:13 28:20 29:25
38:14 40:19 41:4
42:18 41:20 45:1..0
45:15 46:21 56:20
53:24 59:13,14,17
58:12 61:1 63:5..4
64 14,22 71:6,16
72 13 74:5,10 75:10
77:2,13,14,15,19,25
78:2,11,13 79:13,15
80:18 82:3,10,13
84:8,15 86:11 87:..7
88:..1,1? 89:15
90:18 91:23 93:3,18
94:1,7,12,14 97:25
98:8 99:1,20 100:1

103:19 101:5,8
102:1,3,3,9 104:4
104:15 107:20
108:3 109:2,10,13
111:1,7 113:23
114:19 115:17
116:1,17:17 1,8:5
119:15,16,20
120:11,15 121:..0
121:1 122:13,17
122:19 123:5,6,10
123:20 124:2,4,18
124:22 125:16,23
126:14 129:1,23
131:1 132:4 136:19
135:22 137:21
141:19 148:6
151:14,22 152:1
153:2,24 156:..4
163:1 174:20 175:1
176:21 191:18
193:2,14 21:1,3,18
211:18 214:9
216:10,16,17,23
217:..7,15 218:20
219:10 222:2,5,5,6
223:11,17 226:25
226:9 234:12,21
227:15
Q3'
1,9:23 56:7 71:9
77:20,23,25 78:2,4
91:4,7 93:3,8 97:1,7
97:25 98:5,21 99:1
101:5,9 105:8,12
110:2,7,11 116:14
117:3,17 118:4
120 18 123:24
126:23 141:10
151:7 188:11,15
224:1,24
Q3's
224:9
Q3's
28:14 29:24



| R | | | |
|---|---|---|---|
| **R** | 223:16 237:12 | 97:6 1..:24 116:15 | **reconciling** |
| bl | 241:4 | 127:11 139 14 | 95:18 |
| 2:1,16 242.1 | **rearrange** | 115:23 148:15 | **record** |
| **radically** | 165:25 | 154:23 156:21 | 5-11,16 6:2,9 33:25 |
| 219:24 220:1 | **reason** | 164:1v 166.16 | 44.23 55:14 56:17 |
| **raise** | 29:23 89:18 93:4 | 169:25 170:4 171:1 | .67:3 229:3 239:6.7 |
| 97:9,11,17,19,22 | 143:2 175:8 | 173:9,7,5 173;7,10 | 239-10 241:1 |
| 112:12 | **reasoning** | 174:5 176.2 177:11 | **records** |
| **raising** | 22::13 | 181:12 183:11,20 | 63:5,5 140:20 .41:6 |
| 236:14 237:18 | **reason** | 185:2 187-16 | 143:2 211:3,20 |
| 238:25 | 191:6 20v.11,13 | 199:10 204.7 226:6 | 212:25 |
| **ran** | **recalculated** | 229:15 235:14 | **RECROSS** |
| 11:3 22:23 98:24 | 65:14 | 236:17 | 3:2 |
| 99:3 81:20 | **recall** | **receiving** | **REDIRECT** |
| **range** | 9:19 14:11 23:4 | 123:17 153:21 .555b | 3:2 |
| 214:12 | 81-1,1 102:15 110:8 | 204.25 | **redraw** |
| **ranges** | 174:15,25 125:6 | **recess** | 224:18,23 |
| 38:23 99.7 40:9,24 | 126:17 127:2,4,7 | 56::4 113:14 62::8 | **Reducing** |
| 107:20 171::7 | 129:3,17,19 130:8 | 163:12 209:1 | 225:7 |
| 178:3 | 131:8 135:21 139:8 | 233.23 | **reduction** |
| **ratio** | 141:12,24 143:2 | **recession** | 8:18,21 9:5,14 |
| 66:8 | 143:8 144:2? 148:8 | 9:1,1 | 22::16 |
| **read** | 153:22 154;1 | **recognize** | **refer** |
| 98:23 93:5 99:14 | 155:13 157:16 | 47:2 117:1 136:21 | 179:3 211:4,19 |
| 127:21 120:23 | 161:20 168:16,2. | 127:16,20 215:21 | **reference** |
| 139:25 215:23 | 168:24 150-13 | 215 25 229:21 | 61:7 61:13,16 65:8 |
| 236:14 240 24 | 201:14 171:14 | 237.23,14 | 65:11 66:6 102:24 |
| 241:2,3 | 172:18 173:12 | **recollect** | 103:18,25 104:18 |
| **rending** | 174:10,16 175:7 | 60:24 126:3 202:23 | 105:23 106:9 |
| 40:8 56:1 140:7 | 176.7 178:2,24 | **recollection** | 110:14 118:5 141:3 |
| 178:1v 341.2 | 180:12 181:2,7 | 9:19 12:24 14:8 .20 | **references** |
| **reads** | 182:1,19 181:8 | 15:18 18:19 21:3 | 29:7 114:15 |
| 60:3,14 225:23 | 192:8 196:12 199:9 | 22:6 24:2 35:4,19 | **referring** |
| **ready** | 199:3 200:16 | 26:22 31:19 32::21 | 57:1: 60:3 64.6,20 |
| 230:4 234:9 | 211:20 212:10 | 35:6 46:6 60:17 | 68:20 76:13 108:18 |
| **real** | 215:2v 216:3 | 61:2, 62:17 80:5 | 108:22 141:6,19 |
| 26:1 | 222:23 223:13,19 | 81:5 98:7 101:4,7 | 150:23,23 152:10 |
| **reality** | 223:21 225:5,16 | 114:8,23 135:13,21 | 152:15,19 154:1, & |
| 136:16 | 226:13 | 142:13 147:7 155:9 | 172:24 173:19,21 |
| **really** | **raising** | 162.5 166:8 173:18 | 179:7 185:18 |
| 14-16 24:16 51:10 | 104:12 112:3 150:17 | 173.20 176:25 | **refers** |
| 68:1 200:13 202:4 | 171:7 | 179:11 192:1 196:1 | 60:2 152:14 179:15 |
| 202:11 206:1 | **revised** | 200 18.21 212.54 | **refined** |
| 208:14,19 213:7 | 48:11 55.2 57.8 | 230.13 225:9 | 107:4 |
| 216:3 315:10 | 71:10 92:3 75:25 | **recommendation** | **reflect** |
| | 85:22 91:2 93:12 | 179:13 | 18..19 |



Page 20

**reflects**
239:19,20
**refresh**
36:9 101:3,7 112:15
176:20 200:18,21
**refund**
214:1,9,11
**refuse**
222:16
**refused**
222:6
**Reg**
3:21 156:21
**regarding**
54:15 120:25 122:20
124:18 154:4
159:13 162:6
**regards**
65:12
**register**
87:9 174:13,14,21
175:2,9 176:22
179:6
**registered**
87:2 110:19 111:1
124:23
**registering**
146:21 146:18 179:7
**registration**
86:21,25 117:13,25
179:2,3
**regulatory**
47:6 53:9 73:16
102:14 110:17,18
121:4,12,22 122:4
122:18 124:19
125:16
**Reilly**
5:16
**reined**
91:23 211:18 214:9
242:10
**relationship**
129:5,7,10,12,22
169:4
**relative**

242:13
**relaunch**
149:12
**release**
249:19
**released**
198:4
**relevance**
171:18
**relevant**
123:15
**relieve**
267:22
**Relly**
5:12,16
**relying**
103:1 141:25
**remember**
16,23,25 17:14 18:12
19:22 20:4 23:11
24:8 25:9 27:6
28:13,22 51:23 53:6
32:14 33:10,21 34:2
34:16,12 35:19,21
36:18,25,25 37:12
41:9 43:17 46:16
54:23 58:13 59:14
59:21 60:1,22 62:14
63:21 64:10,2,24
68:11,20 70:18 71:2
71:9 74:21 79:5
80:10,16,23,24 81:7
81:14,17 82:2,6,6
37:14,18 83:4,3,4,11
45:5,15 87:10,19,23
87:21 88:1,5 88:5
89:10,13 90:1,0,16
91:9 94:5,24,25
96:7 97:15,23 99:9
102:1 104:5 105:10
105:19 106:3
109:11 1 02:12
114:20   5:16
122:7,1,23 123:1
124:17,21 125:9,10
125:12, 5:16 136:1

126:13 129:23
130:16 132:2,25
134:3 138:1 139:5
140:12 141:8
141:11,16,15,21
145:18 146:20,25
147:6,18 148:1,1
151:23 153:6
154:11,1 151 155:5
155:24 156 2,6,10
157:11,14,18 158:7
158:12,24 159:9,22
160:1,15,17,18,20
161:7,10,24 164:2,6
165:17 171 26,24
174:12,18 175:1
176:9 178:16,17
180:4,5,6 18,21
182:7 184:2,4,11
185:5,9,14,17,19
186:1,16 187:19,23
186:12,25 190:7,10
190:16,17 192:9
193:6 197:12,14
196:18 200:16 20 24
201:17 203:3
204:25 205:1,9,10
205:11 209:16
210:18 211:5
216:18 219:6
225:16 227:24
232:10 234:24
235:3 236:2 257:23
238:21,24
**removes**
233:13
**repaid**
123:1 113:2 120:8
172:13 205:17
207:1
**rephrase**
12:8,10,12 57:2 94:8
98:20 220:3
**report**
167:19  185:20 233:2
**reported**

186:4,8 188:19
**Reporter**
1:13 12:5 33,32 56:7
113:7,9 160:8
208:20 253:21
234:2,6 242,4,20
**reporting**
96:1 13:15 135:23
187 12,17 188:9
191:2 292:11
209:11,18
**reports**
103:2,  9 256:25
**represent**
9:6,7 27:2 74:9,14
88:17 117,10 120:5
120:11 121:2
126:1 201:16
**representative**
120:15,21 121:1
144:11
**representations**
42:22 100:9 218:
**representative**
193 14
**represented**
74:12 141:10
**representing**
3:22 231:12
**reputation**
31:2,5,7,9
**request**
66:2
**requested**
72:15
**required**
8:17 125:3 133:17
**requirements**
47:6 53:4 121,22
**research**
13:12 10:25 228:17
**reside**
42,12
**residing**
176:21
**resolve**



6:20
respect
79:4 193:11 203:4
respectfully
6:16
respond
130:7 233:6
responded
130:15
respondent
231:9
response
122:24 141:20
responsibilities
38:12 140:20 151:25
207:22
responsibility
38:16 42:20 44:21
105:15 158:12
responsible
44:23,25 45:5,9,15
45:18,23 93:19
100:21 101:8
115:18 129:11
rest
168:15 238:10
restore
18:8
Restored
58:13
restriction
211:10
result
50:20 52:5 154:14
195:19 194:11,25
195:20 201:6
233:12
results
26:5 89:9 166:7
167:15
resume
207:19
retained
45:7 121:2
retains
51:21 61:23 211:11

211:13,17 214:8
returned
51:20,21
returning
239:21,22,23,24
returns
14:6 20:7 31:18,21
32:1,12 54:21 63:15
167:10
review
6:15 14:6 58:24
reviewed
6:23
revisited
103:24
Richard
1:7 9:11,17 5:7
Rick
126:21
ride
203:3
right
9:18 7:16 9:16,25
10:15 11,19,23
12:17 15:24 17:11
17:25 18:20 20:6
21:16 22:18 23:3
25:24 26:4 30:11,19
31:2,3,4,6,12 32:16
33:3 34:12 40:14
41:5,23 45:8,10
45:25 47:20 48:24
50:18 51:17,17 52:5
52:2 53:5,14,21
55:5 56:2,16 59:2
63:9,17 64:7,11
65:5 66:6 68:9
69:3 72:4 74:21
75:2 76:13 77:5
78:7,11 79:35 82:7
82:9 83:21 84:3
85:7,8,15 88:3
89:13,20 90:17,21
91:4,15 93:14 93:6
92:21 95:14 96:4,12
96:5,23 97:21

99:10,19 103:1
102:7 2.25 108:11
1:25,3,20,21
111:19,23 114:2,3
113:10 116,6,11,22
112:5,11 118:11
112:7,23 120 19
121:8 123:18,21
125:15 127:8 128:8
128:16,19 129:21
129:25 130. 1
131:20 132:4 131:7
134:17 135:22
137:17 138:2,15,20
139:6 141:21,25
143:3,16,20 144:1
145:6,19 146:9,9
150:20 152:1
154:13,19 155:4
156:17 157:3,5,17
157:25 158:4,6
159:4,20 162:10
163:22 164:8
168:20,25 169:3
171:1 172:1 173:1
173:24 174 11,23
175:11 176:12
178:5,9,15,18,18
179:25 180 111
181:8 182:20,23,25
181:11,19 186:22
186:25 187:11,23
188:24 149,12,17
190:3,9,17 191:15
192:19 194:2,10
195:20 196:1,7
197:16,1 99:25
200:17 201:10,24
203:11,13,24
204:10,16,22
205:19 207:10,16
207:24 208:9 210:5
210:19,25 211 13
213:24 215:5,20
215:25 217:24
218:8 219:1,8 120:7

220:9 223:21 229:3
223:15,17 228:7,22
225:24 229:18,24
230:10,17,24
231 24 232:25
233:7,15 235:16
236:3,24 237:4,5,7
238:25 239:8,11
240:8,14 241:2,10
241:15
rights
78:12
rings
130:15
Ripple
171:25
risk
40:5 106:10,14,17,20
106:22 108:11,20
108:25 109:1
136:10 146:18
Risks
110:17,18
Rivera
43:25 44:8,14 46:3,5
46:8 73:2 74:4,20
78:6 80:7 85:9 87:6
87:9,12,18 93:24
98:17,21,25 100:8
112:18 113:23
116:3 125:22 126:9
126:14 132:24
155:1 217:8,14,23
Riverdale
7:17
Road
3:7
ROBYN
1:13 242:3
Rodriguez
211:24,25 212:12
role
8:5 33:14,14,19
40:22 45:8 47:9
77:14,15
rolling



107:22
room
175:15 201:2
root
202:3
roughly
59:16 112:25
rules
6:18 200:24 233:12
run
10:9 12:19,21 14:5
25:25 47:5 53:2,19
67:12 65:17 157:24
2:8:9
running
23:5 24:14 25:21
102 45:10 82:17
84:24 135:5,7 203:9
runs
151:2,5 152:5
RYNOR
7:6
R-t-v-o-t-e-t
44:10

_____ S _____

S
2,1:8,16,16 5:5 4:1
5:11,11
salaries
60:12 64:18 81:5
salary
60:15
Scout
215:17
SANKET
1:4
Saunders
15:14,15,16,24
152:5 228:17
536:13
saving
63:4,8
saw
30:17 98:20 118:14
129:20 168:25

172:3 204:23
209:11,16,18 212:1
saying
22:1,115 23:3 37:14
51:25 61:15 126:9
167:11 176:17
180:3 187:21 202:3
202:22,23 209:9,10
213:22 238:2
says
19:5 31:5 52:23,24
99:5,15,22 63:17
83:19 91:18 94:20
100:19 101:12
102:20 104:24
108:10,19 109:21
110:19 111:9
116:20 119:16
129:25 130:24
150:10,21 151:9
152:7,8,18 156:25
175:8,15 176:10
230:12 232:2
summary
235:25
scheme
91:22 250:15
scope
120:21 121:3 218:10
Scout
56:21 57:5
screen
22:6 127:18 166:20
209:15
screenshot
37:7,7,21 167:15
168:9
scroll
49:1,5,21 49:1 52:10
55:19 57:15 58:6
68:10 72:24 85:2
93:11 98:14 104:22
105:21 110:17
119:7,3,24 120:20
128:7,4,20 130:12
139:18,23 140:5

146:5,6 149:1,10
153:9 155:1 177:16
225:22 229:18,23
230:4,11 231:25
232:6,7 236:20,22
237:8 238:9
scrolling
53:10 73:10 93:10
128:11 235:25
Sealed
3:11 91:1
Seat-of-the-pants
100:1
sec
19:10,13,14 87:8
92:9,16 102:14
110:20 111:2
214:18 228 7
254:22
second
31:17 55:15 64:17
72:1 75:8 104:11
167:1 225:6 229:11
235:8
secondary
66:17
section
73 73 118:18
securities
63:10 110:21 12:13
121:10,14 122:4,17
124:18 125:2
125:16 219:6
security
19 31 91:6,20 131 18
122:25 2:1:23
214:17 219:10
see
8,12 15,23 22:13, 25
21:5 26:11,13,18
29:11,15,20 34:14
57:10,17 55,17,21
57:25 59:22,7,17
59:18 64:15 65:15
66:19 68:16 69:6
71:13 71:7,23 74:2

75:7 76:1,16 89:5
89:6,8,11 91:24
92,12 96:8,16,18
99:21 100:16,23
101:16 107:17,21
115:20,25 104:19
105:2 106:11 107:9
108:14 104:18
110:25 112:24
116:20 119:16
120:25 177:17
128:2 137:9 139:6
139:19,22 111:17
142:15 145:11
146:4 148:22 149:5
150:21 153:14
157:5 166:19
170:10 172:6
176:16 177:17
183:11 189:10,18
190:20,24 191:4,7
191:22 192:14
194:20 195:10
196:5,17 197:3,15
198:20 200:22
201:22 204:6,21
207:10,11 210:22
220:5 222,9 223:23
225:11 228:19
230:24 231:8 232:1
237:4,20,21,23
238:10,12 241:3
seeing
91:8 195:21 198:11
seek
19:7 125:4
seeking
191:16 20:11,18,22
20:25
seen
37:7 53 17 72:9 91:4
91:7 143:13 189:22
191:16,21 197:23
197:24 271:21
226:9,12
Seldes



2.13 3:3,22 4.17
3:25 n:8,1 7:2
29:20 47:15 48:11
56:20 103:2 113:17
119:17 146:9
148:20 163:19
168:10 172:6
205:18 204:18
2004 21:9 229:14
233:10 239:16
212:7
Seijas00604
3.8 55.2
Seljas01301
2:4 127:13
Seijas01560
2:9 71:10
Seljas01508
3 20 154:23
Seijas02577
4:18 205:11
Seijas02758
4.19 256:17
Seljas03553
3:17 143:23
Seljas04294
9:24 104:19
Seljus12018
166:16
Seljas1592
22:25 73:7
Seijas25605
4.3 169:21,23
Seljas25609
4:1 171:1
Seijas26345
4:5 172:2,9,14
Seijas26989
4:6 173:2,7
Seijas31919
4:8 175:20 176.2
Seljus31934
4:7 173:25 174:5
Seijas3553
146:5
Seljas40025

3:21 156:21
Seijas40910
4:9 165:1 177:11
Seijas40928
4:10 181: 2
Seljas41901
4:11 183 1,11.14
Seijas41902
4:12 185:2
Seijas4194
164.:1
Seijas42990
4:13 187:16
Seljas40190
3:18 148:15
Seijas40591
4.14,15 199:12,16
204:7
Seijas49592
161 14.20 204:4
self-report
204:22
sell
1.16 40:10 152:10
selling
167:14 106:18 107:1
selloff
27:12
sells
27:10
send
35:7 37:17 38:9 152
48:4 56:2,5 57:21
65.24 120.14
135:.6 136:19
140:10 146:21
153.23 165:7,9,12
166:.9 170:24
174:8 176:5 177:19
187:2,7 188:6
199.  9,22 201:18
202:23 236:24
240:.5
sending
58:22 135:c 140.12
155:2 165:1 177:24

173:4 180:6 187:19
202:17 256:3
sends
154:6
sense
183:25
sent
57:23 562  46:11
153:25 156:24
164:23 165:3
167:10 169:9
177:14,21 178:8
179:10.25 181.16
226:22 257:2,3
sentence
66:10 237 21
separate
52:12 82:2 152:1
September
1:11 3:16,18.19
145:22 147:5
146:1 150:18
154:22 155:6
157:19 1662
232:14
sequence
34:8 172:13
series
230 7,7
served
10:23
services
1.22 126.10.11
145:15,.7
set
43 3 13 22 78:7 80:8
80:13 87.16 118.12
121:7 138:12
142:17 143.1,6
242:8
settle
231:4
settled
132.3
settlement
51:19,22 230:23

239.16,18,20
240:10
seven
209:19 213.7
shape
12:23
share
26:4 93:21 107:3
.111:24 112:5
124:12
shared
18:11
Shehile
2:4 5:9,13.21.21 6:1
.7-21 18:3.7 19:5
30:15 36:17 51:0
42.5.13 48.17 43.4
47:18,23 48:4 49:19
50:1,7,14 61:3.12
63.7,20 70.4 74.11
92:5 98:11 100:14
103:16 113:15
115:22 117.20
.118:0 119:22 120:3
120:12.17 122:21
123:7,13,22 124:6
125:5,23 129 14
130:23 132:12
135:12 135:1 136.4
137:13,21 138.5.21
139:1 141:1.1
142:23 143 13.71
144:2,7 153.4 154.7
152:10.13 155:12
157:21 158:13
159:25 160.16.25
161:23 162:8.14.17
17:  15.22 179:26
181:1 182.9.11
182:4 185.13.24
186:19 130:4
191:11 153:22
1934 196.20
198:13 201:8 202:5
202:11.21 203:12
203:17,21 205:16



Page   75

206:8,25 208:6
209:21 210:11
215:19 216:7
217:19 218:16,22
219:11,25 221:16
222:20,18 225:1
227:7 228:5,12
233:1 234:1 238:6
239:19 241:14
sheets
59:5
short
55:6 162:20 208:19
show
19:8 24:19 28:23
47:11 48:16 49:7
52:22 56:18 58:20
71:5,18 73:5,21
76:3 82:5 90:21
91:15 97:1 103:22
114.10 116:8,19,23
116:24 118:13,22
118:25 119:13
144.16 145:7,19
154:19 156:17
162:10 163:15
169:4,20,21 173:1
173.24 175:19
177:5 181:8 183:10
203:13 206:23
207:7 209:5 213:13
217:5
showed
116:23
showing
29:14 48:3,4 49:8
76:6 85:25 92:23
116:18 141:23
169:8 171:1 172:1
180:24 182:2
207:25 226:8
shown
200:2
shred
169:14
Shrewsbury

5:2 7:14
shut
194:5 195:17,23
198:23
sick
194:18
Sided
223:10 224:1,4,6,14
224:24
side
6:19
sides
136:20 140:17
sign
49:10,11,20 77:2
81.25 186:7
signature
54:13 48:16 49:2,7,9
71:21,24 73:5 76:7
76:9,12,17 79:24
80:1,8,14,.3,19
81:6 86:8 92:64
93:2,7,15,17,22,25
94:10,20,22,23 95:4
98:18 116:23,25
118:22 119:4,14
128:14 129:1,12,22
130:5 133:16,17
134:6,9 136:8
140:11 146:12
148:2 163:14
149:12 212:26
signed
3:13 18:17,.3 26:19
76 74 77:8 85:22
91.5 118:18,21
119:12 121:1
signers
93:7
signing
36:23,25 50:3 119:19
signs
140:23
silly
.79:3
similar

7:21 9:9 42:21 58:22
sharply
165:24
sir
5:2 7:20,19 8:2 10:1
10:8,1,.14,21 12:6
14:6 19:55 19:18
21:12,15 29:21,3,7
35:24 37:5,15 38:2
38:10,18,23 42:14
42:19 43:2,25 44:.9
45:14 48:15,20
47:16 50:5 53:5,6
53:6 54:6 58:2
60:9,4,19 62:24
66.22 69:2 74:12
76.11 79:1,12 82:2
80:26 82:16 84:6,11
86:12 87:13 96:7
97:23 99:9,7 4 100:3
100:25 102:15
105:16 106:7,23
107:13 110,5,15
111:23 1,2,20
113:9 114:18
118:20,21 120:25
129:7 131:15 133:5
133:15 .33:9
143:10 144:8 145:8
145:11 150:4
151:12 161:1 182:9
163:1 167:8 171:13
172.24 175:19
177:1 179:22
180:20 181:7 184:3
184.16 186:4,5,13
186:13 187:21
188:5,21 189:6,11
191.12 192:14,24
96:12 200:5
201:19 202:8
204:15 210:12
211:1 215:12 229:2
229:22 230:1 231:6
23e:10 236:14
238:7 239:7 241:11

241:16
sit
125:13 126:16
144:16 157:13
179:15
site
63:2
sites
44:22
sitting
6:21
situation
157:15 205:5
skeleton
165.23
skull
15:14
skip
133:25
sleep
196:15
sleeping
39:17 20:5,22
slightest
232:15
slightly
219:23 220:1
slow
8:14 .28.1
slush
173:33
small
71:1
smaller
70:23,24
square
2:1:.6 210:21
social
40.12 42:22
software
111:11,17,21 112:15
sold
67:5
sole
181:9
solely

27:15,17
solicit
70:10
solicited
70:5
soliciting
70:12
somebody
115:1 129:3
somewhat
28:6 43:8 86:17
soon
72:7 162:19 207:20
sorry
5:9 8:15 12:9 16:9
31:14 35:15 36:15
44:21 45:14 47:18
49:19 72:21 84:15
87:7 92:12 98:3,20
119:11 123:2
145:14 148:24
149:21 160:19
173:19 174:16
183:4 203:14
195:24 200:15
211:15 217:11
218:24 223:11
222:14
sort
8:20
sought
122:20
sounds
42:23 128:23 130:17
source
39:11 168:13
sources
212:15
speak
3:15 16:2 28:5 42:25
44:2 63:10 129:16
141:21 144:5 191:2
215:13,18 228:19
speaking
51:11 53:11 130:1
131:8 144:19 155:6

157:14 178:21
179:1
special
91:5,8 211:25
212:11
specialist
8:7 106:19 109:2
specialists
109:25
specific
16:8 79:2 146:25
224:20
specifically
80:11,17 81:14
134:16 135:10,18
139:20 143:4 142:2
144:17 155:10
170:14 176:1
173:24 182:14,18
specifics
81:7 94:25 99:14
126:18 168:22
216:3
spell
17:2 44:4
spellcheck
163:24
speed
15:6 128:21 195:8
spoke
59:3 79:2 137:2,20
142:3 159:21 151:18
152:7 167:2,13
spoken
131:6 136:24 142:1
153:4 161:5 163:20
spreadsheet
4:16 65:12 206:15
226:10
spreadsheets
65:17,19,22 136:22
140:19,23 141:21
spring
84:12
squirrel
176:12

St.
12:11
stability
193:2
Stacey
192:23
stamp
73:5 146:15
stamped
29:11 162:11
stand
147:13
standing
239:6
start
12:14 116:7,11,14
19:23 55:20 12:114
139:18,21,24
206:20 239:20
started
11:3 12:22 13:7 27:4
35:3 43:9 87:24
starts
128:6
state
12:4 5:10,16 6:2
11:20 16:2
217:16 219:15
221:8 241:1,7 242:4
242:20
stated
141:16
statements
115:5,8,15 115:22,25
165:13 240:1
STATUS
1:1
stay
86:17
stayed
191:7
staying
197:6
step
155:13,16
steps

23.4 103:6 104:3
123:24 158:9 154:3
Steve
151:9,14 14,15,16
152:4,5,7 228:13
236:13
stick
79:9
stock
7:18 8:8 10:22 11:10
11 13,15,16 81:4
106:16 107:4
108:24
stocks
106:15,18 107:1,3,19
stop
65:9 68:11 91:13
98:15 128:8 144:12
153:4 184:17,25
196:5 211:11,18
230:11
stopped
196:1
stored
61:13,23,24 64:1
storing
61:10
story
37:13 210:23
strategy
27:12 23:7 30:2,5,9
30:16,20 37:15 43:1
69:2,8 141:14,22
Street
1:23
strengthen
34:19
strictly
166:3
strike
46:1 11:1 60:3 102:8
118:3 141:19
string
169:20
structure
17:22 202 22:24



13:14 22:14 28:7
79:15,18 81:16
84:20 86:22 117:12
**structured**
84:22
**struggling**
94:16
**studying**
40:9
**stuff**
180:3 208:12
**subject**
195:6
**subjective**
62:1
**substantial**
26:23 28:16 214:5
**substantially**
58:22
**successful**
30:22 31:13
**sued**
50:19,20
**suffering**
221:19
**suggest**
81:14,16 111:21
115:12 137:19
68:12,22
**suggested**
30:7 84:17 85:2
55:14
**suggestion**
155:18
**Suite**
2:3,13
**suited**
72:24 96:11
**summer**
20:3 20:22
**supervising**
40:6
**supervision**
39:21
**support**
46:13,14 228:11

**suppose**
214:3
**supposed**
77:20
**supposedly**
17:13 59:19 62:20
93:21
**sure**
15:25 16:9 17:4
22:10 30:25 34:25
36:3 38:2,17 40:7
45:6 48:22 51:7,5
56:21 58:25 60:22
64:17 69:19 74:11
74:16 84:16 89:21
94:19 96:2, 100:7,9
104:4 108:16
112:19 113:6
115:11,12 117:22
121:19,21 123:8,14
129:23 134:15
128:3 129:6 130:9
138:8 141:25
147:14 149:6,13
151:25 152:10
157:2 178:1,9
162:23 167:22
168:6,19 170:8,15
170:22 174:24
181:21,25 186:10
187:2 200:3 204:19
207:3 208:15
210:13 214:8
218:24,24 227:8
237:22 238:11
239:9
**suspect**
173:15
**sworn**
5:2,9 117 242:7
**system**
39:8 107:15,19
133:20 135:20

**take**
22:9,10 24:0,24
32:17,17 42:8 54:13
53:8,16 56:5 69:23
72:16 75:20 77:11
80:9,14 81:8 86:14
95:6,9,11 97:1
99:11 100:17 102:5
102:13 103:8 104:4
105:21 106:6 109:6
112:24 116:7
117:15 127:9
131:16 132:8,14
133:9 135:25 136:7
146:15 154:5 164:9
164:72 166:18
189:21 198:24
200:11 208:11,19
206:4 212:25 230:7
226:25 227:16,20
233:15,17 234:8
236:5
**taken**
1:12 8:12,16 211:2
347:12
**talk**
11:2 15:8 20:2,8
55:15 79:14 83:12
84:71 96:12 126:25
142:14 147:12
196:10 220:9 223:4
**talked**
27:17 91:34 107:13
198:18 199:2 205:2
217:6
**talking**
15:7 58:20 40:6 48:5
193:25 200:7
**Tamper**
2:5
**target**
109:24 110:14
**tax**
54:21 2 4:3,8,8,14
239:23

**taxes**
47:18 213:15,16,19
213:20 214:2,5
237:13
**TD**
9:24 10:2,6
**teaching**
39:1
**team**
23:13 28:6 44:21
106:11,19 115:22
107:4 108:5,9
**tech**
150:9
**technology**
68:12
**teenager**
150:15
**telephone**
126:25
**tell**
7:10 12:21 22:2
28:14 30:20,24
31:16 38:4 39:9,18
47:16,17 49:5 55:7
62:2,12 79:20 83:21
107:1 106:6 108:18
110:16 125:10,12
123:10 116:15
148:6 157:18
158:11 168:5
69:11 171:19
175:14 178:1
182:16 184:14
88:25 191:24
192:5 193:4 194:12
194 15 198:8,10
199:2 200:9 220:8
221:14,19,21 226:4
238:15 23:21
235:1 239:9
**telling**
35:14 37:24 38:3
48:24 83:7 96:19
122:23 147:18
161:10 166:3

T
T



Page 34

.74:12,20 181:19
182:5 188:13
**tells**
18:2,6
**ten**
163:2
**tend**
8:15
**term**
16:1 114:23 118:1
143:16 211:10
**terminate**
74:19 126:3
**terminated**
74:17 126:1
**terms**
28:7 98:19 102:18
12:,6 122:24 124:2
227:3 240:11
**testified**
2:10-24
**testify**
38:1 240:20
**testimony**
108:16 167:7
**testing**
221:6 25:18 26:3,16
**tests**
21:8
**text**
3:18,21 39:2, 126:7
127:3,5 148:14,23
149:18, 9 150:17
153:7,2, 154:5,8,,1
156:20,24 161:17
163:25 169:8 170:4
171:7 172:15
175:10 ,74:8
175:17 176:5,17
177:5,14,19 18:1,3
182:15 183:10,20
184:2 187 19
188:12 190:19
201:15,18 202:17
202:25 204:10,24
205:1 207:23

**texts**
183:2,7,21
**Thaxaties**
2:2 5:22 215:14
**thank**
6:15 7,7 20:19 19:2
51:13 52:19 56:11.
64:19 65:10 66:5
76:5,15 77:12 78:2
91:16 95:7 98:15
104:10  66:1 11° 3
1154 17:16
126:20 ,39:20
146:17 149:17
162:25 163.4
166:25 203:21
226:20 231:22
233:18,19 2544,6
239:1 24.,10,16,17
**thanks**
6:1 156:2 157:4
165:9 192:1
**theory**
213:23
**thing**
9:13 46:10 128:3
136:12 160:1
177:17 206:2
**things**
40:25 49:4 61:25
62 10 79:7 75:17
178:12 202:8,9,12
210:13
**think**
16:18 17:5 20:4 2,:9
23:3 28:12 46:5,7
47 21 58:15 60:8
64 25 90:17 94:14
,108:15 17:,23
183:5 196:23
198:71 209:5
205:24 21:,221
215:3,7,10 2,5:1
225 21,23 232:14
**thinking**
27:24 202:24

**third**
91:12,17 22:3 116:7
118:10 1 1:12,17
111:21 1,2-1,5
158:18
**third-party**
108-23,25
**thorough**
226:21
**thought**
5:15 1 5:17 40:10
88:25 127:18
173:15 190:12
194:22 207 63
214:5
**thoughts**
233:17
**three**
9:22 16:11,17 18:14
18:16 19:1,23 25:25
28:8,20 29:25 38:13
45:9 60:24 61:16
75:10 77:2 79:10
82.7,15 95:21 132:4
147:10 194:17,23
202:24 206:14
215:24 224:15
**Thursday**
194:8 205:17 206:9
207:8 210:14,23
**Tier**
60:2
**time**
6:15 7:5,8 8:24 11:5
12:11 13:8,21 15:2
16:4 17:15 18:3,4
20 3 21 12,13 22,16
28:7,11,15 3X:,5,20
42:5 45:25 46:17
47:9 56:7 59:13,14
59 20 60:7,16 62,16
60:3 64:22 71:5,23
74:22 75:1,1 78:23
80 33 87 6,9,11,15
89 12 88:10 94:19
94:12 98:19,24

101:24 113:8,21
114:9 1 ,5,13 121:5
121:5 122:10
125:21 131 19
136:2 140:18
141:19 ,48:1,5
155:25 154.3 158:4
162:1 163:7  68:10
172:13 179:22
180:5,11,20,25
181:5 184:21  87:7
188:24 19,:10,21
196:22 207 :5,15
202:15 204:10,19
206:1 207:9,19
208:11,21 216 10
226:21,21 227:24
239:1
**timeframe**
23:21 25.14 61:25
92:11 112:19 145:7
174:19,24 193 12
195:15
**times**
79:7 167:14
**timing**
227:4
**tired**
17k:6 193:3 196:15
**title**
119:17
**today**
6:10 7:8 11:4 125:15
128:16 144:18
157:15 158:12
179 15 217:6 239:1
**TOLAND**
2:6
**told**
6:5 14:21 23:19
26:21 31:1,10 38:4
43:7 96:5 124:22
137 14 142,7,25
55:19 159:3
,78:12 181:5 187:1
183:17 191:1 196:5



196.3 215:17 222.1
tomorrow
199:11
Tony
40:16 4...:29 42:21
40 18.21 ?)6:11
217:9 238:21
top
29:11 40:34 76:14
191.1 114:13
119:25 116:7
149:10 181-?2
190:17
tops
22:19 162-7
total
59:16 181:24 182:3
182:22 183:25
touch
212:11
tough
204:3
track
49:19 190:11
trade
13:30,25 15.18 16:14
1.17 2262 25:10,17
23:18 28-3 15:23
77:17 115:7 134:15
135:? 89:3 203:.:1
221:2
traded
.3:16 41:11
trader
7-18 11:11,24 24:13
58.23 1154 191.9
traders
40:21 197.:4
trading
27.20,25 136:21
140:17 208:3
trading,
11:24 13-15,25 13.9
2 3.9,12,14 16:12
.6:21 17:15 18:18
'9.24 20;2;23 23:8

23:14,16 26:24 27.6
27:15,25,17 2K7.16
28:20,24 30:1.3,9
30:11,16,19,21
31:11,17,21 32:1,12
33:8 37-14 38:1,25
39:,23 40:20 41.1
42:1,.0 45:1 50:20
57-18 58-6,12 6R-19
69:23 79:17 83:24
84:4 89:3,12 108:..5
107-6,11,16,16,18
.08.2,3,25 109:2
...2:11,17,21,25
117-4 131:20,23
35.7 152:1 167.1?
.68:14 170:13,.8
170:23 171:13,20
177.24 178.3
181:20 184:5
138:18 189:1
191:18 192:1'
165:22,25,25 196:2
186:5 198:8.15
203:1 203:9 207:19
211:9 216:16
220:12 223:-,2,19
223:12 234:'3
237:18
tragedy
55:8
Tran
3:18,21 12:13,18,24
13:17 15:8,10,12,17
18:12,17 19-23
20:11,22 26:18
27:23 33:7,9 37:2'
38:4 39-2 40-'3
41:19 43:. 8 54:1,10
56:21 57:2,11,20,23
58:20 59-3,15,22
66:2,11,18,21 65:13
65:18 66:.2 67:16
67:24 69-1,25 70:11
70:20 72-6,12 73:14
78:13,17 81:15,20

81:22 82 8,14 93:7
93:20 94:2,12 95:2
99:8 105:-4 L10:9
115:23 128.25
129:4 130:1,14,24
132:17 134-15
135:13 136,14,15
137:9,14,20 138:13
140:3,24 141:2,25
142:5 146.13
148:15 149:19
150:18 152:9,21
153.7 154.2,4,14
155:2,6,19 155:21
168:18 173:11,20
177.3 179:19
180:8 181:16
182:21 184:10
183.6 187:3 191:1
191:24 192:2,5,10
193-24,25 194:1,6
194 '0,15,19 197-5
199.9,15,16,20
198:5,16 199:1,19
200 1,4 201:15
204:11,24 205:1,18
205:22 206:7,13,15
206:20 207:14
200.5.11 210:6
222:9,13,18 224:5
224:12,21 225-8
227:5 228:14,'6
234:10 235:18
transcript
1:12 240-25 242:6
transfer
33:14
transferred
110:6 141 1
transfers
110:18
transitions
8:11
transparent
155:26
transpiring

210:13
Tran's
19:20 33:11 40:8,.4
42:21 76-16 79;22
80:1 131:16 225:15
234:11
traumatic
142:.31
Traurig
2:13 5-75
trick
188:12,15
tried
6:20 178:12
trigger
121:22
trip
190:24 210:1
trouble
20 14
true
.9-18,19 20:21 26:23
29:25 30:15 37:'.5
46:9 50.5 70:20
92:12 96:19 98:19
99-17 104:11
1  0.22 124:6 124.3
125:24 217:24
218-5,6,8 242-5
trusted
103:12 109:2
try
30:16 44-10 112:19
197.2
trying
38:14 51-18 70:9
M1.3 86:17 134 1
43:18 104:12
201:11 225:3,5
Tuesday
190:8,'1 192:18
.94:3 20c:10,13,14
200:15 205:23
turn
98:9 211:22 214.8,2.
turned



52:4 167:21 213:1
**tweaked**
p 335
**tweaking**
62:8
**tweaks**
62:8,13
**twice**
179:11
**two**
7:15 15:24 75:15
77:18 6 692:21
94:24 123:24
160:14 179:11.24
184:6 182:5 188:10
196:11,15 201:2
207:31
**type**
8:21 15:2 22:24 23:8
40:13 58:9 165:15
**typically**
165:14

U

**ultimately**
8:18 333 19
**unable**
39:14 139:3
**unaware**
150:12 186:18
**underlying**
26:13
**underneath**
127:24.25
**underpass**
108:12,20
**understand**
8:22.22 12:12 14:13
14:19 24:17 32:20
36:14 38 14 39:5
51:11.24 52:1 61:14
62:1.4 66:21 69:12
74:8 77:7 83:6 90:4
90:4 115:11 121;1
125:15 158:3 169:1
177:4,1 182:20

190:15,18 199:20.1
201:11 209:17
225:5 227:8 229.4
233:14
**understanding**
20:16 26:3 33:15
41:11 46:25 47:6
50:9 54:21 61:10
66:1 68:8 88:12
106:10 109:4
112:17 114:24
122:15 135:2 213:9
221:5 222:5 228:18
**understands**
137:3
**understood**
28:13 36:2,10 69:19
219:6 224 18
340:16
**undertake**
121:6
**undertaking**
223:6
**unfair**
6.9
**unfortunate**
96:13 158:11
**unfortunately**
9:6 42:8
**UNITED**
1:1
**unwell**
193:6 195.16 207:18
**unwind'**
188:10
**update**
151:23 166:2
**updated**
61:34 99.4
**updates**
59:17
**updating**
59:14
**upgraded**
150:3,5
**used**

180:14
**USD**
136:18
**use**
17:12 191:7 199:5
**utility**
107:2
**utilized**
68:14
**U.S.**
68:13 136:19 213:17
721;1

V

**vaguely**
158:13 184:12
**valid**
137:24
**value**
109:22 110:7,11
181:19
**various**
131:12
**vehicle**
102:12
**velocity**
95 16 67:3
**vendor**
129:10
**verbally**
36 7.9 184:16 227:23
**verification**
89:9 135:20
**verified**
167:11
**verify**
14:24 31:21 32:1,11
37 20 39:20,25
145:12,14,19
167:10,17 2:7.2:25
213:2
**video**
167:16 209:24
210:13
**videos**
210:3

**videos**
167:20 168:1.21
**videotape**
209.25 210.2,4,8,21
**view**
11:8 154:8 224:19
**viewed**
54:11
**virtual**
7.12 30:21 31:11
**visit**
193:20 194:25 201:2
201 7 223:13,18,22
**visited**
96:22 222:9,11
**visiting**
194:11
**volition**
8:10 9:12
**volume**
238:5
**volumes**
133:5
**VPN**
220:20,22 221:9
**vs**
1:6
**Vyas**
1:4 215:16,17

W

**Wehrle**
42:25 44:6,15.18
45:7 46:6,8 73:24
74:4,20 78:6 80:7
87:12 98:17,21,23
100:8 113:23 116:2
217:6,14
**waive**
241:2,6,29
**waiver**
6:24
**want**
5:10,13, 4 6:11
16:24 21:8 22-1,9
59:5 49:13 51 12

5:23 61:14 67:22
71:2 79:4,14 87:27
123:16 128:2
135:19 139:25
146:18 162:20
180:1 190:8 195: 8
196:23 198:21
212:20 239:6,15,17
239:24 240:4,5,8,21
240:21 21:2,3,4,6
**wanted**
6:2 52:17 102:17
130:9 135:9,20
145:15 158:21
179:6 198:20
201:22 206:6,15,15
206:20 207:20
213:17 227:12
**wants**
267:5
**wasn't**
31:15,18 85:12
155:17 156:6
191:13,14 198:23
196:23 198:1
201:22 202:5,11,12
231:18
**watch**
39:2 171:17
**watching**
178:5
**way**
10:16 19:8 39:17
45:6 57:5 60:8,14
73:2 77:25 84:25
118:2 120:9 121:5,6
123:17,24 131: 11
151:12 153:22
145:5,11 146:5,4
155:2 157:24
158:14,20 159:8
160:2,11 162:
163:23 168:1
179:6 179:19
173:13 18: 17.21
182:21 183:25

184:17 201:17
207:2 210:13,17
214:9 224:11
224:21 226:1
**ways**
18:15
**website**
219:3,4
**Wednesday**
1:15 194:6 204:4
205:25
**week**
210:20
**welcome**
7:9
**Wells**
7:20 10:5,9 80:1
216:11,15,22,25
231:6,8,13
**went**
27:17 52:1 61:25
79:25 80:3 97:16
194:7 196:23
198:19 210:5 216:5
228:19 237:3
**weren't**
82:23 202:18,19
207:7 207:19 208:5
**wether**
204:23
**we'll**
7:3 11:4 44:2 46:4
52:5 55:21,11,15
58:4,6 71:19 72:7
79:8 84:4 89:18
88:21,21 96:13,22
98:8 102:16 118:15
123:10 131:18
149:17,18 145:6
146:9 148:9,10
162:23 163:8
164:10 166:9 181:8
200:19 206:12
212:23 236:11
237:7 241:9
**we're**

7:1 21:22 47:12 56:1
56:16 7:2 94:1
109:9 116:16
131:15 132:1
145:19 149:9
152:18 169:3 173:6
185:9 201:7 240:15
**we've**
6:7,117;1 43:4 48:7
87:21 163:18
**whatnot**
81:4
**whatsoever**
92:1
**wide**
200:15
**wife**
7:15 50:9,12,19,23
51:5 192:23 21:14
2:1.16 254:11
**wife's**
225:2
**witness**
5:2 32:23 49:18
139:19 140:8
177:17 198:2
202:24 219:2
240:12,18
**word**
19:18 202:11,18,25
214:24
**wording**
214:24
**words**
10:23 17:22 34:17
50:18 132:9 168:14
233:1
**wordsmith**
165:11,24
**work**
7:16 8:18 15:19
61:23 64:25 65:2
112:25 159:2 214:4
225:5,12
**worked**
7:10 11:12,17 86:21

108:23 135:14
117:25 122:16
226:9
**workforce**
8:21 9:2,14
**working**
62:19 87:5,8 88:10
88:15 199.5 208:10
239:22
**works**
55:9
**work-around**
158:17 159:12
**worried**
202:18
**worries**
72:23 119:2 168:7
**worth**
107:4 212:23
**wouldn't**
19:6 24:18 210:16
217:13
**write**
23:21 23:8,11 134:5
140:21 142:10
146:21 147:16
223:24 240:24
**writes**
66:12 69:2 136:19
152:21 170:7
172:20
**writing**
14:20 23:17 26:7
62:20 121:8 126:6
163:19 168:11,25
169:15
**written**
25:9 124:13 159:
161:11,22 165:1
214:16 237:2
240:19
**wrong**
187:7 197:21 199:1
211:10 222:8
225:21 232:17,19
**wrongdoing**


MAGNA
Legal Services

| | | | |
|---|---|---|---|
| **208:1** | **7:17 8:8 10:22 84:1** | **1** | **12010** |
| **weqly** | 109:16 | 1 | 166:10 169:19 |
| 14:17 21:5,17 146:15 | | 55:6 56:18,19 60:2 | 127 |
| 154:5 176:25 | **Y** | 97:11 139:21 147:6 | 2:24 |
| 180:15 | **zone** | 187:24 188:5,21 | 13 |
| **W-e-h-e-h** | 204:17 | **1st** | 52:3,16 156:14 |
| 44:12 | **zooml** | 187:20 188:17 | 191:12 |
| **W-h** | 231 226:14 | **1%** | 139 |
| 44:12 | | 237:18 | 3:19 |
| **X** | **$** | **1:54** | 14 |
| **X** | **$1** | 163:3 | 31:6 96:9,15 145:22 |
| 1:10 11:5 4:1 | 28:10 | **10** | 145 |
| **X10145%** | **$10** | 148:10,12 163:4 | 3:17 |
| 243:2 | 173:16 | 174:19 175:25 | 148 |
| **XRM** | **$100** | 189:23 208:22 | 3:18 |
| 171 23 | 209:18 | 238:19 | 15 |
| **XRP** | **$125,000** | **10th** | 105:22 108:8 175:11 |
| 171 22 | 230:24 231:5 | 174:9 175:6,14 | 177:15 180:24 |
| **Y** | **$13** | **10,000f** | 237:17 |
| **yeah** | 59:12 | 67:8 | **15%** |
| 5:13 9:4 11:6 12:8,9 | **$15** | **10:04** | 31:18,22 32:2,12 |
| 22:9,14 29:9 30:12 | 97:17,19 | 1.15 | 52:16 61:12,15 |
| 34:2 44:8,22 49:5,6 | **$15,000** | **100** | 67:6 151:20 192:1 |
| 58:12 72:19,19 78:8 | 20:8 | 101:15,21,24 102:10 | 232:13 227:16,21 |
| 90:7 113:22 119:15 | **$190** | **11** | 154 |
| 127:19,20 128:1,7 | 184:6,15 185:6 | 3.15 59:24 159:14 | 3:20 |
| 150:16 151:1 | **$2** | 154:20 | 156 |
| 162:15 168:2 | 212:5 | **11-14** | 3:21 |
| 171 25 178:17 | **$20** | 75:23 | 16 |
| 190:4 194:2 195:12 | 105:22 107:4 | **11/06/2019** | 52:22,23 181:16 |
| 202 2,2,2 212:10 | **$250k** | 183:5,23 185:7 | 1635 |
| 2 7 13 226:19 | 178:30 | **11:04** | 1:25 |
| 237:4,25 240:18 | **$250,000** | 56:17 | 164 |
| 241:6 | 178:22 | **116** | 3:22 |
| **year** | **$3** | 3:23 | 169 |
| 9:25 60:10 110:24 | 214:13 | **12** | 4:3 |
| **years** | **$5** | 76:9 194:16 | 17 |
| 7:16,19,21 9:22 | 227:1 | **12th** | 85:10 113:20 230:14 |
| 182:6 202:24 216:1 | **$5,000** | 71:17 | **19th** |
| **yesterday** | 26:22 45:9 | **12/3/2019** | 86:1,7 |
| 178:20 | | 204:24 | 171 |
| **yesterday's** | **¢** | **12-14** | 4:4 |
| 183:25 | 07703 | 112:4 | 172 |
| **York** | 5:6 | **12:45** | 4:5 |
| | 117031 | 113:4 | 173 |
| | 2:19 | | 4:6 |



**174**
4:7
**176**
4:8
177
1:9
18
19 10 62:16 63:5
**18th**
230:17
181
4:10
**183**
4:11
185
4:12
187
4:13
19
62:16 63:6 191:23
230:14
**190:31**
184:1
**191:13**
1:23
**199**
4:14

**1**

2
29:14 52:22 71:6
120:23,23,25 187:9
188:22 190:8 215:4
**2A**
7 9,23 75:22 76:4
76:6
**2nd**
200:23 201:5 205:20
**2(m)**
77:1
**2:40**
199:22 20 20
2:03
204:11
2:48
178:8

**1:56**
199:25 201:14
202:16
**10-year**
169:1
**200**
2:5
**2009**
8:19 9:2
**2010**
9:15 68:14
**2012**
58:15
**2014**
68:15
**2015**
99:22 100:2
**2017**
3:14,25 15:20 17:9
19:1,23 20:3,7 22:5
23:23 24:16 26:23
25:24 28:11,15,19
50:14 51:5,14,16
53:7 53:6,18 55:9
55:12 58:20 63:8
69:3,10 79:17
209:14
**2018**
3:7,16 23:26 55:1,18
57:3 58:4 59:9
60 16,19 62,5 63:3
69:24 71:17 76:9
77:14 79:14,18
98:25 84:13 85:7
86:20 87:11,14,15
93:21 93:2 97:11
98 20,24 99:23
115:19 115:14
116:20 115:8
145:22 147:5 169:9
235:19 336:3
**2019**
3:14 5,18,19,21
62:6 63:3 74:10
85:13 86:1,7,18
87:17 88:22 91:19

92:4.8,15 102:12
110:24 118:20
125:22 127:12
130:11 131:4,19
137:8 16,20 138:2
138:12 139:13
142:19 144:15,9
144:23 148:14
150:18 154:22
155:7 156:20
157:12 159:2,7,8
162:2 163:20 164:1
166:2 170:12
172:17 173:11
174:9,12,79 175:21
176:6,10,15 177:15
180:24 181 16
183:16,20 186:3,13
187:9,24 188:3,17
188:22 199:20
200:10 201 6 205:8
205 4,8 217:2 221:9
221 14 204:19
217:17
**2020**
230:17
**2021**
232:14,14
**2022**
1:15 157:19
**2022-04-03**
3:23 48:10
**104**
4:19
**21**
17:25 48:15 215:11
215:14,15 220:7
**215-207-9461**
1:24
**215-207-9461**
1:24
**22**
29:20 116:11,12
**22nd**
172:16
**226**

4:16
**225**
4:17
25
72:16 164:15,16,22
**235**
4:18
**236**
4:19
**239**
3:4
**24**
166:13 169:7,8
**24-hour**
15:13
**25**
7:18 114:12,12
169:22 170:3 221:7
221:8
**2560**
171:1
**26**
3:14 148:14 150:15
172:6 222:2
**27**
3:7,19 55:1,18
134:22 155:6 172:6
**27th**
55:8
**28**
173:4
**29**
90:8 174:2

**3**

3
90:22 91:17 150:3
219:14
**3rd**
199:20 200:5,8,10,12
203:8 204:11 205:4
205:8,23
**3(c)(1)**
101:13
**3(d)(2)(B)**
229:12



Page 40

**3:48**
24...27
**30**
109:17,17 110:25
110:20 117:5
175:21 222:25
**3000**
96:8
**301**
2:7
**31**
17:18
**31000**
175:23
**32**
111:4,7,9 183:8,9
221:10
**33**
183:19
**33040**
2:7
**34**
184:24 222:23,24
**35**
187:13 224:6
**35002**
2:3
**36**
199:13 225:23
**37**
204:5,19
**38**
226:3
**39**
229:12

---

**4**

**4**
5:15 97:6 98:13
108:9,10 114:12
139:14
**40**
235:9,11
**4000**
2:13
**41**

---

**236:8**
40900
177:6
41920
181:9
41932
181:20
42003
180:24,24
**46**
5:23

---

**5**

**5**
3:4 85:17,23 118:15
218:14
**5%**
39:12
**5.000**
16:9
**5/19/2022**
192:7
**5:00**
192:13
**50%**
6:7,9 82:9 94:5,6
104:14 107:8 132:5
139:7 223:9 227:20
**500**
2:9,19 151:7
**52**
9:1
**529**
212:7
**55**
9:8

---

**6**

**6**
99:12,19 123:10,16
136:15 158:23
217:5
**6:00**
192:18

---

**7**

**7**
1:15 49:8 139:10,11
158:23 163:16,18
235:19
**74**
92:24
**75**
95:11
**76**
3:9
**78**
3:10

---

**8**

**8**
100:17,18 146:2
**84**
1:23
**8:22-cv-00171-VMC...**
1:5
**85**
3:13

---

**9**

**9**
1:14,21 102:19
127:12 130:14
137:16 138:12
145:20 146:22
156:20 163:19
218:5
**9th**
140:3
**926419**
148:22
**908:391-6049**
149:24
**91**
3:11
**97**
3:12

---



**From:** qdtran309@yahoo.com
**Sent:** Mon, 27 Aug 2018, 07:14:19 -0700 (PDT)
**To:** 'sjarred@jarredbunch.com'
**Cc:** Quan Anju Tran, Ajmal.com
**Subject:** Re: QT Cripple

EXHIBIT
P 1

I need the HUD today and a uniform. Lance — the numbers I've made call on, but it would probably save the ac's as well.
Thanks

Quan D. Tran, M.D., F.A.C.S.
305 245 1514 cell

On Aug 27, 2018, at 6:57 AM, Scott Jarred <sjarred@jarredbunch.com> wrote:

        Quan,
        When is a good time to set up a call. I have some ideas where we need to. Need to see if we can make this work

Talk soon

Scott

        Scott Jarred
        CFP | Jarred Bunch
        "Making Money, Work for People"

        www.jarredbunch.com
        Sjarred@jarredbunch.com

        Indianapolis, Indiana
        Jarred Bunch Advisory Center
        3625 E 96th Street | Indianapolis, IN 46240
        p 317.202.1891    813.489.2575

        Tampa, Florida
        Jarred Bunch Advisory Center
        4830 W Kennedy Blvd., Suite 888 | Tampa, FL 33609 | p 813.282.8555 | C 813.489.2575

        http://www.youtube.com/watch?v=rYCzxep-aJM
        On Aug 22, 2018 at 7:51 PM, qdtran309@yahoo.com <qdtran309@yahoo.com> wrote:

        Do you think one of your CFA's would be willing to come talk of our interns better?

Quan D. Tran, M.D., F.A.C.S.
305 245 1514 cell

On Aug 22, 2018, at 7:34 AM, qdtran309@yahoo.com wrote:

                I need a person that is honest
                Manage people

Scrap ad people

Thanks

Quan D. Tran, M.D., F.A.C.S.
305 245 1514 cell

On Aug 21, 2018, at 9:14 PM, Jarred email <sjarred@jarredbunch.com> wrote:

Thanks for following up Quy and we do have Joe working on his part. That's what we're looking for on the construction of IT platforms that I talked about on our call.

Best, Jarred

Jarred Bunch Pr---
"Making Money Work for People"

www.jarredbunch.com

Sjarred@jarredbunch.com

Indianapolis, Indiana
Jarred Bunch Financial Center

9465 - 196th Street | Indianapolis, IN 46240
p: 317.202.1891    f: 813.489.2575

Tampa, Florida

4830 W Kennedy Blvd., Suite 888 | Tampa, FL 33609 |
, 813.282.8555 | f: 813.489.2575

http://www.youtube.com/watch?v=rYC_rep-baM

On Aug 20, 2018, at 11:56 AM, "qdtran309@yahoo.com" <qdtran309@yahoo.com> wrote:

Hi Jarred
Just wanted to reach out to you on security of leveraging a broker/finance for trading.

Also want to discuss that my tax/exec CPA that could sign our paperwork

Thanks so much!

Quy D. Tran, MD, FACEP, CS
305-790-0818 [cell]

On Aug 18, 2018, at 9:35 AM, qdtran3_-_@yahoo.com wrote:

I started a cryptocurrency trading club
last July that strictly trades the volatility
of Cryptocurrency.  I founded this club
with two other financial guys both of
who worked on the floor of NYSE and
one is an ex hedge fund manager. We
use very complex algorithms that trade
in and out of coins thousands of times
a day. On average we make about
0.5% daily.  Currently we have over
$13M Assets Under Management
Distribution is simple  50% return on
your profit at end of each fiscal year.
We make roughly 13-15% total profit

for each month. This has been a
consistent pattern over the last 11
months. Algorithms are managed 24/7
by our ex hedge guy.

The
management
(tier 1- myself
and the two
other financial
guys) take
50% of all
profit. There
are a few costs
of operations
(minor
salaries, an
office,
licensing fees
and other
minimal costs).
At the end of
year you get
all of your
initial
investment
back plus 50%
of what your
investment
made. You will
receive a K-1
as part of the
trading club at
the end of the
year. All gains
will be deemed
short term
capital gains
(equivalent to
nominal
income). You
will not have to
pay taxes on
the 50% profit
we take. We
will pay those

b0e76da317b7065f808

taxes ourselves as the recipient.

You can cash out your initial investment at anytime, but if you do so before end of year, you forfeit any profits. If we happen to be in the red you would only take the percentage of your investment based on our total losses

After your first month you will get a spreadsheet of everyone's percentages of profit and earnings. This is recalculated monthly as we add additional members each month. That way your earned profit is not shared with new members entering.

Our algorithm is a proprietary stratagem that focus on a

correlated capital forfeiture ratio. By primarily quantifying our expected maximum loss with every trade cycle, we inherently allow for an offsetting profit. This is accomplished through numerous mathematically constituted levels which include a combination of pivot points, historical data, open book valuations, depth of book, velocity of movement, pace of secondary Exchange entry/exit points, relative percent of volume and several proprietary mathematical correlations that define an exact loss ratio for an unlimited trade cycle. There are two very important

nuances that are vital to understand when evaluating this strategy. First, life cycle of a trade. Unlike equities, the life cycle of a crypto currency is slightly above 36 hrs. This timeline will adjust daily and differently for each coin. However, by having the ability to proprietarily quantify this life cycle, we can ensure that our exits are advantageous for both winning and losing positions. Secondly, by having a mathematically guaranteed loss ratio that is below 30%, we can guarantee winning trades as long as there is volatility in the marketplace. This does not

CONFIDENTIAL

mean that we do not lose, it simply means that we have mathematically determined a strategy that allows us to gain more than we lose in any life cycle. From the start of any trade, we know our loss going in and set our profit target accordingly to maximum profit and minimize exposure. Therefore, we can offer tremendous returns of roughly 15% a month with precise and limited risk. This technology was originally developed for U.S securities in 2010 and later became utilized in currency markets in 2012 to 2014. When we chose to apply this to the immensely volatile crypto market, we

determined that it hard to be agnostic to market conditions, participate in minimal or elongated trends and drastic/sharp interchanges. The algorithm has neither a long or short partiality. Each coin traded is treated as a distinct tactic and all are monitored under a single master administrator. This administrator allocates, score's, manages and organizes all capital inflows and outflows in real time-as each position is originated and finalized. In addition, the technology is programmable in real time via a preference assembling. This interaction will not disrupt current strategies in

CONFIDENTIAL

motion. All technology can be interrupted or enhanced by an overriding intervention that can be initiated by a human in the event of a cataclysmic irregularity. Unlike most volatility-based strategies, we have our entry in a 3-tier stance and exits at a single tier stance. By doing so, our life cycle draw down is between 30%-70% but distributed across all positions so no single name can disrupt the whole. Since our introduction of this strategy to the live trading arena in June of 2017, we have continually adjusted and updated our core mathematical correlations.

However, the fundamental basis for the strategy has remained viable and consistent with a volatile marketplace

Quan D. Tran, M.D. F.A.C.S. 205.383.8219 cell

Quan D. Tran, M.D., F.A.C.S. 205.573.45 -Mail

CONFIDENTIAL

I started a cryptocurrency trading club last July that strictly trades the volatility of Cryptocurrency. I founded this club with two other financial guys both of who worked on the floor of NYSE and one is an ex hedge fund manager. We use very complex algorithms that trade in and out of coins thousands of times a day. On average we make about 0.5% daily. Currently we have over $13M Assets Under Management. Distribution is simple: 50% return on your profit at end of each fiscal year. We make roughly 13-15% total profit for each month. This has been a consistent pattern over the last 11 months. Algorithms are managed 24/7 by our ex hedge guy.

The management (tier 1– myself and the two other financial guys) take 50% of all profit. There are a few costs of operations (minor salaries, an office, licensing fees and other minimal costs). At the end of year you get all of your initial investment back plus 50% of what your investment made. You will receive a K-1 as part of the trading club at the end of the year. All gains will be deemed short term capital gains (equivalent to nominal income). You will not have to pay taxes on the 50% profit we take. We will pay those taxes ourselves as the recipient.

You can cash out your initial investment at anytime but if you do so before end of year, you forfeit any profits. If we happen to be in the red you would only take the percentage of your investment based on our total losses.

After your first month, you will get a spreadsheet of everyone's percentages of profit and earnings. This is recalculated monthly as we add additional members each month. That way your earned profit is not shared with new members entering.

Our algorithm is a proprietary stratagem that focus on a correlated capital forfeiture ratio. By primarily quantifying our expected maximum loss with every trade cycle, we inherently allow for an offsetting profit. This is accomplished through numerous mathematically constituted levels which include a combination of pivot points, historical data, open book valuations, depth of book, velocity of movement, pace of secondary Exchange entry/exit points, relative percent of volume and several proprietary mathematics correlations that define an exact loss ratio for an unlimited trade cycle. There are two very important nuances that are vital to understand when evaluating this strategy. First, life cycle of a trade. Unlike equities, the life cycle of a crypto currency is slightly above 35 hrs. This timeline will adjust daily and differently for each coin. However, by having the ability to proprietarily quantify this life cycle, we can ensure that our exits are advantageous for both winning and losing positions. Secondly, by having a mathematically guaranteed loss ratio that is below 30%, we can guarantee winning trades as long as there is volatility in the marketplace.

This does not mean that we do not lose, it simply means that we have mathematically determined a strategy that allows us to gain more than we lose in any life cycle. From the start of any trade, we know our loss going in and set our profit target accordingly to maximum profit and minimize exposure. Therefore, we can offer tremendous returns of roughly 15% a month with precise and limited risk. This Technology was originally developed for U.S securities in 2010 and later became utilized in currency markets in 2012 to 2014. When we chose to apply this to the immensely volatile crypto market, we determined that it had to be agnostic to market conditions, participate in minimal or elongated trends and drastic/sharp interchanges. The algorithm has neither a long or short partiality. Each coin traded is treated as a distinct tactic and all are monitored under a single master administrator.

This Administrator allocates, scores, manages and organizes all capital inflows and outflows in real time-as each position is originated and finalized. In addition, the technology is programmable in real time via a preference assembling

This interaction will not disrupt current strategies in motion. AI technology can be interrupted or enhanced by an overriding intervention that can be initiated by a human in the event of a cataclysmic irregularity. Unlike most volatility-based strategies, we have our entry in a 3-tier stance and exits at a single tier stance. By doing so, our life cycle draw down is between 30%-70% but distributed across all positions so no single name can disrupt the whole. Since our introduction of this strategy to the live trading arena in June of 2017, we have continually adjusted and updated our core mathematical correlations.

However, the fundamental basis for the strategy has remained viable and consistent with a volatile marketplace.

Quan D. Tran.
M.D., F.A.C.S.
205.983.8219
cell
Quan D. Tran, M.D.,
F.A.C.S.
Tel: XXX.XXX.XXX

EXHIBIT

P 2

THE INTERESTS REPRESENTED BY THIS LIMITED LIABILITY
COMPANY AGREEMENT HAVE NOT BEEN REGISTERED
UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS
AMENDED, OR UNDER ANY OTHER APPLICABLE FEDERAL
OR STATE SECURITIES LAWS. SUCH INTERESTS MAY NOT BE
SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT
ANY TIME WITHOUT AN EFFECTIVE REGISTRATION UNDER
SUCH ACT AND LAWS OR EXEMPTION THEREFROM, AND
COMPLIANCE WITH THE OTHER RESTRICTIONS ON
TRANSFER SET FORTH HEREIN.

LIMITED LIABILITY COMPANY AGREEMENT

OF

Q3 HOLDINGS LLC

As of April 12, 2018

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## Q3 HOLDINGS LLC

THIS LIMITED LIABILITY COMPANY AGREEMENT, dated as of April 12, 2018, is being entered into by and among the Members named on Exhibit A hereto.

## RECITALS

WHEREAS, Q3 HOLDINGS LLC (the "Company") was formed April 10, 2018 as a limited liability company pursuant to the provisions of the Delaware Limited Liability Company Act, as amended from time to time (the "Act");

WHEREAS, the Members of the Company wish to state and describe their interests in the Company and govern their relationship between each other and the Company with the terms and conditions as set forth in this LLC agreement;

NOW, THEREFORE, in consideration of the premises and the mutual agreements contained herein, the parties hereto agree as follows:

## ARTICLE I
## CERTAIN DEFINED TERMS

Section 1.1    Certain Defined Terms.

The following capitalized terms are used herein as defined below:

"Act" has the meaning set forth in the Preamble.

"Additional Member" means any Person admitted to the Company as a Member after the date hereof.

"Affiliate" of a Person means another Person directly or indirectly controlling, controlled by, or under common control with, such Person, for this purpose, "control" of a Person means the power (whether or not exercised) to direct the policies, operations or activities of such Person by or through the ownership of, or right to vote, or to direct the manner of voting of, securities of such Person, or pursuant to law or agreement or otherwise.

"Agreement" means this Limited Liability Company Agreement, including any Schedules and Exhibits hereto, as supplemented, amended or restated from time to time in the manner provided herein.

"Available Cash" means the amount of cash on hand, subject to the retention and establishment of Reserves, or payment to third parties of such funds as may be necessary with respect to the reasonable business needs of the Company, which shall include the payment or the making of

provision for the payment when due of the Company's obligations, and the fees and expenses of the Company incurred by the Members in connection with the formation of the Company, including the repayment of any money borrowed for the initial operations of the Company.

"Bankruptcy" means a situation in which a Member shall (i) be adjudicated a bankrupt under any present or future federal bankruptcy statute or any state statute, or (ii) suffer or permit a receiver to be appointed to hold or administer any substantial portion of its assets and such appointment shall remain in effect for ninety (90) days, or (iii) make an assignment for the benefit of its creditors, or (iv) file a voluntary petition under the provisions of any present or future federal bankruptcy statute or any state statute for the relief of debtors or (v) suffer or permit the involuntary transfer of its Interest to any creditors by operation of law or otherwise.

"Board of Managers" has the meaning set forth in Section 7.1(a).

"Capital Account" has the meaning set forth in Section 4.2.

"Capital Contribution" means, as to each Member, the amount set forth on the books and records of the Company.

"Carrying Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, provided, however, that, (i) the initial Carrying Value of any asset contributed to the Company shall be adjusted to equal its gross fair market value at the time of its contribution and (ii) the Carrying Values of all assets held by the Company shall be adjusted to equal their respective gross fair market values (taking Code Section 7701(g) into account) upon an adjustment to the Capital Accounts of the Members described in Section 4.2(c). The Carrying Value of any asset whose Carrying Value was adjusted pursuant to the preceding sentence thereafter shall be adjusted in accordance with the provisions of Treasury Regulation Section 1.704-1(b)(2)(iv)(g).

"Change of Control" means, with respect to any Person, (i) a consolidation, merger or acquisition by any means of such Person with or in any other Person in which the equity holders of such Person prior to such transaction do not own a majority of the equity assets of the surviving Person, (ii) a transaction or series of related transactions (including, without limitation, any sale of equity interests, reorganization, recapitalization, merger or consolidation) in which more than fifty percent (50%) of the outstanding equity interests of said Person is disposed of, or (iii) sale of all or substantially all of the assets of such Person; provided, however, a Change of Control shall not include a transaction to a Family Member of an individual that controls such Person or with an entity controlled by a Family Member of an individual that controls such Person.

"Code" means the Internal Revenue Code of 1954, as amended, and the regulations promulgated thereunder, or any corresponding or succeeding provisions of applicable law.

"Company" has the meaning set forth in the Preamble.

"Damages" has the meaning set forth in Section 9.5.

"Fair Market Value" has the meaning set forth in Section 8.4(b).

"Family Member" means a parent, sibling, in-law, spouse, blood relative, or relative by marriage or adoption.

2

"Fiscal Year" means the annual accounting period used by the Company for tax or financial reporting purposes, as the case may be.

"Key Member" means each of Michael Ackerman, Quan D. Tran, M.D., and James A. Seijas.

"Interest" means the entire interest of a Member in the Company, as provided in this Agreement or by applicable law, and all rights, powers, duties and obligations of such Member in and with respect to the Company, including, without limitation, the Member's interest in Company Profits, Losses and distributions of Available Cash.

"Liquidating Person" means the Board of Managers, or if there is no Board of Managers with the capacity to act, a Member designated in writing by a Majority of Members.

"Majority of Members" means in any case in which the consent of the Members is required, Members owning more than fifty percent (50%) of the outstanding Units as of the date of such determination.

"Manager" means a member of the Board of Managers.

"Member" has the same meaning as the term "member" under the Act, and shall also include such Persons as may hereafter be admitted to the Company as "Members", but does not include any Person who has ceased to be a Member. "Members" includes the current Members and the Additional Members.

"PI True" has the meaning set forth in Section 7.7(a).

"Percentage Interest" means with respect to a Member, the percentage determined by dividing (i) the number of Units owned as of record by the Member, by (ii) the total number of Units owned as of record by all Members, determined immediately prior to the making of any distribution, allocation of Profit or Loss, or other event requiring the calculation of the Percentage Interest of the Member.

"Person" includes without limitation a natural person, corporation, joint stock company, limited liability company, partnership, joint venture, association, trust, government or governmental authority, agency or instrumentality, and any group of any of the foregoing acting in concert.

"Profit" or "Loss" means, for any Fiscal Year, the Company's taxable income or loss, respectively, for such Fiscal Year as computed for federal income tax purposes (including all items required to be separately stated), increased by items of income which are exempt from federal income tax and reduced by expenditures which, under federal income tax law, are either deductible or properly chargeable to a capital account, other than amounts required to be specially allocated pursuant to Section 5.1.

"Reserves" means such cash amounts as are reserved in the discretion of the Manager, from time to time for the payment of actual or anticipated operating and capital expenses, contingent liabilities and other obligations or liabilities of the Company.

5

"Sale Event" means (i) the sale of greater than fifty percent (50%) of the total Units held by the Members in one or a series of related transactions; (ii) the merger or consolidation of the Company with or into any other entity; or (iii) the sale of all or substantially all of the assets of the Company.

"Transfer" or "transfer" means, with respect to any Interest (or any portion thereof or interest therein) any gift, assignment or intended action to sell, exchange, assign, transfer, give or otherwise voluntarily or involuntarily dispose of, or any action or intended action to pledge, encumber, hypothecate, mortgage, grant or create an option to acquire or a security interest in or lien upon, or otherwise voluntarily or involuntarily encumber in any way, any Interest in the Company.

"Transferor" means any Person who made or makes a Transfer of an Interest (or any portion thereof) as herein.

"Transferee" means any Person who receives or inherits (or any portion thereof) an Interest thereof as a result of a Transfer.

"Treasury Regulation" means any final, temporary or proposed regulation promulgated under the Code. Any reference to specific section shall include any amendment to or successor provision thereto.

"Triggering Event" means with respect to any Member, any of the following: (i) death (other than estate planning involving a Transfer to a Permitted Transferee), (ii) Bankruptcy, (iii) the Member is a entity, a Change of Control of the entity, or (iv) any Transfer of such Member's Interest that does not occur strictly in accordance with the terms of this Agreement, whether such Transfer occurs in connection with a dissolution of marriage or legal separation or otherwise, whether voluntarily or involuntarily.

"Triggering Event Member" means any Member with respect to whom a Triggering Event has occurred and shall include the executor, administrator, or legal guardian of such Member.

Section 1.1   Titles and Captions.   The titles and captions of the Articles and Sections of this Agreement are for convenience of reference only and do not in any way define or interpret the intent of the parties or modify or otherwise use a few any of the provisions hereof and shall not affect the construction or interpretation of any provision hereof.

Section 1.2   Conventions.   Whenever the context requires, each pronoun or verb used herein shall be construed in the singular or the plural sense and each capital and term defined herein and each pronoun used herein shall be construed in the masculine, feminine or neuter sense. The terms "herein," "hereto," "hereof," "hereby," and "hereunder," and other terms of similar import, refer to this Agreement as a whole, and not to any section or article. The use of "Relates to in this Agreement to "including," "includes" and "include" shall be deemed to be followed by "without limitation."

4

ARTICLE II
FORMATION

Section 2.1   Formation.   The Company was formed as a Delaware limited liability company pursuant to the Act upon the filing of a Certificate of Formation with the Secretary of State of the State of Delaware on April 10, 2018.   Hereafter, the Board of Managers shall cause to be executed and filed on behalf of the Company, such amendments to the Certificate of Formation and such assumed name certificates and affidavits, additional instruments and amendments thereto, as may from time to time be necessary or appropriate to carry out this Agreement and enable the Company to conduct its business in accordance with applicable laws.

Section 2.2   Name and Place of Business.   The name of the Company shall be "QS HOLDINGS LLC". The Company may do business under that name and under any other name or names designated by the Board of Managers. The principal place of business of the Company shall be located at such place or places as the Board of Managers determines. The initial place of business of the Company is 1994 Candice Circle N.E. St. Petersburg FL 33703.

Section 2.3   Office and Registered Agent.   The Company's initial registered office and registered agent in the address shall be as set forth in the Certificate of Formation.   The registered office and registered agent may be changed from time to time by the mailing of the address of the new registered office and/or the name of the new registered agent with the Delaware Secretary of State pursuant to the Act and by giving notice to each of the Members in the manner provided in this Agreement.

Section 2.4   Term.   The term of the Company shall continue in perpetuity until the Company is dissolved in accordance with either the provisions of this Agreement, the Company's Certificate of Formation, or the Act.

Section 2.5   Purposes.   The purposes of the Company shall be to:

(a)     engage in any lawful activity or enterprise; and

(b)     do all things necessary, convenient, suitable or proper for the accomplishment of or in furtherance of any of the purposes of such business or to be necessary, useful or incidental to or arising from or connected with any of such purposes.

ARTICLE III
MEMBERS

Section 3.1   Additional Members.   Additional Members may be admitted to the Company as Members in accordance with the terms and conditions of this Agreement.   Each Additional Member shall be admitted to the Company on a Member on the first date on which all of the following shall have occurred: (i) the Board of Managers shall have approved the admission of such Person as a Member, (ii) such Person shall have complied with the provisions of Sections 8.2(b)(i) - (v), and (iii) the Company shall have received such Person's capital contribution, if any, as set forth in Exhibit A, as such Exhibit may be amended from time to time.

Section 3.2   Representations and Warranties and Covenants of Members.   Each Member hereby represents and warrants to the Company and to each other Member that:

5

(a)      such Member has knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of the investment in the Company and making an informed investment decision with respect thereof;

(b)      such Member has reviewed and evaluated all information necessary to assess the merits and risks of his or its investment in the Company and has had answered to his or its satisfaction any and all questions regarding such information;

(c)      such Member is an "accredited investor" as defined under the rules and regulations promulgated under the Securities Act of 1933, as amended (the "Securities Act"), and is able to bear the economic and financial risks of its investment in the Company for an indefinite period of time;

(d)      such Member is acquiring his or its Interest in the Company for investment only and not with a view to or for resale in connection with any distribution thereof or public offering thereof;

(e)      Such Member acknowledges that Interests in the Company have not been registered under the Securities Act or the securities laws of any other jurisdiction and cannot be disposed of unless they are subsequently registered and/or qualified under said Securities Act and such other applicable securities laws, and the provisions of this Agreement have been complied with;

(f)      the execution, delivery and performance of this Agreement have been duly authorized by such Member and do not require such Member to obtain any consent or approval that has not been obtained, and will not contravene or result in a default under any provision of any law or regulation or applicable to such Member or other governing documents or any agreement or instrument to which such Member is a party or by which such Member is bound;

(g)      the decision of such Member to acquire an Interest in the Company has been made by such Member independent of any other Member and independent of any statements or opinions as to the advisability of such purchase or as to the properties, business, prospects or condition (financial or otherwise) of the Company which may have been made or given by any other Member, or by any agent or employee of any other Member; and

(h)      this Agreement is valid, binding and enforceable against such Member in accordance with its terms.

Section 3.3      Limitation of Liability of Members.   Except as otherwise provided in this Agreement or as required by applicable law, no Member shall have any personal liability whatsoever in such Member's capacity as a Member, whether to the Company, to any of the other Members, to the creditors of the Company, or to any other third party, for the debts, liabilities, commitments or any other obligations of the Company or for any losses of the Company, and shall be liable only to make such Member's capital contribution to the Company and any other payments which may be expressly required under this Agreement.

Section 3.4      Meetings of Members.   Meetings of the Members may be called by the Board of Managers, or by Member(s) holding a majority of the outstanding Units in the Company. Meetings of the Members shall be held at the principal executive offices of the Company or at such other place as the Board of Managers may otherwise designate, by notice to all Members not less than ten (10) days nor more than sixty (60) days prior to such meeting, provided that any Member may waive notice, and the presence of a

6

Member at a meeting of the Members constitutes a waiver of notice unless such Member is present solely to object to such meeting by reason of lack of timely notice. At any meeting, any Member may participate by telephone or similar communications equipment, provided that each Member can hear the others. Persons present by telephone shall be deemed to be present in person for purposes hereof. The presence of Member(s) holding a majority of the outstanding Percentage Interests in the Company shall constitute a quorum for the transaction of business. When a quorum is present at any meeting, the Members who are holders of record of a majority of the total outstanding Units entitled to be voted on a matter shall decide such matter, except when a different vote is required by express provision of law, the Certificate of Formation or this Agreement. The Members also may make decisions, without holding a meeting, by written consent of the Members to decisions however, where consent shall require the same approval as would be required at a meeting of the Members. Minutes of each meeting and a record of each decision shall be kept by a designee of the Manager. Members shall not have their votes disqualified on account of having an interest in the matter to be voted on.

Section 3.5  Rights and Duties of Members.  Except as may be otherwise required by law, no Member shall have any power or authority to act for and bind the Company in its capacity as such. To the extent that the rights, powers, duties, obligations and liabilities of the Members are different by any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

## ARTICLE IV
## CAPITAL CONTRIBUTIONS, INTERESTS,
## CAPITAL ACCOUNTS, LOANS

Section 4.1  Capital Contributions.  The capital contributions, if any, of the Members are set forth on the books and records of the Company, and the number of Units issued to each of the Members, is set forth in Exhibit A. The number of Units issued to Additional Members shall be reflected on Exhibit A as it shall be amended at the time of the admission to the Company of each Additional Member. Except as may be required of any Additional Members in connection with their admission to the Company as Members, no Member shall be required or permitted to contribute any additional capital to the Company.

Section 4.2  Establishment and Determination of Capital Accounts.  A capital account ("Capital Account") shall be established for each Member on the books of the Company initially reflecting an amount equal to such Member's initial capital contribution to the Company. Each Member's capital account shall be (a) increased by any additional capital contributions made by such Member pursuant to the terms of this Agreement and such Member's share of Profits, the amount of any Company liabilities that are assumed by such Member and any other items of income and gain allocated to such Member pursuant hereto, (b) decreased by such Member's share of Losses, any distributions to such Member of cash or the fair market value of any other property (net of liabilities assumed by such Member and liabilities to which such property is subject) distributed to such Member, the amount of any liabilities of such Member that are assumed by the Company, and any other deduction allocated to such Member pursuant hereto, and (c) adjusted as otherwise required by the Code and the Treasury Regulations, including but not limited to, the rules of Treasury Regulation Section 1.704-1(b)(2)(iv)(f). Any reference in this Agreement to the capital account of a Member shall be deemed to refer to such capital account as the same may be increased or decreased from time to time as set forth above.

Section 4.3  No Liability for Capital Contributions.  No Member shall (a) be personally liable for the return of any portion of the capital contributions of the Members, the return of which shall be made solely from the Company's assets, or (b) be required to cure any deficit capital account.

7

Section 4.4    Company Capital.  No Member shall be paid interest on any capital contribution to the Company or on such Member's capital account, and no Member shall have any right (a) to demand the return of such Member's capital contribution or any other distribution from the Company (whether upon resignation, withdrawal or otherwise), except upon dissolution of the Company pursuant hereto or (b) to cause a partition of the Company's assets.  Any loan by a Member to the Company shall not be considered to be a capital contribution for any purpose and shall not result in an increase in the amount of the capital account of such Member.

Section 4.5    Additional Financing.  The Company may seek to raise additional equity from third parties and/or Members, and the Company may seek to borrow funds from third parties and/or Members, if the Company were to need additional financing.  The terms and conditions of such financings shall be determined by the Board of Managers in its sole discretion.

Section 4.6    Units.  All Interests in the Company shall be denominated in Units.  Each Unit shall have the same rights, and be subject to the same limitations, as those of each other Unit, provided that the Board of Managers shall have the right to create different classes of Units having such rights and limitations as the Board of Managers may determine.  In addition, the Board of Managers has the authority to issue preferred Units on such terms as it may determine.  The Company may, at the discretion of the Board of Managers, issue certificates to the Members representing their respective Units, which certificates shall contain customary restrictive legends relating to securities laws and this Agreement.

Section 4.7    Non-Voting Unit.  "Non-Voting Unit" shall mean a Unit issued without the right to vote in matters coming before the Company or to participate in the management of the Company.

Section 4.8    Service Provider Units.  The initial number of Units the Board of Managers has authorized the Company to issue is 10,000,000.  The Board of Managers may increase or decrease such number of Units at any time.  It is intended that up to 1,000,000 of the issued and outstanding Units to be issued as Non-Voting Units) (the "Service Provider Units") be reserved for issuance to employees, officers, directors, advisors, and other service providers ("Service Providers") as the Managers may specify.


ARTICLE V
ALLOCATIONS AND DISTRIBUTIONS

Section 5.1    Allocations of Profits and Losses.

(a)    Profits and Losses.  Except as otherwise provided in this Agreement, Profits and Losses (and, to the extent necessary, individual items of income, gain, loss, deduction or credit of the Company shall be allocated among the Members in [ ] thereof and so as to give effect to the distribution provisions contained in Section 5.5 and Section 10.2.  The arrangements of the Company, in attempting to decide how income should be allocated, shall be guided by how cash associated with the income was or will be distributed.

(b)    Tax Allocations.  For United States federal, state and local income tax purposes, items of income, gain, loss, deduction and credit shall be allocated to the Members in accordance with the allocations of their corresponding items for Capital Account purposes under Section 5.1(a), except that items with respect to which there are differences between tax and book basis will be allocated in accordance with Section 704(c) of the Code, the Treasury Regulations thereunder and Treasury Regulation Section 1.704-1(b)(4)(i).

8

(c)     Offsetting Allocations.  If, and to the extent that, any Member is deemed to recognize any item of income, gain, deduction or loss as a result of any transaction between such Member and the Company pursuant to Sections 1272-1274, 7872, 483, 482 or 83 of the Code or any similar provision now or hereafter in effect, and the Board of Managers determines that any corresponding Profit or Loss should be allocated to such Member in order to make the Members' Percentage Interests in the Company, then the Board of Managers may so allocate such Profit or Loss.

Section 5.2   Section 754 Election.  Upon the decision of the Board of Managers, the Company shall elect pursuant to Section 754 of the Code, to adjust the basis of Company property as permitted and provided in Sections 734 and 743 of the Code.  Such election shall be effective solely for federal (and, if applicable, state and local) income tax purposes and shall not result in any adjustment to the Carrying Value of any Company asset or to the Member's Equity Account (except as provided in Treasury Regulations Section 1.704-1(b)(2)(iv)(m)) or in the determination or allocation of Profit or Loss for purposes other than such tax purposes.

Section 5.3   Amounts Withheld.  All amounts withheld pursuant to the Code or any provision of any state, local or foreign tax law with respect to any payment or distribution to the Company or the Members shall be treated as amounts distributed to the Members under Section 5.5, in such amounts as the Board of Managers may determine in accordance with applicable law.

Section 5.4   Distributions of Available Cash.  Distributions of Available Cash shall be made in such amount and at such times as the Board of Managers may determine, to the Members as follows:

(a)     First, pro rata to the Members until each Member has been repaid its Capital Contribution.

(b)     thereafter, pro rata to the Members in proportion to each Member's Percentage Interest.

Section 5.5   Tax Distributions.  The Company may, but shall not be obligated to, make distributions of Available Cash in amounts such that, prior to April 15 of each calendar year, each Member has received distributions (aggregated amounts for the current Fiscal Year and all prior Fiscal Years) which equal not less than the sum for the immediately preceding Fiscal Year and for all prior Fiscal Years of (i) the amount of Profit allocated to such Member for such Fiscal Years, reduced by the amount of Losses allocated to such Member for such Fiscal Years, multiplied by (ii) 45%.  To the extent necessary to conform to Section 5.5 any such tax distributions made to any Member shall be repaid to the Company by reducing the amount of the next succeeding distribution or distributions which would otherwise have been made to such Member or, if such distributions are not sufficient for this purpose, by reducing the proceeds of liquidation otherwise payable to such Member.

Section 5.6   Distributions in Kind.  In the event that the Board of Managers determines to distribute any property other than cash (including, but not limited to securities, notes, mortgages and payments in kind), the Members entitled to such distribution shall be entitled to their pro rata shares of each such asset in accordance with the aggregate amounts otherwise payable to them, respectively.

9

ARTICLE VI
FISCAL MATTERS

Section 6.1   Tax Matters Partner.  Michael Ackerman shall be the "tax matters partner" of the Company within the meaning of Section 6231(a)(7) of the Code.

Section 6.2   Tax Returns.  At the expense of the Company, the Board of Managers shall prepare and file, or shall cause to be prepared and filed, all federal and any required state, local and foreign income and other tax returns for the Company for each Fiscal Year.

Section 6.3   Fiscal Year and Other Elections.  The Fiscal Year shall coincide with the taxable year of the Company and end on December 31 of each year or such other date as the Board of Managers may select pursuant to applicable law.  All other accounting decisions and elections required or permitted to be made by the Company for tax purposes under applicable law shall be made by the Manager.

Section 6.4   Books and Records.  The Board of Managers shall maintain or cause to be maintained at the principal place of business of the Company, or at such other place as the Board of Managers may determine, complete and accurate books and records of the assets, results of operations, financial condition, business and affairs of the Company, including without limitation:

(a)      a current list of the Members, setting forth the name, address, capital contribution and Percentage Interest of each;

(b)      a copy of the Company's Certificate of Formation and all amendments thereto and restatements thereof, together with an executed copy of any power of attorney pursuant to which any certificate, or amendment, restatement or statement thereof, is executed;

(c)      a copy of this Agreement and any amendments thereto; and

(d)      a copy of the Company's income tax and information returns and reports, if any, for each of the three most recently ended Fiscal Years.

Section 6.5   Bank Accounts   The Company shall maintain one or more accounts (including, but not limited to, brokerage, custodial, checking, cash management and/or money market accounts) in such banks, brokerage houses or other financial institutions as the Board of Managers may determine.  All amounts deposited by or on behalf of the Company in these accounts shall be and remain the property of the Company.  All withdrawals from such accounts shall be made by the officers authorized to do so by the Board of Managers.  No funds of the Company shall be kept in any account other than a Company account, and funds of the Company shall not be commingled with the funds of any other Person, and no Member or Officer shall apply, or permit any other Person to apply, such funds in any manner except for the benefit of the Company.

Section 6.6   Tax Information   As soon as practicable after the end of each Fiscal Year, the Company shall distribute to each Member a copy of the Schedule K-1 to the Partnership Tax Return (Form 1065).

19

ARTICLE VII
MANAGEMENT

Section 7.1   Management of the Company

(a)   Except as otherwise specifically provided in this Agreement, the business and affairs of the Company shall be managed by or under the direction of a board of Managers (the "Board of Managers") and no Member shall have any right to participate in or to exercise control over the management power over the business and affairs of the Company or otherwise to bind, act or purport to act on behalf of the Company in any manner solely by reason of being a Member.  Subject to the limitations set forth in this Agreement, the Board of Managers shall have all the rights and powers that may be possessed by a manager under the Act.

(b)   The rights and powers of the Managers shall only be exercised (unless otherwise expressly provided for herein) upon the approval by a majority vote of the Board of Managers.  No individual Manager, in his or her capacity as such, may act on behalf of the Board of Managers or the Company.

Section 7.2   Number of Managers; Appointment and Removal of Managers   The Board of Managers shall consist of three (3) individuals (each such individual, a "Manager").  Each Key Member shall have the right to appoint him or herself (and not a designee) as a Manager.  If a Key Member directly or indirectly transfers its interest its right to serve as a Manager will automatically be terminated.  Unless a Manager resigns, dies, retires or is removed in accordance with this Section, each Manager shall hold office until a successor shall have been duly appointed in accordance with this Section 7.2.  The Parties hereby appoint  Michael  Ackerman, Oran D. Tzur, M.D., and James A Seijas, as the three initial Managers.  Without limiting the generality of Section 7.2 hereof, the Managers shall have power and authority on behalf of the Company, to do the following:

A.   To acquire property from any Person as the Managers may determine, even if a Member is directly or indirectly affiliated or connected with such Person provided such action has been approved in advance in writing by a Majority-In-Interest.

B.   To borrow money for the Company from banks, other institutions, the Members, or affiliates of the Members, on such terms as it deems appropriate, and in connection therewith, to hypothecate, encumber and grant security interests in the assets of the Company to secure repayment of borrowed sums; provided, that no debt or other obligation shall be contracted or liability created by or on behalf of the Company except by the Managers.

C.   To purchase liability and other insurance to protect the Company's property and business.

D.   To hold and own any real and/or personal properties in the name of the Company.

E.   To sell or otherwise dispose of or transfer assets of the Company in the ordinary course of business, provided such action has been approved in advance in writing by a Majority-In-Interest.

F.   To execute on behalf of the Company all contracts, instruments, and documents including, without limitation, checks, drafts, notes and other negotiable instruments.

11

mortgages or deeds of trust, deeds, security agreements and financing statements, documents providing for the acquisition, mortgage or disposition of the Company's property, assignments, bills of sale, stock powers, leases, operating agreements, and any other instrument or documents necessary, in the opinion of the Managers, to the business of the Company; and, subject to any limitation contained in the Certificate of Formation or in this Agreement, authorize in writing any agent, generally or specifically, to execute and deliver any contract or other instrument in the name and on behalf of the Company;

        G.    To cause the Company to change its domicile to a jurisdiction other than the State of New York, provided such action has been approved in advance in writing by a Majority-In-Interest;

        H.    To employ accountants, legal counsel, managing agents or other experts to perform services for the Company and to compensate them from the Company funds;

        I.    To make an assignment for the benefit of creditors of the Company, file a voluntary petition in bankruptcy or appoint a receiver for the Company, provided such action has been approved in advance in writing by a Majority-In-Interest;

        J.    To enter into any and all other agreements on behalf of the Company with any other person or entity for any purpose, in such form as the Managers may approve; and

        K.    To do and perform all other acts as may be necessary or appropriate to the conduct of the Company's business.

Section 7.3  Meetings.

        (a)    Meetings of the Board of Managers for any purpose or purposes may be called at any time by any Manager.  Meetings of the Board of Managers shall be held at any place as the Board of Managers may select and may be held telephonically.

        (b)    Written notice of a meeting of the Board of Managers sent to forth (i) the day and hour of the meeting, (ii) the identity of the Manager calling the meeting and (iii) the purpose or purposes for which the meeting is being called, shall be delivered to each Manager no fewer than two (2) days nor more than forty (30) days prior to the date of the meeting, unless waived by each Manager.  The presence of a Manager at a meeting of the Board of Managers constitutes a waiver of notice, unless such Manager is present solely to object to such meeting by reason of failure of timely notice.  Persons present by telephone shall be deemed to be present "in person" for purposes hereof.  The presence of a majority of Managers shall constitute a quorum for the transaction of business.  Unless a different vote is specified by law or this Agreement, decisions of the Board of Managers at a meeting shall require the approval of at least a majority of all of the then current Managers.

        (c)    Notwithstanding the foregoing or anything to the contrary in this Agreement, to the extent the Board of Managers desires to sell, assign, and/or transfer any of the following (as is to any third party and/or an Affiliate, the Board of Managers must provide written unanimous consent to any and all such transactions, (with all Key Members being necessary to establish a quorum): (i) substantially all of the assets and/or equity or equity interests of the Company and substantially all of the Property of the Company, or (ii) any or all software, algorithms, object code, source code,

12

Information architecture, algorithms, methodology, knowledge, technical drawings, diagrams, databases, data, programming tools held by the Company.

**Section 7.4   Action by Consent; Approvals.** Any action required or permitted to be taken by the Board of Managers, either at a meeting or otherwise, may be taken without a meeting, without prior notice and without a vote, if a written consent setting forth the action is signed by a majority of the Managers; provided, however, that in the event that all the Managers do not consent to such action, notice of such action shall promptly be provided to the Managers who have not consented. Such consents shall be delivered to the Company's offices.

**Section 7.5   Limitation of Liability.** Neither any Manager nor any Advisory Board Member nor any Member shall be liable to the Company or any Member for any loss, damage, liability or expense (collectively, "Damages") suffered or incurred by any Person on account of or by reason of any claim based on or arising from any act taken or omitted to be taken in the course of representing or performing services for the Company or otherwise in such Person's capacity as a Manager or Advisory Board Member or Member, including without limitation such Person's appointment or selection of or reliance upon any employee or agent of the Company, notwithstanding any negligence, fraud or willful misconduct by such employee, agent or Person, except to the extent that a judgment or other final adjudication adverse to a Manager or Advisory Board Member or Member establishes that the Manager's or Advisory Board Member's or Member's acts or omissions were in bad faith or involved intentional misconduct or a knowing violation of law, or that the Manager or Advisory Board Member or Member personally gained in fact a financial profit or other advantage to which the Manager or Advisory Board Member or Member was not legally entitled, or that, with respect to a distribution in violation of the Act, the Manager's or Advisory Board Member's or Member's acts were not performed in accordance with this Agreement.

**Section 7.6   Indemnification.** The Company shall indemnify each Manager, each Advisory Board Member and the Members and their legal representatives, successors and assigns, and hold each of them harmless from and against any Damages suffered or incurred by the Manager, the Advisory Board Member or the Members, as such, or any of them in the course of serving in any office of, or otherwise representing or acting for or on behalf of the Company, except to the extent that a judgment or other final adjudication adverse to the Manager, the Advisory Board Member or Member or other Person establishes that the Manager's or Advisory Board Member's or Member's or other Person's acts were in committed in bad faith or were the result of active and deliberate dishonesty and were material to the cause of action so adjudicated, or (b) that the Manager, the Advisory Board Member or Member or other Person personally gained in fact a financial profit or other advantage to which the Manager, the Advisory Board Member or Member or other Person was not legally entitled; provided, however, that, any other provision hereof notwithstanding, any such indemnification shall be solely from the net assets of the Company, and neither a Manager nor Advisory Board Member nor any Member shall be required to make any capital contribution or otherwise pay any amount from the Managers or Advisory Board Member or Member's own assets as a result thereof. The Company may procure insurance in such amounts and covering such risks as the Board of Managers deems appropriate, in consultation with all of the Members, to fund any indemnification required or permitted to be made hereunder.

**Section 7.7   Officers, Managers.**

(a)   The Board of Managers may delegate powers and duties to others, and may appoint one or more persons, who need not be Members or otherwise interested in the Company ("Officers"), and may assign titles (including, without limitation, Manager, chairman, chief executive officer, president, vice president, secretary, assistant secretary, treasurer and assistant treasurer) to any

13

such person and shall receive the same in the minute books of the Company. The Company may enter into employment agreements with one or more employees of the Company, on such terms as the Board of Managers shall approve in its sole discretion. Unless the Board of Managers decides otherwise, if the title is one commonly used for officers of a business, the exercise of the assignment of such powers, duties or title shall constitute the delegation to such person of the authority and duties that are normally associated with that title, office. Any number of titles may be held by the same person. Any appointment of an officer or of any delegation or assignment of powers, duties, or title pursuant to this Section 7.7 may be revoked at any time by the Board of Managers with or without cause. Designation of a Person as an Officer of the Company shall not of itself create any contract rights in such Person.

(b) Number, Tenure and Qualifications. In the event the Managers resigns or is removed, he shall be elected by the vote of Members owning, in the aggregate a simple majority of the Percentage Interests (Majority-In-Interest) in a meeting of the Members and shall hold office until the next meeting of Members at which an election of the Managers is held, or such longer period as shall be approved by such vote, and until his successor shall have been duly elected and qualified. The Company may engage the Managers pursuant to a written management agreement for the period to which the Managers were created. The Managers need not be a resident of the State of Delaware. The Managers shall not be precluded, from serving the Company in consulting, other than management of the Company, for which the Managers receives compensation from the Company.

(c) Any Officer of the Company may resign at any time, for any reason or no reason at all, upon written notice to the Board of Managers. Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time is specified therein, at the time of its receipt by the Managers. The acceptance of a resignation shall not be necessary to make it effective unless expressly so provided in the resignation.

(d) Any vacancy occurring in any office of the Company may be filled by the Board of Managers.

(e) Subject to the limitations set forth in Sections 7.4 and 7.5, each Officer shall enjoy the full benefits of the limitation of liability provided in Section 7.4 and the indemnification provided in Section 7.5 that is given in favor of a Manager, an Advisory Board Member and the Members.

Section 7.8   Agreements with Affiliated Entities. The Members acknowledge that the Company intends to enter into one or more agreements with affiliated entities. No contract, or other transaction between or among the Company and a Manager, or one or more of the Company's Members or any Affiliate of a Manager, or Member, or any other Person in which a Manager or one or more of the Members are partners, members, managers, directors or officers, or have a substantial financial interest, shall be either void or voidable for this reason alone.

Section 7.9   Deadlock. If a Manager reasonably determines that a Deadlock exists, such Manager may, by written notice (a "Deadlock Notice") to the other Manager, submit such Deadlock to mediation. The terms and procedures for mediation shall be arranged by the Managers. If good-faith mediation of a Deadlock proves impossible or if an agreed-upon mediation outcome cannot be obtained by the Managers, a Manager may commence an arbitration pursuant to Section 11.5 of the Agreement (a "Deadlock Arbitration") by delivering written notice to the other Manager stating its intent to commence such Deadlock Arbitration. Any Deadlock Notice shall describe in reasonable detail the nature of the Deadlock

14

ARTICLE VIII
TRANSFERS

Section 8.1    Withdrawal.   No Member may voluntarily withdraw its membership in the Company. Any Member who withdraws in violation of this Agreement shall not be entitled to receive any consideration therefor.

Section 8.2    Transfer Limitations.

(a)    Except as set forth in Section 8.2(d), Section 8.3, or Section 8.4, no Member may Transfer any Interest without the prior written consent of the Board of Managers. Any purported Transfer in violation of this Agreement shall be void ab initio and shall not bind the Company. The purported recipient of such Transfer shall be entitled only to the rights of an assignee (i.e., an economic interest in such Interest) of such Interest and any distributions to which such Person may be entitled, may be applied (without limiting any other legal or equitable rights of the Company) to satisfy any debts, obligations or liabilities for damages that the transferor or transferee of any such Interest may have to the Company.

(b)    In the event of a Transfer consented to by the Board of Managers pursuant to Section 8.2(a), or a Transfer pursuant to Section 8.3, or the admission of an Additional Member pursuant to Section 3.2, the Transferee, and/or Additional Member, as the case may be, shall become a Member only if (i) the Transferor (or Additional Member) executes and agrees to be bound by this Agreement by executing a joinder to LLC Agreement in a form similar to that annexed hereto as Exhibit 8.2(b), (ii) expressly assumes all of the obligations of the Transferor (in the event of a Transfer hereunder), (iii) executes and delivers such other agreements, instruments, certificates, affidavits, opinions of counsel and other documents as the Board of Managers may reasonably require in order to admit such new Member, and (iv) does such actions which the Board of Managers may deem necessary or desirable to maintain the status of the Company as a partnership for federal tax purposes and assure compliance with Federal and State securities laws.

(c)    Upon and contemporaneously with any Transfer by a Member pursuant to this Article VIII, such Member shall cease to have any further rights under this Agreement with respect to such transferred Interest. Any Transfer in compliance with this Article VIII shall be deemed effective as of the last day of the calendar month in which the Transferee complies (subject to compliance with Section 8.2(b)). The Transferor agrees to execute such certificates or other documents and perform such other acts as may be reasonably requested by the Board of Managers from time to time in connection with such transfer or admission of the Transferee as a Member. The Transferor hereby indemnifies the Company, the Managers and the remaining Members against any and all loss, damage, or expense (including, without limitation, tax liabilities or loss of tax benefits) arising directly or indirectly as a result of any Transfer or purported Transfer in violation of this Article VIII.

(d)    Notwithstanding any thing to contained herein, a Member may transfer some or all of its Membership Interest to a member's spouse, parent, lineal or adopted descendants, executor, administrator, or other legal representative; the spouse of such descendants; the executor, administrator or other legal representative of any thereof, and the trustees of a trust of which any one or more of such individuals shall constitute all of the then table beneficiaries (the foregoing Persons being "Permitted Transferees"), and without the consent of the Board of Managers subject only to compliance with Section 8.2(b)(i) - (iv).

Section 8.3    Right of First Refusal.

18

(a)    **Offer.**  If at any time a Member ("**Transferring Member**") ceases to Transfer any Interest then owned by such Member other than to (X) a Permitted Transferee, or (y) in a Transfer consented to by the Board of Managers pursuant to Section 8.2(a), such Member shall deliver a written notice (an "**Offer Notice**") to the Company and the other Members (the "**Offeree Members**"), setting forth the Interest proposed to be sold, the price, the identity of the transferee (the "**Transferee**"), and other terms of payment.  The Offer Notice shall constitute an irrevocable offer to sell such Interest to the Company and the Offeree Members on the terms and conditions set forth in the Offer Notice.

(b)    **Acceptance.**  The Company and the Offeree Members shall be entitled to purchase all or any portion of such offered Interest by delivering a written notice (the "**Acceptance**") to the Transferring Member within sixty (60) days after delivery of the Offer Notice.  If the Company and any of the Offeree Members shall desire to purchase such Interest, the Company first shall be entitled to purchase, and until it shall have elected to purchase, such Interest, and then the Offeree Members shall be entitled to purchase any or all Interest not purchased by the Company.  The Interest to be purchased by each Offeree Member shall be equal to the Interest available for purchase by all such Offeree Members multiplied by a fraction, the numerator of which shall be the Percentage Interest owned by such Offeree Member and the denominator of which shall be the total Percentage Interest owned by all Offeree Members electing to make such purchase; provided, however, that the Offeree Members shall have the right to agree to a different allocation.

(c)    **Rejection.**  If the offer set forth in the Offer Notice is not accepted by the Company and/or the Offeree Members within such 60 day period, such offer shall be deemed to be rejected and terminated, and the Transferring Member shall be free to Transfer all (but not less than all) of the Interest to the Transferee, but on any upon no terms or on more favorable to the transferee than shall have been contained in the Offer Notice, and subject to compliance with Section 8.2(b)(i) - (iv); provided that as to any Interest for which the Transferring Member shall not have consummated such sale within 90 days after the termination of the 60-day period referred to in Section 8.3(b), the Transferring Member's right to sell such Interest shall terminate, and such Interest shall again be subject to this Agreement to the same extent as if never originally offered to the Company and the Offeree Members.  Upon the consummation of such sale to the Transferee, notice of such sale shall be given by the Transferring Member to the Company and the Offeree Members.

(d)    **Closing.**  If no time for the closing of the sale of the Interest to the Company and/or the Offeree Members is specified in the Offer Notice, then the closing of such sale shall occur on a date mutually agreed to by the Transferring Member, the Company and, if applicable, the Offeree Members.  If the purchase by the Company and/or the Offeree Members results from the Transferring Member's proposed sale of the Interest to a Transferee, the purchase price payable by the Company and/or any Offeree Members to the Transferring Member shall be due and payable on the terms and conditions specified in the Offer Notice; provided that in the event of the Company and/or the Offeree Members were are purchasing the Interest, the purchase price shall be paid fifty percent (50%) on the closing date by certified or bank check, with the balance to be paid in eight consecutive installments, the first of which shall be due and payable six days after the closing date, and the remainder of which shall be due and payable on each 90th day thereafter, each such payment to be accompanied by all accrued and unpaid interest.  The unpaid balance of the purchase price shall be evidenced by a promissory note in customary form which shall be delivered on the closing date, and which shall bear interest at the minimum rate of interest imputed by the Internal Revenue Service as of the closing date for loans of such duration (subject to a customary penalty rate of interest upon a failure to make payment in accordance with the terms of such note).  Such note shall provide that it may be prepaid at any time, from time to time, in whole or in part, together with all accrued and unpaid

16

interest, without premium or penalty.  At the option of the Transferring Member, such Interests shall be pledged to secure such deferred payments pursuant to a pledge agreement in form and substance reasonably acceptable to the parties, which pledge agreement shall be delivered at the closing date.  At the closing the Transferring Member shall transfer the Interests purchased, free and clear of any and all liens, claims, charges, and encumbrances, and with any and all required transfer tax stamps affixed.

Section 8.4    Repurchase of Interest

(a)    If a Triggering Event occurs, the Non-Triggering Event Member(s) shall have the right, but not the obligation, to purchase their pro rata share (or in such allocation as they may agree) of all of the Interest of the Triggering Event Member, for the Fair Market Value (as defined in clause (h) hereof) of such Interest.  The other Members may reserve such right by giving written notice of such election to purchase such Interest, such notice to be delivered to the Triggering Event Member, or such Member's executor, administrator or legal representative, as the case may be, and to the Company and the other Members no later than the first anniversary of the Company's receipt of notice of the occurrence of the Triggering Event.  The other Members' purchase of the Interest shall be consummated at a closing which shall be held at the Company's office no later than 60 days after the Triggering Event Member, or such Member's executor, administrator or legal representative, shall have received the other Member's notice of election to make such purchase.  The purchase price for the Interest shall be payable one-sixth (1/6) in cash at the closing, with the balance to be payable by means of a promissory note bearing interest at a per annum rate equal to the prime rate of interest as announced by Citibank, N.A. in New York, New York as of the date of closing, as adjusted on each annual anniversary date of the closing to such prime rate in effect as of such anniversary date.  Such promissory note shall be payable in five equal annual installments of principal on the first five anniversary dates of the closing of the purchase, together with the interest accrued as of each such anniversary date, provided that such note may be prepaid in whole or in part at any time without premium or penalty.

(b)    If the Board of Managers determines it is in the best interests of the Company to repurchase all, but not less than all, of the Interest of a Member, then the Board of Managers has the right, at any time, in its sole discretion, after such determination, to have the Company repurchase all but not less than all of the Interest of a Member (the "Re-purchased Member") for the Fair Market Value of such Interest (the "Re-purchase Option").  The Board of Managers may exercise the Re-purchase Option by giving written notice to the Re-purchased Member.  The Company's repurchase of the Interest shall be consummated at a closing which shall be held at the Company's office no later than 60 days after the Re-purchased Member, or such Member's executor, administrator or legal representative, shall have received the Board of Managers' notice of election to make such repurchase.  The purchase price for the Interest shall be payable one-sixth (1/6) in cash at the closing, with the balance to be payable by means of a promissory note bearing interest at a per annum rate equal to the prime rate of interest as announced by Citibank, N.A. in New York, New York as of the date of closing, as adjusted on each annual anniversary date of the closing to such prime rate in effect as of such anniversary date.  Such promissory note shall be payable in five equal annual installments of principal on the first five anniversary dates of the closing of the purchase, together with the interest accrued as of each such anniversary date, provided that such note may be prepaid in whole or in part at any time without premium or penalty.

(c)    For purposes of this Section 8.4, the term "Fair Market Value" means the fair market value of the Interest of the Triggering Event Member or the Re-purchased Member (in each case, the "Selling Member") as agreed upon by the Board of Managers and the Selling Member or such

17

Member's executor, administration or legal representative, ... listing such agreement, as determined by an independent Accountant. If the Board of Managers and the Selling Member or such Member's executor, administrator or legal representative, cannot agree on an independent Accountant, then the parties shall each propose an Accountant, and the Judicial Arbitration and Mediation Service, Inc. ("JAMS") or any successor organization shall determine which Accountant is more suitable, in accordance with the rules, regularities and procedures of the JAMS. In any of the foregoing cases the determination of Fair Market Value shall be final and binding on the Company and all Members, and the fees and expenses of JAMS and such firm shall be borne one-half by the purchaser of the interest and one-half by the Selling Member or his or her estate. In making its determination of Fair Market Value, such firm is hereby directed to take into account an appropriate discount for a minority interest and the distribution provisions of Section 5.4 and 10.2.

Section 8.5   Drag-Along Rights   Notwithstanding the provisions of Sections 8.3 and 8.4, if the Board of Managers and the Members holding fifty percent (50%) or more of the outstanding Percentage Interest, have voted, consented or proceed to effectuate a Sale Event with a third party pursuant to a definitive purchase and sale or merger agreement (the "Definitive Agreement"), such Members shall, upon fifteen (15) calendar days prior written notice to the All other Members (the "Remaining Members"), have the right to require the Remaining Members to participate in the Sale Event, provided that the consideration received in the Sale Event is distributed in the same manner required by Section 10.2 as if the Company were liquidated and the proceeds available for distribution upon liquidation equivalent to the aggregate consideration received by Members in the Sale Event. A copy of the Definitive Agreement shall be provided to each Remaining Members along with the notice described above. Each Remaining Member, electing to participate in such Sale Event, (i) will (a) participate in good faith to effectuate the Sale Event pursuant to the Definitive Agreement, (b) will consent to and raise no objections against, and take all actions necessary in order to consummate the Definitive Agreement (including the making of all customary representations, warranties, covenants, indemnities and agreements), and (c) hereby waives any and all dissenters' rights, appraisal rights or other similar rights arising in connection with the Sale Event.

<div align="center">

ARTICLE IX
COVENANTS

</div>

Section 9.1   Confidentiality

(a)     Each Member acknowledges and agrees that the Confidential Information (as defined below) is valuable property of the Company and undertakes that for so long as it is a Member, and thereafter until such Confidential Information otherwise becomes publicly available (other than through a breach of this Section 9.1), such Member and such Member's Affiliates shall:

(i)     treat the Confidential Information as sacred and confidential,

(ii)     not disclose (directly or indirectly), in whole or in part, the Confidential Information to any third party, except with the prior consent of the Board of Managers,

(iii)     not use (or in any way appropriate) the Confidential Information for any purpose other than the performance and furtherance of the business of the Company and otherwise in accordance with the provisions of this Agreement, and

(iv)     limit the dissemination of and access to the Confidential Information to such of the Company's Officers, employees, agents or representatives as may reasonably require such

<div align="center">18</div>

information for the performance and furtherance of Company business and ensure, to the extent practicable, that any and all such Persons observe all the obligations of confidentiality with respect to such Confidential Information as are contained in this Section 9.1. Notwithstanding the foregoing, a Member shall be entitled to disclose Confidential Information if such disclosure (A) is made to attorneys, accountants and other advisors who are bound by contract or law to maintain the confidentiality thereof; (B) is required by law or pursuant to any order or other subpoena of any court, governmental authority or other administrative body; provided that, to the extent permitted by law, such Member shall provide the Company with prompt notice of such request or order, including copies of subpoenas and other requests for such Confidential Information, cooperate reasonably with the Company in resisting the disclosure of such Confidential Information via a protective order or other appropriate legal action, and shall not make disclosure pursuant thereto until the Company has had a reasonable opportunity to resist such disclosure, unless such Member is ordered otherwise, or (C) is required in connection with enforcing its rights under this Agreement.

(a)      As used herein, "Confidential Information" means, except as otherwise set forth below or in this Agreement, all information, whether in tangible or intangible form and whether or not designated as confidential, relating to the Company's or its licensee's rights, sales, personnel, pricing, product development information, including the names of the Company's or its licensee's, customers or clients, plans for future developments, and any other information that a Member should reasonably understand is confidential. Notwithstanding anything in this Agreement to the contrary, the term "Confidential Information" is not limited to any information for which is generally available to the public.

(b)      No Member, during such time in which he is a Member and at all times thereafter, shall issue any press release or advertisement or take any similar action with regard to the Company or its business or affairs without obtaining the consent of the Board of Managers.

(c)      Each Member shall be liable for any breach of this provision by its Affiliates.

(d)      No License. Each Member understands that this Agreement does not, and shall not be construed to, grant the Member any license or right of any nature whatsoever, to any Confidential Information, materials, software or other tools made available to them by the Company.

Section 9.2   Injunctive Relief. Because of the difficulty of measuring economic losses to the Company as a result of a violation or breach of the provisions of Section 9.1, and because of the immediate and irreparable damage that could be caused to the Company as a result of such violation or breach for which the Company might not have another adequate remedy, each Member acknowledges and agrees that the provisions of Section 9.1 may be specifically enforced by the Company against such Member through injunctions, restraining orders and other orders of equitable relief issued by a court of competent jurisdiction, without any requirement for the securing or posting of a bond or other security by the Company in connection with any such equitable remedies described in the preceding sentence.

19

ARTICLE X
DISSOLUTION AND LIQUIDATION

Section 10.1 Dissolution.  Subject to the provisions of applicable law, the Company shall be dissolved upon the first of the following events to occur:

(a)    the sale of all or substantially all of the Company's assets and the collection of all of the proceeds of such sale; or

(b)    with the prior written consent of the Board of Managers; or

(c)    the entry of a judicial Decree of dissolution of the Company pursuant to the Act.

The termination of a Member's membership in the Company shall not result in the dissolution of the Company.

Section 10.2 Liquidation.

(a)    Upon a dissolution of the Company, the Liquidating Person shall take or cause to be taken a full account of the Company's assets and liabilities and total assets of the date of such dissolution and shall proceed with reasonable promptness to liquidate the Company's assets and to terminate its business and affairs.  The Company's assets, or the proceeds from the liquidation thereof, shall be applied in cash or in kind in the following order:

(i)    to the payment of all liabilities and obligations of the Company, including expenses of the liquidation and obligations and liabilities to the Members (including compensation payments (other than on account of the Capital Accounts of the Members) to distributions under applicable law);

(ii)    to the establishment of such reserves for contingent liabilities of the Company as are deemed necessary or desirable by the Liquidating Person, provided, however, that such reserves shall be deposited in escrow with a bank, for the purpose of disbursing such reserves for the payment of such contingent liabilities and, at the expiration of such period as the Liquidating Person may reasonably deem advisable, for the purpose of distributing the remaining balance in accordance with subparagraphs (iii) and (iv) below;

(iii)    pro rata to the Members until each Member has been repaid its Capital Contribution;

(iv)    to the Members in accordance with their respective Percentage Interests.

(b)    The Liquidating Person shall be allowed a reasonable time for the orderly liquidation of the Company's assets and properties and the discharge of indebtedness and other liabilities to creditors, so as to preserve and, upon disposition, maximize the value of the Company's assets and properties.

(c)    Following the liquidation of the Company, the Liquidating Person shall file a Certificate of Dissolution of the Company with the Office of the Secretary of State of the State of Delaware.

30

CONFIDENTIAL

Section 10.3 <u>Continuing Liabilities and Other Obligations</u>.  Except as otherwise expressly provided herein, no dissolution, liquidation or termination of the Company shall relieve, release or otherwise discharge any Member, or any of such Member's successors, assigns, heirs or legal representatives from any previous breach or default of, or any obligation or other liability theretofore incurred or accrued under, any provision of this Agreement or applicable law, and any and all liabilities, claims, demands or causes of action arising from any such breaches, defaults, obligations and liabilities shall survive any such reconstruction, dissolution, liquidation or termination.

Section 10.4 <u>Final Statement</u>.  As soon as practicable after the dissolution of the Company, the Liquidating Person shall cause a statement of the Company's assets and liabilities to be prepared as of the date of such dissolution and furnished to the Members.

<div align="center">

ARTICLE XI

MISCELLANEOUS

</div>

Section 11.1 <u>Notices</u>.  All notices and other communications required or permitted to be given pursuant to this Agreement shall be in writing and shall be deemed duly given as follows: (a) on the date delivered, if personally delivered, (b) on the date sent by telecopy with automatic confirmation by the transmitting machine showing the proper number of pages were transmitted without error, (c) on the next business day if sent by overnight mail by FedEx or other recognized overnight mail service, or (d) five (5) business days after mailing, if mailed by certified or registered mail, return receipt requested, in each case addressed to the parties at their respective addresses set forth on Exhibit A or such other address as may be specified. No notice given in accordance with the provisions hereof.

Section 11.2 <u>Amendment</u>.  The Company's Certificate of Formation and this Agreement may be amended from time to time only with the approval of the Board of Managers and a Majority of Members, <u>provided</u>, <u>however</u>, that, except as otherwise expressly provided herein, an amendment (a) reducing a Member's Percentage Interest or number of Units in a manner which is disproportionately adverse to such Member relative to the rights of other Members holding the same class of Units, (b) increasing a Member's capital contribution, (c) increasing any other obligation of a Member to the Company, or (d) reducing a Member's rights in respect of any Units in a manner which is disproportionately adverse to such Member relative to the rights of other Members holding the same class of Units, shall in each case be effective only with such Member's approval, and <u>provided</u>, <u>further</u>, that an amendment reducing the required interest for any approval under this Agreement shall be effective only with the approval of Members having the interest theretofore required.  Without such approval, the Board of Managers may amend this Agreement to resolve any ambiguity or to correct or supplement any provision herein that may be inconsistent with any other provision herein, if the amendment will not adversely affect the rights of the Company or any Member disproportionately, (b) comply with the then existing requirements of the Code or the Services affecting the status of the Company as a partnership for federal income tax purposes, and (c) reflect the transfer of any Units or the issuance of any new class of Units or Unit Equivalents, including by amending <u>Exhibit A</u>. The Company will send notice of an Amendment to any Member that did not consent to such Amendment. The Members hereby ratify and approve any amendment to this Agreement authorized hereunder.

Section 11.3 <u>Waiver</u>.  No course of dealing or omission or delay on the part of any party hereto in asserting or exercising any right hereunder shall constitute or operate as a waiver of any such right.  No waiver of any provision unless it be effected or made in writing and signed by or on behalf of the party to be charged therewith.  No waiver shall be deemed a continuing waiver or waiver in respect of any current or subsequent breach or default, unless expressly so stated in writing.

<div align="center">21</div>

Section 11.1  <u>Governing Law</u>   This Agreement shall be governed by, interpreted and enforced in accordance with the laws of the State of Delaware, without regard to the conflict of laws principles that would defer to the substantive laws of any other jurisdiction.

Section 11.2  <u>Arbitration</u>   In any dispute over the provisions of this operating agreement and of other disputes among the Members. If the Members cannot resolve the dispute to their mutual satisfaction, the matter shall be submitted to mediation. The terms and procedure for mediation shall be arranged by the parties to the dispute. If a good-faith mediation of a dispute proves impossible or if the agreed-upon mediation outcome can not be enforced by the Members who are parties to the dispute, the dispute may only then be submitted to arbitration. Any dispute arbitration arising under this Agreement shall be finally settled in accordance with the Comprehensive Arbitration Rules of the Judicial Arbitration and Mediation Service, Inc. ("JAMS") by arbitrators appointed in accordance with such rules. The arbitration shall take place in <u>New York County, New York</u> and the arbitral decision may be enforced in any court. The prevailing party in any action or proceeding to enforce this Agreement shall be entitled to costs and attorneys' fees.

Section 11.5  <u>Jurisdiction</u>.  With respect to any equitable Matter, each of the parties hereto hereby irrevocably consents and submits to the jurisdiction of the State and Federal Courts in New York County, New York, as the exclusive jurisdiction for any such matter, waives any objection to venue therein, and agrees that service of any summons, complaint, notice or other process relating to any such proceeding may be effected in the manner provided by <u>Section 11.1</u>.  In connection with any such proceedings, including appellate proceedings, each Member waives a trial by jury.

Section 11.7  <u>Remedies</u>   In the event of any actual, or prospective breach or default by any party, the other parties shall be entitled to equitable relief, including remedies in the nature of injunction and specific performance, without any requirement for the securing or posting of a bond or other security. In this regard, the parties acknowledge that they will be irreparably damaged in the event this Agreement is not specifically enforced, since (among other things) the Interests are not readily marketable. All remedies hereunder are cumulative and not exclusive, and nothing herein shall be deemed to prohibit or limit any party from pursuing any other remedy or relief available at law or in equity for any actual or prospective breach or default, including the recovery of damages.

Section 11.8  <u>Severability</u>.  The provisions hereof are severable and in the event that any provision of this Agreement shall be determined to be invalid or unenforceable in any respect by a court of competent jurisdiction, the remaining provisions hereof shall not be affected, but shall, subject to the discretion of such court, remain in full force and effect, and any invalid or unenforceable provision shall be deemed, without further action on the part of the parties hereto, amended and limited to the extent necessary to render such provision, as so amended and limited, valid and enforceable.

Section 11.9  <u>Counterparts</u>.  This Agreement may be executed and delivered in counterparts (and transmitted by electronic copy, .pdf or telecopier) with the same effect as if the parties executing the counterparts had all executed one counterpart.

Section 11.10     <u>Further Assurances</u>.  Each party hereto shall promptly execute, deliver, file or record such agreements, instruments, certificates and other documents and take such other actions as the Board of Managers may reasonably request or as may otherwise be necessary or proper to carry out the terms and provisions of this Agreement and to consummate and perfect the transactions contemplated hereby.

22

CONFIDENTIAL

Section 11.  Assignment  Except as otherwise provided herein, this Agreement, and any right, interest or obligation hereunder, may not be assigned by any party hereto except as otherwise provided herein. Any other purported assignment shall be void and of no force and without effect.

Section 11.  Binding Effect.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and permitted assigns. This Agreement is not intended, and shall not be deemed, to create or confer any right or interest for the benefit of any Person not a party hereto.

Section 11.  Entire Agreement.  This Agreement constitutes the entire understanding and agreement among the parties hereto with respect to the subject matter hereof and supersedes all prior agreements relating thereto.

Section 11.11  Legal Representation  The parties acknowledge and agree that (a) they have participated in the negotiation of this Agreement and no provision of this Agreement shall be construed against or interpreted to the disadvantage of any party by any arbitrator, court, or government or judicial authority by reason of such parties being deemed to have structured or drafted such provisions, (b) the parties have had the opportunity to consult their own attorneys in the negotiation, preparation and execution of this Agreement, (c) the law firm of Riordan Walsh LLP has been engaged by the Company in connection with the preparation of this Agreement, and (d) to the extent a conflict of interest exists for Riordan Walsh LLP, it has so acted as set forth above, and if such a conflict of interest does exist it is hereby waived by the Company and each of the parties hereto.

IN WITNESS WHEREOF, the Company, the Board of Managers and the undersigned Members will have duly executed and delivered this Limited Liability Company Agreement as of the date set forth above.

QB HOLDINGS LLC

_____

Michael Ackerman

_____

Que   D. Tran, M.D.

_____

James A. Siegel

11

Siegel 04462

Exhibit A

Schedule of Members

of

Q3 HOLDINGS LLC

As of April 12, 2018

| Name and Address | Number of VOTING Units | Number of NON-VOTING Units | Percentage Interest |
|---|---|---|---|
| Michael Ackerman | 3,000,000 | | 33% |
| Quan D. Tran, M.D. | 3,000,000 | | 33% |
| James A Seijas | 3,000,000 | | 33% |
| RESERVED FOR SERVICE PROVIDERS | | 1,000,000 | 10% |

A-1

Exhibit 8.2(b)

Form of Joinder to Limited Liability Company Agreement

Q3 HOLDINGS LLC

Joinder to

Limited Liability Company Agreement

By affixing his/her or its, as applicable, signature hereto, the undersigned, as a Member of Q3 HOLDINGS LLC, a Delaware limited liability company (the "Company"), hereby joins in the execution of the Limited Liability Company Agreement of the Company dated as of April 12, 2018, as amended from time to time (the "LLC Agreement"), and as executed by its other Members (as defined in the LLC Agreement). Upon acceptance of this Joinder by the Company, the undersigned shall be a party to the LLC Agreement and shall be a Member of the Company.

The execution of this Joinder shall be a counterpart execution of the LLC Agreement, and the undersigned agrees to be bound by all the terms thereof as though he, she or it, as applicable, were an original party thereto.

IN WITNESS WHEREOF, the undersigned has executed this Joinder as of this _____ day of _____, 201__.

| If Member is an Entity: | If Member is An Individual: |
|---|---|
| | Signature_____ |
| _____ | *(Individually)* |
| _____ | Print Name _____ |
| By _____ | |
| Print Name _____ | Address:_____ |
| Title:_____ | _____ |
| | _____ |

The undersigned hereby accepts this Joinder, and accordingly, _____ is accepted as a Member of the Company.

Q3 HOLDINGS LLC,
a Delaware limited liability company

By:_____
Print Name _____
Print Title:_____

9

EXHIBIT

P 2A

Limited Liability Company Agreement

By affixing his, her or its, as applicable, signature hereto, the undersigned, as a Member of Q3 HOLDINGS LLC, a Delaware limited liability company (the "Company"), hereby joins in the execution of the  Limited Liability Company Agreement of the Company dated as of April 12, 2018, as amended from time to time (the "LLC Agreement"), and as executed by its other Members (as defined in the LLC Agreement). Upon acceptance of this Joinder by the Company, the undersigned shall be a party to the LLC Agreement and shall be a Member of the Company.

The execution of this Joinder shall be a counterpart execution of the LLC Agreement, and the undersigned agrees to be bound by all the terms thereof as though he, she or it, as applicable, were an original party thereto.

IN WITNESS WHEREOF, this Joinder has been executed on behalf of the ____ day of ____, 201_.

_ Member (or Entity)

By:
Print Name:
Title:

If Member is a natural individual:
Signature

Individual

Print Name

Address

The undersigned hereby accepts this Joinder, and the foregoing subscription above of Shares in the Company.

Q3 HOLDINGS LLC,
a Delaware limited liability company

By: _____
Print Name: Quan Tran Dinh Quang
Title:

Quan Dinh QUAN

# 20 MAG 00554

ORIGINAL

EXHIBIT
P 3

Approved: _____
           VESTOR COORDINATE/SHLE SKETT
           Assistant United States Attorneys

Before:    THE HONORABLE KATHARINE H. PARKER
           United States Magistrate Judge
           Southern District of New York

- - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

        - v. -

MICHAEL ACKERMAN,

                         Defendant.

- - - - - - - - - - - - - - - - - - - - - - - X

SEALED COMPLAINT

Violations of
18 U.S.C. §§ 1343
and 2

COUNTY OF OFFENSE:
NEW YORK

SOUTHERN DISTRICT OF NEW YORK, ss.:

        JOHN KOURTELIS, being duly sworn, deposes and says that he
is a Special Agent with Homeland Security Investigations
("HSI"), and charges as follows:

                         COUNT ONE
                        (Wire Fraud)

        1.      From at least in or about May 2017 up to and including
at least in or about December 2019, in the Southern District of
New York and elsewhere, MICHAEL ACKERMAN, the defendant,
willfully and knowingly, having devised and intending to devise
a scheme and artifice to defraud, and for obtaining money and
property by means of false and fraudulent pretenses,
representations, and promises, did transmit and cause to be
transmitted by means of wire, radio, and television
communication in interstate and foreign commerce, writings,
signs, signals, pictures, and sounds, for the purpose of
executing such scheme and artifice, to wit, ACKERMAN lied to
investors and potential investors in an investment fund in order
to induce investors to wire money into the investment fund.

        (Title 18, United States Code, Sections 1343 and 2.)

        The basis for my knowledge and for the foregoing charge
are, in part, as follows:

2. I am a Special Agent with the HSI. I have been personally involved in the investigation of this matter, and I base this affidavit on that experience, on my conversations with other law enforcement officials, and on my examination of various reports and records. Because this affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

### Background of the Investigation

3. Since at least in or about October 2019, HSI has been investigating MICHAEL ACKERMAN, the defendant, for his involvement in a cryptocurrency investment scheme involving Q3 I, LP and related "Q3" entities. The Q3 entities were part of an investment scheme in which ACKERMAN and his two cofounders ("Founder-1" and "Founder-2," respectively and, together with ACKERMAN, the "Founders") would purportedly invest and trade in cryptocurrency on behalf of investors into the Q3 entities (the "Q3 Investment Scheme").

4. HSI has been investigating allegations that ACKERMAN, directly and through others using information provided by ACKERMAN, lied to investors concerning the amount and location of investor funds held by Q3.

### Background of Q3

5. Based on my review of records obtained from victim-investors in the Q3 Investment Scheme, I have learned, among other facts, that in or about 2019, Founder-2 described Q3 I, LP as follows, in substance and in part:

> Q3 I, LP is a cryptocurrency trading company founded in 2017 that strictly trades the volatility of cryptocurrency. I founded this company with two other financial analysts both of who worked on the floor of NYSE, one of which is an ex-hedge fund manager. We use very complex algorithms that trade in and out of coins thousands of times a day. On average we make about 0.5% daily on invested income. This comes out to roughly 15% total profit monthly. Profits are continuously

delivered, thus compounding our insanity. These returns have been consistent since August 2017. Additionally we manage 24/7 by our client trading of Emery Hedge Agreement. Currently we have over 620M Assets Under Management.

*   *   *

Distribution is a lump 50% return per your profit at end of each fiscal year. The General Partners myself and the other two founders take 50% of all profit. There are new costs of operations (rent expenses, salaries, licensing fees and other costs). At the end of year you get all of your initial investment back plus 50% of what your investment made.

*   *   *

It's been a winning strategy that has been tested through every peak and trough of this market over the last two years without failing. We hope you are interested in our endeavor. Please feel free to call with any questions.

6.      Based on my review of the Interruption Booklet and to other documents from a victim-investor, I have learned, among other facts, that potential investors in Q3 were directed to wire their capital from equity to Q3 at a particular bank account at Signature Bank (the "Q3 Signature Bank Account") and as part of these same instructions were given a "Bank Address" on 565 Fifth Avenue in New York, New York.

7.      Based on my review of bank records obtained from Signature Bank and the nine people in the opening of the Signature Bank Account (based in or about November 2017, I have learned, among other facts, that:

        a.      The Q3 Signature Bank Account was opened in or about August 2017 in the name of Q3 I, LP.

        b.      Michael ACKERMAN, the co-founder, Principal, and Member-2 are authorized signees on the Q3 Signature Bank Account.

5

c.     Between at least on or about September 14, 2018 and on or about October 31, 2019, the Q3 Signature Bank Account received deposits by incoming checks and wire transfers from apparent Q3 investors, including but not limited to wire transfers directed to Signature Bank on Fifth Avenue in New York, New York, and wire transfers from Bank of America NYC.

d.     Between at least on or about November 2, 2018 and on or about September 21, 2019, the Q3 Signature Bank Account was used to make check payments to apparent Q3 investors, including on checks stamped with the name and address of Signature Bank on Fifth Avenue in New York, New York.

h.     Based on my review of text messages obtained from Founder-2, I have learned, among other things, that on or about December 7, 2019, Founder-1 sent a text message to Founder-2 recalculating the total "Q3 investor cap (a)" from 2018 and 2019 to be $31,577,290.95.

## ACKERMAN Claims That Q3's Trading Balance Is Growing

9.     As noted in paragraph 5 above, MICHAEL ACKERMAN, the defendant, is reportedly the chief trading officer of Q3 and manages its trading algorithm.

10.     As detailed in paragraphs 11 below, I have learned, among other things, that in or about 2018 and 2019, ACKERMAN claimed to Founder-1 and Founder-2 that Q3's trading account at a cryptocurrency trading platform ("Platform-1") was increasing in value. As evidenced by the information detailed in paragraph 11 below, Founder- uses the information provided by Ackerman with respect to the trading balances available to Q3 to calculate the rate of return that Q3 investors were experiencing on their investments and to update investors about the health of the Q3 investment fund.

11.     Based on my review of text messages and other documents obtained from Founder-1, I have learned, among other things, that beginning at least in early or in or about October 2019, and continuing through at least as late as in or about December 2019, MICHAEL ACKERMAN, the defendant, sent screenshots of the available balance of a trading account on Platform-1 (the "Platform-1 Account") to Founder-1 and Founder-2. These text messages include but are not limited to the following:

a.    On or about October 6, 2018, ACKERMAN sent a text message to Founder-1 attaching a screenshot purporting to show a tradable balance of $ 8,784,202.934251 USD in an unidentified Platform-1 account. Although this screenshot excluded the portion of the screen that would identify the Platform-1 account number, I believe based on my review of later screenshots sent by ACKERMAN that the account particularly depicted in this screenshot is likely the Platform-1 account.

b.    On or about December 4, 2018, ACKERMAN sent a text message to Founder-2 attaching a screenshot purporting to show a tradable balance of $28,329,856.00078 USD in the Platform-1 Account.

c.    On or about January 1, 2019, ACKERMAN sent a text message to Founder-2 attaching a screenshot purporting to show a tradable balance of $35,040,573.707392 USD in the Platform-1 Account.    In the body of the text message, ACKERMAN wrote, in substance and in part: "35,040,573.707392."

d.    On or about May 27, 2019, ACKERMAN sent a text message to Founder-1 and Founder-2 stating: "CONGRATULATIONS TO YOU A FEW WEEKS OF SUCCESS!"  The text message also attached a screenshot that purported to show a tradable balance of $100,101,931.38479 USD in the Platform-1 Account.

e.    On or about September 1, 2019, ACKERMAN sent a text message to Founder-2 attaching a screenshot purporting to show a tradable balance of $131,930,351.03626 USD in the Platform-1 Account.

f.    On or about October 1, 2019, ACKERMAN sent a text message to Founder-2 attaching a screenshot purporting to show a tradable balance of $ 219,051,823.29963 USD in the Platform-1 Account.

g.    On or about October 8, 2019, Founder-1 sent a text message to ACKERMAN and Founder-2 attaching a document with the header "September 2019" and "Q3 Update," which is signed with Founder-1's initials and appears to be an update to QZ's investors. The document states, in substance and in part, "[W]e are unable to report an astounding September return of 57.27%, which is our best tally yet. . . . We remain steadfast and continue our efforts to emphasize the mantra of making a great deal of money for our small group rather than a small amount for the masses."

h.   On or about November 2, 2019, Founder-1 sent a text message to ACKERMAN and Founder-2 attaching what appears to be a copy of October 2019 update with investors, which was signed with Founder-1's initials. The document stated, in substance and in part, that "we… informed of year-to-date performance figures on a call… an individual previously described as … would need 14% QS Global performance … is 14.19%, that … to throw by 8%... Thank you all for your continued trust and faith in our strategy, … Happy Thanksgiving to all!!"

i.   On or about November 30, 2019, ACKERMAN provided Founder-… attaching a screenshot (the "November 30, 2019 Screenshot") purporting to show a tradable balance of $3,024,983.6041 USD in the Platform-1 Account.

j.   On or about December 1, 2019, ACKERMAN sent Founder-1 a text message with a screenshot (the "December 5, 2019 Screenshot") showing a balance of $4,171,951,262 USD in the Platform-1 Account.

### ACKERMAN Misrepresents the Fund Balance to QS Investors

9.   Based on my review of emails obtained from Founder-1, I have learned, among other facts, that:

a.   At approximately 2:25 p.m. on or about December 13, 2019, MICHAEL ACKERMAN, the defendant, sent an email to certain QS investors. In substance and in part, the email apologized for "endless delays the past month" and described a health issue that would cause ACKERMAN to "be spend not a crazy deal of time in New York aggressively pursuing" treatment. ACKERMAN further stated, in substance and in part, that "we have uncommitted trading activity for the month's late, on December and January… We are in the midst of revamp for our books and waiting on approval, then one of our legal Exchange's for a large scale renewal of funds."

b.   At approximately 2:54 p.m. on or about December 17, 2019, Founder-1 sent an email to QS investors stating:

As you may be aware, early last week Michael Ackerman was hospitalized. He was released from the hospital on Tuesday, December 5. [Founder-1] and I went to his home … this was … . We became concerned after speaking with his associate … "Ackerman is physical" … . We petitioned access to his computer and

discovered what appears to be a very large
discrepancy between the assets Michael had been
reporting to us and the balance in the trading
account we expected to hold the assets.
Michael assured us that the assets were moved
to a more secure account but he refused to
provide us access to that account. Last Friday
morning he sent a screen shot showing the
current amount of assets in a trading account.
We have been unable to verify the accuracy of
this screen shot. We are taking steps to
investigate the discrepancy and have alerted
the ADA off us in Miami, Florida. In addition,
we have directed Michael to cease all trading.
We will provide a further update when we have
more definitive information to report.

c.    At approximately 3:25 p.m. on or about December 16,
2019, Founder-1 sent an email to certain CO investors, stating:

We understand that Michael has advised various
investors that he has been attempting to get in
touch with [Founder-2] and me to facilitate the
return of investor funds. He has not in fact
made any attempts to contact us to facilitate
the return of funds. I did attempt to call
Michael today and text him on behalf of CO and
all its investors to discuss return of funds.
He has yet to reply to us. Based on what
Michael told us, the CO assets are maintained
in one or more blockchain accounts over which
Michael has exclusive control. When we asked
him two weeks ago to identify those accounts
and provide us access, he refused. That
interaction with Michael, is what caused us to
contact the SEC. There is nothing that
[Founder-2] or I can do right now to access
those accounts.

### ACKERMAN Falsifies Evidence of the Platform-1 Account Balance

3.    Based on my conversations with an employee at Platform-
1 ("Employee-1"), and my review of records obtained from Platform-
1, I have learned the following facts, among others:

a.    For the entire year of 2019, the maximum balance
that was reached in the Platform-1 account was approximately $5

million [...] — far less than the total in-state balance of approximately $31,577,000.00. The maximum balance in the Platform-1 Account was reached in or about August 2019.

g.   When Employee-1 reviewed the transfer activity from the Platform-1 Account, Employee-1 identified all of the accounts to which funds had been transferred from the Platform-1 Account. None of the accounts that received funds from the Platform-1 Account had become a variant of the other crypto [...]

h.   Employee-1 has reviewed copies of the December 30, 2019 screenshot and the December 6, 2019 screenshot, as well as other screenshots purportedly depicting the balance of the Platform-1 Account, and determined that these screenshots appear to have been altered. Specifically, Employee-1 identified certain indicators that the screenshots are not true images taken from a legitimate Platform-1 account page. For example, Employee-1 identified that the account balance show evenly or horizontally aligned [...] but instead is higher or lower than the resulting text; the available balance amount in the screenshot is preceded by a "$" symbol, which would not be presently visible in the transaction balance shown in the screenshot is carried out to four decimal places, when that amount should only be carried out to two decimal places.

### ACKERMAN Received from Q3 Lives or Trusts

14.   Based on my review of financial records obtained in the course of this investigation, I have learned, among other things, the following:

a.   Prior to about July 31, 2019, approximately $600,000 was wired from the Q3 Signature Bank account to a Chase Bank account held in the name of Michael Ackerman (the "Ackerman Chase Bank Account").

b.   On or about August 14, 2019, approximately $800,000 was wired from the Q3 Signature Bank Account to the Ackerman Chase Bank Account.

c.   On or about October 7, 2019, approximately $700,000 was wired from the Q3 Signature Bank Account to the Ackerman Chase Bank Account.

5

Q3 Investors Relied on ACKERMAN's False Representations About Q3

15. Based on my review of statements made by certain investors in Q3 (Investor-1 and Investor-2, respectively), I have learned, among other things, the following:

a. Q3 investors would receive monthly emails that contained [illegible] letter [illegible] from the Founders, as well as a statement of the Q3 trading [illegible]. Investors, including Investor-1 and Investor-2, also spoke regularly with the Founders, including JONATHAN ACKERMAN, the defendant, regarding Q3. ACKERMAN told investors, including Investor-1 and Investor-2, among other things, that Q3 had no more than 10% on any single cryptocurrency exchange in case there was a [illegible] of the exchange. ACKERMAN also stated that he could recoup a [illegible]% loss within two hours.

b. Based on the monthly email communications from the Founders, as well as ACKERMAN's direct communications, the investors were [illegible] to invest in the Q3 entities.

c. For example, Investor-1 made an initial investment of $[illegible] in or about May 2018. In or about September 2018, after having received monthly statements reflecting falsely inflated returns, Investor-1 invested an additional $200,000 into the Q3 entities through an investment vehicle.

d. Investor-2 initially invested $100,000 in the Q3 entities in or about May 2017. In or about September 2018, after having received representations regarding the falsely inflated returns, Investor-2 invested an additional $175,000 into the Q3 entities, and then invested another $25,000 into the Q3 entities in or about October 2018.

WHEREFORE, the deponent respectfully requests that a warrant be issued for the arrest of MICHAEL ACKERSON, the defendant, and that he be arrested and imprisoned or bailed, as the case may be.

_____

JOHN RODRIGUEZ
Special Agent
Homeland Security Investigations

Sworn to before me this
13th day of January, 2020

_____

THE HONORABLE KATHARINE H. PARKER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

10

EXHIBIT
P 4

# CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM



Q3 LLP a Delaware Limited Partnership
Aggregate Maximum Contributions: $12,000,000

---

Limited Interests   November 1, 2016

---

Q3 LLP, a Delaware Limited Partnership (the "Partnership"), is hereby offering to a limited class of investors its Limited Partnership Interests (the "Interests") for up to $15,000,000 in aggregate maximum contributions. The Partnership intends to utilize a proprietary cryptocurrency and asset trading methodologies and algorithmically enabled software to buy, sell, and trade via investments in cryptocurrencies as further described in this Memorandum. This offering is limited to those persons who are accredited investors, as defined under Regulation D ("Accredited Investors") of the Securities and Exchange Commission (the "SEC").

The Interests offered hereby involve a high degree of risk, see risk factors for a discussion of the risks in connection with purchasing the Interests. The purchase of the interests offered hereby should be considered only by persons of substantial financial means who can afford a non-liquid, high-risk investment. These are speculative securities. In addition, the partnership is expressly relying on the purchaser of the common interests abiding by any and all securities laws as they may apply to its investors, including not limited to the United States Securities Act of 1933.

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or passed upon the adequacy or accuracy of this memorandum.

i

<u>Right of Rescission</u>

An investor who purchases the Interests hereunder shall have, subject as provided below, a right of action, exercisable on written notice given not more than forty-five (45) days subsequent to the date of investment on which payment was made for the Interests, for rescission against the partnership; provided that:

(a)   the partnership nor the GP (and or its employees, members, directors, or GPs) will be held liable under this section for securities fraud or misrepresentations in connection with any solicitation or offer to invest made by the GP (and or its employees, members, directors, or GPs); prior to the date of this memorandum if the investor chooses not to exercise this foregoing right of rescission;

(b)   in no case will the amount recoverable under this section exceed the price at which the interests were sold to an investor.

**IMPORTANT NOTICES**

You are urged to read this memorandum carefully.  This memorandum is not all-inclusive and does not contain all the information that you may desire in investigating QG II LP. You must conduct and rely on your own evaluation of us and the terms of this offering, including the merits and risks involved in making a decision to buy or acquire Interests. We will make available to you, prior to the sale of Interests described in this memorandum, the opportunity to ask questions of, and receive answers from, our management concerning the terms and conditions of this offering and to obtain any additional information (including information made available to other investors), to the extent we possess it or can acquire it without unreasonable effort or expense, which may be necessary to verify the accuracy of the information in this memorandum. We may require you to sign a confidentiality agreement if you wish to receive additional information that we deem to be proprietary.  You may mail questions, inquiries and requests for information to:

QG II LP
1044 Carolina Circle NE
St. Petersburg FL 33703
XXX.XXX.XXXX

You and your representatives, if any, will be asked to acknowledge in the Subscription Agreement that you were given the opportunity to obtain additional information and that you did so or elected to waive the opportunity.

No representations or warranties of any kind are intended nor should any be inferred with respect to the economic viability of this investment or with respect to any benefits, which may accrue to an investment in our equity interests. We and our managing members, directors, officers and employees, do not in any way represent, guarantee or warrant an economic gain or profit with regard to our business or that favorable income tax consequences will flow therefrom.  We do not in any way represent or warrant the advisability of buying our Interests. Any projections or other forward-looking statements or opinions contained in this

memorandum constitute estimates by us based upon sources deemed to be reliable, but the accuracy of this information is not guaranteed, nor should you consider the information all-inclusive.

You should not consider the contents of this memorandum as legal, business or tax advice. Prior to making a decision to buy our interests, you should carefully review each and all of this memorandum and should consult your own attorneys, business advisors and tax advisors as to legal, business and tax related matters concerning this offering.

### Restrictions on Use of Memorandum

This memorandum is for review by the recipient only. The recipient, by accepting delivery of this memorandum, agrees to return this memorandum, all related or attached documents and all other documents, if any, provided in connection with the offering to Q3 I LP if the recipient does not undertake to purchase any of the securities offered hereby. This memorandum is furnished for the sole use of the recipient, and for the sole purpose of providing information regarding the offer and sale of our equity interests. We have not authorized any other use of this information. Any distribution of this memorandum to a person other than representatives of the person or entity named on the cover page is unauthorized, and any reproduction of this memorandum or the divulgence of any of its contents, without our prior written consent is prohibited. The delivery of this memorandum or other information does not imply that the memorandum or other information is correct as of any time subsequent to the date appearing on the cover of this memorandum.

### Exclusive Nature of Confidential Private Placement Memorandum

The delivery of this memorandum does not constitute an offer in any jurisdiction to any person to whom such offer would be unlawful in such jurisdiction. You should rely only on the information contained in this memorandum. The information contained in this memorandum supersedes any other information provided to potential investors. We have not authorized any person to provide any information or to make any representations except to the extent contained in this memorandum. If any such representations are given or made, such information and representations must not be relied upon as having been authorized by Q3 I LP. This memorandum is not an offer to sell, nor is it seeking an offer to buy, securities in any state where the offer or sale is not permitted. The information in this memorandum is accurate as of the date on the front cover, but the information may have changed since that date.

### Restricted Securities

The interests offered hereby in this offering memorandum have not been registered with or approved by the United States Securities and Exchange Commission, nor have such interests or this memorandum been filed with or reviewed by the attorney general of any state or the securities regulatory authority of any state. This offering is based on the exemption from such registration as set forth in 4(2) and rule 506(b) of Regulation D of the Securities Act of 1933, as amended.

The investment described in this memorandum involves risks and is offered only to individuals who can afford to assume such risk for an indefinite period of time and who agree to purchase the interests only for investment purposes and not with a view toward the transfer, resale, exchange or further distribution thereof. There will be no public market for the interests issued pursuant to this offering memorandum.

Federal and state securities laws limit the resale of the interests and it is therefore recommended that each potential investor seek counsel should they obtain more information.

The price of the interests as described in this offering memorandum has been arbitrarily determined by the sponsors of this investment, and each prospective investor should make an independent evaluation of the fairness of such price under all the circumstances as described in the attached offering memorandum.

*No person is authorized to give any information or make any representation in connection with this memorandum, except such information as is contained or referenced in this memorandum. Only information or representation contained or referenced in or relied upon may be relied upon as having been made by the company. Prospective investors who have questions concerning the terms and conditions of this private offering memorandum or who desire additional information or documentation to verify the information contained herein should contact the company. Projections or forecasts contained in this private offering memorandum or otherwise, must be viewed only as estimates. Although any projections contained herein are expressed in good faith assumptions, and in their company believes to be reasonable, the actual performance of the company may depend upon future beyond the control of the company. No assurance can be given that the company's actual performance will match its intended results.*

### Forward-Looking Statements

Certain statements in this memorandum constitute "forward looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. All statements that address expectations or projections about the future, including statements about our development, market position, expected expenditures and financial results, are forward-looking statements.

Some of the forward-looking statements may be identified by words like "expects," "anticipates," "plans," "intends," "believes," "projects," "indicates," or similar expressions. Any statements contained herein that are not statements of historical fact may be deemed to be forward-looking statements. These statements are not guarantees of future performance and involve a number of risks, uncertainties and assumptions. Accordingly, actual results or performance of QSI LLP may differ significantly, positively or negatively, from forward looking statements made herein. Unanticipated events and circumstances are likely to occur. Factors that might cause such differences include but are not limited to those discussed under the heading "Risk Factors" which investors should carefully consider. These factors include, but are not limited to, risks that our products and services do not receive the level of market acceptance anticipated; anticipated funding may prove to be unavailable; intense competition in our market may rise; lower than anticipated revenues or higher than anticipated costs and general economic conditions, such as the rate of employment, inflation, interest rates and the condition of the capital markets may change in a way that is not favorable to us. This list of factors is not exhaustive. We undertake no obligation to update any forward looking statements.

v

Table of Contents

1.   Executive Summary ................................................................................ 6
2.   Summary of the Offering ...........................................**Error! Bookmark not defined.**
3.   Partner Revolution ................................................................... 15
4.   Management Dies ...........................................................**Error! Bookmark not defined.**
5.   Risk Factors ........................................................................ 16
6.   Conflict of Interest ............................................................ 32
7.   Valuation of Investments ..................................................... 33
8.   Exchange and Currency ........................   ............................ 34
9.   Qualifications of Investors.......................................**Error! Bookmark not defined.**
10.  Federal Tax Aspects............................................................ 38
11.  ERISA Considerations   ............................................... 44
12.  Restrictions on Transfer of Interests................................ 46
13.  Additional Information   ......   ........ ................................ 46

EXHIBIT A - Q3 I LP Subscription Agreement

EXHIBIT B - Q3 I LP Limited Partnership Agreement

v

## 1. Executive Summary

### Pooled Investment Vehicle Using GP's Proprietary Technology and Trading Skillset

QS Holdings LLC (the "GP") which acts as the general partner of the Partnership, was founded in 2016 (formally organized as a limited liability company in 2018) in order to identify and trade various crypto currencies and digital assets through in-house developed proprietary high velocity trading software in a methodically risk mitigating fashion, leveraging high velocity exits, diversified trading, and multiple data sets.

The GP is comprised of an experienced crypto trading management group comprised of individuals with long-standing financial and fin-tech technologies backgrounds — including over three decades of combined experience in fin-tech, software development, and financial markets, as well leveraging algorithmic financial trading solutions to deliver risk adjusted returns (see *Management Bios*)

Over the course of the prior approximately 24 months the GP's personnel have successfully traded various crypto currencies through various crypto exchanges using proprietary algorithmically driven software for other pooled investment groups. Expanding on its prior success, the GP has decided to establish the Partnership as an additional pooled investment vehicle, leveraging its successful algorithmic trading solutions. The GP's intention is for each pooled investment vehicle, such as this one, to aggregate investor funds in a controlled and risk mitigating fashion, while providing each pooled group investor access to the algorithmic trading solution.

*Investment Philosophy.* The current crypto and digital asset market environment creates manifold opportunities for high velocity, algorithmically enabled trades. The GP intends to pursue a targeted range of trades with the following outcomes:

- *Risk Mitigation* – Central to each trade by the GP is a focus on achieving above-average overall returns while protecting downside

- *Diversified and Short-Term Holdings* – This approach features diversified trades to exist on the market to mitigate the threat of high market volatility, as well as taking up a highly diversified set of crypto coins to further mitigate the impact of volatility

- *Human Oversight* – the Manager is constantly recalibrating and updating the software assuring there is human oversight and analysis of data and market movements

### Proprietary Algorithmic Trading Software

The Partnership will leverage a nonexclusive license from the GP to a proprietary algorithmic trading solution focused on crypto currencies and a unique battery of informational data points in a fashion where pursuant using a algorithmic high frequency high risk mitigation basis (the "Algo Trading Software"). The Algo Trading Software is proprietary and exclusively managed and licensed by and through the GP and we believe that coupled with the GP's experience in managing, overseeing, and implementing the Algo Trading software, the Partnership can achieve significant profits (though such outcome is not guaranteed, see Risk Factors)

### Effective Use of Multiple Data Sets

h

The Algo Trading Software employs what we have dubbed a "correlated capital infrastructure." It employs a robust set of data and real time multi-source indicators which include a combination of pivot points, historical data, open book valuations, depth of book, velocity of movement, pace of secondary crypto currency exchange entry/exit points, relative percent of volume and several proprietary, mathematical correlations that define what we believe to be an ideal loss ratio for the applicable trade cycle. Accordingly, we believe this enables us to reasonably gauge and quantify our expected maximum loss with every trade cycle as that would typically also mitigate risk by cost averaging aggregate credit to offset such losses.

## Algorithmic Focus on Shorter, More Effective Time Cycles

The Algo Trading Software has been adapted to the unique lifecycle of crypto currencies, which we believe is not as closely aligned to broader market conditions, trends or otherwise for the total time of analyses associated with equities trading. Accordingly, our licensed Algo Trading Software is agnostic to market conditions, short or elongated cycles and doesn't keep tuned longer. Moreover, the Algo Trading Software does not unnecessarily align itself with "long" or "short" positions. Each crypto currency traded by and through the Algo Trading Software is rental as a distinct tactical engagement and all are monitored by the GP, through, which has significant experience leveraging the Algo Trading Software. The GP is anticipated to utilize the Algo Trading Software's "dashboard" to allocate, score, manage and organize all capital inflows and outflows in real time, as each position is originated and finalized. In addition, the Algo Trading Software real time programming via a preference describing. This real-time calibration will not disrupt current trades or strategies in progress. In addition, the Algo Trading Software can be "paused" and updated by the GP to address unusual volatility in the crypto currency markets and/or improve its performance relative to changing conditions.

7

## 2.  Summary of the Offering

| | |
|---|---|
| **PARTNERSHIP:** | The Partnership was organized as a Delaware limited partnership in November 1, 2011 to operate as a private investment partnership under the name of QI LP. |
| **GENERAL PARTNER:** | The GP of the Partnership is QI HOLDINGS, LLC, a Delaware limited liability company. Under the Partnership Agreement, the GP is generally responsible for the management of the Partnership. |
| **ELIGIBLE INVESTORS:** | Interests in the Partnership are being offered under the Reg D exemption of the Investment Partnership Act for investment by up to 100 persons who are "accredited investors" as defined in Rule 501(a) of Regulation D under the Securities Act and who have sufficient knowledge and experience in financial and business matters to make them capable of evaluating the merits and risks of an investment in the Partnership. The GP intends to solicit and advertise interests in the Partnership to the prospective under Section 506(c) of Regulation D of the Securities Act. All Limited Partners will be required to verify their status as accredited investors through the provision of tax years of investments, brokerage or bank statements, confirmation by certain third parties, or certain other methods deemed acceptable by the GP. |
| | The Interests will not be registered under the Securities Act or the securities laws of any state of any other jurisdiction, nor is any such registration contemplated. |
| | An investment in the Partnership will be suitable only for investors who can bear the economic risk of the investment. Investors will be required to make representations to the foregoing effect in the Partnership subscription documentation and otherwise. |
| | Rule 506(d) of Regulation D of the Securities Act provides for disqualification of a Rule 506 offering. Any of the principals of the GP, or in the event 20 percent or more of the Partnership's interests are owned by a Limited Partner involved in a "disqualifying event" in connection with the sale of securities, a disciplinary sanction within the securities industry or with the SEC (a "Bad Actor Event"). A prospective investor subject to a Bad Actor Event may be denied admittance to the Partnership in the GP's sole discretion. An existing Limited Partner may inform the GP it estimates specifically subject to a Bad Actor Event, the GP may remove such Limited Partner in its sole discretion. |
| | See "Investor Qualification" below for specific Limited Partner eligibility requirements. |
| **THE OFFERING:** | There is no minimum aggregate dollar amount of capital contributions the Partnership must accept to commence operations. The maximum dollar amount of capital contributions the Partnership may accept is fifteen million dollars ($15,000,000). |
| | Capital contributions may be made in cash by means of a wire transfer or electronic fund transfer or, in the sole discretion of the GP, an In Kind contribution at the time of subscription. |
| **INITIAL CAPITAL CONTRIBUTION:** | The minimum initial capital contribution by an investor to the Partnership is $50,000, subject to the GP's sole discretion to accept subscriptions for lesser amounts. The GP may, in its sole discretion, elect to temporarily or permanently suspend the offering of Interests. The GP may, in its sole discretion, reject any subscription request for any reason or no reason. |

8

CAPITAL ACCOUNT: The Partnership will establish and maintain on its books a capital account ("Capital Account") for each limited partner (each, a "Limited Partner," and collectively with the GP, the "Partners") into which capital contributions will be credited and in which certain other transactions will be reflected. At the beginning of each accounting period, an allocation percentage (the "Allocative Percentage") will be determined for each Partner by dividing such Partner's Capital Account balance as of the beginning of each period by the aggregate Capital Account balances of all Partners as of the beginning of such period.

ADDITIONAL
CAPITAL
CONTRIBUTIONS: Existing Limited Partners may make additional capital contributions in amounts of not less than $50,000, with the consent of the GP and subject to its sole and absolute discretion to accept lesser amounts, as of the first business day of any calendar month or at any other time the GP chooses to accept such initial or additional contributions. The GP may, in its sole discretion, elect to temporarily or permanently suspend the ability of investors to invest their capital in the Partnership.

EXCHANGES AND
CUSTODY: The Partnership will utilize multiple online digital exchanges, whether primarily domiciled in the U.S. or abroad ("Exchanges") to buy and sell Digital Assets only accessing the Partnership's accounts on those Exchanges through multiple layers of authentication. When not being actively traded, the GP intends to generally hold Digital Assets in cold storage, in hardware or software wallets utilizing two or multi-factor authentication and otherwise follow industry best practices with regard to security procedures. The GP is responsible for taking such steps as it determines, in its sole judgment, to secure these keys and mitigate the risk that they are exposed to hacking, malware and general security threats.

Notwithstanding the foregoing, absent gross negligence, fraud or other criminal behavior, the GP shall not be liable to the Partnership or investors for the failure or penetration of the security system of an Exchange. To the extent that the security system of an Exchange is penetrated, any loss of the Partnership's private keys could result in a total loss of capital.

PERFORMANCE
ALLOCATIONS: At the end of each accounting period of the Partnership, any net capital appreciation or depreciation is allocated to the Capital Accounts of all Partners in proportion to their respective Allocative Percentages for such period. For this purpose, each accounting period shall end at the close of each calendar month, on any occurrence a Partner makes an additional capital contribution or effects a withdrawal, and at such other times as the GP may determine. Net capital, appreciation and depreciation are determined on an accrual basis of accounting in accordance with GAAP and are deemed to include Partnership expenses.

In addition, the GP shall receive a monthly performance-based allocation (the "Performance Allocation") equal to fifty percent (50%) of the net capital appreciation allocated to each Limited Partner during each calendar month (the "Performance Allocation Period"), provided that such Performance Allocation shall be subject to a loss carry-forward provision, also known as a "High Water Mark," so that the Performance Allocation will only be deducted from a Limited Partner's Capital Account to the extent that the Limited Partner's pro rata share of such appreciation causes its Capital Account balance, measured on a cumulative basis and net of any losses, to exceed such Limited Partner's highest historic capital account balance as of the end of any prior calendar month or, if higher, such Limited Partner's Capital Account balance immediately following its admission to the Partnership (as adjusted

EXPENSES:

The GP may establish reserves for expenses, liabilities or contingencies (including those not accruable to) ... generally accepted accounting principles ("GAAP")) which could reduce the amount of a distribution upon withdrawal (a "Reserve Withholding"). Any such Reserve Withholding, if any, when reversed, shall be allocated among the Capital Accounts of Partners pro rata over the Partners during the period when such Reserve Withholding was in place and distributed pro rata to any Partner who withdrew capital at the time such Reserve Withholding was in place.

At the discretion of the GP, any withdrawal by a Limited Partner may be subject to a charge as the GP may reasonably require in order to defray the costs and expenses of the Partnership in connection with such withdrawal, including, without limitation, any charges or fees imposed by any Partnership investment in connection with a corresponding withdrawal or redemption by the Partnership from such investment or any other costs associated with the sale of any of the Partnership's portfolio investments.

Organizational Expenses. All expenses of the formation and organization of the Partnership (including legal and other expenses ("Organizational Expenses")) will be paid by the Partnership and/or reimbursed by the Partnership to the extent paid by the GP or the GP. The Organizational Expenses will be amortized and charged to the Partners' Capital Accounts on a monthly basis over a period of five (5) years commencing from the launch of the Partnership's investment activities. GAAP requires that organizational costs be treated as an expense when incurred. The GP believes that the focus on the Partnership's results from this departure from GAAP will result in a fairer quantification of such expenses among Limited Partners. This departure from GAAP may also result in a qualified audit opinion from the Partnership's auditor. If the Partnership is terminated within five (5) years of the commencement of its investment activities, any unamortized expenses will be paid by the GP.

Partnership Expenses. The Partnership shall pay all of its ordinary operating costs and expenses, including, administration expenses, and any indivisible share of costs and expenses of the Partnership, listed below:

The Partnership shall pay for, or reimburse the GP or the GP for, all ordinary and reasonable operating and other expenses, including, but not limited to, investment-related expenses (e.g., exchange and brokerage commissions, exchange deposit and withdrawal fees, clearing and settlement charges, custodial fees, interest expenses, expenses relating to consultants, broker-consultant and other cleared-level advisory and research advisory or due diligence services with regard to investments, software licensing fees and expenses, appraisal fees and expenses); record-access and expenses (including fees for news services, quotations and similar information and pricing services, data expenses related to computer software and/or hardware including the expenses related to network access, operations, legal expenses (including, without limitation, the costs of retaining legal counsel and services, license filings and all costs and expenses related to or incurred in connection with the GP's compliance obligations under applicable federal and/or state securities and investment advisory laws arising out of or related to the Partnership, as well as extraordinary legal expense, such as those related to litigation or regulatory investigations or proceedings); accounting fees and audit expenses; administrative fees; tax preparation expenses and any applicable tax liabilities resulting from tax determinations of withholdings on effecting investments charges or fees imposed by the Partnership's trusts and officers and/or owners and employees liability insurance premiums or fiduciary liability insurance premiums for directors,

officers and personnel of the GP, costs of printing and mailing reports and notices and other similar expenses related to the Partnership, as the GP determines in its sole discretion.

<u>GP and GP's Expenses</u>. The GP and the GP will pay for their own administrative and overhead expenses incurred in connection with providing services to the Partnership and Partnership. These expenses include all expenses incurred by the GP and the GP in providing for their normal operating overhead, including, but not limited to, the cost of providing relevant support and administrative services (e.g., employee compensation and benefits, rent, office equipment, insurance, utilities, telephone, secretarial and bookkeeping services, etc.), but not including any Partnership nor Partnership operating expenses described above. Actual realized fees and expenses of the GP, as well as any employment or licensing contracts, can be reviewed at the investors request.

**LEVERAGE:**   While the GP generally does not intend to utilize leverage as part of the Partnership's investment program, the Partnership may, at the GP's sole discretion, borrow cash on margin or otherwise seek to increase the amount of capital available for investment purposes or enter into derivative transactions that have the effect of increasing its positions. The use of leverage would have a material impact on the Partnership's performance, as well as its risk of loss, as further described under "RISK FACTORS". The Partnership may participate in Digital Asset lending programs offered by exchanges or investors seeking to short such Digital Assets. Interest will accrue to the Partnership until such Digital Assets are replaced.

**SIDE LETTERS:**   The GP may enter into agreements with certain Limited Partners that will result in terms that are different with respect to their investment in the Partnership than the terms applicable to other Limited Partners. As a result of such agreements, certain Limited Partners may receive additional benefits which other Limited Partners will not receive. The GP is not required to notify other Limited Partners of any such agreement or any of the rights and/or terms or provisions thereof, nor will the GP be required to offer such additional and/or different terms or rights to any other Limited Partner. The GP may enter into any such agreement with a Limited Partner in its sole discretion.

**RISK FACTORS:**   In general, investment in Interests involves numerous and substantial risks, including, but not limited to, the risks inherent in the unique nature of Digital Assets such as the Partnership's vulnerability to hacks and theft, the unregulated nature of Digital Assets, risks related to the limited transferability of a Limited Partner's interest in the Partnership, the lack of an operating history of the Partnership, the Partnership's dependence upon the GP and the GP, certain tax risks, and a variety of other risks outlined herein and relationships in certain potential conflicts of interest with Affiliates of the GP including transactions between the Partnership and Affiliates (See "RISK FACTORS" and "Conflicts of Interest").

**NET ASSET VALUE:**   The Net Asset Value of the Partnership ("Net Asset Value") will be determined as is required by the Partnership Agreement or as may be determined by the GP, but in any case no less than monthly. Each Partner's share of the Net Asset Value is determined by multiplying the total value of the Partnership's investments and other assets less any Liabilities, by the Partner's Allocation Percentage. (See "Valuation of Investments").

**RESTRICTIONS ON TRANSFER:**   A Limited Partner may not pledge, assign, sell, exchange or transfer its Interest (or any portion thereof), and no assignee, purchaser, or transferee may be admitted as a substitute Limited Partner, except with the consent of the GP, which consent may be given or withheld in its sole and absolute discretion.

FISCAL YEAR:   The Partnership's fiscal year shall end on December 31.

REPORTS:   The GP will furnish financial statements to all Limited Partners within ninety (90) days, and as soon thereafter as is reasonably practicable, following the conclusion of each fiscal year. At the GP's sole discretion, financial statements will include a balance sheet or statement of financial condition, an income statement or statement of operations and a cash flow statement. In addition, all Limited Partners will receive the information necessary to prepare federal and state income tax returns following the conclusion of each Fiscal Year as soon thereafter as is reasonably practical.

All Limited Partners may also receive unaudited performance reports on a monthly basis, including the net value of each investor's capital account and the value of all fees and expenses deducted from such investor's capital account in such form as the GP may determine. With regard to these reports, the GP is not required to provide information about specific investment transactions of the Partnership.

TERM:   The Partnership shall continue until the earlier of (i) the termination, bankruptcy, insolvency or dissolution of the GP, (ii) the complete withdrawal of the GP from the Partnership, unless a successor general partner is appointed, (iii) sale or disposal of patient diversification, (iv) a determination by the GP that the Partnership should be dissolved, or (v) in the event of an adjudication in a final nonappealable decision on the merits of a court of competent jurisdiction that the Principals are physically or mentally incapable of making decisions on behalf of the GP.

AMENDMENT OF THE PARTNERSHIP AGREEMENT:   The Partnership Agreement provides that the GP has the right to amend the Partnership Agreement to, among other things, correct any ambiguous, alter or omission provision, or in otherwise amend the Partnership Agreement; provided that no such amendment shall adversely affect the rights, privileges, and powers of the Limited Partners as a group, unless agreed to by the holders of a majority of Allocation Percentages held by Limited Partners. Notwithstanding the foregoing, the GP may amend the Partnership Agreement to conform to applicable laws and regulations without the approval of the Limited Partners. The GP shall provide Limited Partners with at least 15 days notice of any amendment to the Partnership Agreement to comply with applicable law. The GP is authorized on its own motion to initiate proceedings or authorize of a proposed amendment to the Partnership Agreement. Investors should note that Limited Partners have no voting rights except in very limited and specific instances.

LEGAL COUNSEL:   If is via Wilmer LLP acts as legal counsel to the GP and the Partnership in connection with the organization of the Partnership, the offering of Interests and other ongoing matters and does not represent Limited Partners in any capacity.

ADMINISTRATOR:   The Partnership's administrative services will be provided by an administrator to be engaged by the GP in the near future. The GP reserves the right to use other such administrators' firms for the Partnership's administration services.

SUBSCRIPTION PROCEDURE:   Persons interested in subscribing for Interests will be furnished and will be required to complete and return to the GP and Administrator, subscription documents.

3. Partner Rescission

An investor who purchases the interests hereunder shall have, subject as provided below, a right of action, exercisable on written notice given not more than forty-five (45) days subsequent to the date of investment on which payment was made for the interests, for rescission against the partnership, provided that:

The partnership nor the GP and/or its employees, members, directors, or GPS) will be held liable under this section for securities fraud or misrepresentations in connection with any solicitation or offer of investment made by the GP and/or its employees, members, directors, or GPS) prior to the date of this transaction of the investor elects not to exercise the foregoing right of rescission;

In no case will the amount recoverable under this section exceed the price at which the interests were sold to an investor,

4. Management Bios

The GP is led by an experienced operational team consisting of Michael W. Ackerman, James A. Seijas, and Quan Dinh Tran MD - who have significant knowledge and experience in the crypto currency trading arena. Our retention processes ensure risk management foundation which underpins our decision making process.

<u>Michael W. Ackerman – GP</u>

For approximately 26 years Michael Ackerman has been directly involved in securities, equities trading, and trading software development and implementation at a variety of leading global financial companies and banks, including UBS Securities. For 16 years he was an Nasdaq institutional broker. Moreover, he independently owned and operated a trading group under Portis Clearing Americas (formerly CIC Securities & Associates). He has a BA in Economics and Finance from Manhattanville College and has significant experience with trading specific software development context such as C---, JavaScript, and SQL. Currently, he has spent a significant portion of his career developing, implementing, and maintaining high velocity trading solutions for a variety of large trading operations. For example, he developed and implemented High Frequency trading models for clients specifically leveraging algorithmic strategies at TradeStation Securities Prime Services Group. Hence, we believe that his unique understanding of software development, also his the implementation of trading strategies and risk management makes him a critical member of our management team (especially given the GPS proprietary Algo Trading Software).

Currently, he serves as Director of International Business Development at PDA Laboratories.

<u>James A. Seijas – GP</u>

For approximately 30 years James A. Seijas has been directly involved in securities, equities trading, and client wealth management services in a variety of leading global financial companies and banks, including Wells Fargo, Barclays, and Bank of America. He has a BA in Economics and Finance from Drew University, and holds a variety of securities licenses and other licenses, including but not limited to NASD Registered Series 4,7,55,63/66, as well as NJ, NY, PA, FL & Life Insurance Producer Licenses. We believe that his unique and long-term understanding of equities markets, wealth management, risk management, and growth strategies, makes him a valuable member of our management team, providing us insight and strategy that has high value in the crypto currency space. Moreover, as a result of his tenure at

Bank of America as the NYSE floor trading captain, he has significant experience with high stress, high velocity trading and was responsible for managing risk in excess of $20 million a day. While there, he implemented and refined new trading algorithms which increase profitability and contributed to a 50% increase in market share.

### Quan Dinh Tran, MD FACS – GP

Quan Dinh Tran is a Board certified general surgeon and has been practicing medicine for over 12 years, including having served as a Fellow of American College of Surgeons (FACS). He graduated medical school from the University of Alabama in Birmingham 2001 while performing his residency at Ochsner clinic in New Orleans and completed his residency in 2006. He is currently employed by Bayonet Medical Group in Tampa, FL since 2012 as a general surgeon. Prior to this, he owned his own private practice, Tri-cities Surgical Associates from 2006-2012.

## 5. Risk Factors and Certain Investment Considerations

AN INVESTMENT IN THE PARTNERSHIP INVOLVES A NUMBER OF SIGNIFICANT RISKS. THE RISK FACTORS SET FORTH BELOW ARE THOSE THAT, AT THE DATE OF THIS MEMORANDUM, THE GP DEEMS TO BE THE MOST SIGNIFICANT. THE FOLLOWING IS NOT INTENDED TO BE A COMPLETE DESCRIPTION OR AN EXHAUSTIVE LIST OF RISKS. OTHER FACTORS ULTIMATELY MAY AFFECT AN INVESTMENT IN THE PARTNERSHIP IN A MANNER AND TO A DEGREE NOT NOW FORESEEN. PROSPECTIVE INVESTORS SHOULD CAREFULLY CONSIDER, IN ADDITION TO THE MATTERS SET FORTH ELSEWHERE IN THIS MEMORANDUM, THE FACTORS DISCUSSED BELOW. AN INVESTMENT IN THE PARTNERSHIP SHOULD FORM ONLY A PART OF A COMPLETE INVESTMENT PROGRAM, AND AN INVESTOR MUST BE ABLE TO BEAR THE LOSS OF ITS ENTIRE INVESTMENT. PROSPECTIVE INVESTORS SHOULD ALSO CONSULT WITH THEIR OWN FINANCIAL, TAX AND LEGAL GP REGARDING THE SUITABILITY OF THIS INVESTMENT.

### Cryptocurrencies and Bitcoin Generally

Digital and cryptocurrencies and other crypto-assets are fast-evolving, relatively new technology. The methods whereby each Digital Asset is created, retained, stored and used, may differ from one Digital Asset to another. A general overview of the technology on which bitcoin, the newest and most widely used Digital Asset, is based are set forth below. Other Digital Assets may contain similar (or different) risks and vulnerabilities.

Bitcoin is a decentralized digital currency that enables instant transfers to anyone, anywhere in the world. Managing the functions in bitcoin occurs via an open source, cryptographic protocol (bitcoin) known as the Bitcoin Network, which uses peer-to-peer technology to operate with no central authority. The Bitcoin Network is an online, end-to-end peer network that uses the public transaction ledger, known as the Bitcoin Blockchain, and the source code that comprises the basis for the cryptographic and algorithmic protocols governing the Bitcoin Network. No single entity owns or operates the Bitcoin Network, the infrastructure of which is collectively maintained by a decentralized user base. As the Bitcoin Network is decentralized, it does not rely on either governmental authorities or financial institutions to create, transmit or determine the value of bitcoins. Rather, the value of bitcoins is determined by the supply of and demand

for bitcoins. Bitcoins can be used to pay for goods and services or can be converted to Fiat currencies, such as the USD, at rates determined by the Bitcoin Exchanges.

To prevent the possibility of double-spending a single bitcoin, each transaction is recorded, time-stamped and publicly displayed in a "block" in the publicly available Bitcoin Blockchain. Thus, the Bitcoin Network provides this "transaction against double-spending" by memorializing every transaction in the Bitcoin Blockchain, which is publicly accessible and downloaded in part or in whole by many Bitcoin Network users' software programs.

Prior to engaging in bitcoin transactions, a user must first obtain a digital bitcoin "wallet" (analogous to a bitcoin account) in which to store bitcoins. A "wallet" is an open source software program that generates bitcoin addresses and enables users to engage in the transfer of bitcoins with other users. A user may install a bitcoin software program on its computer or mobile device that will generate a bitcoin wallet or, alternatively, a user may retain a third party to create a digital wallet to be used for the same purpose. There is no limit on the number of digital wallets a user can have, and each such wallet includes one or more unique addresses and a verification system for each address consisting of a "public key" and a "private key," which are mathematically related.

The process by which bitcoins are created and bitcoin transactions are verified is called mining. To begin mining, a user, or "miner," runs a special software mining client, which, like regular Bitcoin Network software programs, turns the user's computer into a "node" on the Bitcoin Network that validates blocks. Sets of bitcoin transactions are combined in new blocks that need to be added to the Bitcoin Blockchain. Miners, through the use of the bitcoin software program, engage in a set of prescribed complex mathematical calculations in order to add a block to the Bitcoin Blockchain and thereby confirm bitcoin transactions included in that block's data. A miner who was the first to complete the calculation is able to add a new block to the Bitcoin Blockchain and is rewarded with newly issued bitcoins. A miner who was the first to complete the calculations adds a new block to the Bitcoin Blockchain and is rewarded with newly issued bitcoins.

Bitcoin is an open source project with no official developer or group of developers that controls the Bitcoin Network. However, the Bitcoin Network's development is overseen by a core group of developers who are able to access and contribute to the Bitcoin Network source code and, as a result, they are responsible for quasi-official releases of updates and other changes to the Bitcoin Network's source code. The release of updates to the Bitcoin Network's source code does not guarantee that the updates will be automatically adopted. Users and miners must accept any changes made to the bitcoin source code by downloading the proposed modification to the Bitcoin Network's source code. A modification of the Bitcoin Network's source code is only effective with respect to the bitcoin users and miners that download it. If a modification is accepted only by a percentage of users and miners, a division in the Bitcoin Network will occur such that one network will run the pre-modification source code and the other network will run the modified source code; such a division is known as a "fork" in the Bitcoin Network.

## Risks Relating to Digital Assets

<u>Development and Acceptance of Digital Assets:</u> As a relatively new product and technology, Digital Assets are not yet widely adopted as a means of payment for goods and services. Banks and other established financial institutions may refuse to process funds for Digital Asset transactions, process wire transfers to or from Digital Asset exchanges, Digital Asset-related companies or service providers, or maintain accounts for persons or entities transacting in Digital Assets. Market capitalization for Digital Assets as a medium of exchange and payment method may always be low. Further, a Digital Asset's use as an international currency may be hindered by the fact that it may not be considered as a legitimate means of payment or legal tender in some jurisdictions. Trading speculators and investors seeking to profit from either short-up

long-term holding of Digital Assets drive much of the demand for it, and competitive products may develop which compete for market share. Further, certain virtual currencies or payment systems may be the subject of a U.S. or foreign patent application (e.g., JP Morgan Chase Bank's patent application for "All Chat" with the United States Patent & Trademark Office), successfully patented, or, alternatively, modified if Digital Asset network source codes and protocols may be patented or owned or controlled by a public or private entity. The Partnership could be adversely impacted if Digital Assets fail to expand into retail and commercial markets.

Development and Acceptance of the Digital Asset Networks: The growth and use of virtual currencies generally is subject to a high degree of uncertainty. Indeed, the future of the industry likely depends on several factors, including, but not limited to: (a) commerce and regulatory conditions relating to both fiat currencies and virtual currencies; (b) government regulation of the use of and access to virtual currencies; (c) government regulation of virtual currency service providers, administrators or exchanges; and (d) the domestic and global market demand for—and availability of—other forms of virtual currency or payment methods. Any slowing or stopping of the development or acceptance of Digital Assets or a Digital Asset network may adversely affect an investment in the Partnership.

Price Volatility: A principal risk in trading Digital Assets is the rapid fluctuation of their market price. High price volatility undermines Digital Assets' role as a medium of exchange as retailers are much less likely to accept them as a form of payment. The value of a Member's Capital Account balance relates directly to the value of the Digital Assets held in the Partnership and fluctuations in the price of Digital Assets could adversely affect the net asset value of the Partnership and a Member's Capital Account. There is no guarantee that the Partnership will be able to achieve a better than average market price for Digital Assets or will purchase Digital Assets at the most favorable prices available. The price of Digital Assets achieved by the Partnership may be affected generally by a wide variety of complex and difficult to predict factors such as Digital Asset supply and demand; rewards and transaction fees for the recording of transactions on the blockchain; availability and access to virtual currency service providers (such as payment processors), exchanges, miners or other Digital Asset users and market participants; perceived or actual Digital Asset network or Digital Asset security vulnerability; inflation levels; fiscal policy; interest rates; and political, natural and economic events.

To the extent the public demand for Digital Assets were to decrease and the Partnership was unable to find a willing buyer, the price of Digital Assets could fluctuate rapidly and the Partnership may be unable to sell the Digital Assets in its possession or employ limited Partners will be subject to the risk of price fluctuations of Digital Assets until they are fully withdrawn from the Partnership. Further, if the supply of Digital Assets available to the public were to increase or decrease suddenly due to, for example, a change in a Digital Asset's source code, the dissolution of a virtual currency exchange, or seizure of Digital Assets by government authorities, the price of Digital Assets could fluctuate rapidly. Such changes in demand and supply of Digital Assets could adversely affect an investment in the Partnership. In addition, governments may intervene, directly and by regulation, in the Digital Asset market, with the result (whether or not intended) of influencing Digital Asset prices and valuation (e.g., releasing previously seized Digital Assets). Similarly, any government action or regulation may indirectly affect the Digital Asset market or Digital Asset network, influencing Digital Asset use or prices.

Loss or Destruction of Digital Assets: Certain Digital Assets are intended to be controllable only by the possessor of both the unique public and private keys relating to the local or online digital wallet in which such Digital Assets are held. To the extent private keys relating to the Partnership's Digital Asset holdings are lost, destroyed or otherwise compromised, the Partnership may be unable to access the related Digital Assets and such private keys will not capable of being restored by a Digital Asset network. Any loss of

private keys relating to digital wallets used to store the Partnership's Digital Assets could adversely affect an investment in the Partnership. Further, Digital Assets are typically transferred digitally, through electronic media not controlled or regulated by any entity. To the extent a Digital Asset transfer is erroneously to the wrong destination, the Partnership may be unable to recover the Digital Asset or its value. Such loss could adversely affect an investment in the Partnership.

Irrevocable Digital Asset Transactions: Just as the blockchain (or similar technology) enables secure payment, public record of Digital Asset transactions, it also creates an irrevocable one. Transactions that have been verified, and thus recorded as a "block" on the blockchain (or similar technologies), generally cannot be undone. Even if the transaction is the one or later been in error, or one or theft of a user's Digital Assets, the transaction is not reversible. Further, at this time, there is no U.S. or foreign governmental, regulatory, investigative, or prosecutorial authority or mechanism through which to bring an action or complaint regarding missing or stolen Digital Assets. Consequently, the Partnership may be unable to replace missing Digital Assets or seek reimbursement for any erroneous transfer or theft of Digital Assets. To the extent that the Partnership is unable to seek redress for such action, error or theft, such loss could adversely affect an investment in the Partnership.

Third Party Wallet Providers: The Partnership intends to use third party wallet providers to hold the Partnership's Digital Assets. The Partnership may have a high concentration of its Digital Assets in one location or with one third party wallet provider, which may be prone to losses arising out of hacking, loss of passwords, compromised access credentials, malware, or cyber-attacks. The Partnership is not required to maintain a minimum number of wallet providers to hold the Partnership's Digital Assets. Certain third party wallet providers may not indemnify the Partnership against any losses of Digital Assets. Digital Assets held by third parties could be transferred into "cold storage" or "deep storage," in which case there could be a delay in retrieving such Digital Assets. The Partnership may also incur costs related to third party custody. Any security breach, incurred cost or loss of Digital Assets associated with the use of a third party wallet provider, may also adversely affect an investment in the Partnership.

Security: While the Partnership intends to use industry-levels of data protection and information assurance internally, at some points during transferring Digital Assets into or out of the Partnership's platform, the Partnership's platform requires interfacing with outside entities whose measures, practices and standards may be outside of the Partnership's control or which may be under the influence of bad actors. Events may occur where the Partnership's platform is penetrated by bad actors, which could compromise the Partnership's operation or result in loss of Digital Assets, adversely affecting an investment in the Partnership.

There exists the possibility that while acquiring or disposing of Digital Assets, the Partnership inadvertently engages in transactions with bad actors who are under the scrutiny of government investigative agencies. As such, the Partnership's systems or a portion thereof may be seized. This pursuant to legal process and/or the service of a search and/or seizure warrant. Such action could result in the loss of Digital Assets previously under the Partnership's control.

The development team and administration of a Digital Asset network's source code could propose amendments to the network's protocols and software that, if accepted and authorized, or not accepted, by the Digital Asset network community, could adversely affect the supply, security, value or market share of the Digital Assets and thus an investment in the Partnership. Further, the Partnership may be adversely affected by manipulation of a Digital Asset's source code.

Hackers: Hackers, or malicious actors may launch attacks to steal, compromise or secure Digital Assets, such as by attacking Digital Asset network source code, exchange servers, third-party platforms, cold and hot storage locations or software, Partnership's Platform, or Digital Asset transaction history, or by other means. For example, in February 2014 Mt. Gox suspended withdrawals because it discovered hackers were able to obtain even more of exchange's Bitcoins by changing the unique identifier of a transaction before it was confirmed by the Bitcoin network. Further, Flexcoin, a so-called Bitcoin bank, was hacked in March 2014 when attackers exploited a flaw in the code governing transfers between users by flooding the system with requests before the account balances could update—resulting in the theft of 896 Bitcoin. As the Partnership increases in size, it may become a more appealing target of hackers, malware, cyber-attacks or other security threats. As a result, the Partnership will undertake efforts to secure and safeguard the Digital Assets it in its custody from theft, loss, damage, destruction, malware, hackers or cyber-attacks, which may add significant expenses to the operation of the Partnership. There can be no assurance that such security measures will be effective. At this time, there is no U.S. or foreign governmental, regulatory, investigative, or prosecutorial authority or mechanism through which to bring an action or complaint regarding missing or stolen Digital Assets. Consequently, the Partnership may be unable to replace missing Digital Assets or seek reimbursement for any theft of Digital Assets, adversely affecting an investment in the Partnership.

Lack of Transparency: Given the type and extent of the security measures necessary to adequately secure Digital Assets, investors will not fully know how the Partnership secures its Digital Assets or the Partnership's complete holding of Digital Assets at any time.

Reliance on Virtual Currency Service Providers: Due to audit and operational needs, there will be individuals who have information regarding the Partnership's security measures. Any of these individuals may purposely or inadvertently leak such information. Further, service companies and financial institutions (including banks) provide support to the Partnership related to the buying, selling, and storing of virtual currencies. To the extent that those providers no longer support the Partnership or cannot be retained, an investment in the Partnership may be adversely affected.

Malicious Actors & Bugs: Malware is software used or programmed by malicious actors to disrupt computer operation, gather sensitive information or gain access to private computer systems. "Botnets" refer generally to a group of computers that use malware to compromise computers whose security defenses have been breached. To the extent that a malicious actor uploads malware, computer virus, hacker, or botnet (e.g., Zeus Access) obtains a majority of the processing power on a Digital Asset network, alters the source code and blockchain on which all of a Digital Assets transactions rely, or prevents the use, transfer, ownership, or integrity of a Digital Asset, an investment in the Partnership could be adversely affected.

Initial Coin Offerings ("ICOs"): An ICO involves the issuance of a new token or cryptocurrency via crowd funding to raise capital from token buyers for a new blockchain project or venture. Holders of the new Digital Asset have the right to royalties or some other form of ownership in the new project and may benefit from appreciation in the price of the new Crypto Asset itself. Since these new Digital Assets have not been tested or used in the market, the risk that these ICOs contain imperfections and/or have a negligible or lacking is greater than the more established Digital Assets. And there is the overarching risk that Digital Assets obtained by the Partnership through ICOs will not develop a following.

Digital Assets acquired by the Partnership in connection with ICOs may also entail promises to sell within or hold for specified periods of time. As a result, the Partnership may be forced to sell an investment at an inopportune time, or hold an investment at times where it would be advantageous to sell.

ICOs offer the Partnership the ability to purchase Digital Assets at discounted prices. Digital Assets purchased by the Partnership will generally be valued at cost until active trading in such Digital Assets develops. Accordingly, while Limited Partners who invest in the Partnership prior to the emergence of such active trading will receive the benefit of purchasing such Digital Assets at discounted prices, any withdrawal proceeds paid to Limited Partners who withdraw from the Partnership prior to the emergence of such active trading will reflect the lower discount of prices and not the expected trading value of such Digital Assets on any active exchange or other market.

ICOs in which the Partnership participates generally are unregulated and may turn out to be fraudulent. There is no guarantee that funds that flow through fraudulent actions will be recovered by the Partnership.

Regulatory Status of Cryptocurrencies and other Digital Assets: The Partnership invests primarily in digital currencies which are not currently regulated by U.S. federal and state governments or self-regulatory organizations. As digital currencies have grown in popularity, several U.S. regulatory agencies such as the Financial Crimes Enforcement Network ("FinCEN") and the CFTC, have begun to examine digital currencies and the operations of their networks. Currently, neither the CFTC nor the SEC has formally asserted regulatory authority over digital currencies, although the CFTC has stated that it considers cryptocurrencies to be commodities and the SEC has stated that certain Digital Assets are securities. On July 25, 2017, the SEC issued a reporting finding that a 2016 token offering, particularly securities in an "ICO" registration involved the offering of a "security" under U.S. federal law which should have been registered (the "SEC Release"). The agency stated that similar token offerings fall within the jurisdiction of federal securities laws, such as applying to state cryptocurrency-based token offerings and security crowdfundings. Furthermore, the SEC, indicated it intends to treat assets valued in virtual currencies, such as tokens, which otherwise possess the characteristics of a security, in the same way as conventional securities valued in U.S. Dollars or other fiat currency.

To the extent that digital currencies are ultimately determined to be a security, commodity, future or other regulated asset, or to the extent that a U.S. or foreign government or quasi governmental agency exerts regulatory authority over the digital currencies, the Partnership may be adversely affected.

Digital currencies currently face an uncertain regulatory landscape in not only the United States but also in many foreign jurisdictions. While many jurisdictions have either taken no formal position with respect to cryptocurrencies or have stated that cryptocurrencies are legal tender in their jurisdiction, others have banned the use of cryptocurrencies in their jurisdictions. In addition, very few jurisdictions have enacted cryptocurrency-specific regulations that govern the creation, transmittal or use of cryptocurrencies. One or more jurisdictions may, in the future, adopt laws, regulations or directives that affect digital currency networks and their users, particularly digital currency exchanges and service providers that fall within such jurisdictions' regulatory scope. Such laws, regulations or directives may conflict with those of the United States and may negatively impact the acceptance of digital currencies by users, merchants and service providers outside of the United States and may therefore impede the growth of the digital currency networks. The effect of any future regulatory change on the Partnership is impossible to predict, but such change could be substantial and adverse.

## Strategy Risks

Virtual Currency Exchanges: The virtual currency exchanges on which Digital Assets trade are relatively new and largely unregulated and may therefore be more vulnerable to theft, fraud and failure than established, regulated exchanges for other products. In general, virtual currency exchanges are currently start-up businesses with no institutional backing, limited operating history and publicly available financial information. Additionally, upon sale of Digital Assets, cash proceeds may not be received from the

exchange for several business days. The participation in exchanges requires users to take on credit risk by transferring Digital Assets from personal account to a third-party account.

Virtual currency exchanges may impose daily, weekly, monthly or customer-specific transaction or distribution limits or suspend withdrawals entirely, rendering the exchange of virtual currency for that currency difficult or impossible. Additionally, Digital Asset prices and valuations on virtual currency exchanges have been volatile and subject to influence by many factors including the levels of liquidity on exchanges and operational interruptions and disruptions. The prices of Digital Assets are subject to any volatility experienced by virtual currency exchanges, and any such volatility can adversely affect an investment in the Partnership.

Virtual currency exchanges are targets for cybercrime, hackers and malware. It is possible that while a paying in transactions with various Digital Asset exchanges located throughout the world, any such exchange may cease operations due to theft, fraud, security breach, liquidity issues, or government investigation. In addition, banks may refuse to process wire transfers to or from exchanges. Over the past several years, many exchanges have, indeed, closed due to fraud, theft (e.g., Mt. Gox voluntarily shutting down because it was unable to account for over $450.0 million), government or regulatory involvement, failure or security breaches (e.g., the voluntary temporary suspensions by Mt. Gox, Coinbase, Bitfinex due to or distributed denial of service attacks by malware and/or hackers), or banking issues (e.g., the loss of Tradehill's banking privileges at Internet Archive Federal Credit Union).

Any financial, security or operational difficulties experienced by such exchanges may result in an inability of the Partnership to recover monies or Digital Assets being held by the exchange or to pay measures upon which it will. Further, the Partnership may be unable to recover Digital Assets awaiting trade execution on one of the Partnership, all of which could adversely affect an investment in the Partnership. Additionally, to the extent that the Digital Asset exchanges representing a substantial portion of the volume in Digital Asset trading are involved in fraud or experience security failures or other operational issues, such Digital Asset exchanges' failures may result in loss or less favorable prices of Digital Assets, or may adversely affect the Partnership, its operations and investments, or the Limited Partners.

Exchanges on which the Partnership trade may and likely do operate outside of the United States. The Partnership may have difficulty in successfully pressing claims in the courts of such countries or enforcing in the courts of such countries a judgment obtained by the Partnership in another country. In general, certain less developed countries lack fully developed legal systems and bodies of commercial law and practices normally found in countries with more developed market economies. These legal and regulatory risks may adversely affect the Partnership and its operations and investments. In addition, to assess the Partnership has successfully leveraged third-party exchanges in such a fashion that it may deploy its Algo Trading Software. In the event that any such exchanges suspend, terminate, or otherwise modify the Partnership's account, it could have a material adverse impact on the business of the Partnership and the value of your investment in the Partnership.

Currently, there is relatively modest use of Digital Assets in the retail and commercial marketplace compared to its use by speculators, thus contributing to price volatility that could adversely affect an investment in the Partnership. If future regulatory actions or policies limit the ability to own or exchange Digital Assets in the retail and commercial marketplace, or use them for payments, or own them generally, the price and demand for Digital Assets may decrease. Such decrease in demand may result in the termination and liquidation of the Partnership at a time that may be disadvantageous to the Limited Partners or may otherwise affect the Partnership's net asset value.

The Partnership will compete with direct investments in Digital Assets and other potential financial vehicles backed or linked to Digital Assets. Any change in market and financial conditions, or other conditions beyond the Partnership's control, may make investment and speculation in Digital Assets more attractive, which could limit the supply of Digital Assets or increase or decrease liquidity.

Leverage. While the Partnership generally does not intend to utilize leverage as a part of the Partnership's investment program, the Partnership may, at the Partnership's sole discretion, borrow cash on margin or otherwise to increase the amount of capital available for investment purposes or enter into derivative transactions that have the effect of leveraging its portfolio. The Partnership does not intend to utilize leverage in excess of ten percent (10%) of the Partnership's Net Asset Value. The use of leverage would have a material impact on the Partnership's performance, as well as its risk of loss.

Through the utilization of leverage, the Partnership may obtain additional (borrowed) capital in an amount significantly greater than the Partnership's actual capital. The actual amount of leverage to be utilized by the Partnership, which is likely to vary over time, will be determined by the Partnership in its absolute discretion (subject to any credit limitations imposed by lenders and/or counterparties). Such use of an amount of leverage may be expected to have a material impact on the Partnership's performance, as well as its risk of loss. Leverage may be obtained through borrowings directly from lenders or through derivative instruments. The lender or a counterparty on any derivative instrument may be any entity or institution that the Partnership determines to be creditworthy. The Partnership has not obtained a commitment for any such financing.

To the extent the Partnership purchases assets with borrowed funds, its Net Asset Value will tend to increase or decrease at a greater rate than if borrowed funds were not used, and a relatively small price movement in a position could result in immediate and substantial losses.

The Partnership's borrowings typically will be secured by a pledge of its assets to the lenders who have extended the credit. Under certain circumstances, a lender might demand an increase in the collateral that secures the Partnership's obligations and, if the Partnership were unable to provide additional collateral, the lender could liquidate assets held in the account to satisfy these obligations. For example, if assets pledged to a lender to secure the Partnership's margin trading activities should decline in value, the Partnership could be subject to a margin call, pursuant to which it must either deposit additional funds with the lender or suffer mandatory liquidation of the pledged assets to compensate for the decline in value. In the event of a sudden precipitous drop in the value of its assets, the Partnership might not be able to liquidate sufficient assets quickly enough to meet a margin call. A forced liquidation of assets under these circumstances could have extremely adverse consequences for the Partnership.

Lending Digital Assets. The Partnership may participate in Digital Assets lending programs offered by certain exchanges to investors seeking to short sell Digital Assets. Interest will accrue to the Partnership until such Digital Assets are replaced. While the exchanges on which the Partnership lends its Digital Assets requires borrowers to post collateral and provides for forced liquidation procedures, there is no assurance that such procedures will prevent the Partnership from losing capital in connection with its lending practices.

For the particular features associated with loans, there are many risks that some or all of the principal and interest may fail to be repaid, including but not limited to:

- the value of the borrower's leveraged position declines so quickly that forced liquidation does not occur quickly enough to preserve some or all of the principal and interest;

- a "flash crash" causes a forced liquidation at a price insufficient to recover some or all of the principal and interest;
- the software systems enforcing forced liquidation do not function correctly or at all;
- the software systems enforcing forced liquidation function correctly but are too slow to preserve some or all of the principal and interest;
- the software systems enforcing forced liquidation are compromised due to an attack or "hack;"
- the exchange purported to enforce liquidation does not do so, for any reason or for no reason at all;
- the exchange purported to enforce liquidation experiences a disruption of service, is caused by an investigation, regulatory enforcement, or litigation, or otherwise becomes non-operational.

Illiquidity of Some Investments:  Some of the Digital Assets in which the Partnership invests may to or been marketed very illiquid, either because they are thinly traded on a longer trade on an exchange.  The Partnership may not be able generally to liquidate these investments if the markets are active, and its ability to realize gains, or to avoid losses in periods of rapid market activity, may therefore be affected.  The prices realized on the resale of illiquid investments could be less than those originally paid by the Partnership. In addition, the value assigned to such Digital Assets for purposes of valuing investments and determining net profits and net losses may differ from the value the Partnership is ultimately able to realize.

The Partnership Methodology:   Trading decisions of the Partnership are on a discretionary basis using fundamental and technical analysis, as well as a myriad of artificial intelligence systems and no assurance can be given that any trading strategy earned by the Partnership will be successful, or that losses could not occur.  In entering orders into the Partnership's accounts, the Partnership will use market, limit, stop, and other qualified orders, if in its judgment, that appears appropriate under given market conditions.  In addition, when liquidating a position, the Partnership may place a reverse order, e.g., the current position is liquidated and no opposite position is affected.

In-Kind Distributions:   A withdrawing Member may, in the sole discretion of the GP, receive financial instruments instead of the Partnership in lieu of, or in combination with, Digital Assets.  The value of financial instruments instead may increase or decrease before such financial instruments can be sold and the Member will incur transaction costs in connection with the sale of such financial instruments. Additionally, financial instruments distributed with respect to a withdrawing Member may not be readily marketable.  The risk of loss and delay in liquidating such financial instruments will be borne by the Member, with the result that such Member may receive less cash than it would have received on the date of withdrawal.

## Management Risks

Reliance on the GP and no Authority by Limited Partners:   All decisions regarding the management and affairs of the Partnership will be made exclusively by the GP.  Accordingly, no person should invest in the Partnership unless such person is willing to entrust all aspects of management of the Partnership to the GP.  Limited Partners will have no right or power to take part in the management of the Partnership.  As a result, the success of the Partnership for the foreseeable future depends solely on the abilities of the GP.

Dependence on Key Personnel.   The GP is dependent on the services of the GP and there can be no assurance that it will be able to retain the GP, whose credentials are described under the heading "Management of Fund."  The departure or incapacity of the GP personnel (or it could have a material adverse effect on the GP's management of the investment operations of the Partnership.

Changes in Investment Strategies:   The Partnership's investment strategies may be altered from time to time with the approval of a majority-in-interest of Limited Partners.  In such event, a Member who does

not consent to such change may nevertheless be out-voted by other Limited Partners, in which case, the opposing Member may only withdraw from the Partnership pursuant to the terms of the Partnership Operating Agreement and subject to the limitations described therein.

Proprietary Nature of Investment Strategy:   All documents and other information concerning the Partnership's portfolio of investments will be made available to the Partnership's auditors, accountants, attorneys and other agents in connection with the duties and services performed by them on behalf of the Partnership. However, because the GP's investment techniques may be proprietary, the Partnership Operating Agreement will provide that neither the Partnership nor any of its auditors, accountants, attorneys or other agents will disclose to any person, including investors in the Partnership, any of the investment techniques employed by the GP in managing the Partnership's investments or the identity of specific investments held by the Partnership at any particular time.

Limitations on Liability and Indemnification:  The Partnership Operating Agreement provides that the GP and any of its respective affiliates, shareholders, members, partners, managers, directors, officers and employees, agents and representatives and the legal representatives of any of them (each, an "Indemnified Party") shall not be liable, responsible or accountable in damages or otherwise to the Partnership or any Partner, or to any successor, assignee or transferee of the Partnership or of any Partner, for (i) any acts performed or the omission to perform any acts, within the scope of the authority conferred on such Indemnified Party by the Partnership Operating Agreement, except by reason of acts or omissions found by a court of competent jurisdiction upon entry of a final non-appealable judgment to have been made in bad faith or to constitute fraud, willful misconduct or gross negligence, (ii) performance by such Indemnified Party of, or the omission to perform, any acts on advice of legal counsel, accountants, or other professional GP to the Partnership; (iii) the negligence, dishonesty, bad faith, or other misconduct of any consultant, employee, or agent of the Partnership, including, without limitations, an affiliate of the GP selected or employed by such Indemnified Party with reasonable care and in good faith or (iv) the negligence, dishonesty, bad faith or other misconduct of any Person at where the Partnership invests or through which the Partnership participates as a partner, joint venturer, or in another capacity, which was selected by such Indemnified Party with reasonable care and in good faith.   No Indemnified Party shall be liable to the Partnership or to any Partner, or any successors, assignees, or transferees of the Partnership or any Partner, for any loss, damage, expenses or other liability arising from any cause beyond its reasonable control, including, but not limited to, strikes, labor troubles, riots, fires, blowouts, tornadoes, floods, bank moratoria, trading suspensions on any exchange, acts of a public enemy, insurrections, acts of God, acts of terrorism, failure to carry out the provisions hereof due to prohibitions imposed by law, rules or regulations promulgated by any governmental agency, or any demand or requirement by any governmental authority.

Furthermore, to the fullest extent permitted by law, the Partnership in the GP's sole discretion, shall indemnify, and hold harmless each Indemnified Party from and against any loss, liability, damage, cost or expense suffered or sustained by an Indemnified Party by reason of (i) any acts, omissions or alleged acts or omissions arising out of or in connection with the Partnership, the Partnership Operating Agreement or any investment made or held by the Partnership (including, without limitation, any judgment, award, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action, proceeding or claim, provided that such acts, omissions or alleged acts or omissions upon which such actual or threatened action, proceeding or claim are based are not found by a court of competent jurisdiction upon entry of a final non-appealable judgment to have been made in bad faith or to constitute fraud, willful misconduct or gross negligence by such Indemnified Party, or (ii) any acts or omissions, or alleged acts or omissions, of any broker or agent of any Indemnified Party, provided that such broker or agent was selected, engaged or retained by the Indemnified Party in accordance with reasonable care.

Limited Reporting:   The Partnership will provide  ...limited reports of Partnership activity. As a result, Limited Partners will not be able to evaluate the Partnership's activity at short  intervals. Additionally, as a result of a de facto  arrangements, questions, due diligence requests, meetings or other communications, certain Limited Partners may receive information that is not generally available or otherwise provided to other Limited Partners, which may affect such Limited Partners' decision to request a withdrawal of their respective Capital Accounts or take other actions on the basis of such information.

Cyber Security Breaches and Identity Theft:   The technology systems used by the GP may be vulnerable to damage or interruption from computer viruses, network failures, computer and telecommunication failures, infiltration by unauthorized persons and security breaches, usage errors by its professionals, power outages and catastrophic events such as fires, tornadoes and earthquakes.  Although the GP has implemented certain measures to manage risks relating to these types of events, if these systems are compromised, become inoperative for extended periods of time or cease to function properly, the GP and/or the Partnership may have to make a significant investment to fix or replace them.  The failure of these systems and/or of disaster recovery plans for any reason could cause significant interruptions in the operations of the Partnership and/or the GP and result in a failure to maintain the security, confidentiality or use value of sensitive data, including private keys and personal information relating to investors (and the beneficial owners of investors).  Such a failure could harm the GP's and/or the Partnership's reputation, subject any such entity and their respective affiliates to legal claims and otherwise affect their business and financial performance.

## General Private Equity Risks

No Operating History:   The Partnership is a recently-formed entity and has no operating history upon which prospective investors can evaluate its likely performance.  There can be no assurance that the Partnership will achieve its investment objective.

Risk of Loss:   A Member could incur substantial, or even total, losses on an investment in the Partnership.  An investment in the Partnership is only suitable for persons willing to accept this high level of risk.

**The Partnership will not be Registered Under the CEA:**  The Partnership will only hold or trade in commodity futures contracts regulated by the CEA, as administered by the CFTC. Furthermore, the GP believes that the Partnership is not currently pool for purposes of the CEA, and that the GP is not subject to regulation by the CFTC as a commodity pool operator or a commodity trading advisor in connection with the operation of the Partnership. Consequently, Limited Partners will not have the regulatory protections provided to investors in CEA-regulated instruments or commodity pools.

Digital Assets held by the Partnership are not Subject to FDIC or SIPC Protections:  The Partnership is not a banking institution nor is it also a member of the Federal Deposit Insurance Corporation ("FDIC") or Securities Investor Protection Corporation ("SIPC") and, therefore, deposits held with or assets held by the Partnership are not subject to the protections enjoyed by depositors with FDIC or SIPC member institutions. The undivided interests in the Partnership's Digital Assets represented by the limited partnership interests are not insured directly by the Partnership or the GP.

Banks May Refuse to Provide Continued Banking Services to the Partnership:  While the Partnership has established a relationship with a bank to operate accounts, a number of banks and other companies that trade or otherwise deal in cryptocurrency have been unable to find banks that are willing to provide them with bank accounts and banking services. Similarly, a number of such entities have had their existing bank accounts closed by their banks. Banks may refuse to provide bank accounts and other banking services to

cryptocurrency-related companies or companies that accept cryptocurrencies for a number of reasons, such as perceived compliance risks or costs. The difficulty that many businesses that provide cryptocurrency-related services have and may continue to have in finding banks willing to provide them with bank accounts and other banking services may be currently decreasing the usefulness of cryptocurrencies as a payment system and harming public perception of cryptocurrencies or could decrease its usefulness and harm its public perception in the future. Similarly, the usefulness of cryptocurrencies as a payment system and the public perception of cryptocurrencies could be damaged if banks were to close the accounts of many or even a few key businesses providing cryptocurrency-related services. This could decrease the price of Digital Assets and therefore adversely affect our investment in the Partnership. Further, there is no guarantee that the Partnership's bank will maintain its current policy on cryptocurrency-related services, which could have a materially negative effect on the Partnership.

<u>Effect of Performance Allocation.</u> The GP will receive a Performance Allocation based on a percentage of any net realized and unrealized profits in the Partnership. Performance fees may create an incentive for the GP to make investments that are riskier or more speculative than would be the case in the absence of such incentive compensation arrangements. In addition, the GP's performance allocations will be based on unrealized as well as realized gains. There can be no assurance that such unrealized gains will, in fact, ever be recognized. Furthermore, the value of an unrealized gain and loss may be subject to material, subsequent revision.

<u>Effect of Substantial Withdrawals.</u> Substantial withdrawals by Limited Partners within a short period of time could require the Partnership to liquidate its investments more rapidly than would otherwise be desirable, possibly reducing the value of the Partnership's assets and/or disrupting the Partnership's investment strategies. Reduction in the Partnership's size could make it more difficult to generate a positive return or to recoup losses due to, among other things, reductions in the Partnership's ability to take advantage of particular investment opportunities or decreases in the ratio of its income to its expenses.

<u>Lack of Liquidity:</u>  The Partnership's withdrawal provisions place certain restrictions on the right of a Member to withdraw all or part of its Interest, transfer its Interest and pledge or otherwise encumber its Interests. Thus, a Member may not be able to liquidate the entire value of his or her Capital Account on any given withdrawal date. Interests may not be transferred or pledged except in compliance with significant restrictions on transfer as required by federal and state securities and commodities laws and as provided in the Partnership Operating Agreement. The Partnership Operating Agreement also will not permit a Member to transfer or pledge all or any part of its Interests to any person without the prior written consent of the GP, the granting of which is in the GP's sole and absolute discretion. These limitations, taken together, will significantly limit a Member's ability to liquidate an investment in the Partnership quickly. As a result, an investment in the Partnership would not be suitable for an investor who needs liquidity.

<u>Suspension of Withdrawals and Deferment of Withdrawal Proceeds:</u>  In certain circumstances the GP, in its sole and absolute discretion, may suspend the valuation of the Partnership's assets, the right or obligation to honor withdrawal requests (including the right to receive withdrawal proceeds), and/or extend the period for payment on withdrawal. In addition, the GP may suspend the right of withdrawal or postpone the date of payment for any period during which there is an extraordinary circumstance as determined in good faith by the GP. The GP may suspend the right of withdrawal or postpone the date of payment for any period during which (i) any stock exchange or over-the-counter market on which a substantial part of the investments owned by the Partnership are traded is closed, (other than weekend or holiday closings) or trading on any such exchange or market is restricted or suspended, (ii) there exists a state of affairs that constitutes a state of emergency, as a result of which disposal of the investments owned by the Partnership is not reasonably practicable or it is not reasonably practicable to determine fairly the value of its assets

(iii), a breakdown occurs in any of the means normally employed in ascertaining the value of a substantial part of the assets of the Partnership or when for any other reason the value of such assets cannot reasonably be ascertained as it; or (d) the GP reasonably necessary to determine in the interest of the resumed dissolution of the GP, in order to effectuate an orderly liquidation of the Partnership's investments in a manner that does not have a material adverse impact on the Partnership or the non-withdrawing Limited Partners. The GP has reserved the right, in its sole discretion and without notice, to require any Member to withdraw entirely from the Partnership for any reason or no reason. As with all other withdrawals, any such required withdrawals may be effectuated in cash (by means of an electronic fund transfer or wire transfer) or, in the sole discretion of the GP, a distribution of securities in-kind.

Contingency Reserves:  Under certain circumstances, the Partnership may find it necessary to set up one or more reserves for contingent or future liabilities or various difficult issues and, upon withdrawal by a Member, withhold a portion of that Member's withdrawal proceeds. This could happen, for example, if the Partnership or the issuer of portfolio securities were involved in a dispute regarding the value of its assets, in litigation, or subject to a tax audit at the time the withdrawal request would otherwise be satisfied.

Tax Considerations; Distributions to Limited Partners and Payment of Tax Liability:  The United States tax rules applicable to an investment in the Partnership and its underlying assets may be uncertain and the tax consequences to an investor of an investment in the Partnership could differ from the investor's expectations. The IRS recently issued Notice 2014-21 which concludes that virtual currency, including Bitcoin, should be treated as property for U.S. federal tax purposes. Notice 2014-21 further concludes that general tax principles that apply to property transactions apply to transactions using virtual currency. Each Investor is urged to consult its tax advisor in determining the tax consequences to it investing in Partnership to its particular circumstances.

It should also be noted that the Partnership's tax return may be audited by the IRS, and any such audit may result in an audit of the returns of the Limited Partners for the year(s) in question or unrelated years. Further, any adjustment resulting from an audit could also result in adjustments to the tax returns of the Limited Partners and may result in the examination and adjustment of other items in such returns as related to the Partnership. Limited Partners could incur substantial legal and accounting costs in litigation of any IRS challenge, regardless of the outcome. (See "Federal Tax Notes.")

Delayed Schedules K-1:  The Partnership may not be able to provide final Schedules K-1 to Limited Partners in any given Tax year until significantly after April 15 of the following year. The Partnership will provide Schedules K-1 as soon as practicable after receipt of all of the necessary information. Limited Partners should be prepared to obtain extensions of the filing date for their income tax returns at the U.S. Federal, state and local level.

Undistributed Income:  The GP in its sole discretion may, but is not required to, make distributions to Limited Partners during the term of the Partnership. Taxable income realized in any year by the Partnership will be taxable to the Partners in that year regardless of whether they have received cash distributions from the Partnership. Accordingly, Limited Partners may recognize taxable income for federal, state, and local income tax purposes without receiving any or a sufficient distribution from the Partnership with which to pay the taxes thereon. The GP may consider such possible tax liability of the Limited Partners when determining whether to make distributions, but no assurance is given that distributions if made will equal the amount of any Member's tax liability.

Restrictions on Transfer:  The Interests are subject to certain restrictions on transfer, including a requirement that the GP consent to any such transfer. There is no present market for the Interests, and no market is likely to develop in the future. Accordingly, Limited Partners may not be able to liquidate their

investment in the event of an emergency or for any other reason, and Interests may not be readily acceptable as collateral for loans. Interests should be purchased only by prospective Investors who can bear the economic risk of their investment, who can afford to lose their funds committed to an illiquid investment secured up to the withdrawal provisions in the Partnership Operating Agreement and who, if necessary, can afford a complete loss of their investment. (See "Restrictions on Transfer.")

Lack of Insurance:  The assets of the Partnership are not insured by any government or private insurer except to the extent monies may be deposited in bank or as insured by the Federal Deposit Insurance Corporation or with brokers insured by the Securities Investor Protection Corporation and such deposits and securities are subject to such insurance coverage. Therefore, in the event of the insolvency of a depository or custodian, the Partnership may be unable to recover all of its funds or the value of its securities so deposited.

Regulations under Investment Partnership Act of 1940:  The Partnership's operations are similar to an investment company as defined under The Investment Partnership Act, because the Partnership engages in the business of purchasing securities for investment. The Partnership is currently not required to register under the Investment Partnership Act in reliance upon Section 3(c)(7) thereof. Accordingly, the provisions and extensive regulations of the Investment Partnership Act, which might otherwise govern the activities of the Partnership will not be applicable.

Risks for Certain Benefit Plan Investors Subject to ERISA:  Prospective investors that are benefit plan investors subject to the ERISA, and Department of Labor Regulations issued thereunder should read the section hereof entitled "ERISA Considerations" in its entirety for a discussion of certain risks related to an investment by benefit plan investors in the Partnership.

Revised Regulatory Interpretations Could Make Certain Strategies Obsolete:  In addition to proposed and actual accounting changes, there have recently been certain well-publicized incidents of regulators unexpectedly taking positions which prohibited trading strategies which had been implemented in a variety of formats for many years. In the current unsettled regulatory environment, it is impossible to predict if future regulatory developments might adversely affect the Partnership.

Limited Financial Resources:  The Partnership has limited financial resources and its business is subject to significant risks and competition. The Partnership's profitability may be diminished if Partnership incurs significant operating losses or becomes subject to significant liabilities which impede its operational efficiency.

Insurance:  The Partnership anticipates obtaining customary insurance coverage for going Digital Assets concerns. However, the Partnership may not be able to obtain or maintain adequate insurance with respect to its assets or may not be able to obtain insurance on reasonable terms. Failure to obtain insurance or the occurrence rates of an insurance expose the Partnership to additional risk of loss or additional expenses to which it could not otherwise be subject.

Lack of Public Market for Interests; Lack of Liquidity:  The Partnership does not anticipate that a public trading market will ever develop for the Interests. Prospective investors should consider their investment in the Partnership as a long-term, illiquid investment of indefinite duration. The Interests are not transferable by investors, except as allowed in limited circumstances as set forth in the Partnership Operating Agreement. Accordingly, investors may not be able to liquidate their investments prior to the end of the Partnership's term. In addition, the suitability standards applied to investors upon the purchase of their Interests may also be applied to persons to whom an investor wishes to transfer its Interests. An investor

may not be able to sell its interests in the event of an emergency and its interests may not be pledged as collateral for a loan without the consent of the Directors, which they may withhold in their discretion.

Reliance on Key Personnel: The success of the Partnership depends on the skills and abilities of the GP. If the GP were to cease to be involved with the Partnership for any reason (including, but not limited to death or termination of employment), the success of the Partnership would depend in part on the ability of the Partnership to engage new people of at least equivalent skill. There is no assurance that the Partnership will be the sole representative GP. The GP has an obligation to devote its full time to the business of the Partnership. It is only required to devote such time and attention to the affairs of the Partnership as it decides is appropriate, and it may engage in other activities or ventures, including competing ventures and/or unrelated employment, which result in various conflicts of interest between it and the Partnership.

Valuations and Appraisals: The GP's determination of the value of the Partnership's assets is based on third party valuations and analysis of the Target Properties. However, there can be no assurance that the Partnership's gross or net asset values as calculated based upon such valuations and appraisals, will be accurate on any given date, nor can there be any assurance that the sale of any property owned by the Partnership would be at a price equivalent to the last estimated or appraised value of such property.

Lack of Independent Representation: The use by the GP and the Partnership of the same counsel in the preparation of this Memorandum and the Partnership Operating Agreement and the organization of the Partnership may result in the lack of independent review. Accordingly, Limited Partners should consult with their own counsel regarding this investment.

Liability for Return of Distributions: If the Partnership is otherwise unable to meet its obligations, the Investors may under applicable law be obligated to return, with interest, cash distributions previously received by them to the extent such distributions are deemed to constitute a return of their capital contributions or are deemed to have been wrongfully paid to them.

Valuation Risk: The Partnership will invest in the Target Properties which does not have a clear valuation. In some cases, conventional valuation methods may be inappropriate or impossible to employ. There is no assurance that the valuation obtained by the Partnership for its investment will be able to provide returns for Limited Partners.

Regulatory Risks: Neither the GP nor the GP is registered as an investment adviser with the SEC or any state securities commission. Accordingly, the protections available to clients of a registered adviser or such under securities legislation are not available to the Partnership or to the Limited Partners.

Restrictions on Transfer and Withdrawal: The Interests have not been registered under the Securities Act or any other applicable securities laws. There is no public market for the Interests and none is expected to develop. In addition, the Interests are not transferable except with the consent of the GP, which may be withheld by the GP in its sole discretion and are subject to the terms and conditions of the Partnership Operating Agreement. Limited Partners may not withdraw capital from the Partnership. Consequently, Limited Partners may not be able to liquidate their investments prior to the end of the Partnership's term.

Absence of Regulatory Oversight: While the Partnership may be considered similar in some ways to an investment company, it is not required and does not intend to register as such under the Investment Partnership Act and, accordingly, Limited Partners are not accorded the protections of the Investment Partnership Act.

Valuation of Assets: The GP will determine the Net Asset Value of the Partnership and the Limited Partners' capital accounts in accordance with the policies noted herein and in the Partnership Operating

Agreement consistently applied. The GP has a conflict of interest in that the GP will receive a higher performance fee if the assets are given a favorable valuation.

<u>Past Performance Is Not Necessarily a Guide to Future Performance:</u>   Although the GP's management team has successfully acquired, managed and disposed of prior Digital Assets projects, a prospective investor should understand that such results are not predictors of future results. Moreover, prospective investors should recognize that any Digital Assets project possesses a unique array of challenges, exigencies, difficulties, and unforeseen circumstances that neither the prior results nor the experience of the GP may be capable of preventing or overcoming.

THE FOREGOING LIST OF RISK FACTORS DOES NOT PURPORT TO BE A COMPLETE ENUMERATION OR EXPLANATION OF THE RISKS INVOLVED IN AN INVESTMENT IN THE PARTNERSHIP. PROSPECTIVE LIMITED PARTNERS SHOULD READ THE ENTIRE MEMORANDUM AND THE PARTNERSHIP OPERATING AGREEMENT AND CONSULT WITH THEIR OWN ADVISERS BEFORE DECIDING WHETHER TO INVEST IN THE PARTNERSHIP. IN ADDITION, AS THE PARTNERSHIP'S INVESTMENT PROGRAM DEVELOPS AND CHANGES OVER TIME, AN INVESTMENT IN THE PARTNERSHIP MAY BE SUBJECT TO ADDITIONAL AND DIFFERENT RISK FACTORS.

## 6. Conflict of Interest

The GP and/or its respective affiliates, shareholders, Principal, members, partners, managers, directors, officers and employees (each an "Affiliate" or collectively "Affiliates") will only devote so much time to the affairs of the Partnership as is reasonably required in the judgment of the GP. Affiliates will not be precluded from engaging directly or indirectly in any other business or other activity, including exercising management responsibility and buying, selling or otherwise dealing with crypto currencies, securities and other investments for their own accounts, for the accounts of family members, for the accounts of other funds, persons, or entities, and for the accounts of individual and institutional clients (collectively, "Other Accounts"). Such Other Accounts may have investment objectives or may implement investment strategies similar to those of the Partnership. Affiliates may also have investments in certain of the Other Accounts Fund. Affiliate may give advice and take action in the performance of their duties to their Other Accounts that could differ from the timing and nature of action taken with respect to the Partnership. Affiliates will have no obligation to purchase or sell for the Partnership any investment that Affiliates purchase or sell, or recommend for purchase or sale, for their own accounts or for any of the Other Accounts. The Partnership will not have any rights of first refusal, co-investment or other rights in respect of the investments made by Affiliates for the Other Accounts, or of any fees, profits or other income earned or otherwise derived from them. If a determination is made that the Partnership and one or more Other Accounts should purchase or sell the same investment at the same time, Affiliates will allocate these purchases and sales in a manner they equitable to each. No Member will, by reason of being a Member of the Partnership, have any right to participate in any manner in any profits or returns earned or derived by or accruing to Affiliates from the conduct of any business or from any transaction in investments effected by Affiliates for any account other than that of the Partnership.

Affiliates will attempt to allocate investment opportunities that is one to their attention on a fair and equitable basis among the Partnership and the Other Accounts for which participation in the respective opportunity is considered appropriate. In determining whether participating by an account is appropriate, Affiliates shall take into account, among other considerations: (a) whether the risk-return profile of the proposed investment is consistent with the objectives of the Partnership, which objectives may be considered (i) solely in light of the specific investment under consideration or (ii) in the context of the portfolio's overall holdings and available capital; (b) the potential for the proposed investment to create an imbalance in the portfolio of the Partnership; (c) liquidity requirements of the Partnership; (d) potential tax consequences; (e) legal or regulatory restrictions; (f) the need to re-size risk in the portfolio of the Partnership; and (g) whether the Partnership and/or Other Accounts have a substantial amount of interrelated trade (e.g. during a "wrap-up" period). Notwithstanding the foregoing, there can be no assurance that an investment opportunity which comes to the attention of any of Affiliates will not be allocated to an or any Other Account, with the Partnership being unable to participate in such investment opportunity or participating only on a limited basis. In addition, there may be circumstances under which Affiliates will consider participation by Other Accounts in investment opportunities in which AIP does or not intend to invest, or intend to invest only on a limited basis, or behalf of the Partnership. Because these considerations may differ for the Partnership and the Other Accounts in the context of any particular investment opportunity, investment activities of the Partnership and the Other Accounts may differ considerably over time to time.

Moreover, the GP has and continues to license and employ its Algo Trading Software in connection with and for the benefit of various third parties, including but not limited to other GP funds and nothing contained herein, the Partnership Operating Agreement nor any other agreement with the Limited Partners shall produce the foregoing nor result in any assignment of any rights, title and or interest in the Algo Trading Software to the Partnership and/or Limited Partners.

31

As a result of the foregoing, Affiliates may have conflicts of interest in allocating their time and activity between the Partnership and the Other Accounts. In allocating investments among the Partnership and the Other Accounts and in effecting transactions for the Partnership and the Other Accounts, including ones in which Affiliates may have a greater financial interest.

The Partnership and the GP are not represented by separate professional advisors. Without independent legal and other professional representation, investors may not receive legal and other advice regarding terms and matters that might be in their interests but contrary to the interest of Affiliates. Moreover, should a dispute arise between the Partnership and any Affiliated Person, or should there be a need in the future to negotiate and prepare contracts and agreements between the Partnership and any of Affiliates, other than those existing or contemplated on the date of this Memorandum, the GP will cause the Partnership to retain separate counsel and, if necessary, other professionals for such matters.

## 7. Valuation of Investments

The Net Asset Value of the Partnership will be determined on if such times as is required by the Partnership Agreement or at any other date fixed by the GP, but in no case less than monthly. The value of assets held by the Partnership shall be denominated in U.S. dollars.

Each Partner's share of the Net Asset Value of the Partnership is determined by multiplying (i) the sum of the value of investments in the Partnership held by the Partnership plus any cash or other assets (including interest incurred but not yet received) minus all liabilities (including incurred expenses), proportionally assigned to the Partner ship, by (ii) the Partner's Allocation Percentage.

The following general guidelines apply to the determination of the value of the Partnership's investments:

a) Digital Assets which are listed on one or more United States or foreign digital exchanges are traded on over-the-counter or on a decentralized exchange, or for which market quotations are available, shall be valued at their last reported sales price on the date of determination or reported on the exchange national exchange or comparable widely recognizing pricing point, or, if no sale occurred on the valuation date, the value for long positions will be the "last bid" and the value for short positions shall be the "last ask" (or, if on such date the exchange(s) on which the asset trades were closed, then the last preceding business day on which they were open)

b) Digital Assets that are not listed on an exchange but for which external pricing sources may be available, will be valued taking into consideration, among other factors, other external pricing sources, recent trading activity or other information that, in the opinion of the GP, may not have been reflected in pricing obtained from external sources.

c) Digital Assets not listed or traded on any exchange or in the over-the-counter market shall be valued based upon quotations obtained from independent market makers or other pricing services, and if no such quotations are available, shall be considered as having no ascertainable market value and shall be valued at fair value based on information available to the GP regarding the value or worthlessness of such assets.

Net Asset Value will include any unrealized profit or loss on open positions and any other credit or debit accruing to the Partnership but unpaid or not received by the Partnership. Interest earned on the Partnership's brokerage account, if any, will be accrued at least monthly. The amount of any distribution declared by the Partnership, and of any withdrawal proceeds due but not yet paid, will be treated as a

ltately from the day when the distribution is declared, or the related withdrawal is effective, as applicable, until it is paid.

The GP may make adjustments to the value of Digital Assets to best reflect their fair market value. All matters concerning the valuation of Digital Assets, the allocation of profits, gains, and losses among the Partners, and accounting procedures not specifically and expressly provided for by the terms of the Partnership Agreement, shall be determined by the GP and shall be final and conclusive as to all of the Partners.

## 8.   Exchange and Custody

The Partnership will utilize multiple online digital exchanges, whether primarily domiciled in the U.S. or abroad ("Exchanges"), to buy and sell Digital Assets only accessing the Partnership's accounts on these Exchanges through multiple layers of authentication. When not being actively traded, the GP intend to generally hold Digital Assets in cold storage on a hardware or software wallets utilizing two or multi-factor authentication, and otherwise follow industry best practices with regard to security procedures. The GP is responsible for taking such steps as it determines, in its sole judgment, to secure these keys and mitigate the risk that they are exposed to hacking, malware and general security threats.

Notwithstanding the foregoing, absent gross negligence, fraud or other criminal behavior, the GP shall not be liable to the Partnership or to Investors for the failure or penetration of the security system of an Exchange. To the extent that the security system of an Exchange is penetrated, any loss of the Partnership's private keys could result in total loss of capital.

34

## 9. Qualification of Investors

An investment in the Partnership is suitable only for investors of substantial financial means who have no need for immediate and full liquidity in this investment.

The Partnership intends to sell Interests generally only to eligible investors. An "eligible investor" in the Partnership must be an "accredited investor" as defined in Rule 501(a) of Regulation D under the Securities Act who have sufficient knowledge and experience in financial and business matters to make them capable of evaluating the merits and risks of an investment in the Partnership. The GP intends to solicit and advertise interests in the Partnership to the public under Section 506(b) of Regulation D of the Securities Act. All Limited Partners will be required to verify their status as accredited investors through the provision of two years of tax or wage statements, brokerage or bank statements, confirmation by certain third parties, or certain other methods deemed acceptable by the GP.

In order to satisfy the criteria for an "accredited investor," in the case of individuals, an investor must have either (i) an annual income of not less than $200,000 for each of the previous two years (or a combined income of such person's spouse of not less than $300,000) and reasonably anticipates the same level of income for the current year, or (ii) a net worth in excess of $1,000,000, excluding the value of each person's primary residence). Other types of accredited investors permitted to invest in the Partnership include (i) banks or savings and loan associations acting in an individual or fiduciary capacity, (ii) broker-dealers registered under the Securities Exchange Act of 1934, as amended, (iii) insurance companies, (iv) any trust with total assets in excess of $5,000,000, not formed for the specific purpose of making the investment, whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii) of Regulation D, and (v) a corporation, business trust or partnership not formed for the purpose of making the investment (a) which has total assets in excess of $5,000,000, or (b) in which all of the equity owners are accredited investors.

Employee benefit plans and individual retirement accounts ("IRAs") will qualify as accredited investors if either (i) the investment decision is made by a plan fiduciary which is a bank, savings and loan association, insurance company or investment adviser registered under the Advisers Act, in the case of plan, including plans established by a state or its political subdivisions or any agency or instrumentality of a state or its political subdivision, for the benefit of employees, has total assets in excess of $5,000,000, or (iii) the plan is a self-directed plan with investment decisions made solely by persons who are accredited investors. Foundations, endowments and other tax-exempt investors must not be formed for the purpose of investing in the Partnership and must have total assets in excess of $5,000,000. Other types of accredited investors include (i) any investment company registered under the Investment Company Act or a business development company as defined in Section 2(a)(48) of the Act, (ii) any Small Business Investment Partnership licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958, (iii) any private business development company as defined in Section 202(a)(22) of the Advisers Act or (iv) any entity in which all of the equity owners are accredited investors.

The Partnership reserves the right to reject subscriptions in its sole discretion. Each purchaser will be required to represent that such purchaser's overall commitment to investments which are not readily marketable is not disproportionate to such purchaser's net worth, and that such purchaser's investment in the Partnership will not cause such overall commitment to become excessive; that such purchaser can sustain a complete loss of such purchase's investment in the Partnership and has limited need for liquidity

in such purchaser's investment in the Partnership; and that such purchaser has evaluated the risks of investing in the Partnership.

Limited Partners may not be able to liquidate their investment in the event of an emergency or for any other reason because there is not now any public market for the Interests and none is expected to develop.

The Partnership will not be registered as an investment company under the Investment Partnership Act of 1940. In reliance on Section 3(c)(1) thereof. As a Section 3(c)(1) fund, the Partnership may offer Interests in a private placement and may have no more than 100 beneficial owners. The Interests therefore may not be resold except in a transaction registered under the Securities Act and the laws of certain states or in a transaction exempt from such registration. (See "Restrictions on Transfer of Interests.")

A potential investor must consult his or her own legal, tax and financial advisers with respect to his or her individual circumstances and the suitability of an investment in the Partnership.

Investors who reside in certain states may be required to meet standards different from or in addition to those described above. Investors will be required to represent, in writing, that they meet any such standards that may be applicable to them. The GP may, without the consent of the existing Limited Partners, admit new Partners to the Partnership. The GP may reject a subscription for an interest for any reason in its sole and absolute discretion. If a subscription is rejected, the payment remitted by the investor will be returned without interest.

Rule 506(d) of Regulation D of the Securities Act provides for disqualification of a Rule 506 offering if any of the principals of the GP or GP's in the event 20 percent or more of the Partnership's Interest is beneficially owned by a Limited Partner involved in a disqualifying event, in connection with the sale of securities, within the securities industry or with the SEC (a "Bad Actor Event"). A prospective investor subject to a "Bad Actor Event within the provision of section may be denied admittance to the Partnership in the GP's sole discretion. An existing Limited Partner main inform the GP immediately upon being subject to a Bad Actor Event. The GP may remove such Limited Partner from the Partnership at its sole discretion. The following eight infractions, as provided under Rule 506(d)(i) – (viii), constitute Bad Actor Events:

1. Conviction, within ten years before the sale of the securities (or five years, in the case of issuers, their predecessors, and a filtered covered of any felony or misdemeanor: in connection with the purchase or sale of any security involving the making of any false filing with the SEC; or arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment advisor or paid solicitor of purchasers of securities;

2. Being subject to any order, judgment or decree of any court of competent jurisdiction, entered within five years before the sale of the securities, that, at the time of such sale, restrains or enjoins such person engaging or continuing to engage in any conduct or practice: in connection with the purchase or sale of any security involving the making of any false filing with the SEC; or arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment advisor or paid solicitor of purchasers of securities;

3. Being subject to a final order of a state securities commission (or an agency or officer of a state performing like functions); a state authority that supervises or examines banks, savings associations, or credit unions; a state insurance commission (or an agency or officer of a state performing like functions) an appropriate federal banking agency; the Commodity Futures Trading Commission, or the National Credit Union Administration that, at the time of the sale of the securities, bars you from: association with an entity regulated by such commission, authority, agency or officer, engaging in the business of securities, insurance or banking; or engaging in

36

savings association or such other entity or constitutes a final order based on a violation of any law or regulation that prohibits fraudulent, manipulative, or deceptive conduct entered within ten years before the sale of securities.

4. Being subject to an order of the SEC, entered pursuant to section 15(b) or 15B(c) of the Securities Exchange Act of 1934 (the "Exchange Act"), or section 203(e) or 203(f) of the Investment Advisers Act of 1940 (the "Advisers Act") that, at the time of the sale of the securities, suspends or revokes your registration as a broker, dealer, municipal securities dealer, municipal securities dealer or investment adviser; places limitations on the activities, functions or operations of; or imposes civil money penalties on such person; or bars you from being associated with any entity or from participating in the offering of any penny stock.

5. Being subject to any order of the SEC, entered within five years before the sale of the securities, that, at the time of such sale, orders you to cease and desist from committing or causing a future violation of any anti-fraud or anti-fraud provision of the federal securities laws including, but not limited to, Section 17(a)(1) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Section 206(1) of the Advisers Act or any other rule or regulation thereunder, or Section 5 of the Securities Act.

6. Being suspended or expelled from membership in, or suspended or barred from association with a member of, a securities self-regulatory organization (e.g., a registered national securities exchange or a registered national or affiliated securities association) for any act or omission to act constituting conduct inconsistent with just and equitable principles of trade.

7. Having filed (as a registrant or issuer), or having been named as an underwriter in, any registration statement or Regulation A offering statement filed with the SEC that, within five years before the sale of the securities, was the subject of a refusal order, stop order, or under suspending the Regulation A exemption or is, at the time of the sale of the securities, the subject of an investigation or proceeding to determine whether a stop order or suspension order should be issued.

8. Being subject to a United States Postal Service false representation order entered within five years before the sale of the securities, or, at the time of the sale of the securities, being subject to a temporary restraining order or preliminary injunction with respect to conduct alleged by the United States Postal Service to constitute a scheme or device for obtaining money or property through the mail by means of false representations.

**EACH PROSPECTIVE INVESTOR SHOULD CONSIDER WHETHER THE PURCHASE OF THE SECURITIES OFFERED HEREBY IS SUITABLE FOR HIM IN LIGHT OF HIS/HER INDIVIDUAL INVESTMENT OBJECTIVES.**

10. Federal Tax Aspects

The following material describes certain Federal income tax aspects of an investment in the Partnership. No consideration has been given to state and local income tax consequences. This summary provides only a general discussion and does not represent a complete analysis of all income tax consequences of an investment in the Partnership, many of which may depend on individual circumstances, such as the residence or domicile of a Limited Partner. Capitalized terms used herein and not otherwise defined will have the same meaning set forth in the Partnership Agreement.

Furthermore, tax tax considerations of an investment in the Partnership are complex and many significant aspects of the U.S. federal income tax treatment of Digital Assets are uncertain. Prospective investors are encouraged to consult with tax advisors who have substantial expertise with this aspect of the tax law.

This summary is based on the Internal Revenue Code of 1986, as amended (the "Code"), the regulations thereunder (the "Regulations") and judicial and administrative interpretations thereof, all as of the date of this Memorandum, taking into effect the Tax Cuts and Jobs Act ("TCJA"), enacted December 22, 2017. No assurance can be given that future legislation, Regulations, administrative pronouncements and/or court decisions will not significantly change applicable law and materially affect the conclusions expressed herein. Any such change, even though made after a Limited Partner has invested in the Partnership, could be applied retroactively. Moreover, the effect of any state, local or foreign tax law, or of federal tax law other than income tax laws, are not addressed in these discussions and, therefore, must be evaluated independently by each prospective investor.

No ruling has been requested from the Internal Revenue Service ("IRS") or any other federal, state or local agency with respect to the matters discussed below, nor has the GP asked its counsel to render any legal opinions regarding any of the matters discussed below. This summary does not in any way either bind the IRS or the courts or constitute an assurance that the income tax treatment discussed herein will be accepted by the IRS, any other federal, state or local agency or the courts. The Partnership is not intended and should not be expected to provide any tax shelter.

**This summary is included for general information only. nothing herein is or should be construed as legal or tax advice to any investor. each prospective limited partner is urged to consult each limited partner's personal tax advisor with respect to the state and federal income tax consequences of his participation as a limited partner in the partnership.**

## Partnership Status

The Federal income tax consequences to the Partnership and its Partners will depend primarily upon the characterization of the Partnership as a partnership for Federal income tax purposes rather than as a corporation. If the Partnership were treated as a corporation for Federal income tax purposes, all items of income, gain, loss, deduction and credit would be those of the corporation and would not be passed through to the Partners, and distributions to Partners would be treated as dividends to the extent of current and accumulated earnings and profits. The GP has not requested, nor does it intend to request, a private letter ruling from the IRS that for Federal income tax purposes, the Partnership will be treated as a partnership and not as an association taxable as a corporation.

Treasury Regulations provide a default classification as a partnership for Federal tax purposes for any entity formed after 1996 as a limited partnership under state law. Such an entity may elect to be treated as a corporation for Federal tax purposes. The Partnership was formed as a Delaware limited partnership and

35

does not intend to elect to be treated as a corporation for federal tax purposes. Accordingly, the Partnership will be classified as a partnership for federal tax purposes.

A partnership is not a taxable entity subject to federal income tax. Accordingly, the Partnership will report its operations for each calendar year and annually will file a United States partnership return of income. Each individual Partner should report on his tax return his distributive share of the Partnership's income, loss, deductions, and credits, if any, for the taxable year of the Partnership ending within or with his taxable year. Each Limited Partner's distributive share of such items is determined in accordance with his allocable share of Net Profit and Net Loss as provided in the Partnership Agreement. As soon as reasonably practicable following the end of the taxable year of the Partnership, the Partnership will provide each Limited Partner with reports showing the items of income, gain, loss, deductions, or credits allocated to the Limited Partner for use in the preparation of the tax return. It should be noted that a Limited Partner may recognize taxable income attributable to his interest without receiving any cash distribution with which he may pay taxes thereon.

## Uncertainty Regarding the U.S. Federal Income Tax Treatment of Digital Assets

Each investor in the Partnership generally will be treated for U.S. federal income tax purposes as the owner of an undivided interest in the Digital Assets. Many significant aspects of the U.S. federal income tax treatment of Digital Assets are uncertain. On March 25, 2014, the IRS released a notice (the "Notice") addressing certain aspects of the treatment of virtual currencies, such as Bitcoins, for U.S. federal income tax purposes. In the Notice, the IRS stated that, for U.S. federal income tax purposes, (x) Bitcoins are "property" that is not currency and (y) bitcoins may be held as capital assets. However, the Notice is not binding on the IRS and a court might not uphold this treatment.

The Notice does not address other significant aspects of the U.S. federal income tax treatment of bitcoins including, (i) whether bitcoins are properly treated as "commodities" or "securities" for U.S. federal income tax purposes; (ii) whether bitcoins are properly treated as "collectibles" for U.S. federal income tax purposes; (iii) the proper method of determining a holder's holding period and tax basis for bitcoins acquired at different times or at varying prices; and (iv) whether, and how, a holder of bitcoins acquired at different times or at varying prices may designate, for U.S. federal income tax purposes, which of his bitcoins is transferred in a subsequent sale, exchange or other disposition.

*INVESTMENT IS IT? Counsel representing the Partnership expresses no opinion regarding other aspects of the U.S. federal income tax treatment of Digital Assets.*

## Distributions

A distribution by a partnership to a partner generally is not taxable to the partner except to the extent the distribution consists of cash and, in certain circumstances, marketable securities, and exceeds the partner's adjusted basis of its interest in the partnership immediately before the distribution. However, pursuant to Internal Revenue Code section 705(a)(2)(B) and the applicable regulations, certain cash or in-kind distributions made within seven years of the partner's contribution may cause gain recognition from a deemed sale or exchange (the "disguised sale rules"). For example, a partner who receives an in-kind distribution of property other than cash may recognize gain if such partner contributed property (other than the property being distributed) to the partnership within seven years before the distribution. In addition, a partner who contributes cash to a partnership may recognize gain if such partner receives an in-kind distribution of property within seven years of the cash contribution. Gain also may be required if

such distributions occur within two years of contribution. Partners should consult their own tax advisor regarding these "disguised sale" rules upon requesting distributions within the seven-year period.

Generally, a taxable gain will be recognized on the transfer of stocks, securities or other financial instruments or assets if such transfer is made to an "investment company" and such transfer results in "diversification". In this context, an "investment company" is any entity owning assets more than 90% of which consist of cash, readily marketable stock, foreign currency or other financial instruments. "Diversification" results if, at the time of transfer, two or more investors are sharing non-identical assets to the Partnership. Should such investors contribute identical assets at the same time (such as the same class of a corporation's only class of stock for the same value received), diversification would not occur and adverse tax implications could be borne.

## Sale of Interest

A Limited Partner receiving a cash liquidating distribution from the Partnership, in connection with a complete withdrawal from the Partnership generally will recognize capital gain or loss to the extent of the difference between the proceeds received by such Limited Partner and such Limited Partner's adjusted tax basis in its interest. Such capital gain or loss will be short term or long term depending upon the Limited Partner's holding period for its interest in the Partnership. However, a withdrawing Limited Partner will recognize ordinary income to the extent such Limited Partner's allocable share of the Partnership's "unrealized receivables" exceeds the Limited Partner's basis in such unrealized receivables, as determined pursuant to the Regulations. For these purposes, accrued but unearned market discount, if any, on securities held by the Partnership will be treated as an unrealized receivable with respect to the withdrawing Limited Partner.

As discussed above, the Partnership Agreement provides that the GP may specially allocate items of Partnership capital gain or loss, including discrete unrealized gain or loss, to a withdrawing Limited Partner to the extent its liquidating distribution would otherwise exceed its adjusted tax basis in its interest. Such a special allocation may result in the withdrawing Partner recognizing capital gain or loss, which may include short-term gain or loss, in the Partner's last taxable year in the Partnership, thereby reducing the amount of long-term capital gain or capital loss recognized during the tax year in which it receives its liquidating distribution upon withdrawal.

Except as provided below, distributions of property other than cash, whether in complete or partial liquidation of a Limited Partner's interest in the Partnership, generally will not result in the recognition of taxable income or loss to the Limited Partner, except to the extent such distribution is treated as made in exchange for such Limited Partner's share of the Partnership's unrealized receivables. Gain generally must be recognized where the distribution consists of marketable securities and the distributing partnership is an "investment partnership" and the recipient is an "eligible partner" as defined in Code section 731(c). While there can be no assurance, it is anticipated that the Partnership will qualify as an "investment partnership." Thus, if a Limited Partner is an "eligible partner," which term should include a Limited Partner whose prior contributions to the Partnership consisted of cash, the non-recognition rule described above should apply.

## General Rules Applicable to Tax-Exempt Organizations

A tax-exempt organization generally is exempt from Federal income tax on its passive investment income, such as dividends, interest and capital gains, whether realized by the organization directly or indirectly

through a partnership in which it is a partner.  ; [tax-exempt organizations which are private foundations currently are subject to a 2% tax on their "net investment income"])

The general exemption from tax afforded to tax-exempt organizations does not apply to their "unrelated business taxable income" ("UBTI").  A type of UBTI is income or gain derived directly or through a partnership from "debt-financed property", which is any income producing property with respect to which there is "acquisition indebtedness" at any time during the taxable year.  Gain from the sale or exchange of, and derived from, debt-financed property generally is taxable in the proportion in which the property is financed by "acquisition indebtedness".  The Partnership Agreement authorizes the Partnership to incur indebtedness (through the purchase of securities on margin and otherwise).  Therefore, tax-exempt organizations which are Partners will be subject to Federal income tax on such portion of their income from the Partnership that is considered to be UBTI.

There are special considerations which should be taken into account by certain beneficiaries of charitable remainder trusts that invest in the Partnership. Charitable remainder trusts should consult their own tax advisors concerning the tax consequences of such an investment on their beneficiaries.  In particular, a charitable remainder trust will not be exempt from federal income tax under Code Section 664(c) for any year in which it has UBTI. Moreover, the charitable contribution deduction for a trust under Code Section 642(c) may be limited for any year in which the trust has UBTI.

## Investment by Non-U.S. Persons

The Partnership may sell Interests to non-U.S. corporations, trusts and estates and individuals who are neither citizens nor residents of the United States ("Foreign Investors").  The U.S. federal income tax treatment of a foreign investor investing as a Limited Partner is complex and will vary depending upon the circumstances of each foreign investor and the activities of the Partnership and the GP.  Each foreign investor must consult with its own tax advisors and such investor regarding the federal, state, local and foreign tax treatment of an investment in the Partnership.

In general, the tax treatment of a foreign investor will depend on whether the Partnership is deemed to be engaged in a U.S. trade or business.  Given the investment nature of the activities of the Partnership, the GP believes that the Partnership should not be deemed to be engaged in a U.S. trade or business.  In that event, the Partnership would generally not be required to withhold tax on gain from the sale of its portfolio securities and is not required to withhold tax on its portfolio interest. However, the Partnership would be required to withhold tax at the rate of thirty percent (30%) (or lower treaty rate, if applicable) on other interest, dividends and income, and special rules apply with respect to dispositions of a "United States real property interest", which can include stock in a corporation.

The GP will use reasonable efforts not to (a) take any action that would result in any Limited Partner (or any direct or indirect beneficial owner of a Limited Partner) recognizing any income that is effectively connected with a United States trade or business, (b) acquire an investment in an entity that the GP reasonably believes at the time of acquisition is, or is likely to become, a "United States real property interest" within the meaning of Section 897(c) of the Code, or (c) take any action that would cause any non-U.S. Partner to whom Section 892 of the Code applies to be considered or deemed to be engaged in a commercial activity for purposes of Section 892 of the Code; provided, however, that notwithstanding the foregoing, the activities of Management Fee will be permitted. If the Partnership were determined to be engaged in a U.S. trade or business, the income effectively connected with such trade or business would be subject to U.S. taxation. In such a case, each foreign investor would be obligated to file a U.S. income tax

returns reporting such income. Foreign investors must consult their own tax advisors as to the potential consequences of being considered engaged in business in the United States.

## FATCA Withholding Tax on Certain Payments to Non-U.S. Entities

The U.S. Foreign Account Tax Compliance Act ("FATCA") imposes certain withholding taxes on U.S. persons holding offshore accounts and designated payments to "foreign financial institutions" which do not provide information about their U.S. accounts to the IRS. The Partnership will receive such information from potential Partners such that this issue is not anticipated to be applicable in the Partnership's case.

A non-U.S. Limited Partner will generally be required to provide the Partnership information which identifies direct and indirect U.S. ownership. Any such information provided to the Partnership will be shared with the IRS. A non-U.S. Limited Partner that is a "foreign" financial institution" within the meaning of Section 1471(d)(4) of the Code will generally be required to enter into an agreement with the IRS identifying certain direct and indirect U.S. account holders or equity holders. A non-U.S. Limited Partner who fails to provide such information to the Partnership or enter into such an agreement with the IRS, as applicable, could be subject to the 30% withholding tax with respect to its share of any such payments attributable to actual and deemed U.S. investments of the Partnership and the GP may take any action in reaction to a Limited Partner's interests or redemption proceeds to ensure that such withholding is economically borne by the relevant Limited Partner whose failure to provide the necessary information gave rise to the withholding. Limited Partners should consult their own tax advisors regarding the possible implications of this legislation on their investments in the Partnership.

**PROSPECTIVE INVESTORS MUST CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE IMPLICATIONS OF FATCA AND SIMILAR INFORMATION REPORTING REGIMES ON THEIR POTENTIAL INVESTMENT IN THE PARTNERSHIP.**

## Tax Shelter Reporting Rules

The Partnership may engage in transactions or make investments that would subject the Partnership, its Partners (who are obliged to file U.S. tax returns) and/or its advisors to special rules requiring such transactions or investments by the Partnership, or investment in the Partnership, to be reported and/or otherwise disclosed to the IRS, including to the IRS's Office of Tax Shelter Analysis (the "Tax Shelter Rules"). A transaction may be subject to reporting or disclosure if it is described in any of several categories of transactions, which include, among others, (a) transactions that result in the occurrence of a loss or losses exceeding certain thresholds (including foreign currency losses), (b) transactions that result in large tax credits from assets held for forty-five (45) days or less or (c) transactions that are offered under conditions of confidentiality. Although the Partnership does not expect to engage in transactions solely or principally for the purpose of achieving a particular tax consequence, there can be no assurance that the Partnership will not engage in transactions that trigger the Tax Shelter Rules. In addition, a Limited Partner may have disclosure obligations with respect to the interest therein if such Limited Partner (or the Partnership) in certain cases) participates in a reportable transaction.

## Partnership Tax Returns

The IRS is applying greater scrutiny to proper application of tax laws to partnerships. An audit of the Partnership's information return may precipitate an audit of the income tax returns of the Limited Partners. Any expense involved in an audit of a Limited Partner's return must be borne by the Limited Partner. If

42

the IRS successfully asserts an adjustment of any item of income, gain, loss, deduction, or credit reported on a Partnership information return, corresponding adjustments will be made to the income tax returns of the Limited Partners.   Further, any audit adjustment result in the IRS making adjustments to items of non-Partnership income or loss.   If a tax deficiency is determined, the taxpayer is liable for interest on the deficiency from the due date of the return and possible penalties.

In general, the tax treatment of items of partnership income, gain, loss, deduction, or credit is to be determined at the partnership level in a unified partnership proceeding rather than in separate proceedings with the partners.   Under partnership audit rules that generally take effect January 1, 2018, the "partnership representative" ("PR") (a function analogous to that of the tax matters partner ("TMP") under prior law), would represent the Partnership before the IRS and may enter into a settlement with the IRS as to the partnership tax issues, which generally will be binding on all the partners.   The new audit rules require, generally, that the partners in the taxable year that the audit is resolved must bear the tax liability arising from the audit, rather than the partners in the year(s) that the audit relates to (the "historical partners").   Similarly, only one judicial proceeding contesting an IRS determination may be filed on behalf of a partnership and all partners.   The PR may consent to an extension of the statute of limitations for all partners with respect to partnership items.   The Partnership has designated the GP as the "PR".   Under the new partnership audit regime, the BBA may make certain elections, which, if applicable, would (i) remove the Partnership from the coverage of the new rules and (ii) require that the historical partners be liable for the tax arising from the audit.   The BBA has up to 45 days to make the second election after receipt of notice of conclusion of the audit.

<u>State and Local Tax Considerations</u>

In addition to the Federal income tax considerations summarized above, prospective investors should consider potential state and local tax consequences of an investment in Interests.   A Limited Partner's distributive share of the Partnership's taxable income or loss generally will be required to be included in determining the Limited Partner's taxable income for state and local tax purposes in the jurisdiction in which it is resident.   However, state and local laws may differ from the Federal income tax law with respect to the treatment of specific items of income, gain, loss, and deduction.   The TCJA substantially limits an individual Partner's ability to deduct state and local taxes.   A Partner is advised to consult his or her tax advisor, who respect to the effect of state and local taxation and tax compliance obligations in respect of an investment in the Partnership.

**PROSPECTIVE INVESTORS MUST CONSULT THEIR OWN TAX ADVISORS FOR FURTHER INFORMATION ABOUT THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF PURCHASING AND HOLDING INTERESTS.**

## 11. ERISA Considerations

The following summary of certain aspects of ERISA is based upon ERISA, judicial decisions, department of labor regulations and rulings in existence on the date hereof. This summary is general in nature and does not address every ERISA issue that may be applicable to the Partnership or a particular investor. Accordingly, each prospective investor should consult with its own counsel in regard to understand the ERISA issues affecting the partnership and its investor.

### General

Persons who are fiduciaries with respect to a U.S. employee benefit plan or trust within the meaning of and subject to the provisions of ERISA (an "ERISA Plan"), an IRA or a Keogh plan subject solely to the provisions of the Code (an "Individual Retirement Account") should consider, among other things, the matters described below before determining whether to invest in the Partnership. ERISA imposes stringent and specific responsibilities on persons who are fiduciaries with respect to an ERISA Plan, including, prudence, diversification, avoidance of prohibited transactions and compliance with other standards. In determining whether a particular investment is appropriate for an ERISA Plan, US Department of Labor ("DOL") regulations provide that a fiduciary of an ERISA Plan must give appropriate consideration to, among other things, the role that the investment plays in the ERISA Plan's portfolio, taking into consideration whether the investment is designed reasonably to further the ERISA Plan's purposes, the risk and return factors of the potential investment, the portfolio's composition with regard to diversification, the liquidity and current return of the total portfolio in relation to the anticipated cash flow needs of the ERISA Plan, the projected return of the total portfolio relative to the ERISA Plan's funding objectives, and the limitation on the rights of Limited Partners to withdraw or to ... any part of their interests or to transfer their interests. Before investing the assets of an ERISA Plan in the Partnership, a fiduciary should determine whether such an investment is consistent with its fiduciary responsibilities and the foregoing regulations. For example, a fiduciary should consider whether an investment in the Partnership may be too illiquid or too speculative for a particular ERISA Plan and whether the assets of the ERISA Plan would be sufficiently diversified. If a fiduciary with respect to any such ERISA Plan breaches its responsibilities with regard to selecting an investment or an investment course of action for such ERISA Plan, the fiduciary may be held personally liable for losses incurred by the ERISA Plan as a result of such breach.

### Plan Assets Defined

ERISA and applicable DOL regulations describe when the underlying assets of an entity in which benefit plan investors ("Benefit Plan Investors") invest are treated as "plan assets" for purposes of ERISA. Under ERISA, the term Benefit Plan Investors is defined to include an "employee benefit plan" that is subject to the provisions of Title I of ERISA, a "plan" that is subject to the prohibited transaction provisions of Section 4975 of the Code, and entities the assets of which are treated as "plan assets" by reason of investment therein by Benefit Plan Investors. Under ERISA, as a general rule, when an ERISA Plan invests assets in another entity, the ERISA Plan's assets include its investment, but do not, solely by reason of such investment, include any of the underlying assets of the entity. However, when an ERISA Plan acquires an "equity interest" in an entity that is neither (a) a "publicly-offered security"; nor (b) a security issued by an investment fund registered under the Investment Partnership Act, then the ERISA Plan's assets include both the equity interest and an undivided interest in each of the underlying assets of the entity, unless it is

_____

- References hereinafter made to ERISA include parallel references to the Code.

44

established that: (i) the entity is an "operating company"; or (ii) the equity participation in the entity by Benefit Plan Investors is limited. Under ERISA, the assets of an entity will not be treated as "plan assets" if Benefit Plan Investors hold less than 25% (or such higher percentage as may be specified in regulations promulgated by the DOL) of the value of each class of equity interests in the entity. Equity interests held by a person with discretionary authority or control with respect to the assets of the entity and equity interests held by a person who provides investment advice for a fee (direct or indirect) with respect to such assets or any affiliate of any such person (other than a Benefit Plan Investor) are not considered for purposes of determining whether the assets of an entity will be treated as "plan assets." For purposes of ERISA, the Benefit Plan Investor percentage of ownership test applies at the time of an acquisition by any person of the equity interests. In addition, an advisory opinion of the DOL takes the position that a redemption of an equity interest by an investor constitutes the acquisition of an equity interest by the remaining investors (through an increase in their percentage ownership of the remaining equity interests), thus triggering an application of the Benefit Plan Investor percentage of ownership test at the time of the redemption.

<u>**Limitation on Investments by Benefit Plan Investors.**</u>

It is the current intent of the GP to monitor the investments in the Partnership to ensure that the aggregate investment by Benefit Plan Investors does not equal or exceed 25% of the value of any class of its interests in the Partnership (or such higher percentage as may be specified in regulations promulgated by the DOL) so that assets of the Partnership will not be treated as "plan assets" under ERISA. Interests held by the GP and its affiliates are not considered for purposes of determining whether the assets of the Partnership will be treated as "plan assets" for the purpose of ERISA. If the assets of the Partnership were treated as "plan assets" of a Benefit Plan Investor, the GP would be a "fiduciary" (as defined in ERISA and the Code) with respect to each such Benefit Plan Investor, and would be subject to the obligations and liabilities imposed on fiduciaries by ERISA. In such circumstances, the Partnership would be subject to various other requirements of ERISA and the Code. In particular, the Partnership would be subject to rules restricting transactions with "parties in interest" and prohibiting certain transactions involving conflicts of interest on the part of fiduciaries, which might result in a violation of ERISA and the Code unless the Partnership obtained appropriate exemptions from the DOL allowing the Partnership to conduct its operations as described herein. The Partnership reserves the right to require the withdrawal of all or part of the interest held by any Limited Partner, including, without limitation, to ensure compliance with the percentage limitation on investment in the Partnership by Benefit Plan Investors set forth above.

<u>**Representations by Plans**</u>

An ERISA Plan proposing to invest in the Partnership will be required to represent that it is, and any fiduciaries responsible for the ERISA Plan's investment are, aware of and understand the Partnership's investment objectives, policies and strategies, and that the decision to invest plan assets in the Partnership was made with appropriate consideration of relevant investment factors with regard to the ERISA Plan and is consistent with the duties and responsibilities imposed upon fiduciaries with regard to their investment decisions under ERISA.

**WHETHER OR NOT THE ASSETS OF THE PARTNERSHIP ARE TREATED AS "PLAN ASSETS" UNDER ERISA, AN INVESTMENT IN THE PARTNERSHIP BY AN ERISA PLAN IS SUBJECT TO ERISA. ACCORDINGLY, FIDUCIARIES OF ERISA PLANS SHOULD CONSULT WITH THEIR OWN COUNSEL AS TO THE CONSEQUENCES UNDER ERISA OF AN INVESTMENT IN THE PARTNERSHIP.**

**ERISA Plan and Individual Retirement Partnerships Having Prior Relationships with the GP or its Affiliates**

Certain prospective ERISA Plan and Individual Retirement Partnership investors may currently maintain relationships with the GP or other entities that are affiliated with the GP. Each of such entities may be deemed to be a party in interest or certain a fiduciary of any ERISA Plan or Individual Retirement Partnership to which any of the GP or its affiliates provides investment management, investment advisory or other services. ERISA prohibits ERISA Plan assets to be used for the benefit of a party in interest and also prohibits an ERISA Plan fiduciary from using its position to cause the ERISA Plan to make an investment from which the certain third parties in which such fiduciary has an interest would receive a fee or other consideration. Similar provisions are imposed by the Code with respect to Individual Retirement Partnerships. ERISA Plan and Individual Retirement Partnership investors should consult with counsel to determine if participation in the Partnership is a transaction that is prohibited by ERISA or the Code. The provisions of ERISA are subject to extensive and continuing administrative and judicial interpretation and review. The discussion of ERISA contained herein is, of necessity, general and may be affected by future publication of regulations and rulings. Potential investors should consult with their legal advisors regarding the consequences under ERISA of the acquisition and ownership of Interests.

## 12. Restrictions on Transfer of Interests

The Interests offered hereby have not been registered under the Securities Act, in reliance upon the exemptions provided by the Securities Act and Regulation D thereunder, nor have the Interests been registered under the securities laws of any state in which they will be offered in reliance upon applicable exemptions in such states. Therefore, the Interests cannot be transferred or resold unless they are subsequently registered under the Securities Act and any other applicable state securities laws or an exemption from registration is available under the Securities Act or such other laws. Pursuant to the terms of the Subscription Agreement, Limited Partners shall agree to pledge, transfer, convey or otherwise dispose of their Interests only in a transaction that is the subject of (i) an effective registration under the Securities Act and any applicable state securities laws or (ii) an opinion of counsel satisfactory to the Partnership, to the effect that the registration of such transaction is not required. Accordingly, prospective investors in the Partnership must be willing to bear the economic risk of an investment in the Partnership for the period of time stipulated in the withdrawal provisions of the Partnership Agreement.

## 13. Additional Information

Prospective investors should understand that the discussions and summaries of documents in this Memorandum are not intended to be complete. Such discussions and summaries are subject to and are qualified in their entirety by reference to such documents. The Partnership will deliver to any prospective investor, upon request, a copy of any and all such documents. The GP will afford prospective investors and their purchaser representatives the opportunity to ask questions and receive answers concerning the terms and conditions of the Offering and to obtain any additional information which the Partnership possesses or can acquire without unreasonable effort or expense.

Exhibit A


Q3 LP
Subscription Agreement

Exhibit A

Exhibit B

QG II LP
Limited Partnership Agreement

EXHIBIT B

EXHIBIT
P 5



1401 Lawrence Street, Suite 2300, Denver, CO 80202  •  (303) 572-9300

April 7, 2018

PRIVILEGED AND CONFIDENTIAL INFORMATION
ATTORNEY CLIENT PRIVILEGED COMMUNICATION

Richard B Levin
313 572 6551
(303) 572-7883 Fax
rlevin@polsinelli.com

Q3 Holdings, LLC
13841 Carolina Circle NE
St. Petersburg, FL 33701
Attn: Denis McEvoy

Re.    Engagement

Dear Denis

        We are pleased and honored that you have chosen Polsinelli to represent Q3 Holdings, LLC (the Company) in connection with the matter described below.  We thank you for your expression of confidence in us.

        This letter is intended to describe the scope of the services our firm has been retained to provide during this engagement, as well as the terms and conditions of the engagement.  To that end, we have attached our standard Terms of Representation which sets forth our firm's established general policies and practices regarding representation of clients and the payment of our fees.

        1.    **Client**.   We understand that the Company will be our client.  In that regard, while we will report to the Company's Board of Directors from time to time and while we will work with you, and other members of management of the Company on a frequent basis, we understand that no officer, director or employee of the Company will be our client.

        2.    **Scope of Representation**.   Regarding the scope of our representation, we understand that we are being retained to represent the Company in connection with securities and regulatory matters and such other matters as the Company may direct to us from time to time and we agree in writing to undertake all on the terms and conditions set forth herein.

        3.    **Responsibilities**   We will provide legal counsel and assistance in accordance with this letter and will rely upon information and guidance you provide to us.  We will keep you reasonably informed of progress and developments, and respond to your inquiries.

        In order to enable us to provide the services set forth in this letter, you will disclose fully and accurately all facts and keep us apprised of all developments relating to this matter.  You will also cooperate fully with us and be available to attend meetings, conferences, hearings and other proceedings on reasonable notice, and stay reasonably informed on all developments relating to this matter.

polsinelli.com

Atlanta      Boston      Chicago      Dallas      Denver      Houston      Kansas City      Los Angeles      Nashville      New York      Phoenix
St. Louis      San Francisco      Silicon Valley      Washington, D.C.      Wilmington


POLSINELLI

O.D. Iclings, LLC
April 17, 2019
Page 4

4.   **Fees and Expenses.**   We bill for our services on an hourly basis, generally recording our time in one-tenth increments.  The hourly rates for the attorneys who will work on your matters vary depending on a number of factors, including the attorney's experience, expertise and subject area involved.  In this regard, my current hourly rate is $700.  The current hourly rates of our shareholders range from $325 to $725, our senior counsel and of counsel range from $300 to $775, and our associates range from $275 to $425.  We also bill for the services of paralegals who assist the attorneys, as well as litigation services personnel, law clerks, case teams with e-discovery and bankruptcy matters, if needed. Their rates are significantly lower than the rates of the attorneys involved.  In the event our rates should change, which occurs from time to time, the bills you receive from us after that time will reflect that rate adjustment.   We include separate entries on our bills for services such as secretarial services (if needed), photocopying, messenger, delivery services, travel, computerized research, and search and filing fees.

5.   **Payment of Fees and Expenses.**   Except as expressly stated below, our fees are not contingent upon any future event and payment of both fees and expenses are due within 30 days of the receipt of each statement.

We ask that you raise any issue regarding any statement within 30 days of its receipt; otherwise, we will assume you found it acceptable.

Further, if any statements or undisputed balances remain unpaid for more than 60 days, we may, consistent with our ethical and court imposed obligations, cease to perform services until satisfactory arrangements have been made for the payment of the unpaid statements and future fees.

6.   **Retainer.**   Our representation will not commence until we receive from you a check in the amount of $5,000.  These funds will be deposited in our client trust account at the inception of the engagement, and be applied only to your bill(s).  Any remaining balance at the end of our engagement will be returned to you.  We reserve the right to use any part of said funds to satisfy a delinquent payment, to request an additional retainer payment and to discontinue our representation until you provide funds to restore the full retainer.

7.   **Waiver of Future Conflicts.**   It is understood that our client for purposes of this representation is the Company, and not any of its individual members or any other entities whose interests in these matters are being represented by those individual members.  As we have discussed, you are aware that the firm represents many other companies and individuals.  It is possible that during the time that we are representing the Company, some of our present or future clients will have disputes or transactions with the Company.  The Company agrees that we may continue to represent or may undertake in the future to represent existing or new clients in any matter that is not substantially related to our work for you even if the interests of such clients in those other matters are directly adverse.  We agree, however, that your prospective consent to conflicting representation contained in the preceding sentence shall not apply in any instance where, as a result of our representation of you, we have obtained proprietary or other confidential information of a non-public nature that, if known to such other client, could be used in any such other matter by such client to your material disadvantage.

We look forward to representing the Company in these matters.  When you advise us otherwise, we will give you a new file or files and execute a new engagement letter for assignments which are different from this assignment.

postmail.com

Atlanta   Chicago   Dallas   Denver   Kansas City   Los Angeles   New York   Phoenix   San Francisco   St. Louis   Washington, DC   Wilmington
Comprehensive strength · Firm On Point

63145v.1   1



C6 Holdings, LLC
April 17, 2019
Page 3

We hope this letter and the attached Terms of Representation adequately explain the scope of our services as well as the payment terms of our fees. If they do and you are in agreement with them, please indicate your affirmation by signing the enclosed copy of this letter and returning it to me for our files.

Please note, in order to continue representing the Company, this letter and the accompanying Terms of Representation must be executed and returned to us within ten days.  Again, should you have any questions, please call me directly.  In the event that the work described herein has begun and the executed letter is not received, we may be required to discontinue representation.

We appreciate the opportunity to work with you and the Company and look forward to a mutually beneficial relationship.

Sincerely,

Richard B. Levin

RBL:xjc

polsinelli.com

Atlanta   Chicago   Dallas   Denver   Kansas City   Los Angeles   New York   Phoenix   San Francisco   St. Louis   Washington, DC   Wilmington
polsinelli.com/polsinelli pc, indiana



OS Holdings, LLC
April 17, 2019
Page 4

On behalf of the Company, the undersigned
hereby accepts the terms of the foregoing
engagement letter and the attached
Terms of Representation.

OS HOLDINGS LLC:

By _____

Title _____

EXHIBIT
P 6

From:        cdtran409@yahoo.com.
Sent:        Tue, 9 Jul 2019  4:01:11 -0400 (EDT)
To:          James Seijas <djseil0@gmail.com>
Subject:     Fwd: Signature Bank

Hey so the basic issue is that it looks like funds deposited from investors are just being transferred to our Q3 holding account to pay us out.
The reality is that we are sending investor money to the exchange (algo) and buying crypto  and then liquidating crypto to USD from the algo to send to Q3 holdings. Instead of losing fees on both sides of those trades, we are registering at our accounting spreadsheet- as such and just passing funds from Q3 account -q3 Holdings account. I have spoken with our accountant GARY Charles and he said that was acceptable to do in this manner as well.

I have spoke with David and he understands what we are doing. He just needs it on paper for his compliance too.

Thanks for your help.

Quan D. T r a  M.D., F.A.C.S
202.393.8214 cell

Begin forwarded message:

> From: "D'Amico, David" <ddamico@signatureny.com>
Date: July 9, 2019 at 1:04:00 PM EDT
To: "qdtran309@yahoo.com" <qdtran309@yahoo.com>
Subject: Signature Bank

Hello Quan.
Hope all is well.
Few easy questions for our compliance team please.

1.  Questions:
    a.   What is the purpose of the incoming funds from the various individuals and entities?
    b.   What is the purpose of the majority of the funds being sent to benefit the Q3 account agates?
    c.   Will this activity continue in this manner?

Sincerely,

David D'Amico | Vice President | Digital Asset Banking
Signature Bank | T: (646)-94-05 | F: (16) 227-046
565 Fifth Avenue, 10th Fl. | New York, NY 1002
DDamico@SignatureNY.com



Case 1:20-cv-01183-NRB   Document 69-7   Filed 02/22/23   Page 389 of 447

INDEX NO. 657094/2020

RECEIVED NYSCEF: 06/11/2021

EXHIBIT
P 7

# EXHIBIT 4

Case 1:20-cv-01183-NRB   Document 69-7   Filed 02/22/23   Page 390 of 447

From:          qdtran309@gmail.com
Sent:          Thursday, July 11, 2019 2:16 PM
To:            D'Amico, David
Cc:            James, Sejas et L
Subject:       Re: Q3


Attention: This message was sent by an external sender. Do not open attachments or click on links from unknown senders or unexpected emails. Sender: qdtran309@gmail.com

==================================================================

Yes please.

Thank you.

Quan D. Tran, M.D., F.A.C.S
206.293.8239 cell


> On Jul 11, 2019, at 2:10 PM, D'Amico, David <ddamico@signatureny.com> wrote:
>
> Hello,
> Please confirm we should pay the 2 checks attached
> Thank you
>
>
>
> Sincerely,
>
> David D'Amico | Group Director - VP    Digital Asset Banking
> C: (201) 452 7671 | T: (646) 846 4024    F: (605) 927 4086
> 565 Madison Avenue, 11-11  New York, NY 10022 |? Jamesx@SignatureNY.com
>
>
>
> ------Original Message------
> From: James Seijas [mailto:4jas310@gmail.com]
> Sent: Tuesday, July 09, 2019 4:11 PM
> To: D'Amico, David <ddamico@signatureny.com>; qdtran309@gmail.com; ack
> <michaelbckermann@aol.com>
> Subject: Q3
>
>
> Attention: This message was sent by an external sender. Do not open
> attachments or click on links from unknown senders or unexpected
> emails. Sender: 4jas310@gmail.com

> 
> 
> _____=============================================
> Greetings David,
> 
> I just spoke with Owen regarding your inquiry into our latest practices in regards to the movement of funds. I am happy to provide more clarity.
> 
> 
> The reality is that we are holding investor money in the exchange (algo) and buying crypto. Then we commence liquidating crypto to USD from the algo to send to Q3 holdings. To avoid losing fees on both sides of those trades, and the time and risk of transfers, we are registering it in our accounting spreadsheets and official audited records. We then push funds from Q3 I account to q3 Holdings account. Prior to implementing this strategy change, we deemed it with our accountant Gary Chadee and he stated that was acceptable to do in this manner. We also cleared it with our fund administrator Mr. Matthew. It is both of their stances that as long as the records are exactly accurate and the funds accounted for then this does serve to save fees and steps and is acceptable.
> 
> I hope this serves to provide you further clarity as to our procedures. Please feel free to contact me directly with any further inquiries. We do appreciate the questions and are very pleased with our Signature account and the excellent service we receive.
> 
> Thank you,
> 
> James Seijas
> CIO
> 
> 
> 
> 
> 
> 
> Sent from my iPhone
> <Stacey Jackson Deposits.pdf>

?

EXHIBIT
P 9

From:       James Seijas <jas31@icloud.com>
Sent:       Fri, 14 Sep 2018 13:47:31 -0400 (EDT)
To:         ddamato@signpursuy.com; xxx <Michael.ackermann@aol.com>; cdnan019@gmail.com
Subject:    Answers

David ,

Please take Michael off. our correspondence as I will handle - thank you
Please send questions directly to me .


As per our phone discussion we have answered these before but just to clarify:

1. yes
Typical exchanges like Coinbase Prax , Bittrex etc ...

2. Q on Tran

3. yes
Our CFA is Derek McEvoy

4. No soliciting
We do not solicit at all
No marketing material
No foreign investors
All family/ friends / colleagues
Accredited

Volatccync is simply the name we assigned the algo . We do not market it at all

Thank you

James



Sent from my iPhone

EXHIBIT
P 10

| | |
|---|---|
| From: | +12163938219 Quan Tran |
| To: | +19083910649 Daniel (owner) |
| TimeStamp: | 06/25/19 10:29:23 PM |
| DateRead: | 06/25/19 10:38:03 PM |

I just spoke with Gary. Gary called a buddy who runs a hedge fund. Gary also used to audit Fortune 500 companies in his last career. Also spoke with Steve who says his fund basically does what we are doing. Every person has said what we are currently doing is correct and co-mingling investor funds with the operating company is advised. At no point in no circumstances should you send money to the operating company. Steve says his investors send money to an escrow account that they send to fund monthly and then fund pays operating company monthly management fees out of profit.

Every company has paid their operating company a 30% greater profits either daily or monthly.

We need to let Polsinelli look at our operating agreements and let them confer.

EXHIBIT
P 11

From:           "Santiago, Nicole" <N.Santiago@signatureNY.com>
Sent:           Fr   27 Sep 2019 19:18:07 -0400 (EID..)
To:             "qdtran309@yahoo.com" <qdtran309@yahoo.com>
Cc:             Mike Ackerman <michael.ackerman@aol.com>; James Seijas <jas310@gmail.com>;
                "D'Amico, David" <ddamico@signatureny.com>
Subject:        RE: Q3 bank accounts
Attachments:    Client Anticipated Account Activity Report - Business.pdf;Business Application for
                Additional Bank Product - Q3 L.LP.pdf;Signature Internet Banking - Additional Account
                Request - Q3 L.LP.pdf;Funds Transfer Application - Q3 L.LP.pdf

Perfect, attached is the paperwork for the additional accounts. All documents have been highlighted where
signatures, initials or missing information is required. Please be advised that the Bank has not yet begun the
process for allowing DocuSign. These documents will have to be required to be signed with a wet signature
however, the original copies are not necessary as we do accept scanned copies.

In addition to the paperwork please provide the following:
- Updated ID for Michael Ackerman. Expired in July.

Thank you,

Nicole Santiago | Senior Client Associate - Digital Asset Banking
T. (646) 560-7092  F. (646) 822-1052
485 Madison Avenue, 11th Floor, New York, NY 10022
nsantiago@signatureny.com

---Original Message---
From: qdtran309@yahoo.com  [mailto:qdtran309@yahoo.com]
Sent: Friday, September 27, 2019 12:49 PM
To: Santiago, Nicole <N.Santiago@signatureNY.com>
Cc: Mike Ackerman <michael.ackerman@aol.com>; James Seijas <jas310@gmail.com>; D'Amico, David
<ddamico@signatureny.com>
Subject: Re: Q3 bank accounts

Attention: This message was sent by an external sender. Do not open attachments or click on links from
unknown senders or unexpected emails. Sender < qdtran309@yahoo.com

================================================================

Correct.

Quan D. Tran, M.D., F.A.C.S.
205.093.82. 9 cell

> On Sep 27, 2019, at 12:49 PM, Santiago, Nicole <N.Santiago@signatureny.com> wrote:

> Hi Quan,

CONFIDENTIAL                                                    Seijas21598

> 
> Hope all is well
> To confirm this is not a third entity but rather a sub account of QSI, LP. Correct?
>
> Thank you
>
> Nicole Santiago | Senior Client Associate - Digital Asset Banking
> T: (646) 949-4205  F: (646) 927-8086
> 565 Madison Avenue, 11th Floor - New York, NY 10022
> nsantiago@signatureny.com
>
>
> -----Original Message-----
> From: qdtran309@yahoo.com [mailto:qdtran309@yahoo.com]
> Sent: Friday, September 27, 2019 11:14 AM
> To: Santiago, Nicole (NS); Lagares.ignacioSNY.com
> Cc: Mike Ackerman <michael.ackerman@jaol.com>; James Seijas
> <jdjss31b@gmail.com>
> Subject: QSI bank accounts
>
>
> Attention: This message was sent by an external sender. Do not open
> attachments or click on links from unknown senders or unexpected
> emails. Sender: qdtran309@yahoo.com
>
>
> ========================================================
> Nicole,
>
> Would it be possible for us to open a third account with you for our accounting purposes.
>
> It can be labeled: QSI LIQUID
>
> This account will just be an extension of the QSI, LP account. This would be solely to assist us in our
> accounting purposes. No other changes would be needed.
>
> Thank you
>
> Quan D. Tran, M.D., F.A.C.S.
> 203.391.8212 x41
>
>
>

EXHIBIT

P 13

From:          (owner)
To:            919020o04o4 Quadriga;  120530082191 Quadriga Iran
TimeStamp:     10/09/19 04:33:37 PM

Denis called me

Polsinelli is completely comfortable with the way QT runs the Six bank account

No issues

Thx ngs

EXHIBIT
P 21

## AFFIDAVIT OF JAMES A. SEIJAS

1.     My name is James Seijas. I am a resident of the State of New Jersey, am over the age of 21, and am competent to give this Affidavit. I have first-hand knowledge of the facts and circumstances set forth herein.

2.     In 2017, Dr. Quan Tran ("Tran"), Michael Ackerman ("Ackerman"), and I started trading cryptocurrency without formalizing any association between the participants.

3.     When the money passing through Tran's account had grown, it was determined that we should formalize the informal association.

4.     Ackerman recommended that the participants of the informal association retain Riveles Wahab, LLP ("Riveles Wahab") to create formal entities and draw up and file the necessary documents.

5.     Riveles Wahab was retained and was paid with what Tran and I believed to be the participants' profits from trading cryptocurrency.

6.     Riveles Wahab knew or should have known that it was retained by the participants of the then informal association to formalize it into a legal entity and draw up the appropriate legal documents to protect the participants' interests.

7.     In 2018, with Riveles Wahab's legal support, Q3 I, L.P., ("Q3LP") and its general partner, Q3 Holdings, LLC ("Q3 Holdings"), were formed.

8.     Riveles Wahab prepared the legal documents for Q3I and Q3 Holdings, including the Private Placement Memorandum ("PPM").

9.     Riveles Wahab never asked to independently verify the representations in the PPM or to verify the exchange account balances.

Wac Polomski 00000577

10.     I believed then, and still believe, that Kveles Watah knew the participants in the initial trading consortium who hired them would rely on them to exercise diligence to confirm the representations they would be including in the PPM were correct.

11.     QSI was never a Ponzi scheme, or otherwise meant to do anything but make QSI's limited partners and general partner money through trading cryptocurrency.

12.     Ackerman duped QSI and US Holdings.

13.     QSI was not complicit in Ackerman's scheme. Neither was I nor Liam, who are the majority members of the board to managers of QSI Holdings.

14.     Ackerman did not have any authority to individually act on behalf of or bind QSI.

15.     Ackerman did not have any authority to individually act on behalf of or to bind QSI Holdings.

16.     QSI hired certain professionals, including Denis McEvoy ("McEvoy"), Polsinelli PC ("Polsinelli"), and Dranden Accountants, to help it manage its business and ensure the fund was run properly, including complying with certain regulatory requirements.

17.     Rick Levin ("Levin") and the Polsinelli law firm were hired to protect QSI and the limited partners of QSI by ensuring QSI had the appropriate safeguards and oversight in place to run the investment fund, and to advise, among other things, on structure, operations, and registration requirements.

18.     QSI hired Levin and Polsinelli because they advertised themselves as experts in regulatory and compliance of digital assets. I understood then, and continue to believe, Polsinelli was QSI's legal counsel.

19.     McEvoy, who was hired as the Fund Administrator for QSI, recommended Levin and Polsinelli to QSI and connected QSI with Levin and Polsinelli.

2

ACTIVE 684700469541

20. Ackerman was supposed to trade QTI's funds on the cryptocurrency exchanges

21. When Ackerman moved the bulk of the trading from other exchanges to Bitfinex, he explained that he needed to use a VPN to access the account because of certain limitations in accessing the platform

22. After Ackerman moved the trading to the Bitfinex account, neither Tom nor I physically accessed that account, but I spoke to Ackerman daily to get updates regarding the QTI account status, ranges for trading, and necessary research for the algorithm that Ackerman purported to use to trade successfully.

23. In addition, Ackerman regularly provided Tom and me screenshots of the account exchanges, at least once a month, and upon request. Ackerman also provided videos purporting to show the trading activity

24. I relied on Ackerman's reported profits and screenshots and believed the QTI's cryptocurrency accounts were incredibly profitable, housing over $300 million at one point.

25. In late November/early December 2019, Ackerman informed that he was suffering from an illness and would be going to the hospital. I directed him to stop trading at that point

26. When Tom and I went to Ackerman's home to check on his health, the login information he previously provided me with did not work, he refused to provide us with access to the cryptocurrency account, and it became apparent that something was wrong.

27. As soon as Tom and I realized that Ackerman may have engaged in wrongdoing, we called the authorities.

28. Until I left his house in December 2019, I believed that the profits that Ackerman reported were real and had absolutely no reason to believe that Ackerman had been lying.

3

Weiss-Dellacroch 0000057?

29.     I was a Financial Advisor for Wells Fargo Clearing Services, LLC ("WFA") from 2013 through my resignation in March 2019.  I understand that my capacity as a WFA Financial Advisor was included in my bio in the offering memorandum used by Q3.

30.     I, at part of my share of the 2018 profits I earned from trading in my wife Donna Seijas' name. Upon formalizing Q3 in mid-2018, I ensured that because Donna had no involvement with Q3.

31.     I submitted my report to WFA regarding outside business activities but did not disclose my involvement with Q3 or the cryptocurrency trading done prior to the creation of Q3I.

32.     Siddharth Pagidipati ("Sidd"), personally, or an entity he was associated with, 1010 Capital, Inc. ("1010 Capital") was a limited partner in Q3I.

33.     Sidd introduced potential limited partners to Q3I.

34.     It is my understanding that in exchange for introducing potential limited partners to Q3I, Sidd negotiated to reduce the management fee he would pay.

35.     On March 7, 2019, Sidd took a distribution of $200,000 in Q3I partnership assets, which did not reduce any initial capital contribution on Q3I's books.  This distribution was booked in Q3I's records as a distribution of profit.

36.     On October 1, 2019, Sidd took a distribution of $3 million in partnership assets, which did not reduce any initial capital contribution on Q3I's books. This distribution was booked in Q3I's records as a distribution of profit.

37.     To the best of my knowledge, the distributions were paid to Sidd personally.

38.     Neither transfer was considered to be or booked as a withdrawal of principal investment.

4

ACTIVE 657269884

Vega Porges Jr 00000890

39.     Had Seid and/or 1010 Capital withdrawn the principal, they would have ceased being limited partners and would not have been allowed to keep their limited partnership interests or rights. This did not happen.

40.     After the distributions of partnership assets, Seid or 1010 Capital retained the limited partnership interests and remained a limited partner of Q3I.

41.     Q3I used Signature Bank ("Signature") to convert the funds contributed by the limited partners from real currency to balances on the cryptocurrency exchanges.

42.     Signature, through its employees with whom I corresponded, understood that the Q3I bank account was a trust/fiduciary account for Q3I's limited partners.

43.     Signature knew that the Q3I account held funds contributed by investors for the purpose of being regularly swept into cryptocurrency exchanges for trading.

44.     Signature sent me and I notifications about the activities of the Q3I account funds.

45.     Signature required me to verify all the funds deposited into the fiduciary account were being transferred first to the Q3 Holdings account and then to the managers of Q3 Holdings rather than for their intended purpose of being swept into a cryptocurrency exchange ("Ackerman's Transfer Method").

46.     Signature was informed that Ackerman's Transfer Method was permissible. Signature Bank thereafter allowed transfers to continue directly from the Q3I fiduciary account to the Q3 Holdings account without further inquiry or investigation.

47.     That Signature approved Ackerman's Transfer Method and did not object to or further inquire to the transfers being made gave me additional comfort that Ackerman's Transfer Method must have been developed.

5

ACTIVE/63700084.4

48.     McEvoy was hired as the QSI Fund Administrator because QSI needed a Fund Administrator and, as I understood, McEvoy had prior fund experience.  Accordingly, I worked with McEvoy and Polsinelli regarding questions relating to fund regulation, agencies, and registration.

49.     I asked McEvoy whether Ackerman's Transfer Method was a legitimate way to handle QSI's funds.

50.     McEvoy never asked me to see the cryptocurrency exchange accounts or otherwise verify Ackerman's reported profits.

51.     McEvoy approved Ackerman's Transfer Method as a viable method of handling QSI's funds, McEvoy told me Polsinelli had advised him Polsinelli was completely comfortable with the way QSI was running its bank account with Signature Bank, including Ackerman's Transfer Method.

52.     McEvoy and Polsinelli's approval of Ackerman's Transfer Method provided us with additional comfort that it was above board.

53.     It is my recollection that QSI relied on McEvoy and Polsinelli's advice concerning its handling of its bank account with Signature.

54.     QSI also hired an accountant, Gary Chaddee of Bleudan Accountancy, to prepare tax returns for QSI and QS Holdings.

55.     QSI also asked Chaddee whether Ackerman's Transfer Method was a legitimate way to handle QSI's funds.

56.     Chaddee never asked to see the cryptocurrency exchange accounts or otherwise verify Ackerman's reported profits.

Yaas Polsinelli 00009582

57.     Chaddee approved Ackerman's Transfer Method as a viable method of handling QSP's funds.

58.     Chaddee's approval of the Ackerman's Transfer Method provided us with additional comfort that it was not part of a fraudulent scheme.

59.     QSP relied on Chaddee's advice concerning its handling of its bank account with Signature.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 30, 2022         _____
                                     James Seiras

THE STATE OF NEW JERSEY

COUNTY OF MORRIS

On August 30, 2022 before me, _Debra A. Donato_, Notary Public in and for said county, personally appeared James Seiras (signer/witness) who has/have satisfactorily identified him/her/themselves as the signer(s) or witness(es) to the above-referenced document.

_Debra A. Donato_
Notary Public Signature

Print _Debra A. Donato_

My commission expires: _10/05/2025_

DEBRA A. DONATO
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires 10/5/2025

7

EXHIBIT
P 22

CONSULTING AGREEMENT

This Consulting Agreement (the "Agreement") is made and entered into as of August 14, 20__, by and between Baat, Howard Prince, Oral, LLC, ("Oral") a Delaware limited partnership (the "Company") and _____ ("____"), a New Jersey limited liability company ("Consultant") (each herein referred to individually as a "Party" or collectively as the "Parties").

RECITALS

WHEREAS, the Company desires to retain Consultant as an independent contractor to perform consulting services for the Company, and Consultant is willing to be retained and perform such services on the terms described below.

NOW, THEREFORE, in consideration of the mutual promises and terms, the parties hereto agree as follows:

**1.      Services and Compensation**

During the Term, Consultant will perform the services (the "Services") described in Exhibit A (the "Services"). In the Company or its designee, and the Company agrees to pay Consultant the compensation described in Exhibit A for Consultant's performance of the Services.

**2.      Confidentiality and Restrictive Covenants**

A.      *Definition of Confidential Information.* Any Verbal Information necessary information including any and all ... of individual items of information disclosed or obtained by Consultant ... in the course of providing services to the Company, its affiliates, subsidiaries or the Company's, its affiliates' or subsidiaries' such company, know-how, including but not limited to trade secrets, business plans (including but not limited to inventory, files, Company or other Consultant or Consultant become acquainted during the Term of this Agreement, including, drafts, trade, or Service ... that is now known or developed by the Company. Whether confidentially, either directly or indirectly, or appropriately or received. Notwithstanding the foregoing, Confidential Information shall not include any information which Consultant can establish (i) was in the public domain prior to the time of disclosure to Consultant; or (ii) become publicly known after disclosure other than ... of breach by any right ... of Consultant; provided, this may constitute of individual items of information that may be deemed to be within the knowledge of public but may aggregate in the combination as a whole or within such exception.

B.      *Access and Nondisclosure.* Consultant acknowledges that by reason of this Agreement that Consultant will have the facilities, use, access and take reasonable precautions to protect any confidential use or disclosure of Confidential Information and ... shall not disclose the Confidential Information for any reason whatsoever other than as necessary in rendering the Services on behalf of the Company, and shall not use the Confidential Information to any third party without the prior

OLKA_TP-KL_01550706

with respect to rights and interests in all inventions, assign and convey to the Company its successors, assigns and permitees the use and execute and perform this, and however, it and it will have legal obligation. Further agrees that Consultant will perform under this Section, the its obligations after the expiration of this Agreement.

**4.    Conflicting Obligations**

Consultant represents and warrants that Consultant has no agreements, relationships, or commitments to any other person or entity that conflicts with the provisions of this Agreement, Consultant's obligations to the Company under this Agreement, and/or Consultant's ability to perform the Services. Consultant will not enter into any such conflicting agreement during the Term of this Agreement.

•    **Return of Company Materials**

Upon the termination of this Agreement or upon Company's earlier request, Consultant will deliver to the Company, and will not keep in Consultant's possession, recreate or deliver to anyone else, any and all Company property, including tangible forms of Confidential Information and all electronic devices and the Company, that Company may have in Consultant's possession or control.

**6.    Term and Termination**

A.    **Term.** The initial term of this Agreement will begin on the date hereof and will continue until the end of (2) years from the Effective Date. Unless terminated earlier as provided in this Section, this Agreement shall automatically renew for additional periods of (2) months unless and until terminated in accordance with this Section. Each Renewal Term of this Agreement, together with any subsequent term.

B.    **Termination.** Either party may terminate this Agreement upon giving written notice to the other party 30 days' prior written notice of such termination pursuant to Section 10(G) of this Agreement.

C.    **Survival.** Upon any termination, all rights and duties of the Company and Consultant toward each other shall cease except:

(1)    The Company will pay all amounts owing to Consultant in accordance with the provisions of Section 3 of this Agreement, for the services of the Term; and

(2)    Section 2 (Confidentiality, including all obligations hereunder) Section 4 (Conflicting Obligations), Section 5 (Return of Company Materials), Section 6 (Term and Termination), Section 7 (Independent Contractor Relationship), Section 8 (Indemnification), Section 9 (Limitation of Liability), and Section 10 (Miscellaneous) will survive termination or expiration of this Agreement in accordance with its terms.

**7.    Independent Contractor Relationship**

It is the express intention of the Company and Consultant that Consultant perform the Services as an independent contractor to the Company. Nothing in this Agreement shall in any way

-1-

e.      *Entire Agreement.* This Agreement represents the entire agreement and understanding between the Parties with respect to the subject matter hereof and supersedes all prior, written and oral, statements, discussions, or representations between the Parties with respect to the subject matter hereof. To the extent any term or term may be in conflict with the terms or terms in the Agreement, the terms of this Agreement shall apply.

f.      *Headings.* Headings are used in this Agreement for reference only and shall not be construed to have any specific legal significance.

g.      *Severability.* If a court or arbitrator of competent jurisdiction finds that the mutually believe any provision of this Agreement is invalid, then such provision or condition to be void or otherwise ineffective in order to carry out the intent of the Parties, and the remainder of the Agreement shall continue in full force and effect.

h.      *Modification, Waiver.* No modification of this Agreement, and no waiver of any rights under this Agreement, will be effective unless in writing signed by the Parties. Waiver by the Company of a breach of any provision of the Agreement shall operate as a waiver of any other or subsequent breach.

i.      *Notices.* Any notice or written communication required or permitted by this Agreement, to be given under this Agreement, be in writing and shall be served either (a) personally, (b) transmitted via registered or certified mail, or (c) by nationally recognized overnight delivery service, and when sent by registered mail will be (d) if mailing by U.S. mail, and each shall until (return receipt requested), to the Party at the Party's address set forth below, or as otherwise set forth. Notices have been received as specified by the notices. Notice may, unless another be deemed effective three business days after mailing in accordance with this Section (i).

(1)      If to the Company:

GVS, LLC
1009 Havana Circle NE
St. Petersburg, FL 33703
Attention: _____

(2)      If to Consultant:

Daniel & Co., LLC
400 Chancel Lane
Wyckoff, New Jersey 07481
Attention: Daniel John

j.      *Counterparts.* This Agreement may be executed and delivered in counterparts. A signature page transmitted via electronic mail transmission in Portable Document Format (PDF) transmission and counterparts received and executed in such form shall (PDF) transmission shall be deemed an original and an executed document.

(signatures on next page)

5

Vistadome

IN WITNESS WHEREOF, the Parties have executed this Consulting Agreement as of the date first written above.

CONSULTANT:                          COMPANY:

[illegible]                          [illegible]

By _____          By _____

Name _____          Name  *Quan D. Tran, MD*

Title _____          Title  GENERAL PARTNER

SIGNATURE PAGE TO CONSULTANT AGREEMENT

[illegible]

QUANTRAN_00000000

IN WITNESS WHEREOF, the parties hereto have executed this Consulting Agreement as of the date first written above.

CONSULTANT                          COMPANY.

DWM & CO. LLC                       OZ LLP

By: _____         By: _____

Name: DENIS McEVOY                  Name: _____

Title: Member                       Title: _____

EXHIBIT A

SERVICES AND COMPENSATION

1.      Contact. Consultant's contact information:

        Name: DWA & Co. LLC

        Email: dhicorpo@gmail.com

        Phone: 484-591-1596

.       Services. Services to be performed by Consultant shall be as provided below:

3.      Compensation

A.      Consultant shall be entitled to receive $5,000.00 per month for each full month of services rendered hereunder (and a prorated amount for any other period of service based on the number of days so rendered), payable in accordance with the regular schedule of the Company with respect to payment of consultants.

B.      The Company will reimburse Consultant for all expenses incurred by Consultant in performing the services pursuant to this Agreement, including, without limitation, the following expenses:

C.      Notwithstanding anything to the contrary set forth in this Agreement, the compensation payable under this Section 3 will survive the expiration or termination of this Agreement.

This Exhibit A is accepted and agreed upon as of August 31, 2018.

CONSULTANT.                              COMPANY.

TPSM & CO., L.L.C                        DX, Jr

By: _____             By: _____

Name: _____             Name: _Adam D. Howes, MD_

Title: _____             Title: _General Partner_

QUARE RAN 0000002

5.      Compensation

a.      Consultant shall invoice to invoice $3,000 per month for each full
month in each business hereunder, provided, prorated during broken period of service based
on the number of days worked), provided in accordance with normal practices of the Company
with respect to payment of consultants.

b.      The Company will reimburse Consultant for all expenses incurred by
Consultant in performing the Services pursuant to this Agreement in accordance with the provision of
the following consents.

c.      Notwithstanding anything to the contrary set forth in this Agreement, the
compensation payable under this Section 5 shall survive the cessation or termination of this
Agreement.

This Exhibit is accepted and agreed upon as of August 15, 2018.

CONSULTANT:                              COMPANY:

TWO4 & CO, LLC                           QSI, LP

By: _____                By: _____

Name: DENIS MCEVOY                       Name: _____

Title: President                         Title: _____

EXHIBIT
P 23

September 2019
LP Update


While the August action was lethargic, we were quite clairvoyant in the closing paragraph of our last update as our prognostication of potential price dislocation with increased volume proved to be timely indeed. While the crypto market itself stumbled in September and many coins suffered price break downs, LP's loss mitigation system adroitly managed the frenetic action. This leads us to our typical monthly quote from President Trump, "America will win again and in fact at some point we are going to say we are tired of winning." Well, we continue on and unlike America, Q3 may never actually become tired with winning as we have remained in front of the curve with math and innovation.

This month we were long 54.66% and short 45.33% of the time while maintaining a market entry at an astonishing 99.68% of the trading hours. Our algorithms were involved in all twists and turns as once again, math and logic prevailed over emotion. In terms of the performance numbers we are thrilled to report an astounding September return of 17.27% which is our best tally yet. Equally impressive was our daily loss ratio which was less than 2.5% and that allowed us to advantage the dynamics of the market. Our long-awaited 50 minute index code actually performed beyond expectation and was well-timed in its introduction mid-month.

In terms of innovation, we continue to pilot test and finalize the 60 minute index code and eagerly anticipate its debut. Crucially, our reliable scalps code filled in the gaps all month during periods of stagnation and contributed impressively to the bottom line.

The whole team performed most admirably in September with a yeoman's effort and it's worth mentioning that our social media team related that many individual traders and funds took a veritable beating during the challenging week that we commented on a few weeks ago. We remain steadfast and continue our efforts to emphasize our mantra of making a great deal of money for our small group rather than a small amount for the masses.

October is off to a strong start and we intend to avoid the tricks and knock on the door with a handsome treat come Halloween. Enjoy the season and thank you all for your continued dedication to QA.


JAS
QP

EXHIBIT
P 24

From:        USC874Lehi9 Daaad (owner)
To:          HOS02u69151 Quacker
TimeStamp:   05/30/15 10:25:54 PM

Nobody
Nobody

Steps in our way with any shreads of doubt

EXHIBIT
P 25

| | |
|---|---|
| **From:** | +13202069454 Quacker |
| **To:** | [owner]~12053638219 Quan Tran |
| **Time Stamp:** | 02/05/19 04:41:51 AM |
| **Read:** | 02/05/19 04:44:01 AM |

We discussed and it will have hard drives sent tomorrow... In the interim ai have A.I. passwords - VERY important we make sure investors are comfortable.

EXHIBIT
P 26

| | |
|---|---|
| **From:** | +13903604943 (Quacker |
| **To:** | (owner):— 2053935219 Quan Tran |
| **TimeStamp:** | 02/05/19 04:47:35 AM |
| **Read:** | 02/05/19 04:43:36 AM |

U both got passwords   so if I give u have access already



EXHIBIT
P 27

**From:**   −13302069454 Quicker

**To:**   (owner) −13033098212 Onari Titat

**TimeStamp:**   02:22/19 02:15:19 PM

**Read:**   02:22/19 02:16:04 PM

Thus my point. Taking all investor contributions and leaving in checking so we have a slush fund. easier. cheaper and more efficient



**From:**        -12041936219 Quan Tran
**To:**          (owner):  13302 694154 Quacker
**TimeStamp:**   03/15/19 07:06:27 AM
**Read:**        03/15/19 07:56:51 AM

I like that idea although I think we would have to withdraw a significant amount each month as it would look pretty suspect if we added $10m of Investor money each month (us) lol

EXHIBIT
P 29

**From:** [owner]
**To:** +13302069434 [broker], +12953938215 [Unit Tran]
**TimeStamp:** 06/20/19 07:08:53 PM

Them: register
16 no

Ok the
Have good day

EXHIBIT

P 30

From:      (name)
To:        +13302 69454 Quacker; +12054 98219 Quax Iran
TimeStamp: 06/13/17 07:16:59 PM

We have Palsinell cellal 2

EXHIBIT
P 31

From:        (owner)
To:          1(302)0639151 Quacker;  1(205)9598219 Quac tror.
TimeStamp:   11/15/19 03:48:31 PM

Guys

I'm sending these alerts all night -

I have a conference call at 11 pm with QTs guy

I did a call yesterday and getting $250k

Speaking of the raising I'm on to get this registration moving

Fielding emails and calls from investors all day

Sent important paperwork twice two many times as pertinent to get Sip Bank approval sweat as important things raised confirmation and it's not done

Now the market is crappin out and I'm sending alerts with no response

Now I just called both of you and can't get either of my partners on the phone

I'm very frustrated

WTF?!

I'm turning my phone off!

**EXHIBIT**

**P 32**

| | |
|---|---|
| **From:** | U30020694454 Quacker |
| **To:** | (owner);+12053309214 Quan Cruz |
| **TimeStamp:** | 12/2/2019 10:49:10 AM |
| **Read:** | 11/2/2019 11:57:59 AM |

1+0:461,084.22285.
281/0.65,+2782009

EXHIBIT
P 33

| | |
|---|---|
| From: | 12053978319 Quan Tran |
| To: | (owner);+13502069354 Quacker |
| TimeStamp: | 1/16/19 11:11:02 AM |
| Read: | 1/16/19 11:57:52 AM |

Mike these numbers don't make sense. That was yesterday's end total. And $16m?

EXHIBIT
P 34

From:           +120599082_S Quan Tran
To:             (owner): 159000A054 Quacker
TimeStamp:      11/16/19 11:16:56 AM
Read:           11/16/19 11:57:59 AM

$25.00 is same number you gave as yesterday's total.

No way we made $150m yesterday?

EXHIBIT
P 35

From:        (owner)
To:          +13302069454 (herder)
TimeStamp:   12/06/19 01:01:48 AM

Did it last night

Put up the number and sleep

EXHIBIT

P 36

From:        11808991,6849 Dssad cewserk
To:          11305950802 Is Quan Tran
TimeStamp:   15/08/19 02 02 56 AM
DateDelivered: 15/08/19 02.02 56 AM

Are you serious ?

EXHIBIT

P 37

From:            +12053936218 Quan Tran
To:              +19365016648 (Danad rowner)
TimeStamp:       12/08/19 02 01 01 AM
DateRead:        12/08/19 02 03 08 AM

Yes

CONFIDENTIAL

**EXHIBIT P 38**

Wells Fargo Clearing Se

$ 50,000.00

| | | | | |
|---|---|---|---|---|
| [illegible] | [illegible] | [illegible] | [illegible] | |
| [illegible] | [illegible] | [illegible] | $ [illegible] | |
| [illegible] | [illegible] | [illegible] | $ [illegible] | |
| [illegible] | [illegible] | | | $ [illegible] |
| [illegible] | [illegible] | [illegible] | $ [illegible] | |
| [illegible] | [illegible] | [illegible] | $ [illegible] | |
| [illegible] | [illegible] | [illegible] | $ [illegible] | |
| [illegible] | [illegible] | [illegible] | $ [illegible] | |
| | | | | |
| Total | | | $ [illegible] | $ [illegible] |

| | | | | |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| [illegible] | | | $ [illegible] | $ [illegible] |

[illegible]

| [illegible] | | | | |
|---|---|---|---|---|
| Date | [illegible] | | [illegible] | |
| [illegible] | [illegible] | [illegible] | $ [illegible] | |
| [illegible] | [illegible] | [illegible] | $ [illegible] | |
| [illegible] | [illegible] | | | $ [illegible] |
| [illegible] | [illegible] | [illegible] | $ [illegible] | |
| [illegible] | [illegible] | [illegible] | $ [illegible] | |
| [illegible] | [illegible] | [illegible] | | $ [illegible] |
| [illegible] | [illegible] | [illegible] | | $ [illegible] |
| [illegible] | [illegible] | [illegible] | | $ [illegible] |
| [illegible] | [illegible] | [illegible] | $ [illegible] | |
| [illegible] | [illegible] | [illegible] | $ [illegible] | |
| [illegible] | [illegible] | [illegible] | $ [illegible] | |
| [illegible] | [illegible] | [illegible] | $ [illegible] | |
| [illegible] | [illegible] | [illegible] | $ [illegible] | |
| [illegible] | [illegible] | [illegible] | $ [illegible] | |
| [illegible] | [illegible] | [illegible] | $ [illegible] | |
| [illegible] | [illegible] | [illegible] | $ [illegible] | |
| [illegible] | [illegible] | [illegible] | $ [illegible] | |
| [illegible] | [illegible] | [illegible] | $ [illegible] | |
| [illegible] | [illegible] | [illegible] | | $ [illegible] |
| [illegible] | [illegible] | [illegible] | $ [illegible] | |
| [illegible] | [illegible] | [illegible] | $ [illegible] | |
| 9/27/2019 | [illegible] | [illegible] | $ [illegible] | |
| [illegible] | [illegible] | [illegible] | $ [illegible] | |
| [illegible] | [illegible] | [illegible] | $ [illegible] | |
| [illegible] | [illegible] | [illegible] | $ [illegible] | |
| [illegible] | Manisha Parikh Maulik | [illegible] | $ [illegible] | |
| [illegible] | [illegible] | [illegible] | | $ [illegible] |
| [illegible] | [illegible] | [illegible] | $ [illegible] | |
| [illegible] | | | $ [illegible] | $ [illegible] |

| [illegible] | | | | |
|---|---|---|---|---|
| Date | [illegible] | | [illegible] | |
| [illegible] | [illegible] | | $ [illegible] | |
| [illegible] | [illegible] | [illegible] | | $ [illegible] |
| [illegible] | [illegible] | [illegible] | | $ [illegible] |
| [illegible] | [illegible] | [illegible] | | $ [illegible] |
| [illegible] | [illegible] | Tran [illegible] Analysis (Anton | | $ [illegible] |
| [illegible] | [illegible] | [illegible] | | $ [illegible] |
| [illegible] | [illegible] | [illegible] | | $ [illegible] |
| [illegible] | [illegible] | [illegible] | | $ [illegible] |
| [illegible] | [illegible] | [illegible] | | $ [illegible] |
| [illegible] | | | $ [illegible] | $ [illegible] |

| Incoming to -3584 | | | | |
|---|---|---|---|---|
| Date | [illegible] | | [illegible] | |
| [illegible] | [illegible] | [illegible] | $ [illegible] | |
| [illegible] | [illegible] | [illegible] | $ [illegible] | |
| [illegible] | [illegible] | [illegible] | $ [illegible] | |
| [illegible] | [illegible] | [illegible] | $ [illegible] | |
| [illegible] | [illegible] | | $ [illegible] | |
| [illegible] | [illegible] | [illegible] | | $ [illegible] |

| [illegible] | | | | |
|---|---|---|---|---|
| Date | [illegible] | | [illegible] | |
| [illegible] | [illegible] | | | $ [illegible] |
| [illegible] | [illegible] | [illegible] | | $ [illegible] |
| [illegible] | [illegible] | [illegible] | | $ [illegible] |
| [illegible] | [illegible] | [illegible] | | $ [illegible] |
| [illegible] | [illegible] | [illegible] | | $ [illegible] |
| [illegible] | [illegible] | [illegible] | | $ [illegible] |



JAMES ALAN SELIAS – BrokerCheck

< Back

⬇ Report   ✉ Share

**JAMES ALAN SELIAS**
JAMES A SELIAS

**CRD#: 2392901**

(PR) Previously Registered Broker

(PR) Previously Registered Investment Adviser ⓘ

🚫 **BARRED**

FINRA has barred this individual from acting as a broker or otherwise associating with a broker-dealer firm.

The representative was previously registered both as a broker and as an investment adviser. Visit IAPD for more information on this individual's investment adviser record.

| GO TO SEC SITE ☑ |
| :---: |

| 4 Disclosures | » |
| :--- | :---: |

| 21 Years of Experience 7 Firms | » |
| :--- | :---: |

| 6 Exams Passed | » |
| :--- | :---: |

| 0 State Licenses |
| :--- |

| 📄 Disclosure(s) ⓘ | ✕ Close |
| :--- | ---: |

View by: Date ▼

| 4/22/2022 | Customer Dispute | Pending | ⌄ |
| :--- | :--- | :--- | :---: |

Allegations

Claimants allege that due to Wells Fargo Advisor's negligence and failure to supervise FA's malpractices, claimants lost millions of dollars



| 11/2/2021 | Regulatory | Final | ⌄ |

Initiated By

FINRA

Allegations

Without admitting or denying the findings, Seljas consented to the sanction and to the entry of findings that he refused to appear for on-the-record testimony requested by FINRA in connection with its investigation concerning the Form U5 amendment filed by his former member firm. The findings stated that one firm filed the amendment to Seljas' Form U5 disclosing for the first time that he had been named as a defendant in a lawsuit alleging that he had misrepresented investments as part of a Ponzi scheme.

Resolution

Acceptance, Waiver & Consent/AWC)

Bar

Bar (Permanent)

Registration Capacities Affected

All capacities

Duration

Indefinite

Start Date

11/2/2021

| 5/19/2020 | Customer Dispute | Settled | ⌄ |

Allegations



Claimant alleges that in or about January 2016, FA recommended investments in a fraudulent hedge fund

Settlement Amount

$125,000.00

| 3/18/2020 | Customer Dispute | Pending | ⌄ |

Allegations

Plaintiff alleges that from August 2014 to December 2019, FA misrepresented investments as part of a Ponzi scheme.



## Examination(s)

**State Securities Law Exam**

Series 66 - Uniform Combined State Law Examination
Aug 6, 2019

Series 63 - Uniform Securities Agent State Law Examination
Oct 5, 2009

**General Industry/Products Exam**

SIE - Securities Industry Essentials Examination
Oct 1, 2018

Series 55 - Limited Representative-Equity Trader Exam
Mar 19, 2010

Series 7 - General Securities Representative Examination
Oct 1, 2009

**Principal/Supervisory Exam**



Series 4 - Registered Options Principal Examination
Mar 24, 2009

Additional information regarding this individual's previous registration is available in the Detailed Report

## Previous Registration(s)                                          ✕ Close

**WELLS FARGO CLEARING SERVICES, LLC (CRD#19616)**
ST LOUIS, MO

**TD AMERITRADE, INC. (CRD#7870)**
MONTVALE, NJ

**FIDELITY BROKERAGE SERVICES LLC (CRD#7784)**
BOSTON, MA

**BARCLAYS CAPITAL INC. (CRD#19714)**
NEW YORK, NY

**BANC OF AMERICA SPECIALIST INC. (CRD#130971)**
NEW YORK, NY

**FLEET SECURITIES, INC. (CRD#14071)**
NEW YORK, NY

**QUICK & REILLY, INC. (CRD#11217)**
NEW YORK, NY

---

### Additional Information

The content of this summary and the available detailed report is governed by FINRA Rule 8312 and is primarily based on information filed on uniform registration forms. Rule 8312 documents that and a notices related to U.S. Securities and Exchange Commission approval proceedings, can be viewed here

state regulators and governed by the public records laws for [unclear]. In the event that information such as a broker check, including information no longer required to be reported or updated on uniform registration forms due, for example, to passage of time, this section. You may **contact your state regulators** to question such additional information.

Click **here** for a explanation of the words that have no check on an investment professional.



### Broker

A brokerage firm, also called a broker-dealer, is in the business of buying and selling securities – stocks, bonds, mutual funds, and certain other investment products on behalf of its customer (as broker), for its own bank (dealer), or both.
Individuals who work for broker-dealers – the sales personnel are commonly referred to as brokers.



### Investment Adviser

An investment adviser is paid for providing advice about securities to clients. In addition, some investment advisers manage investment portfolios and offer financial planning services.
It is common for a financial professional to act as both a broker and an investment adviser. Because of this, we include investment advisers on BrokerCheck, and provide links to the **SEC's Investment Adviser Public Disclosure (IAPD) website** so you can research further.



### Previously Registered

A Previously Registered broker or brokerage firm is not currently licensed to act as a broker (buying and selling securities on behalf of customers) or as an investment adviser (providing advice about securities to clients). They may still be able to offer other investment related services if properly licensed to do so. Click **here** to learn more.



### Disclosures

Disclosures can be customer complaints or arbitrations, regulatory actions, employment terminations, bankruptcy filings and certain civil or criminal proceedings that they were a part of.

Use of the BrokerCheck is subject to
**BrokerCheck Terms of Use**



Privacy | Legal

©2021 FINRA. All rights reserved

FINRA is a registered trademark of the Financial Industry Regulatory Authority, Inc.

EXHIBIT
P 40

From:      James Seijas <jfas313@gmail.com>
Sent:      Sat, 7 Apr 2018 13:16:50 -0400 (EDT)
To:        qdtran309@yahoo.com
Cc:        "michael.ackerman@jacl.com" Spichael ackerman @jacl o m">
Subject:   Re: Fwd: Crypto "Scamsters' Bharadwaj Brothers Arrested For Duping Investors Out Of $30+
           Mln

My take is to keep it, simple and not a precontated defending our club . No need to ,
I answer this question all the time .

I say this

Simply ,

Unfortunately there are scam artists out there in all businesses and in all walks of life. There are bad lawyers ,
bad doctors , bad cons, bad businessmen etc    the key is to stay away from unscrupulous folks.

I am of utmost character period . My word is my word . I have a wonderful family that I would not jeopardize.

You absolutely could lose money in this venture- that's the nature of the risk and the reason the potential is so
amazing   What I can promise is you will absolutely be treated fairly. You will get a fair deal .  We will be
transparent. Period

From there do what you are comfortable with -

That's it

Sent from my iPhone

On Apr 7, 2018, at 9:39 AM, qdtran309@yahoo.com wrote:

> Hey guys
> How should I respond to Rahul's email?

Quan D. Tran, M.D. F.A.C.S.
209 503 5510 cell

Begin forwarded message:

> From: Rahul Pagidipati <pagidipati@gmail.com>
Date: April 7, 2018 at 8:58:26 AM EDT
To: ' pagidipati@gmail.com" <pagidipati@gmail.com>
Subject: India: Crypto 'Scamsters' Bharadwaj Brothers Arrested For Duping Investors Out
         Of $300 Mln

> Be VERY careful out there ...

Seijas02877

EXHIBIT
P 41

From: michaelnackenson@icloud.com
Sent: Sun, 16 Jun 2019 11:22:21 -0400 (EDT);
To: woodyfsu1@gmail.com, rgillon6900@ricloudcom, 4jm3b0f@gmail.com
Subject: RE: Fwd: Re: Q3 statement

Who is this investor, how much does he have in fund?

On Sunday, June 16, 2019 Steve Saunders <woodyfsu1@gmail.com> wrote:

          Forwarded message
From: "Tony Boke" <bokxtony@gmail.com>
Date: Jun 15, 2019 3:39 PM
Subject: Re: Q3 statement
To: Steve Saunders" <woodyfsu1@gmail.com>
Cc:

Let me start off by saying WOW.  What a month!
This has been a surreal moving forward.  The ease and terror momentum of going forever growing capital is a double edged sword as Pursuit all of the partners and technical advisement simple have realized.  We are outpacing the markets by leaps and bounds which would an issue when we were 10 million we now approach 100 million and to be almost 200 million by the end of the year, we have to be eyeing ourselves eventually.  The top 20 of NASDAQ stocks exchanges trade 7.9 billion a day.  This is the volume that actually verifies and each day we are close to the consumption comparison.  If we are nearing approx 0.7% per day even that means we will have to be trading over 200 million a day of not money essentially we estimate.  Trading 1% of the market doesn't seem possible to me there are no questions.

How many exchanges are we on?  I'm assuming our algo has transitioned from an accurate predictor to and accurate predictory influencer model.  Even with that stuff, I can't conceptualize how we will be able to move the amount we need to be maximum and holding.  What can you tell me about how we are able to move so much money?

What is the plan for cleanup, he sheep?  We are going to have to take profit no.  I'm assuming there will be a recipe for reds top to take who?  When will it be triggered/throttled?  Is there a machine in place?

I'll be up for a phone call at anytime on the phone
517-974-8161

Tony Boke

On Sat, Jun 15, 2019 at 5:30 PM Steve Saunders <woodyfsu1@gmail.com> wrote:

   "It is easier to act longs, but much harder to remain bought"This
   guess we be able recently made that enidentally?  Anyway it's just the
   opposite. It was done exactly then Proscious. Maxgal During the best
   market over the previous two months and hold strategies became mired
   in a stagnant stunted sixpe struck, dubiously needing a rebound to
   enter the flow of red ink. However, we as a group continued our close
   mitigation strategy and relied heavily on our core holding block,
   simple math. As the market began to recover, once past few weeks many
   momentum values caused prices higher, only to be bought a bargain
   cut most bull markets on the gaps and corners to confirm support
   levels. This appears in the dynamic market to be the chased
   situation. As much take several times, we are direction against but
   thrive out of the try and volume. These tools have served to Induce
   enter into our future stabbbe radial wall and most would become to
   mentor and enhance, on a daily basis.

   seriously we were long 81.7% of the time and short 12.3% of the
   month of May. Strategy total was responsible for 49.3% of the profit